**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| | ) | |
| 560 SEVENTH AVENUE OWNER PRIMARY LLC, | ) | Case No. 23-11289-PB |
| 560 SEVENTH AVENUE OWNER SECONDARY LLC, | ) | Case No. 23-11071-PB |
| | ) | |
| | ) | Jointly Administered |
| | ) | |
| | ) | |
| Debtors. | ) | |

**SECURED PARTY'S SUPPLEMENTAL BRIEF**
**IN SUPPORT OF MOTION FOR RELIEF FROM STAY**

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................. 1

ARGUMENT ......................................................................................................... 3

I.     The Petition was Filed in Bad Faith.................................................................. 3

       A.     All C-TC Factors Are Satisfied.............................................................. 6

              1.     Factor 1: The Debtor Has Only One Asset ................................. 7

              2.     Factor 2: The Debtor Has Few Unsecured Creditors Whose Claims
                     Are Small in Relation to Those of the Secured Creditors........................ 7

              3.     Factor 3: The Debtor's One Asset is the Subject of a Foreclosure
                     Action as a Result of Arrearages or Default on the Debt ......................... 8

              4.     Factor 4: The Debtor's Financial Condition Is, in Essence, a Two
                     Party Dispute Between the Debtor and Secured Creditors Which
                     Can Be Resolved in the Pending State Foreclosure Action...................... 8

              5.     Factor 5: The Timing of the Debtor's Filing Evidences an Intent to
                     Delay or Frustrate the Legitimate Efforts of the Debtor's Secured
                     Creditors to Enforce Their Rights.............................................. 8

              6.     Factor 6: The Debtor Has Little or No Cash Flow.................................... 9

              7.     Factor 7: The Debtor Can't Meet Current Expenses Including the
                     Payment of Personal Property and Real Estate Taxes ............................ 11

              8.     Factor 8: The Debtor Has No Employees ............................................... 11

       B.     The Debtor's "Holistic" Argument Fails ............................................. 11

              1.     The Debtor and Primary are Separate and Distinct Entities ................... 12

              2.     The Court Should Not Adopt the Debtor's "Holistic" Approach ........... 14

              3.     Even if the Court Were to Apply the "Holistic" Approach, the Stay
                     Should Still be Lifted .............................................................. 15

       C.     The Court Should Disregard the Debtor's Attempt to Ignore the C-TC
              Factors........................................................................................ 16

II.    A Change in the Equity Ownership of the Debtor Will Not Adversely Impact the
       Ability of Primary to Reorganize.................................................................... 20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re 234-6 West 22nd St. Corp.*,
214 B.R. 751 (Bankr. S.D.N.Y. 1997)..............................................................................10, 11

*In re 3868-70 White Plains Rd., Inc.*,
28 B.R. 515 (Bankr. S.D.N.Y. 1983)........................................................................................19

*In re 652 W. 160th LLC*,
330 B.R. 455 (Bankr. S.D.N.Y. 2005).....................................................................................11

*In re 68 West 127 Street, LLC*,
285 B.R. 838 (Bankr. S.D.N.Y. 2002)......................................................................................18

*In re Augie/Restivo Baking Co.*,
860 F.2d 515 (2d Cir. 1988).....................................................................................................14

*In re Balco Ltd.*,
312 B.R. 734 (Bankr. S.D.N.Y. 2004)........................................................................................4

*In re Briarpatch Film Corp.*,
281 B.R. 820 (Bankr. S.D.N.Y. 2002)........................................................................................5

*In re C-TC 9th Ave. Pshp.*,
113 F.3d 1304 (2d Cir. 1997)........................................................................................ *passim*

*In re Clinton Centerfuge, Inc.*,
72 B.R. 900 (Bankr. E.D. Pa. 1987) .........................................................................................19

*In re Cohoes Indus. Terminal*,
931 F.2d 222 (2d Cir. 1991)...............................................................................................17, 18

*In re Consol. Distribs., Inc.*,
2013 WL 3929851 (Bankr. E.D.N.Y. July 23, 2013) .............................................................17

*In re Davis Heritage GP Holdings, LLC*,
443 B.R. 448 (Bankr. N.D. Fla. 2011).....................................................................................16

*In re Dewey Commer. Investors, L.P.*,
503 B.R. 643 (Bankr. E.D. Pa. 2013) .....................................................................................6, 7

*In re EHT US1*,
630 B.R. 410 ......................................................................................................................15, 16

*Feldman v. Trustees of Beck Indus., Inc.*,
    479 F.2d 410 (2d Cir. 1973)...............................................................14

*In re Fraternal Composite Serv., Inc.*,
    315 B.R. 247 (Bankr. N.D.N.Y.) .........................................................5

*In re FRGR Managing Member LLC*,
    No. 09-11061 (MG) (Bankr. S.D.N.Y. 2009), Dkt. 41 .............5, 6, 7, 9

*In re General Growth Props.*,
    409 B.R. 43 (Bankr. S.D.N.Y. 2009).....................................................15

*In re GVS Portfolio I B, LLC*,
    2021 WL 2285285 (Bankr. D. Del. June 4, 2021)..................................6

*In re Hartford & York, LLC*,
    2014 WL 985449 .................................................................................17

*In re JER/Jameson Mezz Borrower II, LLC*,
    461 B.R. 293 (Bankr. D. Del. 2011) ..........................................6, 7, 9, 16

*In re Kingston Square Assocs.*,
    214 B.R. 713 (Bankr. S.D.N.Y. 1997).....................................................18

*Matter of Madison Hotel Assocs.*,
    749 F.2d 410 (7th Cir. 1984) .........................................................2, 19

*In re Mirant Corp.*,
    2005 WL 2148362 (Bankr. N.D. Tex. Jan. 26, 2005).............................16

*In re Northtown Realty Co., L.P.*,
    215 B.R. 906 (Bankr. E.D.N.Y. 1998)......................................................5

*In re Pacific Lumber Co.*,
    584 F.3d 229 (5th Cir. 2009) ...............................................................14

*In re PPI Enters. (U.S.) Inc.*,
    324 F.3d 197 (3d Cir. 2003).................................................................20

*In re Premier Auto. Servs.*,
    492 F.3d 274 (4th Cir. 2007) .................................................................5

*In re Primestone Inv. Partners, L.P.*,
    272 B.R. 554 (D. Del. 2002)..........................................................6, 16

*In re R&G Props., Inc.*,
    2009 WL 1076703 (Bankr. D. Vt. Apr. 16, 2009)..................................18

*In re RCM Global Long Term Capital Appreciation Fund, Ltd.*,
 200 B.R. 514 (Bankr. S.D.N.Y. 1996) .....................................................................18

*In re Red Bull Taxi Inc.*,
 2017 WL 1753234 (Bankr. S.D.N.Y. May 3, 2017) ..................................................6

*In re Reyes*,
 2015 WL 4624156 (Bankr. S.D.N.Y. Aug. 4, 2015) .................................................9

*In re Rubin Family Irrevocable Stock Trust*,
 2013 WL 6155606 (Bankr. E.D.N.Y. Nov. 21, 2013) .............................................20

*In re Sapphire Dev., LLC*,
 2015 WL 5579545 (Bankr. D. Conn. June 26, 2015) ..............................................10

*Sapphire Dev., LLC v. McKay*,
 549 B.R. 556 (D. Conn. 2016) ................................................................................17

