```
                    UNITED STATES BANKRUPTCY COURT
                    SOUTHERN DISTRICT OF NEW YORK
```

In re:                                  Case #23-11289-pb
                                        New York, New York
  560 SEVENTH AVENUE OWNER PRIMARY LLC, August 15, 2023
                              Debtor.    2 o'clock calendar

- DOC 2 MOTION TO APPROVE USE OF CASH COLLATERAL
- DOC 3 MOTION TO AUTHORIZE PAYMENT OF PRE-PETITION PAYROLL
- DOC 5 MOTION FOR JOINT ADMINISTRATION
- DOC 6 AMENDED MOTION FOR JOINT ADMINISTRATION
- DOC 7 AMENDED MOTION TO APPROVE USE OF CASH COLLATERAL
- NOTICE OF HEARING ON FIRST DAY MOTIONS (RELATED DOCS 7,3,6,4)

        - APPEARANCES BEFORE THE HONORABLE PHILIP BENTLEY -

For debtor:                     KEVIN J. NASH, ESQ.
                                Goldberg Weprin Finkel Goldstein LLP
                                125 Park Avenue, 12th Floor
                                New York, New York 10017
                                (212) 301-6944
                                kjnash@gwfglaw.com

For OWS CRE Funding, LLC:        GREGORY PETRICK, ESQ.
                                INGRID BAGBY, ESQ.
                                MICHELE MAMAN, ESQ.
                                Cadwalader, Wickersham Taft LLP
                                200 Liberty Street
                                New York, New York 10281
                                (212) 504-6000

Interested Party:               ROBERT J. GAYDA, ESQ.
                                ANDREW J. MATOTT, ESQ
                                JOHN PATOUHAS, Law Clerk
                                Seward & Kissel LLP
                                One Battery Park Plaza
                                New York, New York 10004
                                (212) 574- 1200; (212) 480-8421 fax

For Garment Center              SCOTT S. MARKOWITZ, ESQ.
Synagogue:                      Tarter Krinsky Drogin LLP
                                1350 Broadway, 11th Floor
                                New York, New York 10018
                                (212) 216-8000
                                smarkowitz@tarterkrinsky.com

2

- A P P E A R A N C E S -

| | |
|---|---|
| Interested Party: | DENNIS C O'DONNELL, ESQ.<br>DLA Piper<br>1251 Avenue of Americas<br>New York, New York 10021<br>(212) 335-4665<br>dennis.odonnell@dlapiper.com |
| For DHG TSQ, LLC: | FRED B. RINGEL, ESQ.<br>ROBERT M. SASLOFF, ESQ.<br>Leech Tishman Robinson Brog PLLC<br>875 Third Avenue, 9th Floor<br>New York, New York 10022<br>(212) 603-6300 |
| For IMCMV Times Square, LLC: | LAWRENCE R. REICH, ESQ.<br>Reich Reich & Reich PC<br>235 Main Street, Suite 450<br>White Plains, New York 10601<br>(914) 949-2126; (914) 949-1604 fax<br>reichlaw@reichpc.com |
| For United States Trustee: | BRIAN S. MASUMOTO, ESQ.<br>One Bowling Green<br>New York, New York 10004-1408<br>(212) 510-0500<br>nysbnotice@gmail.com |

**LISTEN ONLY**

| | |
|---|---|
| For Global One Professional<br>Investment Type: | LAURA E. APPLEBY, ESQ.<br>MARIA CHO, ESQ. (LA Ofc)<br>Faegre Drinker Biddle Reath LLP<br>1177 Avenue of Americas, 41st Fl.<br>New York, New York 10036<br>(212) 248-3140 |
| Interested Party: | RAHIL KAPUR<br>FTI Consulting<br>1166 Avenue of the Americas<br>New York, New York 10036<br>(917) 635-0197<br>rahil.kapur@fticonsulting.com |

3

1          - A P P E A R A N C E S -

2                    **LISTEN ONLY**

3   Interested Party:              TRACY L. KLESTADT, ESQ.
                                   Klestadt Winters Jureller Southard
4                                  200 West 41st Street
                                   New York, New York 10036-7203
5                                  (212) 972-3000
                                   tklestadt@klestadt.com
6

7   Interested Party:              GEORGIA KROMREI
                                   111 West 19th Street
8                                  New York, New York 10001
                                   (512) 850-9498
9                                  kromreig@gmail.com

10  Interested Party:              DANIEL PACE
                                   CHRIS C SAITTA
11                                 Emerald Capital Advisors
                                   150 E. 52nd Street, 15th Floor
12                                 New York, New York 10022
                                   (646) 968-4094
13

14  For OWS BCA Funding, LLC:      RAYMOND NAVARO, ESQ.
                                   ANTHONY GREENE, ESQ.
15                                 Cadwalader, Wickersham Taft LLP
                                   200 Liberty Street
16                                 New York, New York 10281
                                   (212) 504-6000
17

18  For Arden/Corten:             ZACHARY ZWILLINGER, ESQ.
                                   HARVEY A. STRICKON, ESQ.
                                   Paul, Hastings, Janofsky Walker LLP
19                                 75 East 55th Street
                                   New York, New York 10022-3205
20                                 (212) 318-6000; (212) 319-4090 fax

21  For Debtwire:                  TAYLOR HARRISON
                                   1501 Broadway
22                                 New York, New York 10036
                                   (859) 559-5694
23                                 taylor.harrison@iongroup.com

24

25

4

- A P P E A R A N C E S -

**LISTEN ONLY**

```
For The ABI Project:          UDAY GORREPATI
                              2725 Turtle Ridge Drive
                              Bloomfield Township, Michigan 48302
                              (313) 284-7244
                              uday.gorrepati@gmail.com

Transcriber:                  AA EXPRESS TRANSCRIPTS
                              195 Willoughby Avenue, Suite 1514
                              Brooklyn, New York 11205
                              (888) 456-9716
                              contact@aaexpresstranscripts.com
```

(Proceedings recorded by electronic sound recording)

560 Seventh Avenue Owner Primary - 8/15/23                    5

1          THE COURT:  Good afternoon, everybody.  Good to see

2     you again.  It hasn't been very long.  So, we're here on the

3     first day hearing for what I'm going to call the hotel.  We now

4     have a mezzanine debtor, which I might refer to as Holdco, and

5     now we have the operating company as well.  We have three

6     motions on the calendar today, but before we get into that, I'll

7     take any opening statements that people may wish to make.

8          MR. NASH:  Good afternoon, Your Honor.  Kevin Nash for

9     the debtor.  I'm appearing under a colleague's screen, Jessica

10    Sprague, because my speakers didn't work in my office.  I'm

11    happy they work here.  Yes, Your Honor.  I appreciate the

12    opportunity.  As we advised the court during the prior hearings,

13    the bankruptcy of the hotel was forthcoming.  Before we filed

14    the hotel, I think we did a good deal of preparatory work in

15    terms of negotiating with the senior lender on cash collateral,

16    visibility issues, budgets and the like.  We reached agreement

17    on a memorandum of understanding with the union, and we were

18    very much in contact with the franchisor, Margaritaville, who

19    was very interested in what the petition had to say and how the

20    hotel was portrayed.  And we had a good deal of discussion with

21    them over the weekend.  And I think we came to a consensus of

22    what would be said and how it would be said in the declaration.

23          As I indicated before the court in the mezzanine

24    lender situation, I think this is a very good asset.  I think it

25    operates well, it generates income, and the budgets that we put

560 Seventh Avenue Owner Primary - 8/15/23                    6

1   together, I think are reflective of that.  I don't want to get

2   ahead of myself, but I think going forward the hotel will be

3   able to operate within the corners of the budget and will be

4   able to generate positive cashflow for the lender.  But I

5   realize you have to walk before you run, and this is an interim

6   hearing on cash collateral.

7            THE COURT:  I didn't want to cut you off, but if those

8   were the basic points you wanted to make, I do have a question

9   for you.

10           MR. NASH:  Yes?  Yes, Your Honor?

11           THE COURT:  So, I saw the budget and it shows a

12  significant amount of net cashflow after payment of debt

13  service.  But I saw somewhere in the papers, I'm blanking right

14  now on where I saw this, that the debtors are planning to get a

15  DIP loan, and I was wondering whether that's really needed in

16  the circumstances.

17           MR. NASH:  I think it is in the sense that I think the

18  lender is looking to be taken out of this situation.  And I do

19  think we need added liquidity.  And so, we have been moving in

20  the direction of seeking a DIP loan.  And you will hear from

21  lender's counsel.  I think they would like to be refinanced out

22  as soon as we can do it.  But Your Honor is right, we can

23  service the debt not necessarily at the full contract rate, but

24  there is positive cashflow here.  And I do think added liquidity

25  would be very helpful as well.

560 Seventh Avenue Owner Primary - 8/15/23                    7

1    THE COURT:  Okay.  I'm raising the issue now just

2  because I know DIPs sometimes can be quite expensive, and they

3  also can be accompanied by provisions that hamper a debtor's

4  flexibility.  So, I'm quite cognizant of those issues, and I'm

5  sure you are, too.

6    MR. NASH:  Yes, there is an expense to it, judge,

7  you're 100 percent right.  And it's a higher cost of money.

8  Although, this refinancing, given the changes in the market

9  rates, is a decent interest rate as well.  But we are aware of

10  all those costs as well.

11    THE COURT:  And I guess the one other point I'd make,

12  just to get your reaction, and then, I'd be curious to hear Mr.

13  Petrick's reaction to these various points, as I think everybody

14  on this virtual hearing is well aware, there's a pending lift

15  stay motion at the mezzanine level.  And if that were granted,

16  it would result in either the lender stepping into the shoes of

17  management, I assume at the hotel level, or either the lender or

18  a purchaser doing that.  And it just seems to me, I don't want

19  to prejudge what the outcome of that motion will be, but it's

20  very possible that will be the outcome, and it may happen

21  relatively soon.  And if that were to happen, and if I were to

22  have approved a DIP shortly before that, does that have the

23  potential to result in wasted money, and also constraints on the

24  debtors freedom to operate that parties might regret?

