```
                    UNITED STATES BANKRUPTCY COURT
                    SOUTHERN DISTRICT OF NEW YORK

                                        .
IN RE:                                  .   Case No. 23-11289-pb
                                        .   Chapter 11
560 SEVENTH AVENUE OWNER                .
PRIMARY LLC and 560 SEVENTH             .
OWNER SECONDARY LLC,                    .   One Bowling Green
                                        .   New York, NY 10004
                Debtors.                .
                                        .   Monday, December 4, 2023
. . . . . . . . . . . . . . . . . .     .   2:00 p.m.
```

TRANSCRIPT OF STATUS CONFERENCE REGARDING DOC #73 NOTICE OF
CHANGE OF CONTROL OF 560 SEVENTH AVENUE OWNER PRIMARY LLC;
DOC #7 AMENDED MOTION TO APPROVE USE OF CASH COLLATERAL
BEFORE THE HONORABLE PHILIP BENTLEY
UNITED STATES BANKRUPTCY COURT JUDGE

ZOOM APPEARANCES:

| | |
|---|---|
| For the Debtor: | Goldberg Weprin Finkel Goldstein LLP<br>By:  KEVIN J. NASH, ESQ.<br>125 Park Avenue, 12th Floor<br>New York, NY 10017<br>(212) 301-6944 |
| For AREPIII MVTS, LLC and CREP Times Square Hotel LLC: | Paul, Hastings, Janofsky & Walker LLP<br>By:  HARVEY A. STRICKON, ESQ.<br>75 East 55th Street<br>New York, NY 10022-3205<br>(212) 318-6000 |

ZOOM APPEARANCES CONTINUED.

| | |
|---|---|
| Audio Operator: | Courtroom ECRO Personnel |
| Transcription Company: | Access Transcripts, LLC<br>517 Dell Road<br>Landing, NJ  07850<br>(855) 873-2223<br>www.accesstranscripts.com |

    Proceedings recorded by electronic sound recording, transcript produced by transcription service.

ZOOM APPEARANCES (Continued):

| | |
|---|---|
| For OWS CRE Funding I, LLC: | Cadwalader, Wickersham & Taft LLP<br>By:  GREGORY M. PETRICK, ESQ.<br>200 Liberty Street<br>New York , NY 10281<br>(212) 504 6373 |
| For DHG TSQ, LLC: | Leech Tishman Robinson Brog PLLC<br>By:  FRED B. RINGEL, ESQ.<br>875 Third Avenue<br>Ste 9th Floor<br>New York, NY<br>(212) 603-6300 |
| For 560 Seventh Avenue Owner Primary LLC: | Cozen O'Connor<br>By:  FREDERICK E. SCHMIDT, ESQ.<br>3WTC<br>175 Greenwich Street<br>55th Floor<br>New York, NY 10007<br>(212) 883-4948 |
| For IMCMV Times Square, LLC: | Reich Reich & Reich, P.C.<br>By:  JEFFREY A. REICH, ESQ.<br>235 Main Street, Suite 450<br>White Plains, NY 10601<br>(914) 949-2126 |
| For Garment Center Congregation: | Tarter Krinsky & Drogin LLP<br>By:  DEBRA BODIAN BERNSTEIN, ESQ.<br>     SCOTT S. MARKOWITZ, ESQ.<br>1350 Broadway, 11th Floor<br>New York, NY 10018<br>(212) 216-8000 |

1        (Proceedings commence)

2            THE CLERK: Good afternoon. We are here on a status

3 conference and final cash collateral motion in Case Number

4 23-11289. At this moment, we will take appearances for all who

5 wish to speak at today's hearing.

