UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| IN RE: | . | Case No. 23-11289-pb |
|  | . | Chapter 11 |
| 560 SEVENTH AVENUE OWNER | . |  |
| PRIMARY LLC and 560 SEVENTH | . |  |
| AVENUE OWNER SECONDARY LLC, | . | One Bowling Green |
|  | . | New York, NY 10004 |
|  | . |  |
| Debtors. | . | Friday, December 8, 2023 |
|  | . | 2:00 p.m. |

. . . . . . . . . . . . . . . .


TRANSCRIPT OF EMERGENCY MOTION FOR ENTRY OF AN ORDER
(I) CONFIRMING CHANGE OF CONTROL OF DEBTOR 560 SEVENTH AVENUE
OWNER PRIMARY LLC; (II) TERMINATING PRIOR MANAGEMENT;
AND (III) GRANTING RELATED RELIEF [81]
BEFORE THE HONORABLE PHILIP BENTLEY
UNITED STATES BANKRUPTCY COURT JUDGE

ZOOM APPEARANCES:


For the Debtors:          Goldberg Weprin Finkel Goldstein LLP
                          By:  KEVIN J. NASH, ESQ.
                          125 Park Avenue, 12th Floor
                          New York, NY 10017
                          (212) 301-6944

                          Cozen O'Connor
                          BY:  FREDERICK SCHMIDT, ESQ.
                          3WTC, 175 Greenwich Street
                          New York, NY 10007
                          (212) 883-4948

ZOOM APPEARANCES CONTINUED.

Audio Operator:           Courtroom ECRO Personnel

Transcription Company:    Access Transcripts, LLC
                          517 Dell Road
                          Landing, NJ  07850
                          (855) 873-2223
                          www.accesstranscripts.com


     Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

```
ZOOM APPEARANCES (Continued):


For Global One            Faegre Drinker Biddle Reath LLP
Professional              By:  LAURA E. APPLEBY, ESQ.
Investment:               1177 Avenue of the Americas
                          41st Floor
                          New York, NY 10036
                          (212) 248-3140


For OWS CRE Funding I,     Cadwalader, Wickersham Taft LLP
LLC:                       By:  INGRID BAGBY, ESQ.
                               GREGORY M. PETRICK, ESQ.
                           One World Financial Center
                           New York, NY 10281
                           (212) 504-6000


                           Cadwalader, Wickersham Taft LLP
                           By:  ANTHONY L. GREENE, ESQ.
                               MICHELE MAMAN, ESQ.
                           200 Liberty Street
                           New York, NY 10281
                           (212) 504-6848


                           Cadwalader, Wickersham Taft LLP
                           By:  RAYMOND NAVARO, ESQ.
                           1633 Broadway, 31st Floor
                           New York, NY 10019
                           (212) 802-7707


For Flintlock             Hollander Law Group PLLC
Construction Services,    By:  LARRY B. HOLLANDER, ESQ.
LLC:                      40 Cuttermill Road, Suite 203
                          Great Neck, NY 11021
                          (516) 498-1000


For NYS Department of     Office of the NYS Attorney General
Taxation and Finance:     By:  LEO V. GAGION, ESQ.
                          28 Liberty Street
                          New York, NY 10005
                          (212) 416-8592


For Kristine E. Eppes     Morris James LLP
and Benjamin L.           By:  JASON S. LEVIN, ESQ.
Hancock:                  500 Delaware Avenue, Suite 1500
                          Wilmington, DE 19801
                          (302) 888-6888
```

| | |
|---|---|
| For Garment Center Congregation: | Tarter Krinsky Drogin LLP<br>By:  SCOTT S. MARKOWITZ, ESQ.<br>1350 Broadway, 11th Floor<br>New York, NY 10018<br>(212) 216-8000 |
| For the U.S. Trustee: | Office of the United States Trustee<br>By:  BRIAN S. MASUMOTO, ESQ.<br>One Bowling Green<br>New York, NY 10004-1408<br>(212) 510-0500 |
| For IMCMV Times Square LLC: | Reich Reich Reich, P.C.<br>By:  JEFFREY A. REICH, ESQ.<br>235 Main Street, Suite 450<br>White Plains, NY 10601<br>(914) 949-2126 |
| For DHG TDQ LLC: | Leesh Tishman Robinson Brog PLLC<br>By:  FRED B. RINGEL, ESQ.<br>875 Third Avenue, 9th Floor<br>New York, NY 10022<br>(212) 603-6300 |
| For AREPIII MVTS, LLC, and CREP Times Square Hotel LLC: | Paul Hastings Janofsky Walker LLP<br>BY:  VICTORIA J. SIESTA, ESQ.<br>      ZACHARY ZWILLINGER, ESQ.<br>200 Park Avenue<br>New York, NY 10166<br>(212) 318-6785<br><br>Paul Hastings Janofsky Walker LLP<br>By:  HARVEY A. STRICKON, ESQ.<br>75 East 55th Street<br>New York, NY 10022-3205<br>(212) 318-6000 |
| For Hotel Trades Council: | Cohen Weiss and Simon LLP<br>By:  MATTHEW E. STOLZ, ESQ.<br>909 Third Avenue, 12th Floor<br>New York, NY 10022<br>(212) 356-0213 |
| Also Present: | STEVEN SCHROEDER<br><br>GREG DENTON<br><br>BRANDON FLURY |

1        (Proceedings commence)

2            THE COURTROOM DEPUTY:  Good afternoon, this is Greg

3    White, the courtroom deputy.  We're here today on Case Number

4    23-11289, 560 Seventh Avenue Owner Primary LLC and 560 Seventh

5    Avenue Owner Secondary LLC on the emergency motion for entry of

6    an order confirming change of control of debtor, terminating

7    prior management, and granting related relief.

8            At this time, for those who wish to speak, please go

9    ahead and state your name and who you represent for the record.

10           MR. NASH:  Good afternoon.  Kevin Nash for the

11   debtors.

12           MR. STRICKON:  Good afternoon.  Harvey Strickon for

13   the AREPIII MVTS, LLC, and CREP Times Square Hotel LLC.

14           MR. SCHMIDT:  Good afternoon.  Frederick Schmidt of

15   Cozen O'Connor, proposed counsel for 560 Seventh Avenue Owner

16   Primary LLC.

17           MR. GREENE:  Good afternoon.  Anthony Greene,

18   Cadwalader, Wickersham and Taff on behalf of OWS CRE Funding I,

19   LLC.

20           MR. RINGEL:  Good afternoon.  Fred Ringel from Leech

21   Tishman Robinson Brog on behalf of DHG TSQ LLC, the hotel

22   manager.

23           MR. MARKOWITZ:  Good afternoon.  Scott Markowitz,

24   Tarter Krinsky and Drogan for Garment Center Congregation.  I'm

25   not sure I'll say anything, but I'm appearing.

1          And Harvey, your voice thing is still off again from

2  last time.  You should check it.  It's not clear.

3          MR. REICH:  Good afternoon.  Jeffrey Reich from the

4  Law Firm of Reich, Reich, Reich, PC.  We represent IMCMV Times

5  Square LLC, tenant.

6          MR. MASUMOTO:  Good afternoon, Your Honor.  Brian

7  Masumoto for the Office of the United States Trustee.

8          MR. GAGION:  Good afternoon, Your Honor.  Leo Gagion

9  from the Office of the United States Attorney General for the

10  Department of Taxation and Finance.

11          THE COURTROOM DEPUTY:  Okay, thank you, everyone.

12  And the judge will be out in just a moment.

13      (Pause)

14          THE COURT:  Good afternoon.  We're here on the

15  emergency motion of the purported representatives of the

16  debtor.  I may refer to that party as the lenders, because

17  unless and until I find that they're in fact acting for the

18  debtor, they're really just representatives of the lenders.

19  And when I say lenders, I mean, at this point, Mr. Strickon's

20  clients, who I guess, Mr. Strickon, would it be accurate as

21  shorthand to say your clients are the senior mezzanine lenders?

22          MR. STRICKON:  Yeah, they're the secondary debtor.

23          THE COURT:  Correct.  So let's try it again.  What's

24  the best shorthand for your clients?

25          MR. STRICKON:  I think just refer to them as the

1  lenders.