*In re Setzer*,
 47 B.R. 340 (Bankr. E.D.N.Y. 1985) ........................................................................4

*In re Shea & Gould*,
 214 B.R. 739 (Bankr. S.D.N.Y. 1997) .......................................................................5

*In re Sylmar Plaza, L.P.*,
 314 F.3d 1070 (9th Cir. 2002) ................................................................................19

*In re Syndicom Corp.*,
 268 B.R. 26 (Bankr. S.D.N.Y. 2001) ......................................................3, 4, 17, 18

*In re Tower Auto., Inc.*,
 356 B.R. 598 (Bankr. S.D.N.Y. 2006) .....................................................................14

*In re U.I.P. Engineered Prods. Corp.*,
 831 F.2d 54 (4th Cir. 1987) ....................................................................................16

*In re Walden Ridge Dev., LLC*,
 292 B.R. 58 (Bankr. D.N.J. 2003) ...........................................................................20

**Statutes**

UCC ............................................................................................................... *passim*

UCC Article 9 .............................................................................................................8

**Other Authorities**

Rule 1007-2 .................................................................................................................8

AREPIII MVTS, LLC and CREP Times Square Hotel LLC (together, "Secured Party")[1],
respectfully submits this supplemental brief in support of its Motion for Relief from the Stay
(Dkt. 10)[2] (the "Motion") and its Reply to Debtor's Opposition to the Motion for Relief from
Stay (Dkt. 22).

## PRELIMINARY STATEMENT

In *In re C-TC 9th Ave. Pshp.*, 113 F.3d 1304, 1310 (2d Cir. 1997) ("*C-TC*"), the Second
Circuit enumerated eight factors that are "indicative of a bad faith filing."  In this case, the
Debtor itself has essentially conceded that all eight of the factors have been satisfied.  The
Debtor is a special purpose entity whose sole purpose is to own the LLC membership interest in
560 Seventh Avenue Owner Primary LLC ("Primary").  The Debtor has no other assets, no other
secured or unsecured creditors, no cash flow, no ability to pay Secured Party, and no employees.
The only reason the Debtor filed its Chapter 11 petition was to stop the Secured Party from
proceeding with a UCC disposition (the "UCC Disposition") of the membership interest in
Primary, which served as collateral for a mezzanine loan made by Secured Party to the Debtor.
The petition herein was filed mere hours before the scheduled UCC Disposition and only after a
New York state court rejected the Debtor's attempts to enjoin the UCC Disposition.  This is
more than ample grounds for this Court to terminate the stay based on the Debtor having filed its
Chapter 11 petition in bad faith.

Recognizing that its case clearly fails under the Second Circuit's *C-TC* test, the Debtor
nevertheless attempts two workarounds.  Both fail.

---

[1] Whenever Secured Party is referenced herein, it shall mean either AREPIII MVTS, LLC, individually, before the
sale of 50% of the loan referenced herein, or both AREPIII MVTS, LLC and CREP Times Square Hotel LLC,
together, after the sale of 50% of the loan.

[2] Defined terms not otherwise defined herein shall have the meanings set forth in the Motion.

First, in deciding whether the Debtor has filed its Chapter 11 case in good faith, the Debtor asks this Court to apply the *C-TC* factors not to the Debtor, but to the Debtor, the Primary and its property, *i.e.*, the Margaritaville Times Square Resort (the "Hotel"), by using a "holistic approach." But the holistic approach totally ignores the fact that the Debtor and Primary are separate and distinct entities, with separate rights and obligations, and they received separate loans from two separate and unaffiliated lenders. The documents governing the Debtor and its relationship with Secured Party likewise confirm that the Debtor is a special purpose entity whose only role is to own the equity interest in Primary. Any attempt to import the Hotel's business, assets, and obligations into the Debtor would be directly contrary to those documents. The Debtor's approach is also not supported by any case law that has conducted a bad faith analysis in the context of a straightforward mezzanine borrower structure. Instead, the holistic approach is an attempt by the Debtor to ignore the separateness of the Debtor from Primary for its bad faith analysis, when the Debtor and Primary are and have always operated as separate and distinct entities.

Second, the Debtor invites the Court to totally disregard the *C-TC* factors, and instead apply a "dual inquiry" for determining bad faith, which would require a showing of both objective futility and subjective bad faith. But the Debtor totally ignores the fact that the Second Circuit replaced any prior tests with the eight *C-TC* factors, and those factors cover both objective futility and subjective bad faith. Other courts have also rejected the Debtor's "dual inquiry" approach in the context of motions to dismiss and to terminate the stay, and in particular, other courts have held there is no requirement that *both* objective futility and subjective bad faith be satisfied. Either way, the Debtor fails to meet its burden of showing how

2

the Debtor's Chapter 11 petition—where there is a single creditor and a single asset, and no prospect for satisfying or refinancing that one creditor—could be anything but futile.

Finally, terminating the stay in this case will not adversely affect any reorganization of Primary in its own Chapter 11 case. The termination of the stay will merely result in a change of the equity owner of Primary. It will not change Primary, which is a separate and distinct operating entity. Because the Hotel is being run by a contracted hotel manager, and not the current equity owners, the day-to-day operations of the Hotel will not change. Moreover, a change in the ownership of Primary through the UCC Disposition will not adversely impact any of the key agreements or claims to which Primary is a party, including the mortgage loan with the Senior Lender, the Margaritaville franchise agreement, the food and beverage operating lease, the Garment Center Congregation lease, and the hotel management agreement. Indeed, the Debtor does not claim or even provide any argument for how a change in ownership of Primary would adversely impact any reorganization of Primary.

For those reasons, and the reasons that follow, the stay should be terminated and Secured Party should be allowed to exercise its contractual rights and proceed with the UCC Disposition.[3]

## **ARGUMENT**

## I.    **THE PETITION WAS FILED IN BAD FAITH**

"The burden of proof on a motion to lift the automatic stay is a shifting one; section 362(d)(1) requires an initial showing of cause by the movant; then, with the exception of the debtor's equity in the property (which is not at issue on a motion under section 362(d)(1), like this one), section 362(g) places the burden of proof on the debtor for all other issues." *In re*

---

[3] Secured Party provided to the Debtor on August 3, 2023 documentary evidence that it has a valid and perfected security interest in the Collateral. The Debtor did not dispute that the Secured Party's security interest is in fact perfected at the August 4, 2023 hearing or in its brief.

*Syndicom Corp.*, 268 B.R. 26, 43 (Bankr. S.D.N.Y. 2001) (citing *Sonnax Industries, Inc. v. Tri Component Products Corp. (In re Sonnax Industries, Inc.)*, 907 F.2d 1280, 1285 (2d Cir.1990)). "With respect to motions seeking a finding of cause based on bad faith, or a lack of good faith, once the good faith of a debtor is called into question, the burden shifts to the debtor to demonstrate that the petition was filed in good faith." *Id*. at 49.

Under Section 362(d)(1), the Court can grant relief from the automatic stay "for cause." While the term "cause" is not expressly defined in the Bankruptcy Code, it "may be found based on unenumerated factors, including bad faith, or a failure to deal with creditors fairly even where bad faith is not found." *In re Balco Ltd.*, 312 B.R. 734, 748-49 (Bankr. S.D.N.Y. 2004) (internal quotations omitted). "'[T]he standards for bad faith as evidence of cause,' whether in the context of dismissal or relief from the stay, 'are not substantively different from each other.'" *In re Syndicom Corp.*, 268 B.R. 26, 48-49 (Bankr. S.D.N.Y. 2001) (quoting *In re 234-6 West 22nd St. Corp.*, 214 B.R. 751, 757 (Bankr. S.D.N.Y. 1997)); *see also In re Setzer*, 47 B.R. 340, 344 (Bankr. E.D.N.Y. 1985) ("[b]ad faith has frequently been held to provide sufficient cause to warrant both types of relief").