25    MR. NASH:  Let me just be very clear.  We wouldn't

560 Seventh Avenue Owner Primary - 8/15/23                    8

1   bring on an application to approve a DIP facility until we got

2   by August 31.  So, I would never do that; I would never be so

3   presumptuous.  We are working towards that.  I am hopeful we'll

4   be able to survive the first phase of the lift stay motion, but

5   I would never bring on a motion until I survived August 31,

6   although we are working to tighten up that term sheet.

7              THE COURT:  Okay.  All right.  I appreciate that.  And

8   that makes sense.  I guess one other question I'd ask you is, it

9   looks to me that based on your numbers at least, and the lender

10  may have different views, but based on your numbers, you believe

11  that your lender is over secured by a pretty large sum.  Is that

12  right?

13             MR. NASH:  I believe that on a valuation of this

14  hotel, the first lender is in a good position.  The first lender

15  is over secured.  That's what I believe.  Every appraisal I've

16  seen is more than $154,000,000.  And I'm not going to say

17  definitively that the market forces can't change that, but

18  everything I've seen shows this hotel is worth well more than

19  $154,000,000.

20             THE COURT:  Right?  I mean, in fact, the papers that

21  were filed in connection with the mezzanine lift stay motion

22  show that it's worth a good deal more than that.

23             MR. NASH:  Yes, obviously we're talking to a DIP

24  lender, not that that's the barometer, but we're talking to them

25  at $170,000,000.  So, I think on an underwriting basis, I don't

560 Seventh Avenue Owner Primary - 8/15/23                    9

1  think there's any doubt, at least in my mind, that this hotel is

2  well worth $154,000,000.

3           THE COURT:  Right.  Okay.

4           MR. NASH:  I quite frankly, think it would be the

5  steal of the century at $154,000,000.

6           THE COURT:  Okay.  All right.  Thank you, Mr. Nash.

7           MR. NASH:  And I know it's relatively early in the

8  century, but it would be a steal of a century.

9           THE COURT:  Okay.  Thank you, Mr. Nash.  Mr. Petrick,

10  would you like to add anything?

11           MR. PETRICK:  Yes, thank you, Your Honor, and good

12  afternoon.  And thank you for accommodating us all today.  I

13  appreciate it.  I am here on behalf of OWS CRE Funding I, LLC,

14  the senior secured lender.  I do have a few comments and

15  thoughts I'd like to share with Your Honor today.  First and

16  foremost, our primary interest up till today has been to

17  preserve our collateral and to make sure that the hotel has

18  enough funding to operate and operate well.  It's in nobody's

19  interest to see that hotel's operation upended.  And to that

20  end, as Mr. Nash indicated, we have worked the last few weeks to

21  negotiate the consensual use of cash collateral.  And I am

22  pleased to echo Mr. Nash that we have an agreement on consent to

23  use our cash collateral, which we think is in the best interest

24  of all parties in the case.

25           Second, as I foreshadowed to you at the lift stay

1   motion, we have, and we've expressed this in Mr. Nash number of

2   times, great concerns about the necessity of this filing.  Part

3   of that goes to Your Honor's question that if a lift-stay motion

4   is granted in the next few weeks, the necessity or the

5   appropriateness of this proceeding comes into even sharper

6   focus.  And beyond other reasons, it seemed to us that the

7   filing should have been postponed until that Lift-stay motion

8   was decided.  We do not think that this case serves our

9   interest, the mezz's interest, the congregation's interest or

10  the union's interest.  It may serve the out of money equity

11  sponsor's interest, but we are very concerned about that and we

12  reserve all rights to take appropriate action with respect to

13  the petition.

14        There is a piece of paper that describes a DIP

15  facility that would effectively take us out at whole.  We have

16  heard about this financing for some time now, came a little bit

17  more in focus with this piece of paper a few weeks ago.  As we

18  understand it, the lender's due diligence is to be completed

19  during the month of August.  And it would be helpful to us to

20  understand, Mr. Nash, where they are in that due diligence

21  process.  We understand it's mostly confirmatory financial due

22  diligence, but if that loan proceeds and the timeline would be

23  to take us out to file a motion for approval of the DIP in

24  September and to take us out upon approval of that DIP.  So,

25  we're cautious and anxious to see how that financing takes place

560 Seventh Avenue Owner Primary - 8/15/23          11

1  and if it is actionable and executable.  So, we're waiting for

2  that to see how that develops.  In the meantime, reserving our

3  rights to take appropriate action with respect to the filing if

4  that financing were not to materialize.  So, for today that's

5  some background and maybe foreshadowing for what is coming up

6  down the pike.  But for today the main interest is protecting

7  the collateral, and we've been able to reach the cash collateral

8  resolution which we think is appropriate and good for the debtor

9  today.

10          THE COURT:  Okay.  Thank you, Mr. Petrick.  And just

11  to explore a little bit further, I realize you've not made a

12  motion to dismiss, and I'm not suggesting that you do, but I

13  would like to understand the facts a little bit better.  It

14  sounds like your view is, the debtor could have continued

15  operating with no adverse consequences outside of bankruptcy.

16          MR. PETRICK:  Yeah, the mezzanine filing obviously was

17  triggered by the UCC foreclosure action, but there was no

18  imminent threat at the hotel level.  The union matter has been

19  resolved but there was nobody threatening as far as we know, to

20  take action adverse to the hotel.  And indeed, since at least

21  April, the hotel has been functioning well with most of the

22  money that's generated by the hotel from rents and food and

23  beverage being sent to a lockbox in our control and then

24  disbursements of those funds to pay the ordinary and necessary

25  expenses of the hotel.  So, it seems to us that everything that

1    needs to be resolved, there is a deal with the union that was

2    obviously reached outside of bankruptcy.  There is the

3    congregation issue that needs to be resolved, and other than

4    some fairly minor mechanics liens, there does not seem to be a

5    lot of other creditors who haven't been paid which would

6    necessitate, which would either cause a threat to the hotel or

7    necessitate the filing.  So, we do believe that this is a very

8    expensive way for the equity holder to retain control.

9    Obviously, I think the flag, Margaritaville, would have

10   preferred not to see this in bankruptcy as well.

11          So, lots of reasons not to file, not a lot of obvious

12   reasons why it had to file or had to file at this juncture.  But

13   as we say, that is an issue reserving our rights that we will

14   bring forward to report depending on how things progress with

15   the DIP lender.

16          THE COURT:  Let me just follow up on that in one

17   respect.  It sounds to me like from your perspective there's no

18   threat, as you said, at the hotel level.  Looking at it from the

19   outside, one might say the only threat that's apparent or

20   potential threat is the fact that the debtor is in default with

21   its secured lender.  But I gather you're essentially telling me

22   that from your perspective at least, that's not a problem

23   because you want to see the hotel succeed, and you're prepared

24   to work with it to that end.

25          MR. PETRICK:  Correct.  Either through a sales process

560 Seventh Avenue Owner Primary - 8/15/23          13

1  outside of bankruptcy or a refinancing outside of bankruptcy.

2  There were other ways, in our view, less expensive of achieving

3  what the debtor was trying to achieve in this case.

4          THE COURT:  Okay.

5          MR. NASH:  If I could just respond, because I think

6  we're missing three big pieces of this.

7          THE COURT:  Yes.  Go ahead, Mr. Nash.

8          MR. NASH:  Yes, a big piece of this is, there's an

9  outstanding judgment that was recently entered for $3.1 million

10  by the management company, which is a live judgment, but for the

11  chapter 11 filing.  There are defaults under the food and

12  beverage lease and there are defaults under the franchise

13  agreement, there is outstanding payables owed to a number of

14  suppliers.  I think the patience of those people would wane

15  unless they saw, and we've had discussions, quite frankly, with

16  Margaritaville on this.  They are happy to see the ability to

17  pursue a DIP loan.  We are limping along.  We could use

18  liquidity infusion, and the DIP loan would give us that.  So,

19  we're holding the fort, so to speak.  But if you look at where

20  we are, there's defaults under the lease, under the franchise.

21  It's a judgment of $3.1 million.  Yes, there's mechanics liens

22  as well.  There's unpaid suppliers.  And so, I do think the

23  hotel, and I said this at the last hearing, needs a full global

24  restructuring.  There is obviously a senior lender and two

25  mezzanine lenders.  I think the senior lender is, quite frankly,

560 Seventh Avenue Owner Primary - 8/15/23                14

1  in the best position.  But there's a lot of pressure on this

2  hotel.  And the decision to file a chapter 11 was not made

3  lightly, but quite frankly, it's been in the works for some time

4  now.  And notwithstanding that, we have made progress with the

5  union, and I think at the end of the day, we'll be able to

6  present evidence that Margaritaville will support us and that

7  the food and beverage people will support us and so forth.  But

8  I don't want to give any false illusions.  There are multiple

9  issues plaguing this hotel that require a chapter 11.

10         THE COURT:  So, Mr. Nash, I appreciate that input.

11 I'm struggling with one aspect of it.  Maybe you can help me

12 understand this a little better.  Looking at the budget attached

13 to the cash collateral motion, it shows fluctuating numbers from

14 month to month.  But generally speaking, something like $300,000

15 of net cashflow available each month on average.

16         MR. NASH:  Right.

17         THE COURT:  And I'm trying to square that with what

18 you've said about amounts of the suppliers and defaults under

19 various agreements.

20         MR. NASH:  No, I think it's about $300,000 a week.  We

21 are projecting anywhere --

22         THE COURT:  Is it a week, not a month?

23         MR. NASH:  Yes.  We're projecting anywhere between

24 $700 to $900,000 per month of excess cashflow immediately.  And

25 we think that cashflow will get better as we go forward.  Having

1   said that, which sounds good, that there's 900,000 of excess

2   cashflow, the baseline on the first mortgage is a 1.7 million.

3   So, there are issues that we have to restructure.  And to Mr.

4   Petrick's point, what the DIP lender is looking at is a lot of

5   the stuff that we're looking at now.  They're looking at income,

6   projections on income, expenses.  They're drilling down on

7   excess cashflow because every lender has to have a firm handle

8   on that.  I'm not apologizing to anybody if it's a million

9   dollars, we like it a little bit more than a million dollars per

10  month, but that gives a sizable payment towards the first

11  lender.