6            MR. NASH: Good afternoon. Kevin Nash.

7            MR. STRICKON: Good afternoon. Harvey Strickon, Paul

8 Hastings, representing AREPIII MVTS, LLC, and CREC Times Square

9 Hotel LLC.

10           MR. PETRICK: Good afternoon. Gregory Petrick,

11 Cadwalader, Wickersham & Taft, on behalf of OWS CRE Funding I,

12 LLC, the senior secured lender to 560 Seventh Avenue Owner

13 Primary LLC.

14           MR. RINGEL: Good afternoon. Fred Ringel from Leech

15 Tishman Robinson Brog on behalf of DHG TSQ, the hotel manager.

16           MR. SCHMIDT: Good afternoon, Your Honor. Frederick

17 Schmidt from Cozen O'Connor, proposed counsel for the debtor,

18 Primary.

19           MR. REICH: Good afternoon. Your Honor, Jeffrey

20 Reich, Reich Reich & Reich, P.C. We are the attorneys for

21 IMCMV Times Square, LLC, the landlord.

22           MR. MARKOWITZ: Scott Markowitz and Debra Bernstein.

23 We're not sure we're going to be talking. We're primarily

24 observing, but we represent the Garment Center Congregation.

25           MS. BERNSTEIN: Good afternoon.

1          THE CLERK: Thank you. The judge will be out in just
2  a moment.
3      (Pause)
4          THE COURT: Good afternoon. We're here this
5  afternoon, I had thought, on an interim or final cash
6  collateral order, but no proposed order has been submitted.
7  So I'm assuming that matter is not before me today, but rather
8  just the status conference.
9          But before we proceed to the status conference, let
10 me ask the parties. Am I right about cash collateral not being
11 on the agenda today?
12         MR. NASH: Your Honor, Kevin Nash for the debtor.
13 I believe it's not on the agenda. I think it was carried.
14 I think we have an existing order through on or about
15 December 10th, if I'm not mistaken.
16         But I'll ask Mr. Petrick. Am I mistaken?
17         MR. PETRICK: No, Mr. Nash, I think you're correct.
18         We will need, Your Honor, depending on the outcome of
19 this status conference, we will likely need a further interim
20 order to bridge us to a further period down the road. But some
21 of it depends perhaps on your guidance on the Primary status
22 conference issue today.
23         THE COURT: Okay. Let me just alert the parties that
24 my availability is going to be unusually limited next week and
25 perhaps the following week. I'm having surgery a week from

1  today, and so I am completely unavailable probably the entirety
2  of next week.  That is, you would not want me to be ruling on
3  your matters, given that -- the medication that I will be on
4  post surgery.  The week after is uncertain.  I may or may not
5  be available for hearings on the week of the 18th, depending on
6  how things are going medically.
7           So I wanted to raise that because I was aware that
8  the cash collateral order expires, I think this coming Monday,
9  maybe Sunday.  And so, if you're going to need any relief,
10 don't plan to come rushing in next Monday.  I won't be
11 available.  You may need to come in -- I can make myself
12 available on Friday afternoon if that's necessary.  So I wanted
13 to preview that for people.
14           MR. PETRICK:  Thank you, Your Honor.  We appreciate
15 that.  And we'll be sure to get it resolved this week before;
16 and we wish you, of course, the best of luck with your surgery.
17           THE COURT:  Thank you.
18           Does anybody else want to be heard with respect to
19 cash collateral?
20           Okay.  Let's move on then to the status conference.
21 I suspect a number of parties may want to be heard in
22 connection with the issues that were raised in the letters I've
23 received from first Mr. Nash and then Mr. Strickon.
24           Mr. Nash, as debtors' counsel, why don't you lead
25 off?