2  THE COURT:  Okay.  Although, I don't want to get them

3  confused with Cadwalader's --

4  MR. STICKON:  No, Cadwalader will refer to their

5  clients as OWS, One William Street.

6  THE COURT:  Okay, I got to tell you, all these

7  acronyms make my head spin.  So I think of your clients as, how

8  about this, the second -- the lenders at secondary, and

9  Cadwalader's clients are the lenders at primary.

10  MR. STRICKON:  That's fine.  That's simple enough.

11  THE COURT:  Okay.  And I guess just to be clear, the

12  senior lenders at each of those two debtors.

13  MR. STRICKON:  Correct.

14  THE COURT:  Okay.  All right.  With that preamble,

15  before we get to argument, let me first ask whether anybody --

16  you know, I'm a litigator by background, and so I like to do

17  things and follow the proper procedures and deal with the

18  evidence before getting to argument.  And so that we have the

19  record closed before we get to argument.

20  So let me ask if any of the parties have evidence

21  they want to offer.  And I'll start with Mr. Schmidt as the

22  movants counsel.

23  MR. SCHMIDT:  Thank you, Your Honor.  Good afternoon.

24  Thank you very much for being able to accommodate us today on

25  shortened notice.  It's very important for the debtor, very

1  important for this case.  That said, we do not have any

2  evidence to offer into the record.  And Mr. Strickon is really

3  going to be taking the laboring or at argument for our side of

4  the ledger.

5          THE COURT:  Okay.  I guess let me turn next to

6  Mr. Nash.  Well, sorry, just to be clear, since you mentioned

7  Mr. Strickon, Mr. Strickon, I gather you don't have evidence

8  you want to offer either, do you?

9          MR. STRICKON:  That's correct, Your Honor.  We did

10 quote in our papers certain provisions of the pledge and

11 security agreement.  But there is no dispute that those in fact

12 are provisions and that they are accurate quotations.

13         THE COURT:  Yes, I -- yes, I have several of the

14 governing documents in front of me that we'll be talking about

15 in the course of argument.  So I'm comfortable that those are

16 in the record.  But you have nothing other than the governing

17 documents?

18         MR. STRICKON:  No, Your Honor.

19         THE COURT:  Okay.

20         Mr. Nash.

21         MR. NASH:  No, Your Honor.  I'm not putting anything

22 other than the exhibits that I put in that were attached to the

23 letters and so forth.  I do agree that the three operative

24 documents, the two operating agreements in the pledge, I think

25 are in the record.  I hope we sent in the hotel operating

1  agreement, which is primary, and I hope Your Honor's chamber's

2  got that.  So --

3            THE COURT:  We did.

4            MR. NASH:  -- I think that there's two operating

5  agreements in the pledge.  And the notice of disposition of

6  collateral and the other stuff that's online on the ECF, you

7  know, the notices that were sent and so forth.

8            THE COURT:  So I'm sorry, I just want to be clear,

9  because I don't remember exactly what was the next to your

10  papers.  I'm going to treat the two operating agreements, that

11  is the operating agreements for the two debtors and the pledge

12  agreement as being in the record and also the notice of

13  disposition of collateral.  Remind me what else you next to

14  your papers.

15            MR. NASH:  I think you just mentioned it, that

16  September 6th amended and restated notice -- notification of

17  disposition of collateral, which also had the -- as exhibits,

18  the bidding procedures, or the terms of sale for the public

19  auction and the memorandum of sale documents and the exhibits

20  that went along with that.  That was part of my original

21  letter, which I incorporated, and that was issued by the

22  mezzanine lender.  I did put in yesterday, I think, an exhibit,

23  which, if I'm not mistaken, was the operating agreement at the

24  mezzanine level.  And we forwarded to chambers the operating

25  agreement at the hotel level, and it was referenced to the

1    pledge agreement by Mr. Strickon.  And that's an agreement I

2    think is in the record at some place dated September 13th,

3    2021.  But the quotations from it are not disputed.  We're all,

4    I think, operating under the same set of agreements.

5          THE COURT:  Okay.  And let me just invite anyone else

6    to chime in if -- either if they have any issues with my

7    considering the documents Mr. Nash mentioned, or if there's any

8    other documents that they think I should be considering in

9    connection with this motion.

10          Okay, so I just wanted to make sure we're clear on

11    what I'm looking at before we proceed.  All right, so let's

12    move into argument.  Mr. Schmidt, it's your motion.

13          MR. SCHMIDT:  Yes, Your Honor.  On behalf of sort of

14    the, I guess we call it the mezz lender side of the equation,

15    Mr. Strickon will be taking the laboring war for arguments.

16    So, unless Your Honor has any specific questions for me, I'll

17    hand it over to Mr. Strickon.

18          THE COURT:  That's fine.

19          Mr. Strickon, please proceed.

20          MR. STRICKON:  Yes, Your Honor.  As the first

21    observation, the objections that have been filed by the debtor

22    to the relief that's being sought, in our view, is nothing more

23    than stalling and vindictiveness and apparent retribution by a

24    principal of the debtor, because the debtor's principal is

25    being the subject of a litigation on his personal guarantee.

1   The truth of the matter -- yeah, the truth of the matter, you

2   know, it -- yeah?

3         THE COURT:  Mr. Strickon, I'm going to cut you off

4   for a second.  I'm under a somewhat tight schedule here.

5         MR. STRICKON:  I'll go to the next point, Your Honor.

6         THE COURT:  Yeah, but just let me make it clear so

7   that the parties have a common understanding.  I have another

8   hearing at 4.  I need to spend half an hour preparing for that.

9   So we need to be done --

10        MR. STRICKON:  Good.

11        THE COURT:  -- ideally in an hour.  And so I'd ask

12  you to -- I don't want to hear about -- well, here's what I

13  want to hear about.  I want to hear about what you believe your

14  client's rights are under the governing documents.  And also,

15  your position on whether this is really an emergency, because

16  frankly, I'm not seeing an emergency.  But those are the two

17  things I'd like to hear you on.

18        If there's other things you think I have to hear

19  about, you can let me know.  But I really don't want to hear

20  about any sort of back and forth about equities that are

21  independent of the two things.

22        MR. STRICKON:  That's fine.  I'll just hit the legal

23  points.  At the last conference, Your Honor, the debtor made a

24  point of accusing the lenders of trying to avoid the payment of

25  transfer taxes.  What I just want to say briefly on this, that

1    there's no evil intent here.  The debtor -- the secured lenders

2    are looking to utilize an express tax exemption under the

3    bankruptcy code that has been used for decades.  And in fact,

4    in the old days, they even used this exemption in connection

5    with 363 sales until the Supreme Court says you can't do that.

6              Those are issues that will be addressed at the time

7    of confirmation of any plan of reorganization.  So it's

8    premature to make any observations about that.  Mr. Nash has

9    not really presented any controlling legal authority as to why

10   the provisions and the change in control are not fully

11   enforceable.  In fact, the lenders were provided as the -- yes,

12   sir?

13             THE COURT:  Mr. Strickon, I'm sorry to interrupt

14   again, but before we get to that, and I absolutely want to hear

15   you --

16             MR. STRICKON:  Sure.

17             THE COURT:  -- on (indiscernible), but can we start,

18   please, with whether this really is an emergency?

19             MR. STRICKON:  Yes, it is an emergency, Your Honor.

20   Because of the cloud that has been created on who's in charge

21   here, vendors are unwilling to deal, quite frankly, with either

22   party until they have some knowledge or understanding as to

23   who's really in charge.  And that's --

24             THE COURT:  Here's the problem I have with that.  You

25   are -- you and your co-counsel are both capable lawyers.  I

1   assume you know how to make a record.  You have apparently

2   chosen not to make any factual record whatsoever on the need

3   for expeditious relief.  All I have is a single, very short

4   paragraph in a lawyer's affidavit.  That is not evidence.

5           So I just want to make clear, I want to hear what you

6   have to say, but my starting point is you and your co-counsel

7   have chosen not to make a record of any need for expeditious

8   relief.

9           MR. STRICKON:  Well, I think the need for expeditious

10  relief was created by Mr. Nash on behalf of --

11          THE COURT:  You're (indiscernible).

12          MR. STRICKON:  That's where it all started, Your

13  Honor.

14          THE COURT:  Mr. Strickon, you are asking me to

15  shorten time.