As this court has already recognized (*see* Dkt. 23), in *C-TC*, the Second Circuit adopted an eight-factor test to determine whether a Chapter 11 petition was filed in bad faith. These factors often boil down to an assessment of whether a bankruptcy petition was filed primarily as a litigation tactic or whether the debtor in fact intends to—and has a reasonable probability of being able to—reorganize as a viable business under the protection of Chapter 11. "[A]n entity may not file a petition for reorganization which is solely designed to attack a judgment collaterally—the debtor must have some intention of reorganizing." *CT-C*, 113 F.3d at 1310 (citing *In re Cohoes Indus. Terminal*, 931 F.2d 222, 228 (2d Cir. 1991)). The protections of

Chapter 11 are intended to be available only to those parties that seriously intend to reorganize, thereby yielding some benefit for creditors as a trade-off for the breathing room provided by the automatic stay.  "Chapter 11 is not a procedural vehicle which may be commandeered solely for 'the purpose of invoking [its] automatic stay.'"  *In re Premier Auto. Servs.*, 492 F.3d 274, 281 (4th Cir. 2007) (citation omitted).  Nor is Chapter 11 intended to give debtors "the option of litigating a dispute with a single party . . . in an alternative forum, when the Debtor has no other need of or use for the bankruptcy court."  *In re Fraternal Composite Serv., Inc.*, 315 B.R. 247, 250 (Bankr. N.D.N.Y.).  In short, bankruptcy must be used as a shield to facilitate legitimate reorganization efforts, not as a sword to collaterally challenge state court litigation results with which the debtor is unhappy or as a tool to forum-shop.  *See In re Briarpatch Film Corp.*, 281 B.R. 820, 834-35 (Bankr. S.D.N.Y. 2002) (debtor cannot use bankruptcy as "sword" to relitigate unfavorable judgments rather than taking state court appeal).

The bad-faith filing doctrine has been applied with particular vigor in the context of two-party, "single asset real estate cases" such as this, where the courts have repeatedly reaffirmed that "debtors cannot manipulate the bankruptcy code to thwart the legitimate rights of secured creditors to realize on their claims."  *In re Shea & Gould*, 214 B.R. 739, 744 (Bankr. S.D.N.Y. 1997); *see also In re Northtown Realty Co., L.P.*, 215 B.R. 906, 914 (Bankr. E.D.N.Y. 1998) (finding bad faith based on intent to delay or frustrate efforts of secured creditor to enforce legal rights).

Moreover, courts have applied the *C-TC* factors (and factors similar to those found in *C-TC*) to conclude that bankruptcy filings in cases nearly identical to this one were in bad faith.  In *In re FRGR Managing Member LLC*, No. 09-11061 (MG) (Bankr. S.D.N.Y. 2009), Dkt. 41 at 49:24-59:6, a mezzanine borrower, which owned the equity interest in a primary borrower that

held commercial real estate, filed for bankruptcy on the eve of a UCC disposition.  The court

held that the factors "overwhelmingly support a finding for cause and justification for

modification of the automatic stay to allow Citigroup to proceed with its endeavors to foreclose

on its collateral."  *Id*. at 57:22-25.  Likewise, in *In re JER/Jameson Mezz Borrower II, LLC*, 461

B.R. 293, 298 (Bankr. D. Del. 2011), the Court dismissed a Chapter 11 petition by a mezzanine

borrower, which was the sole member of an entity that itself owned companies that owned a

chain of hotels, on the grounds that the filing was made in bad faith.  In dismissing the case, the

*JER/Jameson* court applied the factors in *In re Primestone Inv. Partners, L.P.*, 272 B.R. 554, 557

(D. Del. 2002), which are substantially identical to the *C-TC* factors.  Similar dismissal decisions

for mezzanine debtors were issued in *In re GVS Portfolio I B, LLC*, 2021 WL 2285285, at *9

(Bankr. D. Del. June 4, 2021) (applying the *Primesone* factors) and *In re Dewey Commer.*

*Investors, L.P.*, 503 B.R. 643, 651-52 (Bankr. E.D. Pa. 2013) (applying the analogous *Stingfree*

factors).  In each case found by Secured Party, where the good faith of a straightforward real

estate mezzanine debtor's bankruptcy filing was put into question, the Court ultimately held that

the filing had been made in bad faith.  The Debtor has identified no cases to the contrary.

    A.    <u>All *C-TC* Factors Are Satisfied</u>

In assessing whether a bankruptcy petition was filed in bad faith, "[c]ourts may consider

any or all of the *C-TC* factors."  *In re Red Bull Taxi Inc.*, 2017 WL 1753234, at *4 (Bankr.

S.D.N.Y. May 3, 2017).  Though the factors "should not be considered in isolation and no one

factor is determinative," *id.* (quoting *In re General Growth Props.*, 409 B.R. 43, 56 (Bankr.

S.D.N.Y. 2009)), here, the Debtor has conceded all eight factors have been satisfied.  *See*

Debtor's Mem. (Dkt. 28) at 13-14.

1.     *Factor 1: The Debtor Has Only One Asset*

The Debtor has only one asset: the 100% membership interest in Primary.  Debtor's

Mem. at 13 ("On paper the Debtor's only asset is its membership interest in the Hotel."); Aug. 3,

2023 Hr'g Tr. 51:5-6 ("This debtor has one asset in the sense it owns the membership interest in

a hotel[.]").

Courts have uniformly recognized that, for the purposes of the *C-TC* analysis, an equity

ownership stake in another entity is itself a single asset.  *See* H'rg Tr. Regarding Motion to

Dismiss Chapter 11 Petition or in the Alternative Modify the Automatic Stay 50:15-25, *In re*

*FRGR Managing Member LLC*, No. 09-11061 (MG) (Bankr. S.D.N.Y. 2009), Dkt. 41 ("[T]his

Debtor, FRGR, was formed as a special purpose entity ('SPE') for the purpose of owning the

equity interests of First Republic and to act as borrower for an additional mezzanine loan of $15

million from Citigroup . . . . The Debtor therefore was formed for the purpose of owning a *single*

*asset*, the ownership interest in First Republic.") (emphasis added); *see also JER/Jameson Mezz*

*Borrower II, LLC*, 461 B.R. at 299 (Bankr. D. Del. 2011) ("Mezz II has only one asset (the

membership interest in Mezz I)."); *In re Dewey Commercial Investors, L.P.*, 503 B.R. 643, 651-

52 (Bankr. E.D. Pa. 2013) ("The only significant asset that the Debtor owns is its interest in the

Partnership which in turn owns the Property").

2.     *Factor 2: The Debtor Has Few Unsecured Creditors Whose Claims Are*
        *Small in Relation to Those of the Secured Creditors*

Here, other than Secured Party, the Debtor has *no* creditors, secured or unsecured.