12          THE COURT:  Okay.  All right, thank you, Mr. Nash.  I

13  believe Mr. Masumoto is here.  Did you want to be heard, Mr.

14  Masumoto?

15          MR. MASUMOTO:  Good afternoon, Your Honor.  Brian

16  Masumoto for the Office of United States Trustee.  Your Honor,

17  we had discussions with the debtor regarding the various

18  motions, and I believe we have no issues regarding the joint

19  administration or the wage order.  We did request just prior to

20  the hearing that the combined cash collateral and the cash

21  management order, which is sort of collapsed together, typically

22  done separately.  We asked that a provision that we normally add

23  to the cash management order, indicating that they will have 45

24  days to come into compliance with Section 345 to allow our

25  office to discuss with the debtor the establishment of DIP

1  accounts and the lockbox arrangement.  I also had some

2  discussion with Mr. Nash, regarding the monthly operating

3  report, and how the lockbox would be reported pursuant to that

4  to ensure that all amounts of income generated by the debtor is

5  reflected in the operating reports.  But other than that, I

6  believe we've resolved all of our issues.

7          THE COURT:  I'm trying to understand the upshot of the

8  points you just mentioned.  Is the upshot that these are issues

9  that may that are not yet in the proposed orders that I've seen,

10 but that may get added to them?

11         MR. MASUMOTO:  Yes.  I believe the only additional

12 provision is with respect to the cash collateral/cash management

13 order.  Since it does have a cash management component, which is

14 usually a separate motion, we ask that a provision that we

15 typically add, which is that any bank accounts would be subject

16 to a 45-day extended period, allowing us to make sure that those

17 accounts comply with the Section 345 requirements that they be

18 collateralized.  At this point, I believe the debtor has

19 indicated they haven't really established a DIP account.  I

20 believe that's anticipated that they have existing accounts.

21 They have a lockbox arrangement, a suspense account which will

22 be eliminated and a DIP account will be created.  Until the DIP

23 account has been identified and sort of evaluated to ensure that

24 it complies with Section 345, we ask that there be an extension

25 of period of time to allow the debtor to come into compliance

560 Seventh Avenue Owner Primary - 8/15/23          17

1   with 345.  If at some point the debtor decides that they will

2   seek a waiver of Section 345, that extended period will also

3   allow them to make that determination.

4        THE COURT:  Let's put off going into that issue

5   further until we get to the cash collateral motion and then

6   we'll hear what Mr. Nash has to say about that.  And then

7   obviously you can address it further if you like.

8        MR. MASUMOTO:  All right, thank you.

9        THE COURT:  Okay.  Thank you.  All right.  So, let's

10  move on to the motions.  And Mr. Nash, I believe that the first

11  day declaration that you've filed includes evidence that's

12  relevant to two of the motions.  So, maybe the way to proceed

13  is, why don't you put on any evidence that may bear on any of

14  the three motions first, and then we'll turn to the three

15  motions one by one.

16       MR. NASH:  Yes, Your Honor, Kevin Nash for the debtor.

17  On Zoom with me, I think, is Mr. Pomerantz.  I saw him briefly.

18  There he is.  Mr. Pomerantz is the chief officer of the debtor.

19  He's a financial officer as well.  He submitted a first day

20  declaration, which I would like to move into evidence.  And if

21  Your Honor will allow me, I'd like to make a proffer on behalf

22  of Mr. Pomerance, and I would ask the court to allow me to move

23  that declaration into evidence, and I will make a proffer.  I

24  can tell the court Mr. Pomerantz has worked hand in hand with

25  the lender, and the lender's representative on the budgets.  He

1  is --

2         THE COURT:  Sorry to interrupt.  I don't want you to

3  repeat what's in his declaration.  If you want to offer it into

4  evidence, then, please, let's do that.

5         MR. NASH:  Okay.

6         THE COURT:  If there's anything else you want him to

7  testify to, then you can tell me that as well.

8         MR. NASH:  Yes.  So, I would move, Your Honor, to move

9  Mr. Pomeranz's declaration into evidence.

10         THE COURT:  So, let me ask if anybody objects and also

11  if anybody wishes to question Mr. Pomeranz.  Okay.  I hear no

12  responses, so there are no objections.  And with that, I will

13  accept Mr. Pomeranz's declaration into evidence for purposes of

14  today's hearing.

15         MR. NASH:  Thank you, Your Honor.

16         THE COURT:  And I'm assuming there's no other evidence

17  you want to put into the record before we proceed?

18         MR. NASH:  No, I'm relying on the Pomerantz's

19  declaration, and the terms of the motion and the proposed order

20  in the budget.

21         THE COURT:  All right, so let's proceed.  Let's go by

22  order.  Let's start with the simplest first.  So, the joint

23  administration motion is very plain vanilla and simple.  Mr.

24  Nash, was there anything you wanted to say in that regard?

25         MR. NASH:  No, no, I try to make it as conventional

560 Seventh Avenue Owner Primary - 8/15/23                    19

1   and simple as possible.  And I've circulated to the U.S.

2   Trustee.  I think I filed it online.  I don't think there's any

3   objections to it.  Mr. Masumoto had certain language they want

4   to put in the order, and I think we've incorporated that.

5           THE COURT:  All right.  You're correct.  No objections

6   to that motion have been filed.  Let me ask, though, if anybody

7   wishes to be heard with respect to the joint administration

8   motion.  I'm hearing no response.  The order looks fine to me.

9   So, we will proceed to enter it.

10          MR. NASH:  Thank you, Honor.

11          THE COURT:  All right, next up, the payroll motion.

12          MR. NASH:  Yes, the payroll motion, I think, is a very

13  important motion, Your Honor.  In a large respect, we were very

14  sensitive to the employees.  We obviously want to keep harmony

15  at the hotel.  I try to lay out in the Pomerantz declaration,

16  you know, how the payroll works in terms of the work week when

17  it goes to ADP.  You know, I'm going to say, generically,

18  payroll checks are issued, they're really direct deposits.  But

19  it's, I think, a Monday-Sunday work week.  Monies go to ADP on

20  Tuesday, and payroll is made on Friday.  So, given the fact that

21  we filed on a Saturday, there is an overlap and we did bring on

22  the motion.  Approximately, $100,000 of payroll is covered by

23  the motion.

24          And we do make one clarification, there's certain

25  administrative-type people that are paid under the general

1   administrative budget.  And one of the people is paid by Dream.

2   And Dream is the third party management company, Dream

3   affiliate.  And so, we did include that person in the proposed

4   order.  Her name is Grace Anne Moore.  She makes approximately

5   $1,900 a week.  She is a director of finance type of person.

6   And historically, she, I guess, serves multiple roles in the

7   Dream organization and she's employed by an affiliate and the

8   allocated portion of her compensation is about $1,900 to the

9   debtor.  And so we want to include her in the payroll, not for

10  her prepetition claims or Dream's prepetition claims, but on

11  this, what I call transition payroll between prepetition and

12  post petition.  But the general payroll is fairly consistent.

13  It's covered in the budget under various line items, mainly

14  hotel expenses.  That item includes a good part of the payroll.

15  Some of the payroll is covered under repair and maintenance for

16  those people that do servicing and repair obligations in a

17  hotel.  And the other parts of the payroll are included in

18  general and administrative.

19          So, it's a three headed set of categories that covers

20  the entirety of the payroll.  But obviously, I believe that the

21  payroll is absolutely essential to maintaining the good

22  relations at the hotel.  So, I would ask the court to approve

23  this motion.  Nobody's getting anything more than a priority and

24  mostly it's a small transition claim that we're paying.

25          THE COURT:  Would anybody else like to be heard with

560 Seventh Avenue Owner Primary - 8/15/23          21

1  respect to this motion?

2          MR. MASUMOTO:  Yes, Your Honor.  Brian Masumoto for

3  the Office of the United States Trustee.  Prior to the hearing,

4  Your Honor, I did have some discussions with Mr. Nash to

5  clarify, particularly when the issue came up with the payment to

6  Ms. Grace Ann Moore, whether or not that payment or how it was

7  reflected on the budget that was attached to the cash collateral

8  order.  I inquired as to whether or not the amounts payable to

9  Ms. Moore was included in the management fee to the hotel

10  manager and was advised technically not.  And it was somewhat

11  complicated.  It's actually supposedly included in the

12  administrative and general category line item on the budget.

13  But the debtor, Mr. Nash, confirmed that any payments to Grace

14  Ann Moore was listed on the budget, included on the budget.  My

15  main concern was to make sure that income generated by the

16  debtors would be accounted for either on the budget and to

17  ensure that there weren't any other non debtor entities that

18  were receding such funds.  Again, I did receive assurance that

19  any payments that are generated by the debtors are accounted for

20  by the budget, and accordingly, I have no objection.

21          THE COURT:  Okay.  Thank you.  Would anybody else like

22  to be heard?  Okay.  I hear no responses.  I have a couple of

23  questions of my own, Mr. Nash.

24          MR. NASH:  Sure.

25          THE COURT:  The first is about paragraph three of the

560 Seventh Avenue Owner Primary - 8/15/23          22

1  proposed order.  It refers to paying all withholdings and

2  administrative fees.  What are the administrative fees?

3        MR. NASH:  I think it's generic.  I'm trying to

4  capture anything that an employer has to pay in payroll.  So,

5  maybe we can use the words "pay all withholding related fees and

6  expenses" or "withholding taxes and so forth."  I'm just trying

7  to capture everything on the employer side for a payroll.

8        THE COURT:  So, why don't you clarify that?

9        MR. NASH:  Yes.

10       THE COURT:  I think clarification along those lines is

11 probably useful.

12       MR. NASH:  There's no override on the payroll.  I

13 don't know if there's an ADP fee in there, but I will get a

14 clarification.

15       THE COURT:  Okay.  The only other comment I had

16 relates to the issue whether this is an interim or a final

17 order.  And I think that issue may be a little bit academic here

18 because I think all of the relief you're seeking, assuming I

19 grant the order, is going to happen right away and not await a

20 later order.  On the other hand, I think I'd feel a little more

21 comfortable if we styled this as an interim order.  And then you

22 could add a provision at the end, a standard provision that says

23 something along the following lines:

24       In the event no objections to entry of the proposed

25 final order are timely received, the court may enter the

560 Seventh Avenue Owner Primary - 8/15/23          23

1   proposed final order without need for a final hearing.