1         MR. NASH: Yes, Your Honor. Thank you. I appreciate
2  the Court convening the status conference, and I do think that
3  the issues that are raised in the letters merit some type of
4  judicial resolution.
5         As Your Honor knows, Your Honor knows the history,
6  there was a lift stay motion that was made by the mezzanine
7  lender to complete the foreclosure sale of the membership
8  interest, I guess, at the top level. And that motion was
9  resolved pursuant to the so-ordered stipulation. I think it
10 was entered September 1. Forty-five days was the notice period
11 to re-notice what they call a disposition of collateral within
12 the parlance of the UCC.
13        That notice went out. The auction was held on
14 October 16th, I believe. I tried to get a reinstatement of the
15 stay. I was unsuccessful before that. Your Honor, I think,
16 entered an order denying any type of expedited hearing.
17        The sale went forward. Mr. Strickon's client was the
18 bidder at the sale. Nobody else appeared. And as I said in my
19 letter, everything was proper and in accord with the UCC.
20        What happened was that the mezzanine lender did not
21 actually close on (indiscernible). And so it never took
22 ownership of the membership interest and is now attempting --
23 after the lift stay motion and after all the litigation, is
24 attempting -- and I understand the economics of it, but is
25 attempting to exercise control under some agency theory or

1  management rights or delegation of rights under the pledge
2  agreement.
3           And the obvious reason for this is, as I understand
4  it, there is a transfer tax that is due and payable upon a
5  foreclosure of membership interest (indiscernible) percent of
6  real estate.  And instead of paying that, they after the fact
7  are now contending that the alternative agency powers that they
8  were granted under the pledge is all they need to exercise.
9           Now, they're making that argument after the fact
10 because we did go through a long process where it was in my
11 mind clear that they were seeking to complete the foreclosure.
12 That's what their motion said.  That's what their disposition
13 of collateral said.  And when it came to close on it, that's
14 when the brakes were pulled, so to speak.
15          And I think that puts us in a gray area that they are
16 the high bidder, they haven't closed, they do have certain
17 rights.  And the question is, is that enough to take over the
18 debtor in a Chapter 11, going to a sale and never closing?
19          And so I think that's an issue that's worthy of the
20 Court's attention.  I asked for a conference, you know, to talk
21 about what Your Honor would -- A, if Your Honor thinks that's
22 an issue; B, if the Court does think it's an issue, the best
23 process to adjudicate that issue.
24          I think it's important because whoever in control of
25 the debtor -- I mean, I don't think the hotel will suffer

1   during this transition, but if management of the debtor is
2   attempting, and they still are attempting, to put together a
3   financing package, the controversy over actual control, it's on
4   the docket that there has been a removal of control, is
5   prejudicial.  It makes a very difficult situation doubly
6   difficult.
7            So I asked the Court for the conference.  We both
8   point to the same case of Judge Schwartzberg.  There was
9   language in that case that the secured creditor needs to take
10  possession of the stock certificate.  Implicitly, the only way
11  you can do that is by closing.  In the Schwartzberg case, I
12  think the stock certificate was still with the pledgee.  Here
13  it's with an auctioneer.
14           And Mr. Strickon cited to language, the proxy
15  language, that if the secured creditor has rights to designate
16  under the proxy, that may be all that's required.  I do think,
17  in this context, you need to actually take possession, pay the
18  transfer tax if you want to exercise management.
19           And I look at it as a significant legal issue, not
20  only in this case, but, you know, in mezzanine financing
21  generally.  I think when mezzanine lenders take these pledges,
22  I don't know if they really pinpoint, but that there is a
23  transfer tax that is implicated.  And when you have that
24  transfer tax on properties of this kind, the numbers are
25  significant.