16          MR. STRICKON:  Yeah.

17          THE COURT:  I am hearing you on less than 48 hours'

18  notice.  My clerks got up at 6 a.m. this morning to read the

19  reply brief.  So I want to hear why you're telling me I've got

20  to decide today.

21          MR. STRICKON:  Well, one issue, for example, is that

22  NEC, which install the telephone and security systems in the

23  hotel, is threatening to yank them out because they haven't

24  been paid.  And you --

25          THE COURT:  They have --

```
 1              THE STRICKON:  Yeah?

 2              THE COURT:  You have to make a record of that.

 3              MR. STRICKON:  I'm sorry?

 4              THE COURT:  You have chosen not to make a proper

 5   evidentiary record --

 6              MR. STRICKON:  Yeah.  We put it in our argument,

 7   okay?  And with a --

 8              THE COURT:  Exactly (indiscernible) --

 9              MR. STRICKON:  -- shortened period of time, I can't

10   get an affidavit from NEC, although I'm not sure if their

11   counsel may be here, and their counsel could make a statement

12   to that effect also.  I understand the shortness in the time,

13   but, you know, I'm trying to get the point across that there

14   are operational issues.  And I think Mr. Nash will even confirm

15   that there are operational issues because of uncertainty as to

16   who's in charge here.

17              THE COURT:  So give me your full litany in as much

18   detail as you have available of what the urgent -- what the

19   urgency comes -- what the facts are that demonstrate the need

20   for immediate action.

21              MR. STRICKON:  Well, I mentioned the fact that the

22   NEC has contacted us and is threatening to shut down the

23   telephone and security systems since they haven't been paid.

24   We understand, we've done a preliminary investigation, that the

25   debtor has run up a million dollars in unpaid sales tax and
```

1  occupancy taxes and some $100,000 in penalties for non-payment.

2  It's -- the urgency is that the operation of the hotel at this

3  point is getting, you know, worse and worse as the days go by

4  because nobody has taken a firm control over getting these

5  creditors satisfied so that the hotel can operate flawlessly.

6  And the debtor has done nothing in these cases in five months.

7  There's been nothing to address any of the claims.  There's

8  nothing that's ever been presented to the Court as to what the

9  debtor intends to do if it gets more time.  Indeed, the debtor

10 has gotten additional time when they could refinance and pay

11 off the mezzanine debt and redeem the property, but they

12 haven't done anything there either.

13         Whereas our clients have actually entered into an

14 agreement with One William Street.  It's been executed to

15 restructure the senior debt to get this case moving.

16         THE COURT:  Okay.  Mr. Strickon --

17         MR. STRICKON:  Yeah?

18         THE COURT:  -- let me sharpen the question a little

19 bit.  If I were to say I'm not satisfied, and I want to get

20 into the merits in a moment, but assume for a moment that my

21 ruling today maybe I am not persuaded that you have shown an

22 entitlement to the relief that's requested.  However, I am --

23 that -- I might make that ruling without prejudice to your

24 ability to come back on regular notice and have a hearing, you

25 know, say, two or three weeks from now.  What I want to hear

1   is, are you really telling me that there would be meaningful

2   harm suffered because of the delay between today and let's call

3   it three weeks from now?

4           MR. STRICKON:  Yeah.  I believe so, and I believe

5   that if that was the Court's ruling, Mr. Nash would be back

6   into court asking for relief because of the fact that his

7   client -- I shouldn't say his client, the principals that

8   purportedly are running the hotel have had their hands tied

9   because of the cloud created on the control issue.  We didn't

10  come to the Court in the initial.  Don't forget, we didn't

11  start this proceeding.  This was started by Mr. Nash when he

12  wrote a letter to the Court saying there's a cloud.  We needed

13  to be removed.

14          So I'm a little bit confused as to why the burden is

15  being put on us when we brought --

16          THE COURT:  (Indiscernible).

17          MR. STRICKON:  -- back this motion in the first

18  place.

19          THE COURT:  No.  It's because he didn't make a

20  motion.  He --

21          MR. STRICKON:  Oh, that's right.  That's right.

22          THE COURT:  And I was very clear at the status

23  conference that I don't grant relief, generally speaking --

24          MR. STRICKON:  Yeah.

25          THE COURT:  -- at status conferences.  I require a

1   proper motion.  So you and your co-counsel then made an

2   emergency motion.  That's why I'm busting your chops about the

3   lack of evidence.

4          MR. STRICKON:  Well, the answer is that Mr. Nash --

5   we had -- somebody had to make a motion to bring this on so we

6   could have a conference with Your Honor on Friday of this week.

7          THE COURT:  Okay.

8          MR. STRICKON:  And so, you know, and it didn't appear

9   that Mr. Nash was doing anything.  So we were the ones that

10  took the laboring oar.

11         THE COURT:  All right, let's turn to the merits.  Let

12  me tell you what the problem I have is with your position.  You

13  have put one document before me, the pledge agreement, and

14  reading just the pledge agreement, which by the way is all that

15  I had before me at the status conference, it appears to support

16  your position.  What you did not put before me is the operating

17  agreement, or maybe the title used in this case for it is the

18  LLC agreement.  You didn't put that before me and you didn't

19  address the governing law, Delaware corporate law.  And when I

20  look at both of those, which I've now done, they're darn clear.

21  They say your clients, as the lenders and the pledgees, have

22  the right to take over management functions, exercise

23  management powers upon a foreclosure, but not before.  In other

24  words, it's flat out contrary to what one of the provisions of

25  the pledge agreement says.

1          That's what I want you to address, because frankly, I

2   look at that and I do not see any basis to rule in your favor.

3          MR. STRICKON:  Well, I, you know, (indiscernible) of

4   time, one thing I can see in reference to Your Honor is that at

5   the closing, our clients received an enforceability opinion.

6   And not, you know, unusual, the enforceability opinion came

7   from Mr. Nash's own firm that these documents were enforceable

8   in accordance with their terms.  And as we voted in our re-

9   trial (indiscernible) during the service --

10          THE COURT:  Mr. Strickon, you're having audio

11   problems again.  And I'm saying this because half of what you

12   just said, I could not hear.  It sounded like you were

13   underwater.

14          MR. STRICKON:  What I'm saying, Your Honor, is that

15   the pledge agreement would state --

16          THE COURT:  I can't hear you.  Mr. Strickon, take me

17   off the speaker and speak into your phone.  It's the only way

18   I'm going to be able to hear you.

19          MR. STRICKON:  I'll dial into my phone and then I'll

20   deal with my --

21      (Pause)

22          MR. STRICKON:  Can you hear me now, Your Honor?

23          THE COURT:  Yes, I hear you.  Now I hear an

24   echo.  That's really weird.

25          MR. STRICKON:  Let me take off the speaker.  Can

1   you hear me now, Your Honor?

2                    THE COURT:  Yeah, there's an echo.

3                    MR. STRICKON:  Wait a second.  How about -- not

4   very good at going on at the same time.  Let me try again

5   without the phone.

6                    THE COURT:  Okay.

7                    MR. STRICKON:  Can you make me out now, Your

8   Honor?

9                    THE COURT:  Now it's clear.  Fingers crossed.

10                   MR. STRICKON:  Okay.  Sorry about that.

11                   THE COURT:  Let me make a request.  This is the

12  second hearing in a row that this has happened in.  Let me

13  make -- let me strongly urge you to call your tech people and

14  get this fixed before the next hearing, because it makes it

15  difficult to conduct our business.

16                   MR. STRICKON:  Okay.  What I was saying is that

17  the pledge agreement is quite clear.  Okay.  And it does

18  provide that we can exercise all rights and remedies as if we

19  were the member of the primary.  And the -- there is nothing in

20  the -- what do you call it -- the operating agreement or

21  Delaware law that says we cannot do that.

22                   THE COURT:  That's absolutely not true.

23  Delaware law says that unless the operating agreement or the

24  LLC agreement --

25                   MR. STRICKON:  Mm-hmm.

1          THE COURT:  -- (indiscernible) it doesn't say a

2     pledge agreement can give you these rights.  It says unless the

3     LLC agreement so provides, you don't get management rights

4     until you foreclose.