Debtor's Mem. at 13 ("The Mezz Lender is the only direct creditor of the Debtor."); Aug. 3,

2023 Hr'g Tr. 60:15-16 ("Directly, they have no unsecured creditors.").

7

3.      *Factor 3: The Debtor's One Asset is the Subject of a Foreclosure Action as a Result of Arrearages or Default on the Debt*

The Debtor's one asset is subject to a disposition under Article 9 of the UCC, the equivalent of a foreclosure action.  Debtor's Mem. at 13 ("[T]he Debtor's membership interest was subject to foreclosure").  Indeed, the Rule 1007-2 Declaration submitted with the Chapter 11 petition notes that "[t]he immediate purpose of this Chapter 11 case is to stay a UCC foreclosure auction sale of the Debtor's 100% membership interest in the Hotel."  Dkt. 1 ¶ 2.  At the preliminary hearing on the Motion, the Court recognized that this factor was not in reasonable dispute, and this was not contested by the Debtor's counsel.  *See* Aug. 3, 2023 Hr'g Tr. 60:18-20 ("THE COURT: Number three, the debtors one asset is the subject of a foreclosure action.  That seems clear.").

4.      *Factor 4: The Debtor's Financial Condition Is, in Essence, a Two Party Dispute Between the Debtor and Secured Creditors Which Can Be Resolved in the Pending State Foreclosure Action*

The Debtor's counsel agreed that "the debtor's financial condition is, in essence, a two party dispute, which can be resolved in the foreclosure action."  Aug. 3, 2023 Hr'g Tr. 60:20-25 ("MR. NASH:  Well, it is directly a two party dispute.").

5.      *Factor 5: The Timing of the Debtor's Filing Evidences an Intent to Delay or Frustrate the Legitimate Efforts of the Debtor's Secured Creditors to Enforce Their Rights*

There is likewise no dispute that the timing and purpose of this bankruptcy filing was entirely to delay or frustrate Secured Party's ability to exercise its rights to dispose of its collateral through a UCC Disposition.  As the Debtor's counsel admitted, the timing of the filing of the Debtor's Chapter 11 petition was "[m]ost assuredly" driven by the impending UCC disposition.  Aug. 3, 2023 Hr'g Tr. 62:2-5; Debtor's Mem. at 14 ("[T]he timing was dictated by the UCC auction sale.").  The petition was filed at 7:05 pm on Sunday, July 9, 2023, less than 15

8

hours before the UCC Disposition was scheduled to occur at 10:00 am the next day. *See* Dkt. 1. This is exactly the sort of timing that courts conclude satisfy this factor. *See* H'rg Tr. Regarding Motion to Dismiss Chapter 11 Petition or in the Alternative Modify the Automatic Stay 55:5-9, *In re FRGR Managing Member LLC*, No. 09-11061 (MG) (Bankr. S.D.N.Y. 2009), Dkt. 41 ("Fifth, the timing of the filing (on the eve of foreclosure at 10:42 P.M.) indicates that the Debtor's intention was only to stop Citigroup from foreclosing on its liens and was not motivated by any serious intent to reorganize."); *JER/Jameson Mezz Borrower II, LLC*, 461 B.R. at 299 ("The petition was filed on the eve of foreclosure, solely to obtain the benefit of the automatic stay.").

The Debtor does not dispute the timing of its Chapter 11 petition. Rather, the Debtor only cites case law that indicates suspect timing "is not a *per se* basis to find bad faith." Debtor's Mem. at 14. But, in both of the Debtor's cited cases, the courts ultimately did hold that the filings were made in bad faith. *See* Debtor's Mem. at 14 (citing *In re Sunshine Grp., LLC*, 2020 WL 1846940, at *7 (Bankr. 9th Cir. Apr. 10, 2020) (B.A.P. affirming bankruptcy court's holding that the Debtor's filing of a petition during a pending receivership was bad faith); *In re Ofty Corp.*, 44 B.R. 479, 482 (Bankr. D. Del. 1984) (granting motion to dismiss bankruptcy petition)). The Debtor ignores the fact that the timing of the filing of a petition is often the "most significant badge of bad faith in [the] case." *See, e.g.*, *In re Reyes*, 2015 WL 4624156, at *5 (Bankr. S.D.N.Y. Aug. 4, 2015) ("The debtor concedes that he filed the chapter 11 case in order to litigate his rights in this Court instead of the Surrogate's Court.").

6.    *Factor 6: The Debtor Has Little or No Cash Flow*

The Debtor has no cash flow. The Debtor admits that it has not made any payments to the Secured Party since March 2023. Aug. 3, 2023 Hr'g Tr. 64:5-13. The payments that were made to the Secured Party prior to April 2023 were not from available cash flow but, as the

Debtor itself concedes, were from "reserves or capital infusions."  Debtor's Mem. at 14.  The

Debtor has drained millions in reserves to cover debt service, and will need millions in equity

infusions just to keep the property afloat.  Courts have uniformly held that such outside sources

of cash are not cash flow under *C-TC* Factor 6.  *In re Sapphire Dev., LLC*, 2015 WL 5579545, at

*4 (Bankr. D. Conn. June 26, 2015) (concluding *C-TC* Factor 6 was satisfied because debtor was

being supported with advances from its principal's other entities); *In re 234-6 West 22nd St.

Corp.*, 214 B.R. 751, 760 (Bankr. S.D.N.Y. 1997) (concluding *C-TC* Factors 6 and 7 were

satisfied because debtor "will only be able to pay insurance and heat on the building thanks to

advances from its principal.").

      Moreover, the Debtor's counsel has already conceded to the Court that there is no cash

flow at the Debtor's level.  In support of Primary's motion to use cash collateral (Dkt. 7 in Case

No. 23-11289) ("<u>Primary's Cash Collateral Motion</u>"), Primary attached as an exhibit a budget

showing "Net Cash Flow for Debt Service." Dkt. 7-2 in Case No. 23-11289.  This budget

showed weekly cash flow available for *all* debt service hovering around $300,000. *Id*.  During

the hearing on Primary's Cash Collateral Motion, counsel for Primary confirmed that this

amount was not even close to covering the debt service owed to the Senior Lender.  *See* Aug. 15,

2023 Hr'g Tr. at 14:23-15:2 ("We're projecting anywhere between $700 to $900,000 per month

of excess cashflow immediately. . . . Having said that, which sounds good, that there's 900,000

of excess cashflow, the baseline on the mortgage is a 1.7 million[.]"); *id*. at 33:3-4 (explaining

that the $700,000 - $900,000 in cash flow is "for debt service.  It's not after we make debt

service.").  Likewise, the Debtor's proposed $170 million in DIP financing would solve nothing,

as it requires over $2 million in monthly debt service payments.

Indeed, the Debtor admits that any such cash flow to the Debtor is merely "potential," and would only start to "mov[e] up the waterfall once full stabilization is achieved." Debtor's Mem. at 14. Such vague, unsubstantiated assertions are not entitled to credence by the Court, especially where (as explained above) it is the Debtor that has the burden to show that its filing was made in good faith.