2          MR. NASH:  I will do that, Your Honor.  I've seen

3   those provisions.  We are going to pay it immediately, assuming

4   Your Honor enters the interim order.  But I will certainly put

5   that in.

6          THE COURT:  I guess from my standpoint, the one thing

7   that gives me a little bit of comfort is this way if there is a

8   committee appointed, and I suspect that may be unlikely, but one

9   never knows for sure, they'd have a chance to weigh in and if

10  they had any issues, they could raise them.  I realize the money

11  will have gone out the door.

12         MR. NASH:  Yes, that's fine, Judge.

13         THE COURT:  Okay.  So, why don't you submit a new

14  order with clarifying language, maybe run it by Mr. Petrick and

15  Mr. Masumoto first, and at the same time, perhaps, submit a

16  proposed final order and we'll hold that, and then, potentially

17  enter that when the time comes.

18         MR. NASH:  I will do that.

19         THE COURT:  All right.  Mr. Masumoto, I forgot to ask

20  you before we got to the motions, so let me ask you now, can you

21  fill me in on whether there's any possibility of a committee

22  being appointed here, and if so, what the timing would look

23  like?

24         MR. MASUMOTO:  Your Honor, we sent out solicitation

25  letters with our typical form today, and we received email

560 Seventh Avenue Owner Primary - 8/15/23                24

1   addresses to the creditors that were listed on the top 20

2   largest creditors.  We did put August 24th as sort of the

3   deadline to receive any responses.  So, we should by that date

4   have received responses of creditors who are interested in

5   serving on the committee and generally within a day or two of

6   receiving those responses, if there is sufficient interest, we

7   typically will appoint a committee.

8           THE COURT:  Okay.  Let me just look at my calendar.

9   Give me one second.  So, if there is a committee, it sounds like

10  you're saying, in all likelihood, it would be appointed within

11  the next two weeks, if not a little bit sooner.

12          MR. MASUMOTO:  That's correct, Your Honor.

13          THE COURT:  Okay.  That's helpful.  I realize the

14  chances of that happening may be low.  Okay.  So, I think we're

15  done with the payroll motion.  Let's move on to the main event,

16  the cash collateral motion.

17          MR. NASH:  Yes, Your Honor.  It is the main event.

18  And I recognize from the U.S. Trustee's perspective, it is a

19  combined use of cash collateral and cash management.  And the

20  genesis for that is, since day one, there's always been a

21  lockbox in place.  And I just want to spend a little time

22  explaining, as I understand it, the mechanic and where we see

23  that mechanic being utilized in the bankruptcy case.  Prior to

24  bankruptcy, I guess all of the hotel accounts, collections,

25  credit cards and receipts were linked in the first instance to a

1  lockbox, which as I understand was maintained at Wells Fargo.

2  Then I understand, prepetition, once the monies went into

3  lockbox, if not simultaneously, contemporaneously, they went

4  from a lockbox into a suspense account for the debtor's

5  collections.  And then from there, they went out of the suspense

6  account into a hotel operating account for the payment of

7  expenses.  And so, it was a lockbox, suspense, operating account

8  system.  And what we wanted to do as part of the cash collateral

9  is to keep that in place, not rock the boat on any of this

10  stuff.  But we did want to simplify it, and I think it's

11  important how I think we're going to simplify it.

12        THE COURT:  I appreciate this explanation, but let me

13  just ask one question.  I'm new to cash management systems, how

14  they work.  It's not something I've dealt with much in the past.

15  What's the purpose, just as a general matter, for having two

16  separate accounts, a lockbox and separately a suspense account?

17        MR. NASH:  I think that's more on the bank's side.

18  They have, I guess, a collecting account, but I don't know if

19  it's a master collecting account or just for the debtor.  But

20  the disbursement comes out of a suspense account.  They don't

21  keep it there for an indefinite period at all.  I think they

22  keep it there very transitory.  And the main action goes from a

23  suspense account to an operating account.  I just think with

24  their administrative banking system, that's how it was done

25  prepetition or that's how it was explained to me.  Once it was

1    explained to me that way, I said, why don't we -- and I think

2    the bank's in agreement, because these accounts are maintained

3    or administered by Wells Fargo.  So, my thought was keep the

4    lockbox in place and set up a DIP account with Wells Fargo and

5    the monies that come into the lockbox, as the debtor needs them,

6    would go into the DIP account at Wells Fargo.  And I think

7    that's the way we have it set up under the proposed interim cash

8    collateral.  So, it's really a receipt, requisitions are made,

9    proper paperwork is given to the lender, they remit into the DIP

10   account, and the rest of the money, I guess, will be held by the

11   bank in reserve for their debt service payments.  And so, we

12   would fund operations through a conventional DIP account.  And

13   it being at Wells Fargo, it's a matter, I think, of more

14   internal transfers than anything else.

15        THE COURT:  And I gather this arrangement you've

16   worked out with the consent of your lender and also Mr. Masumoto

17   in his office.

18        MR. NASH:  Yes, we spent a fair bit of time on it.  I

19   wrote it up one way, the bank expanded upon the way I conceived

20   it and spoke about it.  And a lot of the terminology in that

21   cash collateral order and the terminology in the motion is a

22   unified way between the debtor and the bank of presenting how

23   this is going to be done.  And it ensures complete visibility,

24   proper accounting, and we don't have to reinvent how these

25   collections are made.  It's all electronic payments at this

560 Seventh Avenue Owner Primary - 8/15/23                27

1  point, or substantially all electronic payments.  It's just an

2  easier way of keeping status quo, keeping that lockbox in place.

3        THE COURT:  And just to eliminate any suspense here, I

4  had no issues with the arrangements described in your papers.

5  And particularly given that both your lender and the U.S.

6  Trustees office are fine with it, then I'm not going to raise

7  issues about that.

8        MR. NASH:  I appreciate that, judge.  Just so the

9  court knows, we did think about it.  We tried to do it in a way

10  that promoted an easy transition and gave accountings and dealt

11  with the U.S. Trustee guidelines and their requirements as well.

12  So, we try to be fair that are processed from all angles.

13        MR. MASUMOTO:  Your Honor, if I may?  Brian Matsumoto

14  for the Office of the United States Trustee.  As I believe I

15  stated earlier, I did have discussions with Mr. Nash regarding

16  the lockbox arrangement and did receive a commitment that the

17  Lockbox arrangement would be reflected on the monthly operating

18  reports, so that all income of the debtor is captured and

19  accounted for through those reports that will be available to

20  our office and to the public.

21        THE COURT:  Mr. Nash?

22        MR. NASH:  Yes.  I was very attuned to the need to do

23  that.  Obviously, the biggest payment of the month is going to

24  be a lockbox payment to the lender, and that has to be captured

25  in the operating report for both reporting and quarterly fee

560 Seventh Avenue Owner Primary - 8/15/23                    28

1   purposes.  Plus, the U.S. Trustee wants to know at all times,

2   where the money is, where it sits, and how it's spent, so we are

3   going to do that report.

4         THE COURT:  Okay.  I don't want to disrupt the flow of

5   your presentation, but either now or at some point, do you want

6   to address the point Mr. Masumoto made earlier about the

7   creation of the DIP account, which is, I guess, in process right

8   now?

9         MR. NASH:  Right.  The thought is to use Wells Fargo,

10  which administers the lockbox, as the DIP lender, and we will

11  prepare and file all the necessary paperwork.  We just think

12  that's the easiest way to go.  They're already involved in the

13  administration of the funds, and so we'll turn our attention

14  full throttle right after this hearing to do the paperwork to

15  open DIP account.  And I don't anticipate that will be too

16  controversial.  I think Wells Fargo is a depository, recognized

17  depository, and it certainly would ease the transition and the

18  flow of funds from one Wells Fargo account, so to speak, to

19  another.

20        THE COURT:  Well, I guess when Mr. Masumoto was

21  addressing that point earlier, it sounded to me like he might be

22  asking for the addition of some further language in the cash

23  collateral order.  I don't know if that's something you're

24  working on, or alternatively, if Mr. Masumoto might be satisfied

25  with the representations you're making at today's hearing.

560 Seventh Avenue Owner Primary - 8/15/23                    29

1          MR. MASUMOTO:  Your Honor, Brian Masumoto for the

2     Office of the United States Trustee.  I provided Mr. Nash with

3     the typical language that's included in most cash management

4     orders, providing for a period of time, typically 45 days, in

5     order for the debtor to come into compliance, so that we can

6     review the DIP account, which is, as far as we know, currently

7     has not been established.  But once established, we will have

8     the opportunity to verify that it meets the authorized

9     depository requirements and so forth.  I believe Mr. Nash has

10    seen similar language, and I'm assuming that that won't be an

11    issue to include in the cash management portion of the order.

12         MR. NASH:  Your Honor, just briefly, it's not.  I'm

13    aware of the language, I euphemistically call it 345 language,

14    and we will certainly put it in, and I do think Wells Fargo will

15    be able to meet those requirements.

16         THE COURT:  Okay.  And just, just to talk about

17    logistics for one second, I want to hear you and anybody else

18    who wants to be heard on this motion.  After that, I do have a

19    number of concerns of my own about specific provisions of the

20    proposed order.  So, we're going to spend some time walking

21    through those.  And the upshot is going to be that I'm going to

22    ask you to submit a revised order that addresses the various

23    points.  And I'm hoping that you'll work out any revised

24    language with Mr. Petrick and Mr. Masumoto.  So, when you're

25    doing that, then I trust you will also add a paragraph

560 Seventh Avenue Owner Primary - 8/15/23                30

1  addressing the issue that Mr. Masumoto was just raising.

2          MR. NASH:  Yes, we will do that, Your Honor.

3          THE COURT:  Okay.  All right.  I think I interrupted

4  you.  Was there more you wanted to address?