1        So I understand the position of the lender.  I
2   think they understand my position.  They had the ability on
3   October 16th to close and cut off this issue.  They didn't do
4   it.  And I think there is a genuine issue here as to the -- it
5   might be a gray area:  What are the rights without an actual
6   closing after a mezzanine sale is conducted?
7        THE COURT:  Okay.  I'd like to hear from Mr. Strickon
8   next.  Let me just say preliminarily though, Mr. Nash, I'm not
9   going to be giving an advisory opinion on these issues.  If you
10  want to bring a motion, you should do that.  And once you've
11  brought the motion, once we know exactly what sort of motion it
12  is, then I think it would be appropriate to discuss scheduling
13  of the motion.
14       But I think scheduling is premature till you've
15  brought a motion.  And I think commenting on the merits of this
16  issue, which, you know, I gather from the papers is not a
17  clear-cut issue, and so it's particularly inappropriate for me
18  to comment on the merits at this early stage.
19       Mr. Strickon.
20       MR. STRICKON:  Thank you, Your Honor.  As you know,
21  we represent the secured lenders.  And Mr. Nash is correct that
22  the UCC sale did go through on October 16th, and the lenders
23  chose at that point not to take actual title of the collateral.
24       As a preliminary matter, I would say that Mr. Nash
25  saying it's interfering with the debtors' ability to refinance

1  is sort of a non-issue because the debtors have been trying to
2  refinance this property, not only since the filing of the
3  petitions, but since about a year before the filing of the
4  petitions.  Okay?
5          And there were -- are a number of legitimate reasons
6  why the lenders chose not to take title at that time.  As we
7  pointed out in our letter, okay, the secured lenders needed
8  time to determine what material issues there were in the
9  bankruptcy proceeding itself that they would be obligated to
10 deal with if and when they took actual title to the membership
11 interest.
12         And the purpose of going down this route is to get
13 these cases moving.  Nothing, absolutely nothing has been done
14 in these cases since the filing of the petitions to deal with
15 creditor claims, to propose a plan, or to do anything to get
16 these cases moving.  They've been just static since the filing
17 of the petition.
18         The secured parties in this case are in fact in
19 physical possession of the membership interest in Primary, the
20 Primary debtor, unlike the case that was cited to, the case of
21 Judge Schwartzberg, where the secured lender did not have
22 possession and control of the membership interest and had no
23 right to conduct a UCC disposition.
24         That's very different here in the case where the
25 secured lenders do have possession and control of the

1  membership interest and have the absolute right to conduct the
2  UCC disposition.  There is nothing in the Uniform Commercial
3  Code that mandates that the secured lenders actually take title
4  to the collateral that is securing their debt.  They are
5  permitted upon the event of default to exercise any and all
6  other rights and remedies that may have been granted to them by
7  the operative documents and by the UCC.
8              As we pointed out in our letter to the Court, there
9  are express provisions in the pledge agreement that allow the
10 secured lender to exercise control over the membership
11 interest, including rights and remedies.  And that is exactly
12 what the secured lenders did.  They adopted a resolution as the
13 pledgee of the membership interest, removing all the officers
14 and directors of the debtor, the debtor being Primary, putting
15 in their own slate, and have moved along expeditiously to try
16 to get these cases moving.
17             In the first instance, they have negotiated an
18 agreement in principle with the secured -- senior secured
19 lender for restructuring of the mortgage loan in order to be
20 able to be in a position to propose a plan of (break in audio).
21 In addition, they have reached an agreement which they are
22 prepared to execute and sign to replace the --
23             THE COURT:  Mr. Strickon, sorry.  You've been cutting
24 in and out.  Is there anything you can do to improve your
25 audio?

1               MR. STRICKON:  Move a little closer to my speaker, if
2    that's better.
3               As they say, the secured lenders have already
4    negotiated an agreement in principle with One William Street,
5    which is the secured -- senior secured lender, to restructure
6    the mortgage debt to allow the proposal and confirmation of a
7    reorganization plan.  They have negotiated a new management
8    agreement (break in audio) hotel manager.  They are --
9               THE COURT:  You're cutting out again, I'm afraid.
10              MR. STRICKON:  I have to get my firm to get me a new
11   computer.
12              Let me backtrack.  The secured lenders have
13   negotiated an agreement in principle with One William Street,
14   the senior mortgagee on the hotel, to restructure the mortgage
15   debt with the filing of a plan of reorganization which will get
16   this hotel out of its Chapter 11 proceeding.
17              The secured lenders have additionally negotiated a
18   new hotel management agreement with a new hotel manager to get
19   the hotel's operations going.  And they are in the process of
20   negotiating the engagement of a broker, a real estate broker,
21   to lease out the commercial retail vertical space which has
22   remained vacant since the building was constructed.
23              We're prepared to go forward with a plan, and the
24   plan will take care of creditors 100 percent in full.  But in
25   the present state of management here, nothing is going on in