5          MR. STRICKON:  I'm going to have to check with

6     our corporate people who are familiar with all these documents.

7     I'm only a bankruptcy lawyer, but I will tell you that at the

8     closing of the transaction, the lenders obtained an opinion

9     letter from counsel to the borrower that these agreements are

10    all enforceable and in accordance with their terms.

11         THE COURT:  So you (indiscernible) --

12         MR. STRICKON:  And that's Mr. Nash's firm, by

13    the way.

14         THE COURT:  Yeah.  You know, there's two

15    relevant provisions of the pledge agreement.  You quoted both

16    of them in your letter.  You didn't -- you only mentioned one

17    of them just now.  The other one is relevant because it says

18    that upon a default, you have management powers to the maximum

19    extent permitted by law.  So, that provision appears -- looks

20    to me like it's a reference to the limitations contained in the

21    LLC statute.

22         MR. STRICKON:  I went through the LLC agreement

23    very quickly, and I didn't see any limitations in the LLC

24    agreement.  Unless Mr. Nash is able to point them out.

25         THE COURT:  I'm sorry.  You're having audio

1   problems again.

2              MR. STRICKON:  (Indiscernible) I very quickly

3   went through the LLC agreement to try to find provisions that

4   would bear on the exercise of theses remedies, and I was unable

5   to find anything.

6              THE COURT:  You said the LLC agreement or the

7   LLC statute?

8              MR. STRICKON:  The LLC agreement or the LLC

9   statutes.

10             THE COURT:   So look at -- okay.  So the LLC

11  statute is Delaware -- it's section 18-702(b)(3) of the

12  Delaware LLC statute.  And the operative provision of the LLC

13  agreement is section 23(b) and(c).  You know what?  I'm going

14  to -- I don't want to pause while you read those sections now.

15  I want to ask you, is there anything else you want to include

16  in your argument?  Then I'll turn to Mr. Nash.  And when he and

17  others have had their say, I'll let you tell me what you have

18  to say about the statute and the LLC agreement.  Because by

19  then you'll have had some time to review them.  Does that

20  seem -- does that work from your standpoint?

21             Okay.  Mr. Nash, it's your turn.

22             MR. NASH:  Yes, Your Honor.  We did put in objections

23  to the motion.  And I'd like to just, you know, go towards the

24  emergency to (indiscernible).  I hope that's my voice.  Maybe

25  now I have a problem.

```
1              Can you hear me, Judge?

2              THE COURT:  Yeah, that's better.  It actually was not

3    perfect a moment ago.

4              MR. NASH:  I got a little nervous there.  We did -- I

5    don't think there's an emergency here, Judge.  This hotel is

6    running under the cash collateral order.  We submitted an

7    extension this week, I believe Wednesday.  All the bills and

8    the expenses at our hotel will be paid through the cash

9    collateral order.  I've been very responsive to the senior

10   lender in addressing cash collateral concerns.

11             The issue that Mr. Strickon raised today happened to

12   do with I gave approval to pay the money directly instead of --

13   and we have this in a new cash collateral order, instead of

14   switching it over to the DIP account.  Expenses are paid.

15   They're budgeted.  I'm sure between now and if we have this on

16   regular notice, Mr. Strickon and I can come up with a protocol.

17   Everybody's in favor of making sure expenses are paid.

18             I do think they overplayed the issue of an emergency

19   nature of this motion.  As Your Honor said, there is no

20   evidence of anything of that nature in the documents.  And I do

21   think that the emergency nature, there's no basis for that.

22             I do recognize the issue.  The issue is what happens

23   if there's an incomplete foreclosure sale, and that's what

24   we're dealing with.

25             THE COURT:  Yeah.  Mr. Nash, before you turn to that,
```

1   let me just ask you, sticking with the emergency issue for a

2   moment.  What's your response to what Mr. Strickon said about

3   NEC threatening to cut you off?

4           MR. NASH:  There -- I got a call literally two hours

5   or three hours before the hearing from the senior lender.  They

6   received a request for payment, and the issue there was instead

7   of taking the money from the suspense account and putting it

8   into the DIP account, which is -- would take a little bit of

9   time, was it okay to pay it directly from the suspense account?

10  I immediately said yes.  I copied Mr. Strickon on that email,

11  and I -- and the senior lender then copied Mr. Strickon.

12          So going into the hearing, Mr. Strickon was aware

13  that that issue has been addressed.  I think it's fair to say I

14  got a phone call, and I addressed it within five minutes' time.

15  And so the goal here is -- there's a dispute as to a legal

16  issue.  The goal here is not to do anything to harm the hotel

17  between three sets of lawyers.  And I am more than confident,

18  because we're on our fourth or third extension of cash

19  collateral, we do have the budgets in place, that all of these

20  issues can be easily addressed.  And I understand, if I'm not

21  mistaken, Your Honor has the extension of cash collateral.

22          So I dealt with that issue this morning.

23  Mr. Strickon knew I dealt with it, and I will continue to deal

24  with all administrative issues.  We have never stood in the way

25  of paying any bill, any expense.  The cash collateral order

1  does have, you know, procedures in terms of funding into one

2  account into another, but we will never stand in the way of

3  making sure expenses are paid.

4         THE COURT:  And sorry, I have one question.  I didn't

5  follow the acronym that Mr. Strickon used.  I think it was NEC?

6  Who are they?

7         MR. NASH:  I -- if I'm not mistaken, I think that's

8  the name of the big company that does the servicing for the

9  hotel at the phone level.  Is that the NEC company, the old NEC

10  company, Mr. Strickon?

11         MR. STRICKON:  Yeah.  NEC is the equipment leasing

12  company.  And the one thing that I didn't mention is that the

13  lenders were under the assumption that the equipment had been

14  purchased.  And according to NEC, it was not purchased.  It was

15  subject to an equipment lease, and that the debtor was in

16  arrears in making its monthly lease payments.

17         AUTOMATED VOICE SYSTEM:  You're muted.

18         THE COURT:  Okay, thank you for the clarification.

19         Mr. Nash, I'm not sure, did you respond to that

20  point, the point about NEC threatening to terminate?

21         MR. NASH:  I got an email that they were -- my

22  information was they wanted to be paid, and we took care of

23  that this morning.

24         THE COURT:  Okay.  Let me ask you, because to me, it

25  seems plausible that, you know, when there's an uncertainty

1   about who controls and has the right to manage a company of any

2   sort, including a hotel, it strikes me as quite plausible that

3   that could cause problems, operational problems.  You're

4   telling me that so far you don't think any problems have

5   occurred or are likely to occur anytime soon?

6           MR. NASH:  Yes.  You know, there isn't a hotel

7   manager in place.  What we're talking about is the senior level

8   management of the hotel, not day-to-day operations.  There's a

9   hotel manager in place.  The hotel manager actually runs the

10  day-to-day.  There's a budget in place.  There is a -- we've

11  been doing this for four or five months, and there's a protocol

12  as to how payments are made.  All the payrolls, as Your Honor

13  may recall, you know, are a Tuesday item for the ADP services,

14  and payroll checks go out on Fridays.

15          So on a day-to-day level, the issues that we're

16  having here will not impact the operations of the hotel on a

17  day-to-day basis.  We're talking about senior level management

18  and not day-to-day management.

19          THE COURT:  Okay.  Thank you.  That's helpful.

20  Here's what I propose.  I guess, first, if Mr. Strickon has --

21  have you had enough time to review the agreement on the

22  statute, Mr. Strickon?  Because if --

23          MR. STRICKON:  I have it in front of me, by me, so

24  I'm asking if you could redirect me to the specific provision

25  that's given you proposed.

```
 1              THE COURT:  Are you talking about the statute or the

 2    agreement?

 3              MR. STRICKON:  Statute.  The statute, the Delaware --

 4              THE COURT:  Yeah.  So it's Title VI of the Delaware

 5    Code.

 6              MR. STRICKON:  Yeah, Section 18.

 7              THE COURT:  Section 18-702(b)(3).

 8              MR. STRICKON:  Okay.

 9              THE COURT:  And then did you get the section of the

10    LLC agreement that I referred to?

11              MR. STRICKON:  Yes.

12              THE COURT:  Okay.  All right.

13              So we're going to go back to -- so I'll give you a

14    little more time, and I'm going to go back to -- I -- Mr. Nash,

15    I think what probably makes sense is, let me hear if you have

16    anything more you want to say about the emergency, the need for

17    urgent action or the lack thereof.  After that, I want to hear

18    if anybody else wants to address that issue, including -- it

19    would be nice if we could hear from the counsel for the

20    manager, if they're prepared to weigh in on that.  And after

21    that, we'll go back to Mr. Strickon to respond on the merits.

22    I think, Mr. Nash, it probably makes sense for him to make his

23    argument before I ask you to respond to him.

24              MR. NASH:  That's fine, Your Honor.

25              THE COURT:  Okay.  So are you done on the emergency
```

1  issue, or did you have more to say on that?