7. *Factor 7: The Debtor Can't Meet Current Expenses Including the Payment of Personal Property and Real Estate Taxes*

Nor is there any dispute that the Debtor cannot meet its current expenses. As the Debtor's counsel admitted, the Debtor is currently in arrears with the Secured Party, and it has not made payments to the Secured Party since March, and in any event was never able to make payments out of property cash flow. Aug. 3, 2023 Hr'g Tr. 63:15-64:13; *see In re 652 W. 160th LLC*, 330 B.R. 455, 466 (Bankr. S.D.N.Y. 2005) ("[T]he debtor's operating reports reveal it cannot meet current expenses on its own."); *In re 234-6 W. 22nd St. Corp.*, 214 B.R. 751, 760 (Bankr. S.D.N.Y. 1997) ("[F]inally, seven, the debtor cannot meet its current expenses. . . . Debtor . . . will only be able to pay insurance and heat the building thanks to advances from its principal."). While the Debtor's brief claims that it "has no significant expenses to fund going forward as compared to the Hotel," Debtor's Mem. at 14, the Debtor conveniently omits the outstanding obligations the Debtor owes to Secured Party.

8. *Factor 8: The Debtor Has No Employees*

The Debtor has no employees. Debtor's Mem. at 14 ("[T]he Debtor has no employees."); Aug. 3, 2023 Hr'g Tr. 64:14-17 ("[W]e have no direct [employees].").

B. <u>The Debtor's "Holistic" Argument Fails</u>

In an effort to avoid the conclusion that the stay should be terminated because each and every one of the *C-TC* factors has been met, the Debtor attempts to circumvent *C-TC* entirely by

11

arguing that the Court must engage in a "holistic approach" that blurs the distinction between the Debtor and Primary. Debtor's Mem. at 1. This should be rejected.

1.    *The Debtor and Primary are Separate and Distinct Entities*

The Debtor's "holistic" argument fails because it ignores the actual corporate structures the parties put in place. As the Debtor itself admits, the loan that it received from Secured Party "falls into a conventional mezzanine loan model." Debtor's Mem. at 2. In such a model, a primary borrower (here, Primary) owns the fee of the property, and borrows money from a mortgage lender (here, Senior Lender), whose interest is secured by the property itself (here, the Hotel). The equity of the primary borrower is then wholly owned by a secondary borrower (here, the Debtor), which borrows money from a mezzanine lender (here, Secured Party), whose interest is secured by the secondary borrower's equity interest in the primary borrower. The benefit of such mezzanine lending structures is it allows borrowers to incur greater amounts of debt than they otherwise could based on the value of their property, either due to customary lending limits based on loan to value ratios, or because there are prohibitions on subordinate lending imposed on mortgage borrowers. The senior/mezzanine bifurcation also creates different tranches of risk and return, which can appeal to different types of lenders.

In this case, the lenders (*i.e.*, Senior Lender and Secured Party) are wholly unrelated. These separate and unrelated lenders made separate loans to two separate entities (*i.e.*, Primary and the Debtor). The lenders made their own lending decisions, based on the unique rights and obligations of their separate borrowers. Importantly, this is not a transaction where a single lender has created a separate mezzanine portion of its loan in order to circumvent a possible bankruptcy of its borrower or to avoid the delays of foreclosing on a mortgage.

The transaction documents between the Debtor and Secured Party clearly demonstrate that it would be improper to use the "holistic" approach proffered by the Debtor. The Debtor

was established as a special purpose entity for the sole purpose of owning the equity interest of

Primary, and to act as a borrower of the mezzanine loan provided by Secured Party.  The

Debtor's LLC agreement makes clear that the purpose of the Debtor is "solely" to "acquire, own,

hold, finance, pledge, refinance, sell, lease, operate, manage, maintain, develop, improve,

transfer or otherwise deal with the Collateral," and "Collateral" is defined as the equity interest

in Primary.  *See* Debtor LLC Agreement § 7(i) and Schedule A; Pledge Agreement § 2.  Indeed,

the Debtor LLC Agreement specifically prohibits it from "owning any asset or property other

than (A) the Collateral, and (B) incidental personal property for the ownership or operation of the

Collateral."  Debtor LLC Agreement § 7(iii).  The Debtor LLC Agreement contains a litany of

"limitations on the Company's Activities," which the Debtor expressly "adopted in order to

comply with certain provisions required in order to qualify the Company as a 'special purpose'

entity."  Debtor LLC Agreement § 9(d)(i).  For example, the Debtor LLC Agreement requires the

Company to "hold itself out to the public as, a legal entity separate and distinct from any other

entity."  *Id*. § 9(d)(iv)(H).

Likewise, in the Mezz Loan Agreement, the Debtor represented that it "(i) has at all times

since its formation been, and as of the date hereof is, a Special Purpose Bankruptcy Remote

Entity and (ii) shall at all times be a Special Purpose Bankruptcy Remote Entity."  Mezz Loan

Agreement § 4.1.35.  The Mezz Loan Agreement also provides that the Debtor "shall not directly

or indirectly make any change, amendment or modification to its organizational documents, or

otherwise take any action which could result in Borrower not being a Special Purpose

Bankruptcy Remote Entity."  *Id.*; *see also id*. § 5.1.32 (Debtor covenanting that it "shall at all

times comply with the provisions of Section 4.1.35 hereof[, and Debtor] shall cause [Primary] at

all times comply with the provisions of Section 4.1.35 of the [Mortgage Loan Agreements,

13

dealing with SPE status as well].").  In Schedule IV of the Mezz Loan Agreement, the parties

laid out exactly what the Debtor can and cannot do to preserve its status an SPE.  *Id*. at Sched.

IV.  Breach of the these SPE provisions is an Event of Default under the Mezz Loan Agreement.

*Id*. § 8.1(a)(xii).

### 2.    *The Court Should Not Adopt the Debtor's "Holistic" Approach*

This Court cannot ignore the corporate distinctions between Primary and the Debtor.

"Ownership of all of the outstanding stock of a corporation . . . is not equivalent of ownership of

the subsidiary's property or assets."  *Feldman v. Trustees of Beck Indus., Inc.*, 479 F.2d 410, 415

(2d Cir. 1973).  "It is a basic principle of bankruptcy law that each separate individual or

corporate entity . . . is treated separately unless grounds for substantive consolidation are

demonstrated."  *In re Tower Auto., Inc.*, 356 B.R. 598, 603 (Bankr. S.D.N.Y. 2006) (citing *FDIC

v. Colonial Realty Co.*, 966 F.2d 57, 58 (2d Cir. 1992)).

The court should see the Debtor's "holistic" argument for what it is—an attempt to get

the Debtor's and Primary's cases treated as one and the same, as if they were substantively

consolidated without any showing that either (i) "creditors dealt with the entities as a single

economic unit and did not rely on their separate identity in extending credit;" or (ii) "the affairs

of the debtors are so entangled that consolidation would benefit all creditors."  *See, e.g.*, *In re

Augie/Restivo Baking Co.*, 860 F.2d 515, 518 (2d Cir. 1988).  Indeed, if this Court were to treat

the Debtor and Primary as one and the same, the holding would potentially threaten the entire

industry of mezzanine lending and deprive many businesses of the ability to finance their

operations.  *See In re Pacific Lumber Co.*, 584 F.3d 229, 249 n.25 (5th Cir. 2009) ("If courts are

not wary about substantive consolidation of special purpose entities, investors will grow less

confident in the value of the collateral securing their loans; the practice of securitization, a

powerful engine for generating capital, will become less useful; and the cost of capital will increase.").

       3.      *Even if the Court Were to Apply the "Holistic" Approach, the Stay Should Still be Lifted*

Even if this Court were to apply a "holistic" approach and consider Primary and the Debtor together in the bad faith analysis, this Court should still conclude that the filing was in bad faith and terminate the stay.