5          MR. NASH:  No, Your Honor, I think it's a good segue

6  into fielding the court's comments.  As Your Honor is aware,

7  cash collateral orders, I said tongue in cheek, try not to send

8  over too draconian a provision for me, and we try to work

9  through it to neutralize certain terms. I did do in my motion, I

10  think we went over the local rule disclosures on cash

11  collateral, and I did try to make sure that there are a

12  challenge period for outside creditors.  And I try to balance

13  the hotel's need for cash, the lender's first priority position,

14  and as much as I could get out of the lender on this.

15          THE COURT:  Okay.  All right, let me hear next from

16  Mr. Petrick.  Mr. Petrick, if there's anything you'd like to

17  add?

18          MR. PETRICK:  Thank you, Your Honor.  I don't have

19  anything substantive to add.  We've been engaged in the process

20  with Mr. Nash now for some weeks of reaching a consensual order.

21  So, it reflects our agreement.  Obviously, we will work with him

22  as well to reflect whatever changes come out from this

23  afternoon, including Your Honor's comments.

24          THE COURT:  I guess while I have you, let me ask you

25  one preliminary question, because it relates to a few of the

560 Seventh Avenue Owner Primary - 8/15/23                31

1  provisions that I'm going to be looking at with all of you.  Is

2  it your position that you're over secured?  I know it's the

3  debtor's position.  Do you agree with that?

4      MR. PETRICK:  As far as we can tell, Your Honor, we

5  are we have not had a full valuation.  We have seen desktop

6  appraisals that suggest we are over secured, and we believe that

7  that is the case.  The extent to which we may be over secured, I

8  am not certain of that.  There is not sufficient cashflow to

9  service the debt as it exists, but our belief is that we are

10 over secured.  My colleague Ingrid Bagby is on the phone.  I

11 don't know, Ingrid, if you have anything to add to that.

12     MS. BAGBY:  Good afternoon, Your Honor.  Ingrid Bagby

13 from Cadwalader, for OWS CRE Funding I LLC.  And I just want to

14 echo my partner Greg Petrick's comments with respect to your

15 question about whether the lender is over secured.

16     THE COURT:  Okay.  Good to see you.  I guess I have

17 one question for whichever of the two of you wants to answer.

18 So, I'm sure I'm missing something, but Mr. Petrick just said

19 there's not sufficient cashflow to service the debt.  Maybe I'm

20 misreading the budget because I thought the cash collateral

21 order proposes to pay debt service going forward, and it shows

22 something like $300,000 a week of net cashflow remaining after

23 the debt has been serviced.  So, what am missing?

24     MR. PETRICK:  I will ask Ms. Bagby to jump in, but the

25 hotel is performing better now than it had been.  Occupancy is

560 Seventh Avenue Owner Primary - 8/15/23                  32

1   up.  However, since this loan has closed, the cashflow from the

2   building, there's only been sufficient cashflow or cashflow

3   above and beyond the operating needs for payment towards debt

4   service a few times.  So, we have that budget.  I think it sort

5   of reflects the summer season and some improvement in the

6   operation of the hotel, but I don't think we're prepared to say

7   today that that's a steady state condition of the property.

8          THE COURT:  So, is it fair to say that I'm not

9   misreading the budget?  The budget does show that for the next

10  13 weeks, there's more than enough cash to pay debt service, but

11  it's cyclical or seasonal.

12         MR. PETRICK:  Yes.  Yes.

13         THE COURT:  And we're in the best season right now.

14         MR. PETRICK:  I think that that's an accurate summary,

15  Your Honor.  And how that transpires for the rest of the season

16  and into slower parts of the year remains to be seen.

17         THE COURT:  Understood.

18         MR. NASH:  Your Honor, can I just make one

19  clarification?

20         THE COURT:  Sure.

21         MR. NASH:  The bottom line, as they say, the category

22  is net cashflow for debt service.  Maybe it's not as artful as

23  it needs to be, but that's what we have available for debt

24  service.  It's not after we make debt net, it's not a net profit

25  type of thing, it's net cashflow for debt service.  And we're

560 Seventh Avenue Owner Primary - 8/15/23                33

1   projecting around $900,000 on the next debt service payment

2   date, which would be the September 8th and 9th.  So, I don't want

3   to mislead anybody, it's for debt service.  It's not after we

4   make debt service.  It's not net overall profits.  I wish we did

5   have that, to be honest with you.

6        THE COURT:  Okay.  All right.  So, thank you for

7   clarifying, because I guess I was misreading the budget then.

8   But just to put it in perspective for me, so call it 300,000 a

9   week of net cashflow for debt service, do the debt service

10  obligations exceed that amount?

11       MR. NASH:  Yes.  At the base contract rate, it's a 1.7

12  million.  At the default rate, it's a much higher number.

13       THE COURT:  So, it's 1.7 what?

14       MR. NASH:  Million.

15       THE COURT:  I know, but annually?

16       MR. NASH:  No, monthly.

17       THE COURT:  Oh, monthly.  Okay.  Ah!  Okay.  All

18  right.  So, in other words, even now, at the best season,

19  there's significant cash flow.

20       MR. NASH:  From the regular debt service from the

21  regular contract rate payment.

22       THE COURT:  That's what I'm and if default rate were

23  used, it would be even greater.

24       MR. NASH:  Even greater.  But on that point, we did

25  make a full $1.7 million payment to the lender last week.  I

560 Seventh Avenue Owner Primary - 8/15/23          34

1  think it was August 8th or 9th, and I reviewed the papers again,

2  and I think there were some protective advances made to the

3  lender as well.  So, as we sit here today, I think the fall to

4  the lender is being managed, and they will be getting monies

5  under this budget.

6           THE COURT:  Okay.  All right.  So, I appreciate this

7  clarification.  And frankly, to turn back to the question of

8  whether this debtor is properly in bankruptcy, it's a whole lot

9  easier to see that a bankruptcy filing is proper once one

10 understands what you've just educated me about.  Right?  Because

11 basically, you're telling me this hotel is not able to meet its

12 obligations as they come due in the ordinary course.

13          MR. NASH:  They certainly are not.

14          THE COURT:  All right.  Okay.  Thank you.  I know that

15 was not, strictly speaking, on the table for today, but I always

16 like to get a broader context, and so I appreciate your helping

17 educate me in that regard.  Okay.  Let's turn to the proposed

18 order.  Let me grab my copy, and please do the same at your end.

19 And I want to walk through it page by page.

20          MR. NASH:  Sure.

21          THE COURT:  I want to walk through it page by page,

22 and some points are little knits and others are much more

23 substantive, but I still think the simplest way to do it is just

24 go page by page.

25          So, page 2, first paragraph, sixth line.  After it

560 Seventh Avenue Owner Primary - 8/15/23          35

1    says, approval of the requested relief, please add, comma as

2    modified herein, comma.

3          My next comment is not till page 7, paragraph G.  So,

4    this is a much more substantive comment.  I think this paragraph

5    should come out, and there are similar paragraphs on page 27

6    that should also come out.  And let me just be very clear about

7    my thinking here, and I think this won't surprise you.  Like

8    many other judges, certainly in this court, I don't think it's

9    appropriate at an interim order stage on a cash collateral

10   motion to approve waivers of 506(c) or 522(b) or waivers of

11   marshalling.  I am not ruling those out at the final order

12   stage, but I think those should be deferred, and you can put

13   them in the order, and I will consider them at the final order

14   stage.

15         So, just to jump ahead to page 27, the conforming

16   change there, is to delete paragraphs 13, 14 and 15.  Those are

17   the three corresponding paragraphs.  And by the way, let me make

18   one logistical note.  At certain points in the order, there are

19   references to other numbered paragraphs of the order.  And just

20   please be careful, after you've made the very substantive

21   changes to do a careful search for those sort of cross

22   references and fix the paragraph numbers are going to change.

23         MR. NASH:  We will do that, Your Honor.

24         THE COURT:  Okay.  My next comment is on page 9.

25   First, a couple of small comments.  In paragraph 1, where it

560 Seventh Avenue Owner Primary - 8/15/23                    36

1   says, the motion is granted on an interim basis.  Then it says,

2   as set forth herein.  Please change that to, the extent set

3   forth herein, given that there's certain modifications that

4   we're talking about.  And then, similarly, in paragraph 2, at

5   the end of the first sentence, after overruled on the merits,

6   please add except to the extent set forth herein.

7             Okay.  Moving on.  I have a problem with paragraph 3,

8   and this is a conceptual point.  Let's talk through the

9   substance of it, and then I'll let you work out language.  I

10  have a problem with the very end of paragraph 3 where it says

11  that, the debtor's authorization to use cash collateral will

12  automatically end 15 days after the petition date.  That's very

13  soon.  That's going to be before any final hearing.  To me,

14  that, frankly, just looks like a mistake.  Certainly, I don't

15  think it's appropriate.

16            MR. NASH:  I will say it is a mistake.  I think we

17  were, in our minds, looking that this is an interim, with the 15

18  days being the statutory notice in terms of that.  Maybe it

19  should be 15 days after entry of this order.

20            THE COURT:  So, I'm happy to talk about when the final

21  hearing will be.  I guess we'll be getting to that later on.

22            MR. NASH:  Right.

23            THE COURT:  I mean, first off, under Bankruptcy Rule

24  6003, I think I'm required to make that no less than 21 days

25  after the petition date.  And then I want to go back to my

1  calendar and think about a proper date.  In light of what Mr.

2  Masumoto told us, let's say a committee is appointed at the you

3  know, let's say it doesn't happen till Monday, the 28th of

4  August.  I'm giving a little bit of a day or two of possible

5  slippage of time.  If that were the case, I think -- I mean tell

6  me if this creates problems, but I would think it's proper to

7  give the committee -- they're going to have to hire counsel.

8  Counsel will have to get up to speed about this case generally

9  and then dig into this specific motion.  So, I think we need to

10 give them a week before the final hearing.  So, I think that

11 would we'd be looking at a final hearing on -- you know,

12 generally, I like to do hearings on Tuesdays and Thursdays of

13 each week, although I'll make exceptions to that when it's

14 needed.  But if we look at Tuesdays and Thursdays, I think we'd

15 be looking at September 5th or 7th for a final hearing.  Does

16 that create problems?  And I'm asking this both to you and to

17 the lender's counsel.