1  this case.  This case has not moved in over six months.  And we
2  believe that not only -- that legally and contractually, the
3  secured lenders have the right to take control, place
4  management, replace the debtors' counsel, and are prepared to
5  expeditiously file a plan of reorganization that will get this
6  hotel reorganized and out of its Chapter 11 proceeding.
7          We're not quite sure, you know, what the debtors'
8  objective is (break in audio) in trying to stall the change in
9  management when, with the flip of a switch, it could easily
10 take place with a transfer to the members of interest.  The
11 only problem is that the transfer taxes, and I'm being candid,
12 are some six-plus million dollars, which could be better
13 utilized in funding a plan of reorganization that pays
14 everybody in full and gets these cases out of their Chapter 11
15 proceedings.
16          THE COURT:  So, Mr. Strickon, I want to make sure I
17 understand your plan, your expectations here.  Is it your plan
18 to take title at some point in the not-too-distant future, or
19 is your plan to put that off indefinitely and even confirm a
20 plan of reorganization without taking title?
21          MR. STRICKON:  No, Your Honor.  The contemplated plan
22 of reorganization would be for both Primary and Secondary, and
23 it would provide that in the Secondary case the funds would be
24 generated to fund a plan in the Primary case in exchange for
25 taking title to the membership interest.

1            So the consideration would be the funding of whatever
2   is necessary in order to reorganize Primary; and in exchange
3   for providing that funding, the lenders would take title to the
4   membership interest.  And under the Bankruptcy Code, that
5   transfer, pursuant to a confirmed plan of reorganization, would
6   be exempt from transfer taxes.
7            THE COURT:  I see.  So your plan is essentially to
8   take title upon consummation of the plan.
9            MR. STRICKON:  That is correct, Your Honor.
10  Absolutely.
11           THE COURT:  Well, again, I'm not going to comment,
12  express a view on an issue not before me, but I will simply say
13  I suspect that New York State and/or City, the folks owed the
14  transfer taxes, might have an objection to this attempted way
15  of getting around the tax.
16           MR. STRICKON:  Well, except that there is substantial
17  consideration that is going to be provided; and in addition,
18  and it's known in the industry, that once we get past December,
19  the hotel occupancies will be dropping and the hotel will not
20  be generating enough cash to keep the mortgagee current.
21           So there is going to be almost a 100 percent
22  likelihood that the mortgage is going to go into default once
23  we go into -- when I say go into default, it's already in
24  default, but there will not be enough cash generated to pay all
25  the operating expenses of the hotel, so that the lenders to

1   Secondary will have to supplement that cash flow in order to

2   keep the hotel operating, which will be part of the

3   consideration for the confirmation of the plan.

4            THE COURT:  Do you have a time table in mind when you

5   expect you'd be aiming to confirm?

6            MR. STRICKON:  I don't have a time table.  We'll have

7   to discuss it with new bankruptcy counsel.  But I imagine that

8   once this issue is put to rest, we can immediately file a plan

9   and seek confirmation of the plan immediately because our

10  understanding is that, if we have an agreement with the senior

11  secured lender for the restructuring of the plan, and the plan

12  provides for the payment in full of all allowed claims, that we

13  don't have to go through the solicitation process because

14  nobody will be impaired by the plan.

15           THE COURT:  All right.  Was there anything more you

16  wanted to add or should we turn the podium over to the next

17  party?