2          MR. NASH:  No, I think I've completed that.

3          THE COURT:  Okay.  So, Mr. -- I believe it's

4  Mr. Ringel, representing the manager?

5          MR. RINGEL:  Yes, Your Honor.  What I have heard from

6  my client is that the operations are continuing in accordance

7  with the cash collateral order, as one would expect.  And

8  beyond that, we really don't want to get into the middle or

9  we're really agnostic as to the change of ownership issue.

10 It's a legal issue for the Court to decide.  But operationally,

11 from a day-to-day point of view, it's my understanding that

12 it's operating in accordance with the budget and so on.

13         THE COURT:  Okay.  All right.  Thank you.  And to be

14 clear, I did not mean to ask you to weigh in on the merits

15 issue.

16         MR. RINGEL:  Understood, Your Honor.  Thank you.

17         THE COURT:  Okay.

18         Does anybody else, before I turn back to Mr. Strickon

19 and turn to the merits, does anybody else want to be heard on

20 the emergency issue?

21         MR. REICH:  Judge, if I may just be heard on second

22 overall, because we are affected by all this.  I represent --

23 by the way, I'm Jeffrey Reich from the Reich Law Firm, and I --

24 we represent IMCMV Times Square LLC.  My client is a -- I think

25 the largest tenant other than the hotel, in that they run the

1    Margaritaville Restaurant and Entertainment Facility in Times

2    Square, which is the bottom floor, and also have a contract

3    with the hotel where they provide services to the hotel for

4    what I understand to be all their culinary needs, so to speak.

5         And I can't really comment on the emergency issue,

6    but I will comment to this level that this needs to be dealt

7    with because it is causing uncertainty for my client.  It's

8    causing uncertainty for everybody.  I can't say, and I will not

9    say that it has to be dealt with today, but it does need to be

10   dealt with.  And it's really not for the Court.  This is not

11   for the Court.  It's really for the parties that this needs to

12   end on one way or the other because it's going to interfere

13   with hurting those that are within the building and trying to

14   provide services for the hotel.

15        There was one instance where I believe recently there

16   was a late payment to my client.  I believe that's been cured.

17   I'm not here to make a factual record.  I'm simply making a

18   point that this does need to be dealt with, whether it's today,

19   three weeks from now, or four weeks from now, and I urge the

20   parties to deal with it because it is going to hurt not only

21   the lenders, but those in the building.

22        THE COURT:  So I appreciate your point.  It sounds

23   highly plausible to me.  But just to put a fine point on the

24   emergency issue, I gather you are not saying to me that if I

25   decided it's three weeks from now, that would be too late.

 1          MR. REICH:  That's correct, Your Honor.  I just made

 2  my point to tell the Court, I guess, from the street's

 3  perspective, in a very real sense, that this issue hanging over

 4  not only my client, but the hotel, the restaurant, the

 5  entertainment facility, it interferes, right?  Because people

 6  need to know with certainty whether they have jobs, certainly

 7  in the management company Ed Allen, who we're dealing with.

 8  And I don't think I need to say anything further, Judge.  I

 9  know you're time-pressed, but it's something that needs to be

10  dealed [sic] with, but certainly not today.

11          THE COURT:  Okay.  All right.  Thank you.  Thank you

12  for that.

13          Would -- does anybody else want to be heard on the

14  emergency issue?

15          MR. GREENE:  Good afternoon, Your Honor.  Anthony

16  Greene from Cadwalader Wickersham Taft, on behalf of OWS CRE

17  Funding I, senior lender of the primary Debtor.  We share the

18  view that these cases need an expeditious resolution and

19  therefore this issue as well.  Clarity over who has title and

20  control over the debtor will assist with operations.  We've

21  been working with the debtor.  We have a proposed interim cash

22  cloud order we submitted jointly this week.

23          However, there have been some difficulties in getting

24  bills paid.  There have been bills that have been submitted to

25  OWS for funding.  We've funded the DIP account and they still

1   have not been paid.  I understand these issues are ongoing and

2   we believe a resolution of this issue will aid in the operation

3   of the hotel.

4           THE COURT:  Well, and I'm going to ask you the same

5   question I just asked Mr. Ringel.  If I decide this issue three

6   or four weeks from now rather than today, does that cause --

7   does that delay cause problems?

8           MR. GREENE:  Well, in our view, the sooner this is

9   resolved, I think, the better.  So if there is additional

10  briefing required, we would ask that it be on some sort of

11  truncated schedule so that we can have a resolution as

12  expeditiously as possible.

13          THE COURT:  Okay.  But nobody's falling off a cliff

14  two weeks from now or any - you don't want to point me to any

15  specific harm that's about to occur at some definite date.

16          MR. GREENE:  Well, Your Honor, in the revised fifth

17  interim cash cloud order we submitted, there are some minor

18  nits that we think would prevent harm in the event that

19  there -- additional time is required, including as to the

20  manner in which we receive invoices and the manner in which

21  certain expenses are funded or paid.

22          For example, in the event, you know, there's an issue

23  with payroll and OWS needs to fund it directly from one of

24  these existing accounts, the new order provides the flexibility

25  to do that.  So in the event that the clarity issue is not

1   resolved immediately, we believe that the new order will allow

2   us the flexibility to operate during that interim period.

3        THE COURT:  Okay.  And just remind me, if you would,

4   that I guess the interim order, I believe, is currently before

5   me.  That is, I think it was filed.  I think it's been signed

6   by both sides and it has been sent to chambers.

7        MR. GREENE:  Yes.  Both the -- Harvey's --

8   Mr. Strickon's group and Mr. Nash's group have reviewed and

9   signed off on the order.

10       THE COURT:  Okay.  And when does the authorization to

11  use cash collateral in that order expire?

12       MR. GREENE:  I believe it is on or around January

13  11th.  It's just a one-month extension.

14       THE COURT:  Okay.  Okay.  Okay.  Thank you.

15       Does anybody else wish to be heard on the emergency

16  issue?

17       MR. GAGION:  Your Honor, Leo Gagion for the New York

18  State Department of Taxation and Finance.  Just peripheral

19  because we just want to put on the record, whenever your Honor

20  decides this, whether it's three weeks from now or today, the

21  state reserves all of its rights regarding the issue of the

22  application of Section 1146 to this transaction.  And I've been

23  in -- while I don't represent the city, I have been informed by

24  counsel to the city that the New York City reserves those

25  rights as well.  Thank you.

```
 1            THE COURT:  Okay.  Understood.

 2            Anybody else?  Again, just on the emergency issue.

 3   Okay.

 4            Mr. Strickon, have you had enough time to review --

 5            MR. STRICKON:  Your Honor, I would like to point out,

 6   number one, that Section 23(b) of the LLC agreement has an

 7   acknowledgement by the company that the pledge of the limited

 8   liability company interest in the company made by a member in

 9   connection with the senior mezzanine pledge agreement shall be

10   a pledge not only of its rights with respect to profits and

11   losses, but also a pledge of all rights, powers, and

12   obligations of the members.  So the LLC agreement --

13            THE COURT:   You lost me.  What provision are you

14   reading from?

15            MR. STRICKON:  Section 23(b) of the LLC agreements is

16   an acknowledgement by the LLC that the pledge of the membership

17   interest includes all rights, powers, and obligations of the

18   member.

19            THE COURT:  Okay.  It then goes on to say some other

20   things that are quite relevant.

21            MR. STRICKON:  Yeah.  It does say, though, upon a

22   foreclosure, sale, or transfer, the successor member may

23   exercise rights and powers of the member, except to the extent

24   not so registered, cause the company to register to transfer.

25   It does go on to say other things, but the acknowledgement by
```

1   the company is exactly what's contemplated by the Delaware

2   statute.  It says, unless the LLC agreement provides otherwise.