The Debtor cites to a number of cases that suggest the Debtor be considered as "part of a larger enterprise" with Primary.  Debtor's Mem. at 13.  But, in all of those cases, the debtors were part of complicated enterprises with many assets and affiliated entities.  For example, in *In re General Growth Properties, Inc.*, 409 B.R. 43 (Bankr. S.D.N.Y. 2009), the ultimate parent entity was "a publicly-traded real estate investment trust" that owned "approximately 750 . . . Debtor and non-Debtor subsidiaries, joint venture subsidiaries and affiliates."  409 B.R. at 47.  Moreover, the parent entities at issue in *General Growth* were subject to "billions of dollars of *unsecured* debt" that could not "be restructured responsibly if the cash flow of the parent companies continued to be based on the earnings of subsidiaries that had debt coming due in a period of years without any known means of providing for repayment or refinancing."  *Id.* at 62-63 (emphasis added).

Likewise, in *In re EHT US1, Inc.*, the decision occurred "in the context of [a] large, complex, multi-debtor chapter 11 case[]."  630 B.R. 410, 430-31 (Bankr. D. Del. 2021); *see also id.* at 418-22 (explaining that the debtors at issue were part of a "collective investment scheme" involving "several layers of holding companies" and a parent company that "itself remain[ed] exposed to claims from [unsecured] creditors").  Moreover, the court in *EHT* recognized that

"almost all of the thirteen *Primestone* factors [comparable to the *C-TC* factors] are not present (or alleged) here." *Id*. at 430.[4]

These cases are transparently inapplicable to the circumstances at bar, wherein the Debtor owns the membership interest of a single entity that operates a single real estate property. *Cf. In re EHT US1*, 630 B.R. at 431 n.93 (distinguishing the case at bar from cases involving "a two-party dispute between the debtor and a secured creditor"). Indeed, in the one case that did apply a "holistic" approach to a mezzanine lender in a real estate transaction, *In re JER/Jameson Mezz Borrower II, LLC*, 461 B.R. 293, 299, 301 (Bankr. D. Del. 2011), the court concluded that the case should still be dismissed for bad faith, and separately that "virtually all of the *Primestone* factors" warranted dismissal as well. The court noted that "although the Debtors collectively have 103 Inns and related assets and many creditors, Mezz II has only one creditor and one asset. Mezz II cannot confirm a plan over Colony's objection because it could get no accepting class. Therefore, in the absence of substantive consolidation, Mezz II does not have any chance of confirming a plan." *Id*. at 302-03; *see also In re Davis Heritage GP Holdings, LLC*, 443 B.R. 448, 458–59 (Bankr. N.D. Fla. 2011) (determining entity that held no assets other than interests in real estate companies "does not own anything that it can reorganize").

C.    The Court Should Disregard the Debtor's Attempt to Ignore the *C-TC* Factors

Recognizing that it loses on the application of the straightforward *C-TC* factors, the Debtor submits that the Court should instead ignore them and focus on the purported "dual inquiry of whether" there is "both [] objective futility and subjective bad faith." Debtor's Mem. at 8 ("While the *C-TC* Factors certainly help define bad faith, the lynchpin of the analysis still

---

[4] Similarly, *In re U.I.P. Engineered Prods. Corp.*, 831 F.2d 54, 55 (4th Cir. 1987) involved a parent company, three of its corporate subsidiaries, and two of its unincorporated divisions. And *In re Mirant Corp.*, 2005 WL 2148362, at *3 (Bankr. N.D. Tex. Jan. 26, 2005) involved the Chapter 11 petitions of a major utility company "and 74 of its affiliates."

16

revolves around the dual inquiry of whether" there is "both [] objective futility and subjective bad faith.").

First, the Debtor ignores the fact that the *C-TC* factors touch upon both objective futility and subjective bad faith. *See In re Consol. Distribs., Inc.*, 2013 WL 3929851, at *8 (Bankr. E.D.N.Y. July 23, 2013) ("The majority of the *C-TC* factors are 'objective,' in that they can be gauged by objective facts . . . . The fifth factor, touches on subjective intent—the debtor's 'intent.'"). In other words, the *C-TC* Factors are not one prong of a two-prong test; rather, the *C-TC* Factors provide courts with the *framework* for assessing both the objective futility of the petition and the subjective bad faith of the petitioner. *See In re Syndicom Corp.*, 268 B.R. at 52-53 ("Because the Second Circuit's later decision in *C-TC 9th Ave.* both cited and discussed *Cohoes*, actually considered a motion under section 1112(b), and provided much more guidance to the Bankruptcy Courts in this regard, the Court believes it is appropriate to focus its analysis on the factors identified by the Second Circuit in *C-TC 9th Ave.*"); *In re Hartford & York, LLC*, 2014 WL 985449, at *3-6 (dismissing Chapter 11 petition for bad faith after considering only the *C-TC* Factors).

Moreover, while the Debtor claims that dismissal requires *both* a showing of objective futility and subjective bad faith (Debtor's Mem. at 8-9), this approach has been rejected. "[T]he Second Circuit's precedents in this area" do not "bar dismissal absent a finding of *both* subjective bad faith *and* objective futility." *Sapphire Dev., LLC v. McKay*, 549 B.R. 556, 567-68 (D. Conn. 2016) (emphasis in original). *In re Cohoes*, which the Debtor cites in support of this contention, "reviewed a bankruptcy court's imposition of *sanctions* . . . for the filing of a frivolous bankruptcy case . . . , not [a] dismissal for 'cause' under Section 1112(b)." *Sapphire*, 549 B.R. at 567-68 (emphasis added). In fact, "the Second Circuit in *Cohoes* noted that

17

'[b]ecause Bankruptcy Courts readily dismiss Chapter 11 petitions that are brought in bad faith, . . . the [bankruptcy] court's initial decision not to dismiss the Chapter 11 petition . . . strongly indicate[s] that the petition itself had some valid basis in law.'" *In re Syndicom Corp.*, 268 B.R. at 52-53 (quoting *In re Cohoes*, 931 F.2d at 229).  Per Judge Gerber's decision in *In re Syndicom*, this "underscores . . . the power of the Bankruptcy Courts to dismiss cases for bad faith filing (and as a power separate from that to award sanctions . . . ), hinting . . . that the Second Circuit's decision might not have been the same if, upon consideration of a motion under section 1112(b), it was reviewing the Bankruptcy Court's dismissal of the case." *In re Syndicom Corp.*, 268 B.R. at 52-53.[5]

In any event, the Debtor's arguments on objective futility and subjective bad faith are without merit.  *C-TC* Factors 1, 2, 3, 4, 6, 7, and 8 all assess the objective futility of the Debtor's Chapter 11 petition.  *See In re R&G Props., Inc.*, 2009 WL 1076703, at *2 (Bankr. D. Vt. Apr. 16, 2009) ("The majority of the *C-TC* factors are 'objective,' in that they can be gauged by objective facts (e.g., number of assets, amount of cash flow). . . . [T]he fifth factor touches on subjective issues—the debtor's 'intent.'").  Each suggests the Debtor has "no realistic chance of reorganizing . . . ."  *C-TC*, 113 F.3d at 1310; *see also supra* at Part I.A.