18        MS. BAGBY:  Your Honor, may I be heard?  It's Ingrid

19 Bagby from Cadwalader, for OWS CRE Funding.  I certainly,

20 appreciate Your Honor's comment with respect to the 15 days.  I

21 think the one issue I'd like to raise with respect to going past

22 Your Honor's decision on or potentially, past Your Honor's

23 decision on the lift-stay motion is, I think, we, certainly, one

24 of the drivers behind having a relatively short period of cash

25 collateral use under this order, is having the ability to

560 Seventh Avenue Owner Primary - 8/15/23                    38

1   understand what happens at that lift-stay hearing because we

2   certainly want to be in a position to re-evaluate cash

3   collateral use depending on who may be ultimately the owner of

4   the equity in the hotel.

5         THE COURT:  And I'm just trying to recall the date.

6   The lift-stay hearing, is it set for August 31st?

7         MR. NASH:  Yes, it is, Your Honor.

8         THE COURT:  Okay.  So, Ms. Bagby, am I understanding

9   you correctly?  You're saying imagine, hypothetically, that I

10  grant the lift-stay motion, and I do that either on the 31st or

11  on September 1st, you might want to terminate cash collateral

12  right away.  Is that basically what you're saying?

13        MS. BAGBY:  Well, what I would say is we may want to

14  re-evaluate the circumstances under which cash collateral would

15  be used by a debtor that may or may not have a continuing

16  interest in managing the property, depending on who's running

17  the debtor at that moment.

18        THE COURT:  No, it's a fair point, but just to make it

19  concrete, you're basically saying, you might want, at that

20  point, to terminate it.

21        MS. BAGBY:  Well, I don't think it's limited to

22  termination, Your Honor.  I think there can be other remedies

23  put in place, depending on the court's decision.  You know, I

24  don't want to presuppose, but if we have a scenario where the

25  stay is lifted, I think we, as the lender, want to make sure

560 Seventh Avenue Owner Primary - 8/15/23                    39

1   that there are sufficient protections in place while there's a

2   transition, if you will.  And I imagine that may take some time,

3   but there's a transition in terms of who is running the hotel.

4   It seems to me that it would be a situation that calls for

5   perhaps more elaborate protections or different types of

6   protections, if you will, than are contemplated under this order

7   or under a typical cash collateral order.

8          THE COURT:  I'm with you on I think this is a very

9   legitimate point.  I'm just trying to think about how to

10  implement.  So, right now we have a date for the lift-stay

11  hearing.  I'm not anticipating it will change, although one

12  never knows.  Sometimes things change unexpectedly.  What would

13  you propose to implement the concern you just expressed?

14         MS. BAGBY:  Well, Your Honor, as you noted, we were

15  proposing a relatively short period.  I hear Your Honor's

16  concerns with respect to the 15 days.  If Your Honor anticipates

17  having a decision, if not on the 31st, on the 1st, if we can have

18  the date be just after that, or the ability for the lender to

19  come in and ask for essentially what's like a bridge order or

20  something to address the concern about, as I said, the ability

21  to use cash when the whole fact set may have changed.

22         THE COURT:  So, all of that makes sense to me.  The

23  funny thing is, the date I was proposing, at least one of them,

24  is very shortly after the first.

25         MS. BAGBY:  I'm looking at my calendar now, Your

560 Seventh Avenue Owner Primary - 8/15/23                40

1  Honor, and I do appreciate that.  August and September seemed

2  very far apart when you first said the dates.

3          THE COURT:  Okay.  So, let's just say, tentatively,

4  suppose I were to fit you all in for a final hearing on

5  September 5th.  Now, I don't want to destroy your Labor Day

6  weekend, and so, if you all want to push that back, I would

7  listen.  But let's just say, hypothetically, September 5th.

8  Then, I guess, I want you to think about, is that good enough,

9  or do you want to propose something a little more complicated to

10  deal with the issue you were just raising?

11          MS. BAGBY:  Your Honor, if we go with September 5th,

12  perhaps we can add, like I said, a sentence providing a

13  provision.  Very simply providing for the lender's ability to

14  seek relief sooner or modifications of the order sooner,

15  depending on whatever ruling Your Honor issues on the lift stay.

16          THE COURT:  That makes sense to me, although we're

17  getting sort of crazy quick, given that basically you'd be

18  asking me to hold a hearing on the Saturday of Labor Day

19  weekend.

20          MS. BAGBY:  Yes, I appreciate that, Your Honor, and I

21  think we're in a little bit of uncharted waters here, given the

22  fact set, but I'd like to have the ability, depending on what we

23  see going into the hearing as well, to at least bring to Your

24  Honor's attention that there might need to be alternate

25  mechanisms built into cash collateral use.

1    THE COURT:  I think that's appropriate.  And if Mr.

2    Nash wants to be heard to object, that's fine.  But if not, my

3    suggestion is going to be why don't the two of you work out

4    language along the lines of what you've suggested?

5        MR. NASH:  I will attempt to do that, Your Honor.  I

6    just know from a practical point of view, and I did discuss this

7    with the lender's counsel, even if the stay is lifted, there

8    still has to be a re-noticing of an auction sale.  And I did

9    mention to lender's counsel that there is some statutory

10   authority in Delaware that a pledge and an assignment confers

11   economic entitlements as opposed to full management

12   entitlements.  So, we'll build in all that.  I understand the

13   lender's concerns.  I'm sure we can come to a date.  I don't see

14   anything happening instantaneously, and I think everybody's

15   interest is, no matter what happens, to maintain the operations

16   at the hotel.

17       MS. BAGBY:  Your Honor, I don't want to belabor the

18   point, but I will just say, if we are in a world where the stay

19   has been lifted, I certainly appreciate Mr. Nash's point that

20   maybe the transition will not be immediate.  But that isn't

21   essentially the situation where we may need additional

22   protection because things may be uncertain as to who has what

23   economic incentive and who's running the hotel.  So, hopefully

24   we never get to that argument, we can agree on what happens, but

25   I just wanted to flag that.

1    THE COURT:  I think that's a fair point.  Yeah.  I

2  mean, frankly, if parties find themselves in a situation where

3  the debtors know they're being ousted, but they haven't yet been

4  ousted, that, frankly, could give rise to issues.

5    MR. NASH:  And we'll address that, judge.  That's not

6  where I'm heading.  And so, we'll give everybody comfort and try

7  to come up with an appropriate date.

8    THE COURT:  Okay.  All right, so the ball is in your

9  collective court on how to deal (b) portion, the last line of

10  paragraph 3.

11    Okay.  Moving on.  My next comment is on page 14,

12  paragraph 5, near the top of the page.  Specifically, the third

13  line, and then again, on the fifth line, it refers to three (3)

14  days.  And I think in both cases, it should be changed to three

15  (3) business days.  Just to give you sort of an example that

16  makes clear why that needs to be the case, imagine there's a

17  three-day holiday, a three-day weekend.  Any problems with that

18  change?

19    MS. BAGBY:  No, Your Honor.

20    THE COURT:  Okay.  Okay.  Now we come to one of my

21  most substantive points.  And this comes up on page 15, and also

22  page 20, and also page 25.  And it relates to the power that the

23  lender is given under this order as currently drafted to

24  terminate cash collateral use if the debtor seeks entry of a DIP

25  order.  And right now, that's drafted in unqualified fashion.  I

560 Seventh Avenue Owner Primary - 8/15/23                43

1   think that's too sweeping.  For example -- one second.  Yeah, I

2   don't think it's appropriate in any circumstance to restrict the

3   debtor's ability to enter into a non-priming DIP.  I appreciate

4   that the lender would have greater concerns if there's a priming

5   DIP that's proposed.  But I don't see that it's legit to bar a

6   non priming debt.  In addition, in this case, it appears to be

7   the case.  I know nobody knows for sure and you haven't yet done

8   a full appraisal, but certainly everybody appears to believe

9   that the lender is over secured.  And if that's the case, then

10  even a priming DIP shouldn't be a problem or shouldn't be

11  something that the lender has the power to block.  And so, I'm

12  inclined to ask that this provision on paragraph on page 15 and

13  then also, when it reappears on pages 20 and 25 be modified to

14  take those points into account.  I'm happy to hear from both Mr.

15  Nash and either Ms. Bagby or Mr. Petrick on that point, if you

16  want to be heard.

17          MS. BAGBY:  Your Honor, I understand your point with

18  respect to the non priming DIP.  I think with respect to a

19  priming DIP, we are in a unique situation here in a sense.

20  First, as Your Honor noted, we don't actually know the extent of

21  the over collateralization in this situation.  And second, we

22  are in a situation where the debtor has already proffered an

23  alleged term sheet.  And so, the debtor has stated their

24  intention to obtain a DIP that takes out the lender.  And we

25  don't want to be in a scenario where we're being told that we're

560 Seventh Avenue Owner Primary - 8/15/23                44

1  being taken out, but we're not actually being taken out,

2  obviously.  As Mr. Petrick foreshadowed, we are concerned about

3  why we're even here, although I understand the dialogue that the

4  court has had with Mr. Nash, but having a chapter 11 case where

5  we are now dealing with a priming DIP that's not even addressing

6  our debt seems like a big load to bear.