18           MR. STRICKON:  No, we can -- you can certainly get

19  some input from the other parties as to what their preferences

20  might be, if it has any impact on the Court's position.

21           THE COURT:  Mr. Petrick, would you like to be heard?

22           MR. PETRICK:  Yes, Your Honor, just briefly.  First

23  off, Your Honor, thank you for accommodating us today by video

24  conference.  Appreciate that.

25           You know, we fully understand that there is no formal

1  request for relief before the Court and there's not much we can
2  ask you to do today without an application before the Court.
3  I will say that I agree with Mr. Strickon that this current
4  posture of the case is an impediment to moving the case along.
5  Nothing is really happening.  And while there's sort of this
6  impasse about who's in charge and who has the ability to file a
7  plan, you know, who's running the debtor, it's important to get
8  that resolved so that we can move forward.
9           It does impact us to some extent in that we disburse
10 funds from the debtor-in-possession accounts and other accounts
11 to pay for the operating expenses, salaries, wages, other
12 things necessary to operate the hotel under the cash collateral
13 order, and there is some ambiguity about who is giving that
14 direction that we need addressed in the cash collateral order.
15          I should also inform the Court that we have been in
16 discussions with the mezzanine lender.  We have an
17 intercreditor agreement that provides for the circumstances
18 where the mezzanine lender takes over by (indiscernible) limit
19 the interest, and we're operating under that agreement.
20          There's been negotiations around that to give us
21 comfort and security that when the mezzanine lender operates
22 the property, we will be protected in full.  That agreement's
23 not quite done yet, but it's close; and if that is done, we
24 would fully support the lender coming in and running the debtor
25 in a better posture than we're in now currently.

```
 1             So I don't know if I can add much more to today,
 2  without anything before Your Honor, but that's sort of a
 3  summary of our position.
 4             THE COURT:  Okay.  Thank you, Mr. Petrick.
 5             Would anybody else like to be heard?
 6             All right.  No one else is speaking up, so I think
 7  I've now heard from everybody who wants to speak.  I can
 8  certainly appreciate that right now there's a cloud raised by
 9  the question of who controls the Primary debtor.  I am not
10  going to purport to resolve that dispute until it's properly
11  before me.
12             So I think I'll just leave it at that.  You all are
13  good lawyers.  You all know how to file proper motions.  And if
14  and when you feel the need to do so, I trust you will file a
15  motion addressing this issue.
16             MR. NASH:  Thank you, Your Honor.
17             THE COURT:  Okay.  Thank you. And let me just say,
18  if parties are going to need relief with respect to cash
19  collateral, you know prior to -- well, I told you what my
20  schedule is next week and the week after.
21             If you're going to need relief this week, please
22  don't wait till the last second.  Please let us -- give us some
23  advance notice and tee it up properly so we can address
24  whatever you choose to put before us.
25             MR. PETRICK:  Understood, and appreciate that,
```

1  Your Honor.  Thank you.
2          MR. NASH:  And I'm sure everybody on the call, Judge,
3  wishes you the very best.
4          THE COURT:  Okay.  Yeah.  Thank you.  Fingers
5  crossed.
6          Okay.  Thank you, everybody.  I hope you're able to
7  work it out.  I suspect this will not get consensually
8  resolved, but I will wait to hear from you all.
9          COUNSEL:  Thank you, Judge.
10         THE COURT:  Okay.  Thank you.
11     (Proceedings concluded)
12                         * * * * *
13
14                    **C E R T I F I C A T I O N**
15
16     I, Alicia Jarrett, court-approved transcriber, hereby
17 certify that the foregoing is a correct transcript from the
18 official electronic sound recording of the proceedings in the
19 above-entitled matter.
20
21
22 *[signature: Alicia F. Jarrett]*
23 _____
24 ALICIA JARRETT, AAERT NO. 428    DATE: December 6, 2023
25 ACCESS TRANSCRIPTS, LLC