3           And in this case, the LLC agreement expressly

4   provides that the member may pledge its membership interest, as

5   well as pledging its right to exercise any powers that the

6   member has under the LLC agreements.

7           THE COURT:  The statute says that unless the LLC

8   agreement provides otherwise, the pledge of an interest --

9           MR. STRICKON:  Yeah, it says, unless the LLC

10  agreement provides otherwise.

11          THE COURT:  But hang on.  It says, unless the LLC

12  agreement provides otherwise, the pledge, quote, "shall not

13  cause the member to have the power to exercise any rights or

14  powers of a member."

15          MR. STRICKON:  Right.

16          THE COURT:  Do you have any response to that,

17  because --

18          MR. STRICKON:  Yeah, my response is that the Delaware

19  statute says, unless provided otherwise by the LLC agreement.

20  And this LLC agreement expressly authorizes a member to pledge

21  its membership interests and to grant, as part of that

22  membership interest, the right to exercise all powers otherwise

23  held by the member.

24          THE COURT:  Okay.  Do you have anything else?

25          MR. STRICKON:  No, I think those provisions are quite

1    specific.

2              THE COURT:  Okay.

3              Mr. Nash, do you want to respond?  I'm not sure you

4    really need to say much in response, but you're welcome to.

5              MR. NASH:  Judge, just briefly, I did lay out all

6    these statutes in my objection.  Mr. Strickon has under his

7    pledge both economic and management rights.  But, and this is

8    the big but, for those to go into effect, he needs to complete

9    the foreclosure.  When he doesn't complete the foreclosure, he

10   doesn't have automatic management rights.  Everything is

11   predicated upon completing the foreclosure.  The statute that

12   Mr. Strickon referred to is -- and it's fairly well recognized

13   at this point, the old rule was, if you pledged a membership

14   interest, you pledged economic entitlements, you can pledge

15   management entitlements as well.  And had he foreclosed on and

16   completed the sale, he would have had both economic and

17   management rights.

18             The problem here is he did not complete the

19   foreclosure.  So, I do think he cannot exercise the management

20   rights outside of that.  I did cite the statutes.  I cited a

21   case in California with comparable type of language.  And it's

22   not that he doesn't have the rights.  He just didn't complete

23   the foreclosure.  And Your Honor to hit on the language to the

24   extent permitted by Delaware law.  I think Delaware law would

25   require a completion of foreclosure.  And that's our position.

1          THE COURT:  Okay.

2          Would anybody else like to be heard on the merits

3    issue?  Okay.  I'm not hearing any response.

4          All right.  I -- here's what I'm going to do.  It's

5    now 3:04.  Let's take a break for 10 minutes.  And, well, let's

6    say at 3:20 -- well, now it's 3:05.  So, let's take a break for

7    ten minutes.  And in ten minutes, let's get back on and I will

8    read my bench ruling.  See you soon.

9      (Recess taken)

10          THE COURT:  All right.  Okay.  I'm ready to read my

11   ruling into the record.  We're here on the emergency motion

12   filed by Cozen O'Connor on behalf of certain purportedly

13   authorized representatives, who I'll refer to either as the

14   representatives or the movants.  They're here as purported

15   representatives of the primary debtor.  But, of course, the

16   issue before me is whether, in fact, they are properly acting

17   on behalf of the primary debtor.

18          The representatives were purportedly appointed to

19   their positions by a resolution of the executive committees of

20   the mezzanine lenders of the secondary debtor.  The emergency

21   motion asks me to find on less than 48 hours' notice that the

22   mezzanine lenders have full voting and managerial control over

23   the primary debtor.

24          Based on this finding, the motion asks me to enter a

25   number of -- enter an order -- sorry, let me try that again.

1    Based on that finding, the motion asks me to order, one, that

2    the change in control of primary described in the notice filed

3    on the docket on November 15 is effective.  Two, that prior

4    management is terminated from their positions with primary.

5    Three, that primary's management and professionals are directed

6    to cooperate with and provide information to the mezzanine

7    lenders as entities in control of primary.  And four, that the

8    debtor can take all actions necessary to effectuate that

9    release.

10          I'm going to decline to grant the requested relief

11   for a number of reasons including principally that I don't find

12   there's any showing of a need for emergency action.  And two,

13   that my preliminary view of the merits issue presented to me is

14   that the lenders have not shown that they're likely to win on

15   the merits.  In fact, quite the contrary.

16          So what I'm going to do is I'm going to explain the

17   reasons for my ruling.  I'm then going to set this down for

18   full briefing on a regular briefing schedule.  And I'm going to

19   set it for a hearing on January 12.  I'm going to direct that

20   the lenders file their brief one week from today.  The lenders

21   or authorized representatives, however we want to designate

22   them.  That the debtor file its responsive brief the following

23   Friday.  Obviously, I've set that schedule because the week

24   after that is the week between Christmas and New Year's, and I

25   assume that you all don't want to be briefing this during that

1   week.  And I certainly don't want to hold a hearing that week.

2          Before I give a further explanation of my findings,

3   let me make one other point.  And that is when the lenders do

4   come back with a further showing on the merits, I don't think

5   the lenders have properly thought through the relief they're

6   requesting.  I think that if the lenders had persuaded me that

7   they were right or likely to win on the merits, that would

8   potentially have supported a finding that the lenders are

9   entitled to exercise control over primary.  That is, they're

10  allowed to step into the shoes of the current equity owners and

11  exercise all the rights that they would have as the holders of

12  LLC interests.

13         It's -- several additional steps are required to get

14  from that conclusion, which is the issue that's really been

15  briefed, to get from there to the further types of relief that

16  I've been asked to enter, particularly the request that I

17  terminate management.  That's something that needs to be done

18  pursuant to proper corporate procedures, not by a court

19  parachuting in and acting -- exercising powers under I don't

20  know what authority.  And similarly, directing management's -

21  sorry, directing the primary debtors management and

22  professionals to cooperate, there hasn't been a proper motion

23  made to support relief of that sort either.

24         So if the debtor wants to seek relief of any of those

25  sorts, I don't view that as being properly part of this motion.

1   You're welcome to do a follow on motion if you win on January

2   12, you can file a follow on motion seeking relief of that

3   sort.  But you have not yet laid a necessary groundwork for me

4   to consider granting that sort of relief, even if you win on

5   the merits.

6           Okay, let me turn first to whether there's an

7   emergency and I'll then turn to the merits.  As I mentioned,

8   during the hearing, there's been absolutely no proper

9   evidentiary showing supporting the need for emergency relief.

10  There's simply a declaration from counsel, actually, counsel

11  who's brand new to this case, and presumably doesn't know a

12  whole lot about what's actually going on at the debtor.  And

13  counsel's declaration contains just conclusory statements.

14          No detailed facts and no indication that this -- that

15  these statements are based on personal knowledge, rather than

16  being purely hearsay statements.  So, counsel really should

17  know better.  You need to make a -- if you want relief from

18  this Court, you need to make a proper evidentiary showing.

19          Now, I am a bankruptcy court.  And so I did -- I do

20  want to do what's best for the debtor, even if counsel have not

21  properly put the evidence before me.  And so I did hear the

22  arguments of the lawyers for what they're worth about whether

23  harm is likely to occur if I don't rule on the merits today.

24  And what I'm about to say on that score, I hesitate to say it

25  because it's not based on evidence.  But if what counsel said

1  to me today were backed up by evidence, it still wouldn't

2  support the need for emergency relief.

3          The one fact that I have before me that really is a

4  fact, and not just lawyers say so, is that the parties have

5  reached agreement on a new interim cash collateral order, which

6  will run through January 11.  There -- it also seems to be

7  undisputed that there's a manager in place, and that the

8  manager is able to continue to act on behalf of the hotel,

9  despite the cloud caused by the uncertainty on the legal issue.

10 And so you put all that together, it suggests to me that

11 nothing terrible is going to happen if I defer ruling until

12 mid-January, which is what I'm going to do.