---

[5] The Debtor cites three cases in support of its contention that both objective futility and subjective bad faith, separately, are required to lift a stay.  *See* Debtor's Mem. at 8-9.  All three cases rely on *In re Cohoes*, which was both resolved six years prior to *C-TC* and, as noted, reviewed only the propriety of a bankruptcy court's imposition of sanctions for the filing of a frivolous bankruptcy case.  *See, e.g.*, *In re RCM Global Long Term Capital Appreciation Fund, Ltd.*, 200 B.R. 514, 520 (Bankr. S.D.N.Y. 1996); *In re Kingston Square Assocs.*, 214 B.R. 713, 725 (Bankr. S.D.N.Y. 1997) (citing *In re RCM*, which cites *In re Cohoes*); *In re 68 West 127 Street, LLC,* 285 B.R. 838, 846-47 (Bankr. S.D.N.Y. 2002) (citing *In re Cohoes* and *In re Kingston Square*).  Moreover, not one of these three cases actually analyzed whether a conjunctive test is the appropriate standard outside of the sanctions context.  And *In re 68 West 127 Street*—the only one of the Debtor's three cases that substantively addresses *C-TC*— expressly states that objective futility is not always a requirement.  285 B.R. at 847 ("[A] debtor's behavior can be so egregious—especially in a two party case . . .—that there may be no need to look into . . . the reasonable likelihood of the debtor confirming a chapter 11 plan in a reasonable time.").

The Debtor does not attempt to rebut the subjective bad faith prong, likely in light of the Debtor's express statements that it both would and did file for bankruptcy at the last minute to stop the UCC Disposition. Likewise, the Debtor's pre-petition conduct, as already detailed in the opening motion, and as will be further developed in Secured Party's evidence at the hearing, further demonstrates Debtor's subjective bad faith.

The Debtor ignores the objective elements of the *C-TC* Factors and instead rests its entire objective futility argument on its notion that its Chapter 11 petition was a legitimate use of the Bankruptcy Code because it delayed the UCC disposition and thereby gave Primary more time to try to procure refinancing. Debtor's Mem. at 14. But the Debtor provides no evidence to suggest that any refinancing is forthcoming that would satisfy even a portion of Secured Party's indebtedness. Because the Debtor has the burden to demonstrate that its filing was made in good faith, this lack of evidence is fatal to its argument.

Moreover, the Debtor does not claim that any refinancing is forthcoming for *itself*; rather, the Debtor expressly indicates that it is working to refinance Primary. *See id.* ("Debtor understands the imperative for the Hotel to procure a refinancing as the center piece of bankruptcy."). Without any indication that the Debtor will repay the Mezz Loan, there is simply no reorganization for the Debtor to achieve, rendering its Chapter 11 case objectively futile. *See In re 3868-70 White Plains Rd., Inc.*, 28 B.R. 515, 518 (Bankr. S.D.N.Y. 1983) (dismissing debtor's Chapter 11 petition as futile where there was "no evidence in the record to support a conclusion that there is any possibility for an infusion of third party funds").[6]

---

[6] The Debtor fails to cite a single case that hold that a single-asset debtor with only a single, secured creditor filed a Chapter 11 petition in good faith despite a complete lack of evidence of any forthcoming financing. *See, e.g., In re Clinton Centerfuge, Inc.*, 72 B.R. 900 (Bankr. E.D. Pa. 1987) (concluding Chapter 11 petition to stay debtor's requirement to post a supersedeas bond was legitimate in light of the debtor's "ongoing business, with several employees and several creditors other than the movants"); *In re Sylmar Plaza, L.P.*, 314 F.3d 1070 (9th Cir. 2002) (concluding debtor's Chapter 11 reorganization *plan*—not its petition writ large—was proposed in good faith); *Matter of Madison Hotel Assocs.*, 749 F.2d 410 (7th Cir. 1984) (upholding the bankruptcy court's good faith

Moreover, Primary's proposed $170 million in DIP financing (Debtor's Mem. at 4) would only make things worse. Because no DIP financing motion has been filed (and the Debtor's counsel has confirmed that no such motion will be filed at least until after the August 31, 2023 hearing; *see* Aug. 15, 2025 Hr'g Tr. 7:25-8:6), it is premature for the court to even consider it on this motion. Furthermore, the purpose of DIP loans is to cover current operations where there is no other source of funds; in contrast, Primary's own budget shows that there is sufficient cash flow at the Primary level to cover all operating expenses, and the Senior Lender has consented to the use of cash collateral. But as explained above, there is insufficient cash flow to satisfy Primary's own debt service obligations (thus leaving no cash flow at the Debtor level, and in turn for Secured Party). This problem would only get worse if Primary enters into DIP financing that increases Primary's monthly debt service obligations, and Secured Party will introduce testimony at the hearing in support of this fact.

## II.    A CHANGE IN THE EQUITY OWNERSHIP OF THE DEBTOR WILL NOT ADVERSELY IMPACT THE ABILITY OF PRIMARY TO REORGANIZE

During the hearing on the Motion, the Court expressed concern that terminating the stay would impact the ability of Primary to reorganize, either within or outside of a Chapter 11 case. *See* Aug. 3, 2023 Hr'g Tr. 51:16-21 ("But here's what I think really matters. I think it's a question of, would keeping the stay in place for this debtor further the purposes of the

---

determination where the debtor and creditor had entered into an escrow stipulation under which debtor had made regular monthly payments into the escrow account); *In re PPI Enters. (U.S.) Inc.*, 324 F.3d 197 (3d Cir. 2003) (rejecting futility allegations of movant, an unsecured judgment creditor, against debtor, the American subsidiary of former international textile giant Polly Peck International, which had four classes of unsecured creditors); *In re Rubin Family Irrevocable Stock Trust*, 2013 WL 6155606, at *10 n.7 (Bankr. E.D.N.Y. Nov. 21, 2013) (expressly noting that *C-TC* was inapposite because this case did not involve a "hopelessly insolvent" single-asset debtor "engaged in a last-minute effort to fend off foreclosure"); *In re Walden Ridge Dev., LLC*, 292 B.R. 58 (Bankr. D.N.J. 2003) (concluding debtor's Chapter 11 petition was not futile where—two days before it filed its petition— debtor assigned its interest in a purchase contract to an entity that had obtained a loan commitment of roughly $5 million and whose entity had more than $2 million in marketable securities available for liquidation to fund the purchase price thereunder).

Bankruptcy Code?  And what I mean by that is, if I lifted the stay and Mr. Strickon's client were

to foreclose, would that impair the hotel's ability to reorganize?").

If the Court were to terminate the stay to allow the Secured Party to proceed with the

UCC Disposition, the Secured Party's collateral (*i.e.*, the LLC membership interest in Primary)

would be put up for a public auction.  Unless a third party pays off the Mezz Loan, or funds a

winning bid by the Debtor at the public auction, the ownership structure of Primary will change,

and it will be owned either by Secured Party or another winning bidder.

But the mere transfer of the equity ownership of Primary from one entity to another will

do nothing to undermine the ability of Primary to reorganize, and nowhere in the Debtor's brief

does it argue otherwise.  The entity actually directly owning the property (*i.e.*, Primary) will be

the same.  Moreover, because the current direct and indirect equity owners of Primary are not

managing the Hotel (that is being done by an affiliate of the Dream Hotel Group), a change in

equity ownership will not change the actual day-to-day management of Hotel operations.

Moreover, none of the key agreements or claims relevant to the Hotel would be adversely

affected by a change in the equity ownership of Primary.