7           THE COURT:  Okay.  Mr. Nash, did you want to --

8           MR. NASH:  Yes.  Yes.  If I could just give you my

9  thought process, because we did discuss this provision.  My

10  thought process was both practical and -- in an effort to give

11  the debtor flexibility in this scenario.  From a practical point

12  of view, from my discussions with the debtor, and I've spoken to

13  at least two lenders, I didn't see a priming DIP for anything

14  other than to take out the first lender and to give added

15  liquidity.  I didn't see any real appetite for lenders to do

16  anything that was a priming type of situation, and I didn't see

17  any real benefit to the estate of doing that because we did have

18  positive cashflow, and we are looking for liquidity to deal with

19  other obligations at a hotel towards a plenary organization.  I

20  did carve back for myself and for the estate that if the DIP

21  loan took care of the first lender, that was a permitted type of

22  borrowing.  So, I balanced that.  That's my goal is to refinance

23  the existing first.  I didn't see a market for a smaller DIP

24  facility.  Even if I got it, I don't know what I would do with

25  it because I have a senior loan that I owe $164,000,000, and

560 Seventh Avenue Owner Primary - 8/15/23                45

1   they probably would have first call on those monies, and they

2   wouldn't let me do much with it, and I didn't see any great

3   benefit on doing anything other than a senior loan that took out

4   the first or a DIP loan that took out the senior.  So, that was

5   my mindset when we went over this provision.  And from my point

6   of view, as long as I have the ability to take out the senior

7   lender in its entirety under a DIP loan and that doesn't cause

8   any problems, I was satisfied with that.  I appreciate what Your

9   Honor is saying, to give me even more flexibility, but that was

10  my mindset.  I didn't give away the store per se, I tried to

11  balance the interest from a practical point of view because I

12  didn't see me getting a DIP loan other than to take out the

13  first and have added liquidity.

14          THE COURT:  Okay.  All right.  I think what I'm going

15  to do is I'm going to ask that this be modified to permit a non-

16  priming DIP, but only modified to that extent.  And just to be

17  clear, in addition to page 15, it comes up again on page 20 in

18  paragraph 9(a), and then it comes up again on page 25 in

19  paragraph 11.  Okay.  When you're ready, let's move on.  Oh, I

20  was waiting for you, Mr. Nash.

21          MR. NASH:  I'm sorry.  Yes, I'm ready.  I made those

22  notes.

23          THE COURT:  Yeah, no worries.  Okay.  Page 16 at the

24  very bottom of the page, last couple of lines.  This relates to

25  adequate protection, replacement liens, and whether they cover

560 Seventh Avenue Owner Primary - 8/15/23                46

1  avoidance actions, or the proceeds of avoidance actions.  At the

2  interim order stage, these need to be carved out.  That is,

3  right now, it needs to say the opposite of what it now says.  It

4  now says, they can cover avoidance action proceeds.  It needs to

5  say they cannot cover, at this stage, avoidance actions or the

6  proceeds thereof.  I am not ruling that out for consideration at

7  a final hearing.  And I don't think it'll surprise you, it's

8  pretty standard to not allow that at the interim order stage.

9       MS. BAGBY:  Understood, Your Honor.

10      THE COURT:  Okay.  If you have that, the next comment

11 is at page 18.  This is one of my more substantive and slightly

12 more complicated points.  Ms. Bagby or Mr. Nash, either of you,

13 tell me if I have this wrong, but the way I'm reading the

14 provision in paragraph little four on page 18 is that, if

15 there's a failure to make adequate protection, monthly adequate

16 protection payments to cover non-default interest, the unpaid

17 amount gets picked and added to the amount of unpaid principal.

18 And I'm assuming that as a result of that, interest would be

19 charged from then on, on that increased principal amount.

20      MS. BAGBY:  That's correct.  That's my understanding,

21 Your Honor.  And that's also consistent with the loan agreement.

22      THE COURT:  Okay.  The problem I have with it is that

23 for all we know, we don't know what your client's position is

24 going to be at the end of the case.  It's conceivable at that

25 point, although maybe not at all likely, but conceivable that at

560 Seventh Avenue Owner Primary - 8/15/23          47

1   that point you're under secured, it's conceivable there's been a

2   challenge to the validity of your claim or your liens, and maybe

3   that has succeeded.  And if that were to happen, then I need to

4   have the authority -- I can't have my hands tied by this order.

5   I need to have the authority in that circumstance to

6   recharacterize or recalculate the amount of your allowed secured

7   claim.  Did that make sense?

8        MS. BAGBY:  Your Honor, it makes sense to me.  Mr.

9   Nash, I don't know if you wanted to speak.  I do understand Your

10  Honor's concern.  I think we can address it by adding some

11  language reserving for the possibility that the court may need

12  to, as you said, revisit the recharacterization of the post

13  petition interest as an obligation.

14       THE COURT:  That would be the idea.  That I'm not

15  barring you from doing this, but I just want it to be clear that

16  nothing in this order, it's all without prejudice to the power

17  of the court in appropriate circumstances to recharacterize it

18  at the end of the case.

19       MS. BAGBY:  Understood, Your Honor.  We can make that

20  change.

21       THE COURT:  Okay.  Mr. Nash, any comments?

22       MR. NASH:  No, that's fair.  I appreciate that, Your

23  Honor.  I would just say, it's probably recharacterized or

24  reallocated, but I think the point is well taken.  I do think

25  they are over secured, but if there is a challenge period, then

560 Seventh Avenue Owner Primary - 8/15/23                48

1  obviously, their entitlements change with that.  So, I'm sure

2  the lender and I can work out some reservation of rights on

3  that.

4           THE COURT:  Okay.  Yeah, and I'm in no way wedded to

5  the word "recharacterized."  That was my shorthand.  Okay.

6  Actually, I see I jumped over a smaller point on page 16.  So,

7  when you're ready, let's go back to page 16.

8           MR. NASH:  I'm there.

9           THE COURT:  Okay.  This point comes up in two places.

10  Sorry, hang on.  So, actually, you know what, this is not a new

11  substantive point, but this is just one further detail

12  concerning implementing the point I made a few minutes ago about

13  avoidance claims and the proceeds of avoidance claims.

14          MR. NASH:  Right.  So, that needs to be built into the

15  end of paragraph little two.  It also needs to be added at the

16  end of paragraph little one.  One way of doing it -- you know,

17  I'll leave it to you to implement the drafting.  But one way of

18  doing it would be in the last line and a half of paragraph

19  little one, that starts, provided, however, you could say,

20  provided, however, that the replacement liens, (x) shall only be

21  blah blah blah.  And then at the end of the sentence, and (y)

22  shall not apply to avoidance actions or the proceeds thereof.

23  However you want to do it, I just want to make sure you address

24  the point in that paragraph as well.

25          MR. NASH:  I think that's very good language.  I think

560 Seventh Avenue Owner Primary - 8/15/23                    49

1   that covers it.

2          THE COURT:  Okay.  I have one other language knit.

3   Now, we're back to page 18.  This is a typo, but the sort of

4   typo that can create problems. You see at the top of the page on

5   the second line you have a little A?  Shall be entitled to 'A'

6   blah blah blah.

7          MR. NASH:  Right.

8          THE COURT:  And then six lines or seven lines up from

9   the bottom, you have a little two, right before the additional

10  benefits set forth.

11         MR. NASH:  Right.

12         THE COURT:  And I'm sure that should be a 'B', not a

13  two, because I'm pretty sure that's meant to correspond to the

14  little A.

15         MS. BAGBY:  We will look at it carefully, Your Honor,

16  but I believe you are correct, and we appreciate the

17  clarification.

18         THE COURT:  Okay.  Yeah, I mean, that's the sort of

19  error that can screw people up when they're trying to read and

20  understand the order.  Okay.  My next comment is more

21  substantive, and this relates to the very bottom of page 18,

22  carrying over to the top of 19, the definition of available

23  cash.  Here's the problem I have.  I think you need to add a

24  cushion.  Because the way it works, as currently drafted, is

25  every -- is it month or week?  There's a periodic sweep.

560 Seventh Avenue Owner Primary - 8/15/23          50

1   Basically every available dollar gets swept out and that happens

2   both in good months as well as bad.  But every debtor has ups

3   and downs, every business has ups and downs, and there may be

4   weeks or months where there are shortfalls.  And the way this is

5   drafted, it doesn't allow a cushion for the debtor to cover

6   shortfalls of that sort.  So, I think you need to build in a

7   cushion and I think the two of you need to negotiate what the

8   amount of that cushion should be.

9        MS. BAGBY:  Your Honor, maybe -- oh, I'm sorry, Mr.

10   Nash.

11        MR. NASH:  I understand the point, and I'm sure we'll

12   work that out.  We did spend a good bit of time on how we define

13   excess cashflow, available cash, the mechanic of how it's going

14   to work.  There's a variance on expenses as we go in there, and

15   it's budgeted expenses.  So, if the revenues aren't what we

16   budgeted, but the expenses are consistent, it's just less

17   available cash.  But we will build in a cushion.  Maybe if we

18   see a need in the following months for a little bit more cash,

19   then we'll build something in.

20        MS. BAGBY:  If I can propose something, Your Honor?

21   Again, Ingrid Bagby from Cadwalader.  Perhaps since we can't

22   foresee what any particular month will be.  And it's certainly

23   the lender's desire that the hotel always have sufficient funds

24   to cover operations.  Perhaps we can build in a good faith

25   conference.  If, as Mr. Nash said, the debtor foresees that

560 Seventh Avenue Owner Primary - 8/15/23                51

1  there's an upcoming month where they're forecasting insufficient

2  cash, we agree to confer in good faith with them.

3       THE COURT:  Here's a suggestion.  What if you did a

4  hybrid that had a cushion and also had a conference mechanism?

5  Because of the conference mechanism, the cushion wouldn't have

6  to be as big as if there wasn't a conference mechanism.

7       MS. BAGBY:  Understood, Your Honor.  That's something

8  we can certainly talk to Mr. Nash about.

9       THE COURT:  All right.  Moving on.  Give me one second

10 to check my notes.  Yeah.  Okay.  Page 19, paragraph 7, little

11 one, the carve out for professional fees.  Two points.  The

12 first is, right now, it says the carve out will be acceptable to

13 the lender in its sole discretion.  It really needs to be

14 acceptable to me as well.  So, I think you could say the lender

15 in its discretion and to the court.  And then second, in order

16 for me to evaluate the adequacy of the carve out, I think I need

17 you to file a final budget in a reasonable amount of time before

18 the final hearing.  And when I say final, what I'm thinking of

19 is the budget that's been filed is quite non-final in the sense

20 that it doesn't include professional fees.  So, I assume you're

21 building in professional fees, and future budgets will include

22 those.  And I think you should add a provision that ensures that

23 a complete budget -- and maybe complete is a better word than

24 final.  A budget that includes fees gets filed in a reasonable

25 amount of time before the final hearing.

560 Seventh Avenue Owner Primary - 8/15/23                52

1          MR. NASH:  Yes.  We will do that, judge.  We've had

2    discussions on it, and we will certainly do that.