13         And I -- the last thing I would say on that score is,

14 you know, to the extent I'm giving any weight to statements of

15 counsel, I found it encouraging that counsel for a number of

16 relevant parties spoke up, including one of the Cadwalader

17 lawyers, plus Mr. Ringel and Mr. Reich, and all of them seem to

18 be in agreement that pushing this off till mid-January will not

19 cause the sky to fall, although I suspect all of them agree

20 that it is necessary to bring this issue to a head and decide

21 it at some point before too long.  And so that's what I plan to

22 do.  I do plan to rule shortly after the hearing that I'm

23 scheduling.

24         Okay, let me turn to the merits.  I have had a very

25 limited amount of time and my clerks have had a very limited

1   amount of time to research the issues that have been raised

2   before me, and the issues are not simple.  And that's why I'm

3   not going to rule on the merits today.  Instead, what I'm going

4   to do is I'm going to tell you my tentative thinking that in

5   the hope that that may help shape your research and the

6   arguments you make in your briefs.  And when you're performing

7   next in January, I have a strong preliminary view that the

8   debtors win this fight on the merits.  That is, that the

9   lenders had no proper legal basis to exercise the management

10  rights conferred by the LLC interests prior to taking title

11  with respect to those rights.

12          I'm going to tell you why that's my strong leaning,

13  but it's with the big caveat that my strong leaning is based on

14  a limited amount of research and it's very possible that some

15  of you will come up with stuff that I'm not aware of and that

16  will change my mind.

17          But nevertheless, here's what I'm looking at right

18  now.  The lender has pointed to two provisions of the pledge

19  agreement, both in Section 7 of that agreement.  The two

20  provisions are significantly different.  The one that

21  Mr. Strickon mentioned first during his argument today, if one

22  was looking at nothing else, nothing other than this provision,

23  this would seem to be a winner for him.  This is the provision

24  that says, quote, "lender may exercise all membership rights,

25  powers, and privileges following a default to the same extent

1  as debtor is entitled to exercise such rights, powers, and

2  privileges."  On its face, that seems to be the relief that

3  Mr. Strickon is asking for.

4          However, another passage in Section 7 of the same

5  agreement is quite different.  And I'm not going to read it

6  verbatim.  But to paraphrase, it essentially says that

7  following default, the secured party can exercise management

8  rights, quote, "to the maximum extent permitted by law."  And

9  that caveat is the crucial issue here, because as I'm about to

10  address, applicable law, namely Delaware LLC law, appears to

11  not allow a secured party to exercise management rights prior

12  to foreclosure.

13          So there does -- there seems to be a tension between

14  these two different passages that are both part of Section 7.

15  Let me put a pin in that and turn to the Delaware law and the

16  LLC agreement, and then I'm going to circle back to what does

17  this say about how one interprets Section 7 of the pledge

18  agreement.

19          The starting point in looking at Delaware law is the

20  Delaware LLC statute, because primary, the debtor we're calling

21  primary, is an LLC organized under Delaware law.  So any issues

22  concerning governance, LLC governance with respect to primary,

23  including any issues concerning the construction of its LLC

24  agreement or the implementation of that agreement, is governed

25  by Delaware law.

1            The Delaware LLC statute has some very relevant

2    provisions, and I'm going to quote a few of them.  And --

3    the -- no, it says that, quote, unless otherwise provided in

4    the party's LLC agreement, one, an assignment of an LLC -- I'm

5    paraphrasing to some extent -- an assignment of an LLC interest

6    does not entitle the assignee to become or to exercise any

7    rights or powers of a member.  Two, an assignment of an LLC

8    interest does entitle the assignee to share in profits, losses,

9    distributions, et cetera, of the LLC.  Three, the pledge of or

10   granting of a security interest in an LLC interest of a member

11   shall not cause the member to cease to be a member or to have

12   the power to exercise any rights or powers of a member.  That

13   is, to reiterate, pledging the LLC interest does not strip the

14   member of its powers as a member.  And finally, assignees have,

15   quote, "no right to participate in the management of the

16   business and the affairs of an LLC, except as provided in the

17   LLC agreement."  And I've been quoting from section 18-70(a) of

18   the Delaware LLC statute.

19            In short, the upshot of these provisions is that

20   members of an LLC have both economic interests and non-economic

21   interests, the former being rights such as the right to share

22   in profits and losses, and those rights are freely

23   transferable.  Non-economic rights, such as the power to manage

24   the entity, are not transferable unless -- prior to foreclosure

25   unless otherwise provided in the LLC agreement.

1           And by the way, New York law is the same, although I
2    don't think that matters here because there's no question that
3    primary is a Delaware LLC.

4           So the next question is, what does primary's LLC
5    agreement say?  And for starters, let me say I am not happy
6    about the fact that the lenders came running into court seeking
7    emergency relief on very short notice, and they chose to put
8    before me the pledge agreement, but not the LLC agreement.  And
9    they chose not to mention Delaware's LLC statute.

10          Mr. Strickon mentioned that he is not a secure
11   transactions lawyer.  Well, guess what?  I'm not either, and
12   most bankruptcy judges are not.  I think it's quite troubling
13   to seek relief and especially emergency relief where the Court
14   is going to have limited time to review the arguments and fail
15   to mention something as critical as this.  Frankly, I think
16   it's somewhat comparable to failing to cite a Second Circuit
17   decision that is contrary.  And as you know, the ethics rules
18   provide that that is a serious breach of ethics.

19          At my request, counsel for the debtor provided my
20   chambers with a copy of the LLC agreement just a few hours
21   before the hearing and we reviewed it.  And Section 23 of that
22   agreement is extremely relevant.  It has a number of relevant
23   revisions.  And for starters, Section 23(b) provides that upon
24   a foreclosure sale or other transfer of the LLC interests in
25   primary under the pledge agreement, the mezzanine lender or

1    other purchaser is automatically admitted as a member effective

2    upon such foreclosure sale or other transfer.

3        It then says the following, quote, "upon a foreclosure

4    sale or other transfer, the successor member is entitled to,"

5    quote, "exercise all the rights and powers of the member

6    pursuant to this agreement, including the power to designate,

7    appoint, expel, and remove the directors and officers of the

8    company."  So these are exactly the rights that the lenders are

9    telling me they have, but their LLC agreement provides that

10    they -- explicitly that they do not have those powers until

11    they have actually foreclosed, which they have not done.

12            Finally, section 23(c) provides that primary sole

13    member, quote, "shall be permitted to pledge and upon any

14    foreclosure of such pledge" -- sorry, "upon any foreclosure of

15    such pledge in connection with the admission of the mezzanine

16    lender or purchaser as a member, transfer to the mezzanine

17    lender or other purchaser the member's rights and powers to

18    manage and control the affairs of the company pursuant to the

19    terms of the pledge agreement."  So again, the power to manage

20    the company kicks in for the lenders only upon foreclosure, not

21    before.

22            So let's go back now to the to the pledge agreement.

23    As I mentioned earlier, the first of the two clauses -- or

24    there are two clauses.  One of them says that management rights

25    are transferred upon default, quote, "to the maximum extent

1   permitted by law", close quote.  That provision clearly is very

2   easy to harmonize with the LLC agreement and LLC statute

3   provisions that I just discussed.  You reach exactly the same

4   conclusion.

5         The other relevant pledge provision is harder to

6   harmonize.  Arguably, it conflicts.  In which case, I think,

7   but I encourage all of you to brief this if you think that's

8   helpful.  I think that if that other portion that I quoted from

9   Section 7 of the pledge agreement, if that other portion of the

10  agreement is flat out conflicts with the LLC agreement, I think

11  it's legally ineffective, inoperative, because I don't think

12  the pledge agreement can give powers that the member doesn't

13  have under the LLC agreement.

14        But again, I encourage you to brief that.  I think

15  another possible conclusion, another possible way to look at

16  this passage from Section 7 is that the parties didn't really

17  mean what it seems to say.  And you have to read the expressed

18  terms of this provision in conjunction with the other passage

19  in Section 7, the one that does limit it to the extent

20  permitted by law.  And you have to say they really meant this

21  should be construed to mean the same thing as that other

22  passage.