**Senior Mortgage.**  Pursuant to the loan agreement between Primary and Senior Lender

(the "Term Loan Agreement"), an Event of Default occurs if Primary makes or allows a

"Transfer" to occur in violation of the provisions of Section 5.2.10 of the Loan Agreement or

Article VII of the Security Instruments.  Term Loan Agreement § 8.1(a)(iv).  However, a transfer

of 100% of the membership interests in Primary to Secured Party pursuant to the Mezzanine

Loan Documents, and in accordance with agreement among the Senior Lender, Secured Party,

and Junior Mezzanine Lender (the "Intercreditor Agreement"), is expressly excepted from the

definition of "Transfer."  *Id*. § 5.2.10(a).  Thus such a transfer would not cause an Event of

Default.  Moreover, the Intercreditor Agreement provides that Secured Party has the right to take all necessary steps to change the equity ownership of the Primary through the UCC Disposition, so long as the Secured Party adheres to Section 5(b) of the Intercreditor Agreement. Intercreditor Agreement § 5(b).

**Margaritaville License.**  Primary is authorized to operate the Hotel under the Margaritaville brand and to use the Margaritaville name and marks pursuant to an agreement (the "Sub-License Agreement") dated as of March 21, 2018.  Pursuant to Section 10.2(a) of the Sub-License Agreement, Primary, as the direct sub-licensee, is permitted to effect a "Change of Control" (or assign or transfer its rights and obligations under the Sub-License Agreement), subject to certain notice and approval requirements under the Sub-License Agreement.  Sub-License Agreement § 10.2(a).

However, these provisions are not directly applicable to Secured Party (or its successor or nominee following a UCC disposition) because, in connection with (and as a requirement to) the closing of the Mezz Loan, Margaritaville delivered to Secured Party a "Comfort Letter," dated September 13, 2021.  Pursuant to Paragraph B(i) of the Comfort Letter, if Secured Party or its designee acquires control of Primary "through an exercise of its rights under the Pledge, including any UCC foreclosure of the Pledge or assignment-in-lieu thereof, or any other exercise of its rights as a secured party," and if such person desired that the Hotel continue to operate under the Margaritaville flag, such person would need to submit an application fee within 30 days of such person's acquisition of the pledged interests in Primary and execute a new, direct sub-license agreement with Margaritaville within 30 days of requesting such new sub-license agreement from Margaritaville.  Comfort Letter ¶ B(i).  In connection with such new sub-license agreement, Secured Party (or such other person acquiring the pledged interests in Primary)

would only be obligated to (i) pay the application fee, (ii) cure quality and service deficiencies (excluding unpaid liquidated damages) of Primary under the Sub-License Agreement, and (iii) comply with any renovation and upgrade requirements stated in the Sub-License Agreement. *Id.* ¶ B(iii). Additionally, under the Comfort Letter, Secured Party would also have the right to propose a substitute manager for the Hotel, provided the substitute manager is approved by the Sub-Licensor. *Id.* ¶ C.

**F&B Operator Lease.** The Hotel's food and beverage operations are subject to a lease (the "F&B Lease") with IMCMV Times Square LLC ("IMC"). Pursuant to Article 31, the F&B Lease is binding on any successor landlord thereunder following a transfer of the landlord's (*i.e.*, Primary's) interest in the building located at the property. F&B Lease § 31. If any such transfer and assignment of the F&B Lease occurs prior to landlord's completion of the "Landlord Work" under the F&B Lease, then Primary will remain obligated to complete such "Landlord Work," unless the transferee/assignee assumes those obligations, but there is otherwise no restriction on transfers or assignments of the F&B Lease, or on any change in direct or indirect ownership of Primary. F&B Lease § 36.14. As a result, the change in equity ownership of either Primary or the Debtor will not have any impact on the F&B Lease.

Additionally, as a condition to providing the Mezz Loan, Secured Party required that IMC provide a Tenant Estoppel Certificate given by IMC for the benefit of Secured Party, Senior Lender and Junior Mezzanine Lender (the "Tenant Estoppel"). The Tenant Estoppel provided, among other things, that IMC "agrees to attorn to and recognize as its landlord under the Lease each party acquiring legal title to the Property by foreclosure (whether judicial or nonjudicial) of the Security Instrument, deed-in-lieu of foreclosure, or other sale in connection with the enforcement of the Security Instrument or otherwise in satisfaction of the Loan on the condition

that such Landlord be subject to the provisions of the Lease." *Id*. § 11.  In the event of a change

in equity ownership of the Debtor, while the landlord under the F&B Lease will not change, the

party which owns the landlord will change.  Because the Tenant Estoppel provides that the IMC

will recognize any other party with takes control as a result of change in ownership due to the

enforcement of the Security Instrument, such a change will have no effect on the F&B Lease.

**Garment Center Congregation.**  The Property is subject to a lease (the "GCC Lease")

with the Garment Center Congregation, which obligates Primary to provide a replacement space

for a synagogue in the Property.  There does not appear to be any provision in the GCC Lease

that would be adversely affected by a change in the equity ownership of Primary, which will

continue to remain the Landlord under the Lease.

**Hotel Management Agreement.**  The Hotel itself is managed by DHG TSQ LLC

("DHG"), an affiliate of the Dream Hotel Group pursuant to a February 22, 2019 Hotel

Management Agreement (the "HMA").  In the event of a change in the equity ownership in the

Debtor, Primary will still be the party that is subject to the terms and conditions of the HMA.

Moreover, Secured Party received from the Debtor a September 13, 2021 Mezzanine

Subordination of Management Agreement (the "Subordination of HMA"), given by the Debtor

to Secured Party and acknowledged and agreed to by DHG and Primary.  There are no

restrictions in either the HMA or the Subordination of HMA on Secured Party's exercising its

remedies and retaining Manager to manage and operate the Hotel under the HMA.  Accordingly,

in the event there is a change in the equity ownership of the Debtor, there will be no effect on

Primary and the terms of the HMA.

Additionally, Section 11.2 of the HMA provides that "[Primary] has the right, without the

consent of Manager, to assign the Hotel Management Agreement unless, after giving effect to

24

such transaction, [Primary] (or its successor, as applicable) (i) is a Prohibited Person or (ii) is a Competitor.  A "Prohibited Person" is "a person or entity that is, or is controlled by, a person that has been convicted of a crime, fraud or similar malfeasance, or has been subjected to any sanction or similar regulatory action by any Governmental Authority for any fraud or similar malfeasance, or could jeopardize any Governmental Permits held by Manager," or similar actions.  A "Competitor" is "any person or entity that is, or is controlled by, the owner of another recognized hotel brand (that owns and/or licenses not fewer than 10 hotels under such brand) that operates under standards that are materially consistent with the Operating Standards.  For the avoidance of doubt, a Person is not a Competitor if such Person is a REIT, institutional investor, or family office that owns or holds real estate assets, any portion of which are hotels, so long as such Person does not own or control a hotel brand or engage in hotel operations or management contracts, as opposed to merely holding real estate interests."  Secured Party does not fall within either of the prohibited assignee categories of Prohibited Person or Competitor, and there is no expectation that such an entity could or would be the winning bidder.  As a result, a change in the equity ownership of the Debtor will not affect or give rise to a default under the HMA.

Dated: New York, New York
       August 21, 2023

PAUL HASTINGS LLP

By:   /s/ Harvey A. Strickon
          Harvey A. Strickon

Attorneys for Secured Party

200 Park Avenue
New York, NY 10166
Tel:    (212) 318-6380
Fax:    (212) 230-7689
e-mail: harveystrickon@paulhastings.com