3          THE COURT:  All right.  Give me one second.

4          MR. MASUMOTO:  Excuse me, Your Honor.  Brian Masumoto

5    for the Office of the United States Trustee.  I did discuss with

6    Mr. Nash with respect to the carve out that the carve out

7    doesn't provide what we frequently refer to as burial expenses

8    should the case convert to a chapter 7.  And I believe Mr. Nash

9    said, he was bringing that up with the lender.  I know that

10   there's discussion as to whether or not the lender is over

11   secured, which in some cases lenders argue, therefore, no burial

12   expense is necessary.  But I take the position that if they are

13   over secured, any amounts included in a burial expense should

14   not be an issue.

15         THE COURT:  Let me hear from Mr. Nash and Ms. Bagby on

16   that.

17         MR. NASH:  Your Honor, I think it's fairly

18   conventional to have a burial expense provision in there, and I

19   would be very surprised if the lender has great objection to

20   that.

21         MS. BAGBY:  Your Honor, we understand that as part of

22   any final order that's going to be part of the process.

23         THE COURT:  But I think what Mr. Masumoto is proposing

24   is that, in this order, you provide that it will be in the final

25   order.

560 Seventh Avenue Owner Primary - 8/15/23                53

1        MS. BAGBY:  Understood, Your Honor.

2        THE COURT:  So, in other words, you don't have to

3   quantify it in this order, but you do have to reference it.

4        MS. BAGBY:  Yes.  Understood.

5        THE COURT:  Okay.  Moving on.  Just one second.  Okay.

6   Paragraph 9 on page 20.  We've already talked about the DIP

7   point, but I want to address a different point.  This new point

8   is in 9(b) at the bottom of the page, which currently says, (b),

9   pay any amount for any use not provided for in the approved

10  budget.  I think you should add at the end of that phrase,

11  except to the extent approved by the court.  And I don't think

12  that's a substantive change, because I think in other places of

13  the order, you recognize that variances from the budget can be

14  approved by the court.

15       MS. BAGBY:  Of course, Your Honor.  Understood.

16       THE COURT:  Right.  Okay.  Very top of page 21.  Here,

17  I think, the parties just dropped the ball.  I assume this was

18  inadvertent.  Little 'D', at the very top of 21, refers to the

19  fact that, this is part of a litany of things that cannot for

20  which funds cannot be used, cash collateral cannot be used

21  without the lender's consent, and there's a bar to any

22  investigation of claims, except as set forth in paragraph 10.

23  And paragraph 10 doesn't have a dollar amount that's carved out

24  for investigation, and it should.  Right?  Ordinarily, you'd see

25  a provision saying the committee can spend up to, say, $50,000.

560 Seventh Avenue Owner Primary - 8/15/23          54

1   I think that would be an appropriate amount in a case like this

2   to investigate potential claims against the lender.  Any big

3   squawks about that number?

4            MS. BAGBY:  We don't object to that number, Your

5   Honor.

6            THE COURT:  Okay.  And you understand the point,

7   right?  I mean, I think this was just inadvertent.  Okay.

8   Moving on.  Give me one second.  I think that point may also

9   come up again in another spot, and I'm trying to find it.  No,

10  maybe not.  If you see that it does come up somewhere else,

11  please fix it there, too.  But I'm not sure it does.  Okay.

12           Another substantive point on page 25, paragraph 12.

13  So, this actually is a very long paragraph.  I think paragraph

14  12 needs to come out.  Like several other points we've talked

15  about, you can put it in the final order, and I'll consider

16  whether it's appropriate at that stage, but it's not appropriate

17  at the interim order stage.

18           And sorry to jump around, but let's go back.  When

19  you're ready, let's go back to page 21.  Sorry, hang on, I got

20  the page wrong.  Give me one second.  Okay.  Sorry, we're not

21  going back.  We're going forward, you'll be glad to know, to

22  page 32.  Paragraph 21, sub one, needs to come out.  And

23  frankly, this strikes me as just an error.  This paragraph, if

24  I'm understanding it, is predicated on a misreading of section

25  363(m) of the Code.  That paragraph of the Code only applies to

560 Seventh Avenue Owner Primary - 8/15/23                    55

1   sales and leases.  It does not apply to use of collateral.  And

2   so, a provision of this sort in a cash collateral order is not

3   appropriate, even in the final order.  So, I think this

4   paragraph needs to come out.  I'm going to pause for a moment in

5   case either of you want to respond.  Okay?  Am I right?

6   Everybody's okay with that?

7            MS. BAGBY:  Understood, Your Honor.

8            THE COURT:  Okay.  Page 33, paragraph little four.

9   This is a smaller, smaller point.  Third line of paragraph

10  little four.  At the bottom of 33.  Please strike the words and

11  the final order.  It's just not appropriate at this stage to say

12  what the final order will do or will not do.  We'll deal with it

13  at that time.

14           Okay.  The very bottom of page 34.  The very last line

15  of page 34.  This is just an example where it references

16  paragraph 12, where the number will need to change.

17           Okay.  Next, top of page 36.  Very end of paragraph

18  26.  Give me one second.  Okay.  So, this is the final hearing,

19  and I guess let me ask, the time is upon us to pick a date for

20  the final hearing.  If this works for both of you, I'm prepared

21  to give you September 5th, but I don't want to force that on you.

22  So, would either of you prefer a different date?

23           MS. BAGBY:  For the lender, September 5th works.

24           MR. NASH:  I have no objection, judge.  I think it's a

25  good day.

560 Seventh Avenue Owner Primary - 8/15/23                    56

1    THE COURT:  Okay.  Let me just check my calendar for

2    that day.  So, I would say two o'clock, except I have something

3    that ends at 2:00, and I want to take a short break in between.

4        MS. BAGBY:  So.

5        THE COURT:  Let's say 2:30, September 5th at 2:30 for

6    the final hearing.  And then I want to build in a safety valve,

7    that is, in the event a committee is appointed and they want to

8    argue that they need more time, I'm not telling you I'll grant

9    it, but I want to give them the right to make that argument.

10   And I guess not just for a committee, but if any other party and

11   interest wants to make that argument.  So, I think the way to do

12   it is, if you add at the very end of paragraph 26, language

13   along the following lines, without prejudice to the right of a

14   committee, if appointed, or any other party in interest, to

15   request an adjournment of the final hearing.  And that is all I

16   have.

17        So, I know that's a fair amount, probably a bit more

18   than you expected, but tell me what let's just spend a minute on

19   what's next.  I assume you need prompt relief on this motion, so

20   when you submit a revised order, particularly if you tell me

21   it's been blessed by the debtor, the lender and the U.S.

22   Trustee, I'm prepared to act quickly.  I'll want to review it

23   carefully, but I and my clerks will make it a top priority to

24   review it quickly and hopefully enter it the same day.  So, do

25   you want to set a schedule or just do your best to turn this

560 Seventh Avenue Owner Primary - 8/15/23                    57

1   around?

2        MS. BAGBY:  I anticipate that this order could be

3   revised per Your Honor's instructions fairly quickly, unless Mr.

4   Nash has a different view.

5        MR. NASH:  No, I think we can.  I mean, we'll work

6   together.  We've been working together for the last several

7   weeks, and I'm sure we'll get it together.  I took notes.  I'm

8   sure that all the lenders counsels took notes and hopefully I'll

9   make sense of those notes.  But I think we can get it together

10  sometime tomorrow.

11       THE COURT:  Okay.  I guess let me just point out I

12  have a personal conflict on Thursday.  I'm going to be

13  traveling, and so I won't have no availability on Thursday, but

14  I don't know, it may be quicker if you can get it to me by

15  tomorrow afternoon.  In that case, I'll try to prepare to work

16  into the evening to turn it around and finalize it by tomorrow

17  evening.  If you can get it to me by, say, mid afternoon, if you

18  can't, then so be it.  But I just wanted to flag that for you.

19       MS. BAGBY:  Your Honor, again, it's Ingrid Bagby from

20  Cadwalader.  I certainly think we can get it to you by that

21  time.  If I can raise one procedural issue, actually, or timing

22  issue with respect to the wages motion, I want to make sure that

23  the debtors counsel is aware.  I think we're sort of ready to go

24  on that.  But we want to make sure that order gets entered as

25  soon as possible.

560 Seventh Avenue Owner Primary - 8/15/23                    58

1      THE COURT:  And remind me, I'm afraid it's escaped

2   from my head where we left that, exactly.

3      MR. NASH:  Your Honor, Kevin Nash.  Your Honor granted

4   it.  I'm going to make a change or two consistent with the

5   record.  We do fund monies into ADP on Tuesday.  So, it stays

6   there.  Checks won't be issued until Friday.  So, I would ask

7   Your Honor at least allow us, pending submission of this order,

8   which you'll have tomorrow, to fund the money into ADP.

9      THE COURT:  Does anybody object to that?  And Mr.

10  Masumoto, I'm particularly looking at you.

11     MR. MASUMOTO:  No objections, Your Honor.

12     THE COURT:  Okay.  So, that's acceptable, Mr. Nash.

13     MR. NASH:  Thank you, Your Honor.

14     THE COURT:  Ms. Bagby, does that solve your problem?

15     MS. BAGBY:  Absolutely.  Thank you very much, Your

16  Honor.

17     THE COURT:  All right.  Anything else?  Okay.  So, I

18  think we're adjourned for now, and I will look forward to

19  getting the various orders from you.

20     MR. NASH:  Thank you, Your Honor.

21     MR. PETRICK:  Thank you very much, Your Honor.

22     THE COURT:  Thanks everybody.

23     MR. NASH:  Thanks.

24     THE COURT:  Bye.

25     MR. MASUMOTO:  Thank you, Your Honor.

560 Seventh Avenue Owner Primary - 8/15/23                    59

1                          CERTIFICATION

2    I, Rochelle V. Grant, approved transcriber, certify that the

3    foregoing is a correct transcript from the official electronic

4    sound recording of the proceedings in this matter, 23-11289-pb,

5    held on 8/15/23.

6    *Rochelle V. Grant*

7    August 16, 2023

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25