23        In any event, that's an issue that I encourage the

24  parties to brief, because to me, the answer to that question is

25  not obvious based on the record before me.  And I guess I

1   should also say, to the extent the parties wish to present

2   evidence on how those provisions should be construed, or

3   evidence on any other matter, bearing on the merits issue,

4   you're welcome to do that.  If you're going to do that, though,

5   you know, just be aware in that event, the hearing in January

6   will need to be an evidentiary hearing.  It'll need to be in

7   person in my courtroom.  And there'll need to be advance notice

8   and coordination concerning how testimony, witness testimony is

9   going to be handled.

10          I guess what I should add is if you're going to do

11  that, give me at least a week's advance notice and I'm going to

12  want to schedule a pretrial conference at least a few days

13  before the hearing to deal with any trial issues.  Give me one

14  moment.

15          That completes my preliminary ruling, my preliminary

16  thinking on the merits issue.  I welcome further briefing

17  because, as I said, my thinking may not reflect everything that

18  I should be considering and everything that you'll wish to

19  bring before me when you have a bit more time to do so.

20          I do want to address one final issue before

21  completing my bench ruling, and that is the automatic stay.

22  Until today, until having analyzed the issues that are before

23  me right now, I didn't think there was a stay issue.  I didn't

24  think the actions that lenders have been taking violated the

25  stay or even, you know, raised a question as to whether they

1   might be violating the stay.  Based on what I now know, based

2   on having now seen the LLC agreement and read the Delaware LLC,

3   the relevant provisions of the Delaware LLC statute, I have a

4   serious question whether the debtors may have -- whether the

5   actions the debtors have already taken may have violated the

6   automatic stay.

7        And I encourage the debtors to either raise this

8   issue with me or not, as they see fit.  But I want to share

9   with you my thinking on that and then I leave it to the

10  debtors, whether they want to bring a motion to address this or

11  I guess if the lenders want to bring a sort of preemptive

12  motion asking for a ruling that there's no stay violation,

13  they're welcome to do that as well.

14       The starting point for thinking about the stay here

15  is the stipulation and order that I entered lifting the

16  automatic stay pursuant to the settlement reached by the

17  parties some months ago.  That stipulation was drafted by the

18  two parties and -- which may be relevant to how one construes

19  what it means.  But I'll quote the relevant language.  It said

20  that the stay, quote, "is terminated so as to permit the

21  mezzanine lender to proceed with the UCC disposition of the

22  debtor's membership interest in primary and to exercise any and

23  all other rights and remedies relating thereto."

24       Now, up to now, I had not seen any reason to disagree

25  with the lenders characterization of what that latter phrase,

1    rights and remedies relating thereto, meant.  That is, I've not

2    seen until now any reason to doubt that that included them

3    taking steps purportedly standing in the shoes of the debtors

4    management, such as purporting to replace the debtors manager

5    and take other actions on behalf of the debtor.  I think it's

6    clear, though, based on my ruling so far that my prior reading

7    of this provision may have been wrong.

8            That is, if my tentative ruling on the merits issue

9    is correct and the lenders have no right until they foreclose

10   to exercise any management powers on behalf of the debtor, then

11   in that event, the phrase all other rights and remedies

12   relating thereto would not seem to cover actions the lenders

13   have taken to manage and control the debtor.  That phrase

14   instead would merely cover actions necessary to tee up the

15   auction and sale of the membership interest, which is not the

16   same thing as stepping into the debtor's shoes and purporting

17   to manage the debtor.

18           So this is new to me.  I had not thought of this

19   problem.  It should not have been new to the parties, because

20   the parties drafted the LLC agreement.  They were aware or

21   arguably were on notice of what it said.  I was not.  It was

22   not in the record before me until I asked for it and received

23   it today.

24           So I think that's all I'll say on this front, but I

25   think it's quite possible there has been a meaningful violation

1    of the automatic stay by the lenders.  I don't know whether

2    that has caused any harm.  It's quite possible it has not.  And

3    so this may not be enormously consequential, but I did want to

4    say that that seems to be the implication of my tentative

5    ruling on the merits issue.

6          Give me -- I may be completed -- I may be done with

7    my ruling.  Give me one second.

8          Oh, okay.  My clerks have corrected me about

9    scheduling.  I think I misspoke when I said -- I may have

10   misspoken when I said January 12.

11         Let me put you on pause for a minute and I'll come

12   back and clarify whether we're talking about a hearing on

13   January 5 or on January 12.  And then if the parties want to

14   have availability issues, I'll obviously hear that as well.

15   But first, give me one minute.

16      (Pause)

17         THE COURT:  Okay, I'm back.  Sorry if I -- I might

18   have misspoken about the scheduling.  What I meant to say or

19   should have said is unless parties have a problem with this

20   date, I want to schedule the hearing for January 5 at 2 p.m.

21   And with the briefing schedule, the same as what I previously

22   said, that is lender's brief due one week from today.  Debtor's

23   brief, that is Mr. Nash's brief, due one week thereafter.  Does

24   anybody have a problem with that schedule?

25         MR. NASH:  Your Honor, Kevin Nash, I'm traveling that

1    week.  Is it -- can we go back to the 12th?

2             THE COURT:  Oh, okay.  So, I -- let me hear what

3    other parties have to say.  I'm okay from my standpoint, from a

4    chamber standpoint, I'm okay with January 12.

5             Mr. Strickon, do you have a position on that?

6             MR. STRICKON:  January 12th is fine, Your Honor.

7             THE COURT:  Okay.

8             MR. STRICKON:  The only thing I would ask is if

9    we're -- if the hearing is not until January 12th, could we get

10   an extra few days for the filing of a brief?

11            THE COURT:  Yeah, no, I think that's reasonable.  So,

12   actually, hang on one sec.

13            What if I propose January 11 instead of 12?  Is that

14   okay?

15            MR. STRICKON:  Let me double check on there.  January

16   11th is fine also.

17            THE COURT:  Okay.

18            Mr. Nash?

19            MR. NASH:  Yes, that would be fine, Judge.

20            THE COURT:  Okay.  So, January 11 at 10 a.m.

21            MR. STRICKON:  January 11th.

22            THE COURT:  And that'll be a Zoom hearing unless

23   people plan to put on testimony, in which case it'll be in the

24   courtroom.

25            Okay, briefing.  So, the problem we're facing is

1  Christmas week.  But, give me one second.

2          So, Mr. Strickon, what if I gave you -- what if I

3  gave you till Wednesday, December 20?

4          MR. STRICKON:  That's fine.

5          THE COURT:  Okay.

6          And Mr. Nash, what date do you want?

7          MR. NASH:  Would it be okay with Your Honor if it was

8  the Wednesday, you know, at least 10 days before?  If we're

9  going to do it on the 11th, maybe, if it's okay with Your

10  Honor.  I don't have a calendar, but January 3 or 4, I assume

11  that's after New Year's.

12          THE COURT:  Yeah, I'm going to give you until January

13  5, just because you're --

14          MR. NASH:  Thank you.

15          THE COURT:  -- the one who got the short stick in

16  terms of being forced to brief over the holidays.

17          MR. NASH:  Right.

18          THE COURT:  So, I'm giving you to Friday, January 5,

19  which is six days before the hearing.

20          MR. NASH:  I appreciate that, Judge

21          THE COURT:  Okay, I need to wrap up because I'm now

22  late for my next hearing.  Is there any urgent final issue

23  anybody needs to raise?

24          Okay, I will see you all on January 11.  Happy

25  Holidays to all of you.

1            UNIDENTIFIED:  You too.  Thanks, Judge.

2            UNIDENTIFIED:  And good luck with your procedure,

3    Judge.

4            UNIDENTIFIED:  Thank you, you too, Judge.

5            UNIDENTIFIED:  Good luck with the surgery.

6            UNIDENTIFIED:  Yes.

7            THE COURT:  Thank you very much.

8            MR. STRICKON:  Take care.

9            THE COURT:  Okay.  Bye.

10        (Proceedings concluded)

11                        * * * * *

12

13

14            **C E R T I F I C A T I O N**

15

16        I, Alicia Jarrett, court-approved transcriber, hereby

17    certify that the foregoing is a correct transcript from the

18    official electronic sound recording of the proceedings in the

19    above-entitled matter.

20

21

22

23    _____

24    ALICIA JARRETT, AAERT NO. 428     DATE: December 12, 2023

25    ACCESS TRANSCRIPTS, LLC