EXHIBIT "1"


AMENDED DISCLOSURE STATEMENT WITH RESPECT TO
SECOND AMENDED CHAPTER 11 PLAN OF
560 SEVENTH AVENUE OWNER PRIMARY LLC

**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------x

In re                                                             Chapter 11

560 SEVENTH AVENUE OWNER                  Case No. 23-11289 (PB)
PRIMARY LLC,

               Debtor.

---------------------------------------------------------x

## AMENDED DISCLOSURE STATEMENT WITH RESPECT TO AMENDED CHAPTER 11 PLAN OF 560 SEVENTH AVENUE OWNER PRIMARY LLC

### Dated:  February 3, 2025

**This is not a solicitation of acceptance or rejection of the plan. Acceptances or rejections may not be solicited until a disclosure statement has been approved by the Bankruptcy Court. This disclosure statement is being submitted for approval but has not been approved by the Court.**

**COZEN O'CONNOR**
3 WTC, 175 Greenwich Street
New York, New York 10007
(212) 883-4900
(212) 986-0604
Frederick E. Schmidt, Jr.

Peter J. Roberts
Christina M. Sanfelippo
123 N Wacker Drive, Ste. 1800
Chicago, Illinois 60606
(312) 382-3100
proberts@cozen.com
csanfelippo@cozen.com

*Attorneys for 560 Seventh Avenue Owner*
*Primary LLC*

ALL CREDITORS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT, INCLUDING THE FOLLOWING SUMMARY, ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, ANY AND ALL SUPPLEMENTS TO THE PLAN AND THE OTHER EXHIBITS ANNEXED TO THE PLAN AND THIS DISCLOSURE STATEMENT. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER SUCH DATE.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE LAW. THIS DISCLOSURE STATEMENT HAS NEITHER BEEN APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC") NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING CLAIMS SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSES FOR WHICH THEY WERE PREPARED.

CERTAIN STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING FORWARD-LOOKING STATEMENTS, ARE BASED ON ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL REFLECT ACTUAL OUTCOMES.

THE INFORMATION IN THIS DISCLOSURE STATEMENT IS BEING PROVIDED SOLELY FOR PURPOSES OF VOTING TO ACCEPT OR REJECT THE PLAN. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE USED BY ANY PERSON OR ENTITY FOR ANY OTHER PURPOSE. THE FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING THE DESCRIPTION OF THE DEBTOR, ITS BUSINESS AND EVENTS LEADING TO THE COMMENCEMENT OF THESE CHAPTER 11 CASES, HAS BEEN OBTAINED FROM VARIOUS DOCUMENTS, AGREEMENTS AND OTHER WRITINGS RELATING TO THE DEBTOR. NEITHER THE DEBTOR NOR ANY OTHER PARTY MAKES ANY REPRESENTATION OR WARRANTY REGARDING SUCH INFORMATION.

THE TERMS OF THE PLAN GOVERN IN THE EVENT OF ANY INCONSISTENCY WITH THE SUMMARIES IN THIS DISCLOSURE STATEMENT. ALL EXHIBITS TO THE DISCLOSURE STATEMENT ARE INCORPORATED INTO AND ARE A PART OF THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.

AS TO CONTESTED MATTERS, EXISTING LITIGATION INVOLVING THE DEBTOR, ADVERSARY PROCEEDINGS, AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE WITHOUT PREJUDICE SOLELY FOR SETTLEMENT PURPOSES, WITH FULL RESERVATION OF RIGHTS, AND IS NOT TO BE USED FOR ANY LITIGATION PURPOSE WHATSOEVER.  AS SUCH, THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING INVOLVING THE DEBTOR, OR ANY OTHER PARTY IN INTEREST, NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, FINANCIAL OR OTHER EFFECTS OF THE REORGANIZATION AS TO HOLDERS OF CLAIMS AGAINST OR EQUITY INTERESTS IN THE DEBTOR.

TO ENSURE COMPLIANCE WITH TREASURY DEPARTMENT CIRCULAR 230, EACH HOLDER IS HEREBY NOTIFIED THAT (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON, BY ANY HOLDER FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON A HOLDER UNDER THE TAX CODE; (B) SUCH DISCUSSION IS INCLUDED HEREBY BY THE DEBTOR IN CONNECTION WITH THE PROMOTION OR MARKETING (WITHIN THE MEANING OF CIRCULAR 230) BY THE DEBTOR OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) EACH HOLDER SHOULD SEEK ADVICE BASED ON ITS PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

## TABLE OF CONTENTS

I. INTRODUCTION ........................................................................................................1

II. OVERVIEW OF THE PLAN AND SUMMARY OF THE TREATMENT OF CLAIMS AND INTERESTS ........................................................................8

III. OVERVIEW OF CHAPTER 11 ........................................................................13

IV. DESCRIPTION OF THE DEBTOR'S BUSINESSES........................................15

V. THE CHAPTER 11 CASE ................................................................................17

VI. SUMMARY OF THE PLAN OF REORGANIZATION....................................24

VII. CONFIRMATION PROCEDURE....................................................................71

VIII. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN...................................................................................................76

IX. CERTAIN RISK FACTORS TO BE CONSIDERED ......................................77

X. SECURITIES LAWS MATTERS......................................................................79

XI. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN .........79

XII. RECOMMENDATION AND CONCLUSION .................................................83

EXHIBIT A—PLAN

EXHIBIT B— DISCLOSURE STATEMENT ORDER

EXHIBIT C - LIQUIDATION ANALYSIS

EXHIBIT D—FINANCIAL PROJECTIONS

LEGAL\75473915\1

# I.
## INTRODUCTION

On August 12, 2023 (the "Petition Date"), 560 Seventh Avenue Owner Primary LLC (the "Debtor") filed a petition for relief under chapter 11 of the title 11 of the United States Code (the "Bankruptcy Code") with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"). Contemporaneously herewith, the Debtor filed the *Amended Chapter 11 Plan of 560 Seventh Avenue Owner Primary LLC* (as may be further amended, revised, modified or supplemented, the "Plan"). A copy of the Plan is annexed as Exhibit A. The Plan, among other things, sets forth the manner in which Claims against and Equity Interests in the Debtor will be treated. This Disclosure Statement (the "Disclosure Statement") describes certain aspects of the Plan (including the treatment of creditor Claims under the Plan), the Debtor's business and related matters. Unless otherwise defined herein, all capitalized terms used herein have the meanings ascribed to them in the Plan.

When the Debtor – then controlled by its Former Directors and Officers – first filed its chapter 11 petition, its corporate parent at the time, 560 Seventh Avenue Owner Secondary LLC ("Secondary") was already a debtor with its own chapter 11 case pending in the Bankruptcy Court. Secondary filed its case in order to prevent a pending foreclosure of collateral for a mezzanine loan it had taken. As hereafter described, the mezzanine lenders, AREPIII MVTS, LLC (an affiliate of Arden Group) and CREP Times Square Hotel LLC (an affiliate of Corten Real Estate) (together, the "Mezzanine Lenders") obtained relief from the automatic stay in Secondary's chapter 11 case and foreclosed on their collateral consisting of 100% of the equity interests in the Debtor. As a result, the Debtor is now owned and controlled by the Mezzanine Lenders' designee, AC MVTS Holdco, LLC (together with its affiliates or corporate parents, the

"Parent"). Under the Parent's management, the Debtor has continued to operate in chapter 11 and now proposes the Plan as a means to exit chapter 11.

The Plan is predicated on agreements that the Debtor has reached with many of its largest creditors for the treatment of their claims as outlined herein and in the Plan. Chief among those is an agreement with the Debtor's senior secured creditor, OWS CRE Finding I, LLC ("OWS"), which agreement is set forth in the OWS Term Sheet attached to the Plan. The OWS Term Sheet provides for the Plan's treatment of the OWS Secured Claim, which is in the approximate amount of $150 million, plus all other amounts due in connection with the existing OWS loan. OWS will (i) receive a cash payment on or prior to the Effective Date of the Plan and (ii) provide the Reorganized Debtor with a $140 million loan extension on the Effective Date with the balance to be paid over a two-year period thereafter, with two Debtor options each to extend the term by an additional one year.

Another key agreement that the Debtor reached was with its largest general unsecured creditor, the Garment Center Congregation (the "Congregation"). As more fully set forth below and in the Plan, the Congregation has agreed to accept a payment of $4 million on the Effective Date in full and final satisfaction of any and all claims that it has against the Debtor, including its filed $39 million general unsecured claim and any and all claims that it would otherwise have as a result of the Debtor rejecting its lease of real property to the Congregation. In addition, the Congregation has agreed that the lease will be treated as terminated under the Plan and will forego any rights it otherwise may have to occupy the premises.

The Debtor has also reached an agreement with its former hotel manager, DHG TSQ, LLC ("DHG) for the treatment of its secured and unsecured claims totaling approximately $4.5

million.  Under that settlement, DHG's claims shall be paid by non-Debtor entities pursuant to the terms of the Plan in accordance with terms and conditions set forth in Exhibit B to the Plan.

The Debtor has also made a proposal for the treatment of the secured claim in the amount of approximately $3.278 million asserted by Flintlock Construction Services, LLC ("Flintlock") which provides for the parties to consensually agree on an Allowed amount of such claim and for payment on account of such claim over time in accordance with the terms set forth on Exhibit C to the Plan.  If Flintlock does not vote in favor of the Plan, its claim shall automatically become a Claim in Class 1c (Other Secured Claims) and will be subject to any and all defenses of the Debtor or Reorganized Debtor as the case may be.  The Debtor estimates the total amount of Other Secured Claims to be approximately $90,000 to $3.8 million (largely depending on whether Flintlock votes in favor of the Plan).

As a result of these key agreements, and upon the terms and conditions contained in the Plan, the Parent has agreed to forego distributions on account of its $23,928,420.11 administrative expense claim and to provide funding sufficient (when coupled with the Debtor's cash on hand, if any)  for the Debtor to make all distributions and payments required to be made under the Plan on or within 90 days following the Effective Date.  This funding will provide recoveries to creditors who would not receive any recovery if the Debtor were to be liquidated under chapter 7 of the Bankruptcy Code.  The Debtor estimates that the total value of the Parent's contributions to the Plan will be in excess of $30 million.  In exchange for such funding, the Parent (or one or more of its designees) will either retain its existing Equity Interests or be issued new Equity Interests in the Debtor.  The Plan funding to be provided by the Parent is not on account of any preexisting Parent obligation, is indisputably substantial, and is necessary to make the distributions and payments required by the Plan.

Pursuant to the terms and conditions of the Plan and largely through the funding provided by the Parent, all Administrative Expense Claims will be paid in full, including Professional Fees.  Priority Tax Claims will also be paid in full.  These claims will all be paid on the later of the Effective Date or the date that they become Allowed except that the Debtor may elect to pay Priority Tax Claims in equal monthly installments over a period of five (5) years at the statutory rate of interest.  Secured Claims (other than the OWS Secured Claim, the DHG Claim and the Flintlock Claim) will be paid in full on the Effective Date and are unimpaired under the Plan, as are Priority Non-Tax Claims.  General Unsecured Claims (estimated by the Debtor to be approximately $5.76 million) will receive their Pro Rata share of $1 million provided that the Class votes to accept the Plan.  Personal Injury Claims (filed in the amount of $1.75 million) will be permitted to pursue any available insurance proceeds notwithstanding any chapter 11 or Plan stays or injunctions.As discussed more fully below, the Debtor, after careful analysis and discussion, and in consultation with its advisors, has concluded that recoveries to creditors will be maximized under the Plan, as contrasted with other possible alternatives.

This Disclosure Statement is submitted to Holders of Claims against the Debtor in connection with (i) the solicitation of acceptances of the Plan and (ii) the hearing to consider confirmation of the Plan (the "Confirmation Hearing") presently scheduled for March 18, 2025, at 10:00 a.m. (Prevailing Eastern Time).

Attached as Exhibits to this Disclosure Statement are copies of the following:

• The Plan (Exhibit A); and

• An Order of the Court dated February 4, 2025 (the "Disclosure Statement Order"), among other things, approving this Disclosure Statement and establishing certain procedures with respect to the solicitation and tabulation of

votes to accept or reject the Plan (Exhibit B).

•        Liquidation Analysis (Exhibit C)

•        Financial Projections (Exhibit D)

In addition, a Ballot for the acceptance or rejection of the Plan is being transmitted with this Disclosure Statement to the Holders of Impaired Claims that are entitled to accept or reject the Plan.

On February 4, 2025, after notice and a hearing, the Court approved the Disclosure Statement and determined that the Disclosure Statement contained adequate information of a kind and in sufficient detail to enable hypothetical, reasonable investors typical of the Debtor's creditors to make an informed judgment whether to accept or reject the Plan. APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.

The Disclosure Statement Order sets forth in detail the deadlines, procedures and instructions for voting to accept or reject the Plan and for filing objections to confirmation of the Plan, the record date for voting purposes and the applicable standards for tabulating Ballots. In addition, detailed voting instructions accompany each Ballot. Each Holder of a Claim entitled to vote on the Plan should read this Disclosure Statement, the Plan, the Disclosure Statement Order, the other Exhibits hereto and the instructions accompanying the Ballot(s) in their entirety before voting. These documents contain, among other things, important information concerning the classification of Claims for voting purposes and the tabulation of votes. No solicitation of a vote to accept the Plan may be made without giving the voter a Disclosure Statement approved by the Court.

A.    **Holders of Claims and Equity Interests Entitled to Vote**

Only Impaired Holders of Allowed Claims or Interests are entitled to vote to accept or reject a proposed chapter 11 plan. Unimpaired Classes are deemed to have accepted the Plan and are not entitled to vote. Classes of Claims or Interests that will not receive any distribution under a reorganization plan are deemed to have rejected such plan and also are not entitled to vote.

Under the Plan, Classes 1, 1a, 1b, 3, 3a and 3b are Impaired and entitled to vote on the Plan. Classes 1c, 2 and 4 are Unimpaired and conclusively deemed to have accepted the Plan.

The Bankruptcy Code defines "acceptance" of a plan by a class of claims as acceptance by creditors in that class that hold at least two-thirds in dollar amount and more than one-half in number of the claims that vote for acceptance or rejection of the plan. For a more detailed description of the requirements for confirmation of the Plan, see Article VII, "Confirmation Procedure."

B.    **Voting Procedures**

If you are entitled to vote to accept or reject the Plan, a Ballot is enclosed for that purpose. If you hold a Claim or an Interest in more than one Class and you are entitled to vote in more than one Class, you will receive separate Ballots that must be used for each separate Class.

Please vote and return your Ballot(s) by one of the following methods: (i) by First Class Mail, Overnight Courier, or Hand Delivery to 560 Seventh Avenue Owner Primary LLC Ballot Processing Center, c/o Kroll Restructuring Administration LLC, 850 Third Avenue, Suite 412, Brooklyn, NY 11232; or (ii) by electronic Ballot through the Online Balloting Portal on the Debtor's website at https://cases.ra.kroll.com/560SeventhAve/.

**DO NOT RETURN ANY OTHER INSTRUMENTS OR AGREEMENTS WITH YOUR BALLOT. TO BE COUNTED, YOUR BALLOT INDICATING ACCEPTANCE**

OR REJECTION OF THE PLAN MUST BE RECEIVED NO LATER THAN 4:00 P.M. (PREVAILING EASTERN TIME) ON MARCH 7, 2025.

Each Holder of an Allowed Claim in an Impaired Class that receives or retains property under the Plan shall be entitled to vote separately to accept or reject the Plan and indicate such vote on a duly executed and delivered Ballot as provided in such order as is entered by the Bankruptcy Court establishing certain procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan, or any other controlling order or orders of the Bankruptcy Court.

If you are a Holder of a Claim entitled to vote on the Plan and you did not receive a Ballot, received a damaged Ballot or lost your Ballot, or if you have any questions concerning the procedures for voting on the Plan, please contact Kroll at (844) 712-1864 (U.S./Canada, toll-free) or +1 (646) 777-2463 (international, toll) or 560SeventhAveInfo@ra.kroll.com (with "560 Seventh Ave. Solicitation Inquiry" in the subject line).

C.    **Confirmation Hearing**

The Confirmation Hearing will be held on March 18, 2025 at 10:00 a.m. (Prevailing Eastern Time) before the Honorable Philip Bentley, United States Bankruptcy Judge, One Bowling Green, New York, New York 10004.   The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan be served and filed so that they are received on or before March 7, 2025, at 4:00 p.m. (Prevailing Eastern Time).   Service of any objection to confirmation must be served upon (i) counsel for the Debtor, Cozen O'Connor, 3WTC, 175 Greenwich Street, New York, New York 10007, Attn: Frederick E. Schmidt, Jr. (eschmidt@cozen.com), Peter J. Roberts (proberts@cozen.com), and Christina Sanfelippo (csanfelippo@cozen.com); (ii) counsel for OWS CRE Funding I, LLC, Cadwalader, Wickersham & Taft LLP, 200 Liberty Street, New York, NY 10281, Attn:  Gregory M. Petrick

(Gegory.Petrick@cwt.com), Thomas J. Curtin (Thomas.Curtin@cwt.com), and Anthony L.

Greene (Anthony.Greene@cwt.com); (iii) the Office of the United States Trustee, Alexander

Hamilton Custom House, One Bowling Green, Room 534, New York, NY 10004-108, Attn:

Brian S. Masumoto; and (iv) all entities which have filed a notice of appearance and demand for

service of documents in these cases (the foregoing, collectively, the "Notice Parties"). The

Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without

further notice except for the announcement of the adjournment date made at the Confirmation

Hearing or at any subsequent adjourned Confirmation Hearing.

THE DEBTOR BELIEVES THAT THE PLAN IS IN THE BEST INTERESTS OF THE

DEBTOR AND ITS CREDITORS AND URGES CREDITORS TO VOTE TO ACCEPT THE

PLAN.

## II.
## OVERVIEW OF THE PLAN AND SUMMARY OF THE
## TREATMENT OF CLAIMS AND INTERESTS

The Plan is a plan of reorganization. Upon the Effective Date of the Plan, the Debtor will

emerge from its Chapter 11 Case as a Reorganized Debtor. Pursuant to the Plan, the Debtor's

Parent will make a New Value Contribution that will enable the Debtor to make required

distributions under the Plan. The Debtor has not received any other offer from any person or

entity to provide funding for the Plan. Further, although the exclusive period for the Debtor to

file a plan expired on or about December 11, 2023, no other person or entity has proposed

another plan. There are seven Classes of Claims provided under the Plan, and one Class of

Equity Interests. Claims in Classes 1 (OWS Secured Claim), 1a (DHG Claim), 3 (General

Unsecured Claims), 3a (Personal Injury Claims), and 3b (Congregation Claim) are Impaired

under the Plan and entitle to vote to accept or reject the Plan. Claims and Interests in Classes 1b,

2 and 4 are unimpaired by the Plan and are deemed to have accepted the Plan.

The table below briefly summarizes the specific classification and treatment of Claims and Equity Interests under the Plan. Holders of Claims are strongly encouraged to review the full treatment provisions of the Plan. As provided in the Plan, Administrative Expense Claims, Priority Tax Claims, and Professional Fee Claims have not been classified and are excluded from the following Classes in accordance with section 1123(a)(1) of the Bankruptcy Code:

| Class | Type of Claim or Equity Interest | Treatment | Estimated Claim Amount (By Class) | Estimated Recovery |
|---|---|---|---|---|
| 1 | OWS Secured Claim | Impaired. The OWS Secured Claim shall be deemed Allowed and paid over time in accordance with the terms and conditions set forth on the term sheet attached as Exhibit A to the Plan (the "OWS Term Sheet"). | $149,373,904.88 | 100% |
| | | Per the OWS Term Sheet, OWS shall receive an initial distribution in Cash on the Effective Date in the estimated amount of $9,373,905.88[1] (or such other amount which would reduce the OWS Secured Claim to $140,000,000.00), plus additional amounts for OWS's fees and expenses, including the Restructuring Expenses, incurred in connection with the restructuring of the OWS Claim under the Plan. The remaining $140,000,000.00 of the OWS Secured Claim shall be restructured and paid, interest only, over a period of two years, with the balance due to be paid at the end of the extended term (subject to two one-year Debtor extension options). The treatment under the Plan for the Holder(s) of the OWS Secured Claim shall be in full satisfaction, release and discharge of the Debtor's obligations with regard to the OWS Secured Claim. | | |
| 1a | DHG Claim | Impaired. The DHG Claim is the claim asserted by DHG TSQ, LLC by proof of claim number 39, asserted on or about April 9, 2024 in which it asserts a Secured Claim in the amount of $3,111,115.25 and a General Unsecured Claim in the amount of $1,353,013.19. Provided DHG votes in | $4,464,128 | 28% - 100% |

---

[1] The size of the OWS Secured Claim may be subject to paydowns from the Parent. To the extent any such paydowns are made after the filing of the Plan, the size of the cash Distribution on the Effective Date shall be reduced in an amount equal to such paydown.

favor of the Plan, on the Effective Date, DHG, the Reorganized Debtor, AREPIII MVTS, LLC, CREP Times Square Hotel, LLC, Brookriver Hotels & Resorts, LLC and Highgate Hotels, L.P. shall be deemed to have entered into the agreement annexed to the Plan as Exhibit B (the "DHG Agreement") and the DHG Claim treated in accordance therewith in full satisfaction, release and discharge of the Debtor's obligations with regard to the DHG Claim. In the event that DHG does not vote in favor of the Plan, that portion of the DHG Claim asserting a Secured Claim will become a Class 1c claim (subject to any and all defenses of the Debtor or Reorganized Debtor as the case may be) and that portion of the DHG Claim asserting a General Unsecured Claim will become a Class 3 Claim (subject to any and all defenses of the Debtor or Reorganized Debtor as the case may be).

| 1b | Flintlock Claim | Impaired. The Flintlock Claim is the Claim asserted by Flintlock Construction Services, LLC in proof of claim number 49, filed on or about April 10, 2024, asserting a Secured Claim in the amount of $3,277,814.24. Under the Plan, the Debtor and Flintlock will enter into good faith discussions to consensually arrive at an Allowed amount of the Flintlock Claim. The Holder of the Flintlock Claim shall receive the treatment set forth on Exhibit C to the Plan, summarized as follows: Flintlock shall receive an initial distribution in Cash in the amount of 33% of the Allowed Flintlock Claim ten (10) business days (or as soon thereafter as is practicable) from the later to occur of (i) the Effective Date; and (ii) the date on which a final Certificate of Occupancy is obtained and all open construction items itemized on Schedule 1 to Exhibit C to the Plan have been resolved in a manner satisfactory to the Debtor in its sole discretion; and (iii) the date on which the Flintlock Claim becomes Allowed. Flintlock shall then receive distributions in Cash on account of the remaining 66% of its Allowed Flintlock Claim at intervals, and upon the terms and conditions set forth on Exhibit C to the Plan, based upon the magnitude, timing and occurrence of a "Monetization Event" generating sufficient "Net Proceeds" as more fully set forth on | $3,277,814 | 33% - 100% |

Exhibit C to the Plan.

| | | | | |
|---|---|---|---|---|
| 1c | Other Secured Claims | Unimpaired. To the extent not previously paid, in full satisfaction, release and discharge of the Debtor' Pre-Petition obligations to each Holder of an Allowed Class 1b Other Secured Claim, on the later to occur of (a) the Effective Date (or as soon as reasonably practicable thereafter) and (b) the date on which a Secured Claim shall become Allowed, each Holder of an Allowed Secured Claim shall receive, at the Debtor's option, and to the extent such Claim is secured by collateral in the possession of the Debtor as of the Effective Date (i) payment in Cash of 100% of the Allowed Secured Claim; (ii) the return of the relevant collateral (provided, however, that to the extent that such collateral is subject to the first priority mortgage and security interest securing the OWS Secured Claim, then any return of relevant collateral may not occur unless the OWS Secured Claim and Restructuring Expenses have been paid in full); (iii) such treatment that leaves unaltered the legal, equitable and contractual rights of the Holder of such Allowed Secured Claim; or (iv) such less favorable treatment as the Debtor and the Holder of such Other Secured Claim may agree upon. | $90,000 - $3,800,000 | 100% |
| 2 | Priority Non-Tax Claims | Unimpaired. The Plan will not alter any of the legal, equitable and contractual rights of the Holders of Allowed Priority Non-Tax Claims. To the extent not previously paid, on the later to occur of (a) the Effective Date (or as soon as reasonably practicable thereafter) and (b) the date on which a Priority Non-Tax Claim shall become Allowed, the Debtor, in full and final satisfaction of such Priority Non-Tax Claim, will (i) pay to each Holder of an Allowed Priority Non-Tax Claim, in cash, the full amount of such Allowed Priority Non-Tax Claim, or (ii) satisfy and discharge such Allowed Priority Non-Tax Claim on such other terms and conditions as may be agreed between the Holder of such Allowed Priority Non-Tax Claim and the Debtor. The Debtor does not believe that there exist any liquidated Priority Non-Tax Claims. | $0 | 100% |
| 3 | General Unsecured Claims | Impaired. Class 3 is comprised of all General Unsecured Claims except for Personal Injury Claims and the | $5,758,648 | 17% |

| | | | | |
|---|---|---|---|---|
| | | Congregation Claim. Provided Class 3 accepts the Plan, in full and final satisfaction, release and discharge of the Debtor's obligations with respect to General Unsecured Claims, each Holder of an Allowed General Unsecured Claim in Class 3 shall receive, in full and complete settlement, satisfaction and discharge of such Allowed General Unsecured Claim, its Pro Rata share of $1,000,000.00. If Class 3 rejects the Plan, it will not receive any distribution. | | |
| 3a | Personal Injury Claims | Impaired. Class 3a is comprised of Personal Injury Claims. To the extent not previously paid, Holders of Personal Injury Claims shall, notwithstanding any injunction or similar provision contained in the Plan, pursue such /claim to final judgment, including any appeals or settlement. Any judgment or settlement will be paid solely to the extent of any available proceeds of any applicable Personal Injury Insurance Policy. To the extent that any applicable Personal Injury Insurance Policy contains a SIR, such SIR shall be paid, satisfied, settled and discharged by the allowance of a Class 3 General Unsecured Claim in the amount of the applicable SIR. | $1,750,000 | 0 - 100% |
| 3b | Congregation Claim | Impaired. Class 3b is comprised of the claims held by the Congregation (the "Congregation Claim"). The Congregation Claim is classified separately from other General Unsecured Claims due in part to a provision in the real property lease pursuant to which the Debtor leased certain space in the now-demolished building located at 560 Seventh Avenue, New York, NY and pursuant to which the Debtor was obligated to provide the Congregation with comparable space in the new building located at 560 Seventh Avenue, New York, NY. That provision specifies that the Debtor (as the successor landlord) shall have no personal liability with respect to any provisions in the lease and Congregation may look solely to the Debtor's interest in the subject real property for satisfaction of any remedies. No other property or assets of the Debtor are subject to levy, execution or other enforcement procedure. In addition, as the tenant under a lease to be rejected under the Plan, the Congregation is the only creditor which potentially has rights under section 365(h) of the Bankruptcy | $39,000,000 | 10.26% |

Code.

In full and final satisfaction, release and discharge of the Debtor's obligations with respect to the Congregation Claim, the Congregation Claim, which is hereby deemed Allowed, shall be treated as follows:

(1)    In connection with the rejection of the Congregation Lease under the Plan, on the Effective Date, the Congregation shall be deemed to have opted for the treatment provided under section 365(h)(1)(A)(i) of the Bankruptcy Code such that the Congregation Lease shall be deemed terminated by such rejection and the Congregation shall have no right to occupy any part or portion of the Premises.

(2)    The Congregation shall receive a Cash distribution of $4,000,000.00 on the Effective Date.

| 4 | Equity Interests | Unimpaired. In consideration for the New Value Contribution, the Parent, as the Holder of Equity Interests, shall be entitled to one of the following two options to be exercised prior to the Effective Date: | N/A | 100% |

(i)    existing Equity Interests shall be reinstated in full and the Parent will own 100% of the outstanding Equity Interests in the Reorganized Debtor (the "Equity Reinstatement Option"); or

(ii)    all existing Equity Interests shall be cancelled and new Equity Interests shall be issued in the Reorganized Debtor and distributed to one or more entities of the Parent's choosing (the "New Equity Option").

## III.
## OVERVIEW OF CHAPTER 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.

Under chapter 11, a debtor is authorized to reorganize its business for the benefit of interested

parties, including its creditors and equity interest holders.  In addition to permitting rehabilitation of a debtor, another goal of chapter 11 is to promote equality of treatment for similarly situated creditors and equity interest holders with respect to the distribution of a debtor's assets.

The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the filing date.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."  The consummation of a plan of reorganization is the principal objective of a chapter 11 reorganization case.  A plan of reorganization sets forth the means for satisfying claims against and interests in the debtor.  Confirmation of a plan by the bankruptcy court makes the plan binding upon a debtor, any issuer of securities under the plan, any person acquiring property under the plan and any creditor or equity interest holder of a debtor.  Subject to certain limited exceptions, the confirmation order discharges a debtor from any debt that arose prior to the date of confirmation of the plan and substitutes therefor the obligations specified under the confirmed plan.

After a plan has been filed, the holders of claims against or interests in a debtor are generally permitted to vote to accept or reject the plan.  Before soliciting acceptances of the proposed plan, however, section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the plan.  The Debtor is submitting this Disclosure Statement to Holders of Claims against or Equity Interests in the Debtor to satisfy the requirements of section 1125 of the Bankruptcy Code.

# IV.
# DESCRIPTION OF THE DEBTOR'S BUSINESSES

The Debtor owns and operates a hotel in the Times Square neighborhood of Manhattan under the brand name Margaritaville Resort Times Square (https://www.margaritavilleresorts.com/margaritaville-resort-times-square) (the "Hotel"). The Hotel opened in July 2021 and is located at 560 7th Avenue, New York, NY 10018. It is a 29-story full-service hotel with 234 guestrooms. The Hotel contains various food and beverage concessions which the Debtor leases to tenants, including the Margaritaville Restaurant & Tiki Bar, Joe Merchant's Coffee & Provisions, LandShark Bar & Grill, License to Chill Bar and the 5 o'Clock Somewhere Bar. There are also meeting rooms, a roof deck swimming pool, and a fitness room. In addition, the Hotel features approximately 17,463 square feet of total leasable retail space, 4,865 of which was recently leased to NYC Megamart Management Corp which intends to use the space as an upscale retail sale of gifts/coffee shop.

Pursuant to the *Declaration Pursuant to Local Bankruptcy Rule 1007-2 and in Support of First Day Motions* [Docket No. 1] (the "First Day Declaration")[2] the development of the Hotel started in 2014 and was completed in 2021 after about two years of construction. The Hotel's opening coincided with the tail end of the COVID-19 pandemic which presented challenging economic conditions.

Per the First Day Declaration, the development of the Hotel was financed through loans provided by Related Real Estate Partners. In the fall of 2021, those loans were refinanced with (1) senior secured mortgage debt (the "Senior Mortgage Debt") held by OWS; (2) senior

---

[2]  As more fully set forth hereafter, when the Debtor filed its chapter 11 petition, it was under different ownership and management. It was not until December 20, 2023 - approximately four months after the commencement of the Chapter 11 Case - that current ownership and management took over the Debtor and its operations. Descriptions herein of the Debtor's business and operations preceding December 19, 2023 are taken from various filings in the Bankruptcy Court, including the First Day Declaration. The Debtor makes no warranties or representations regarding the accuracy of such information.

mezzanine debt in the initial principal amount of $57 million (the "Senior Mezzanine Debt")

provided to the Debtor's then corporate parent, 560 Seventh Avenue Owner Secondary LLC

("Secondary"), by AREPIII VMTS, LLC and CREP Times Square Hotel LLC (together the

"Mezzanine Lenders"); and (3) junior mezzanine debt in the initial principal amount of $85

million (the "Junior Mezzanine Debt") provided to Secondary by Global One Real Estate

Investment Trust and its affiliates (together, "Global One").  As the Debtor stipulated in the Cash

Collateral Order, the Senior Mortgage Loan had an aggregate principal amount of no less than

$156,652,018.10, which is valid, perfected, binding, enforceable, and not subject to any

challenge or defenses of any kind.  ECF No. 117, ¶ (D).

    As of the Petition Date, Secondary owned 100% of the equity interests in the Debtor.

Those equity interests, however, were pledged as collateral in connection with the Senior

Mezzanine Debt.  Beginning on or about March 9, 2023, numerous events of default occurred

under the Senior Mezzanine Debt (which at that time had an approximate balance of $85

million).[3]  Those events of default were both monetary and non-monetary.  As a result of the

numerous defaults under the Senior Mezzanine Debt, the Mezzanine Lenders delivered to the

Debtor, on or about April 10, 2023, written notice of their intention to sell their collateral – 100%

of the equity interests in the Debtor – to the highest qualified bidder in a UCC disposition to be

conducted on July 10, 2023.

    In an effort to halt the UCC disposition of the Debtor's equity interests, Secondary

commenced an action in the Supreme Court of the State of New York, County of New York on

June 28, 2023 seeking a preliminary injunction and temporary restraining order.  That effort

---

[3]    Secondary also defaulted under the Junior Mezzanine Debt which, according to a default notice issued to
Secondary on March 31, 2023, had an accrued and unpaid balance of approximately $113 million.

failed and Secondary commenced its chapter 11 case on July 9, 2023 in order to prevent the Senior Mezzanine Lenders' foreclosure.

The Mezzanine Lenders obtained relief from the automatic stay from the Bankruptcy Court on September 1, 2023, conducted a public auction for the pledged Debtor equity interests on October 16, 2023, and closed on the foreclosure sale on December 19, 2023. All of the Debtor's equity interests are now owned by the Mezzanine Lenders' designee, AC MVTS Holdco, LLC.

The Debtor's prior ownership severely mismanaged the Hotel. It failed to pay the Debtor's financial obligations while reporting to its lenders that such obligations were being paid. The Debtor further defaulted on its franchise, management and lease agreements, placing the Hotel in financial peril.

## V.
## THE CHAPTER 11 CASE

### A.    <u>Motions and Orders</u>

***First Day Motions.*** Immediately upon the commencement of the Chapter 11 Case, the Debtor filed the following "first day" motions: (i) *Motion to Approve Use of Cash Collateral*; (ii) *Motion to Authorize Payment of Pre-Petition Payroll*; and (iii) *Motion for Joint Administration.* Each of the Debtor's first day motions was ultimately granted by the Bankruptcy Court.

***The Joint Administration Motion.*** The Debtor sought and obtained an order authorizing it to jointly administer the Chapter 11 Case with Secondary's case. At the time, Secondary, an entity whose only tangible asset was the Debtor's equity interests, was the Debtor's corporate parent. The joint administration of the bankruptcy cases permitted the Clerk of the Court to use a single docket for both Primary and Secondary's cases and to combine notices to creditors and other parties-in-interest of the Debtor's and Secondary's respective estates. Thus, at the time,

joint administration saved time and money and avoided duplicative and potentially confusing filings by permitting counsel for all parties-in-interest to (a) use a single caption on the numerous documents that were served and filed in the bankruptcy cases and (b) file the papers in one case rather than in multiple cases.

*The Wage Motion*.    Because obligations to employees typically constitute pre-petition claims, the Debtor, as is customary in chapter 11 cases, sought and obtained an order authorizing, but not directing, the Debtor's payment of pre-petition obligations to its employees. Per the motion, although the Hotel was managed by a hotel management company[4] which directly oversaw the Debtor's employees, those employees remained under the Debtor's employ. As of the Petition Date, the Debtor had approximately 75 employees with a total average weekly payroll of approximately $100,000.    The employee obligations included (i) the payment of accrued pre-petition payroll; and (ii) the payment of all withholding taxes and deductions as well as any administrative fees owed to the Debtor's payroll processor.

*The Cash Collateral Motion*.    The Debtor filed a motion seeking interim approval for the use of cash collateral, which included the hotel's cash deposits, receipts, and rents. The Debtor aimed to continue using existing cash management and lockbox arrangements to operate the hotel. As the Debtor stipulated in the Cash Collateral Order, the hotel had a Senior Mortgage Loan with an outstanding principal amount of approximately $156.7 million, which is valid, binding, enforceable, perfected, and not subject to any challenges or defenses of any kind.[5] The

---

[4]  As of the Petition Date, the Debtor utilized DHG TSQ, LLC as its hotel manager.  After the postpetition change in ownership and control of the Debtor (described below), the Debtor began utilizing Highgate Hotels, L.P. as its hotel manager.  Highgate directly employs and manages all of the personnel working at the hotel.  Therefore, the Debtor currently has no employees of its own.

[5]  The Cash Collateral Order requires parties to file challenges to the Senior Mortgage Loan no later than 75 days after the entry of that order.  No party filed any such challenge in a timely fashion, and thus, the stipulations in the Cash Collateral Order with respect to the Senior Mortgage Loan are binding on all parties in interest.  *See* ECF No. 117 ¶ 9.

Debtor and OWS negotiated terms allowing the use of cash collateral to pay budgeted expenses, granting the lender replacement liens and adequate protection. The use of cash collateral was required to maintain hotel operations and avoid significant value loss and job cuts.  The cash collateral motion also contained a cash management component seeking to maintain a series of designated accounts for collecting and disbursing the hotel's revenues. This arrangement aimed to maintain operational continuity and provide adequate protection to the prepetition senior mortgage lender.

*Official Committee of Unsecured Creditors*.  On August 28, 2023, the United States Trustee filed a notice that it was unable to appoint an Official Committee of Unsecured Creditors (the "Committee") pursuant to 11 U.S.C. § 1102 of the Bankruptcy Code.

*Filing of Schedules and Statement of Financial Affairs*.  On September 15, 2023, the Debtor, under prior management, filed its schedules [ECF # 44] (as thereafter amended, the "Schedules") and statement of financial affairs [ECF # 45] (the "Statement of Financial Affairs") pursuant to Rule 1007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

*Initial Application to Retain Debtor Professionals.*   The Debtor, under prior management and ownership, and its then-corporate parent, Secondary, sought to retain Goldberg Weprin Finkel Goldstein LLP as their principal bankruptcy counsel, by application filed on October 27, 2023.  On November 1, 2023, AREPIII MVTS, LLC and CREP Times Square Hotel LLC objected to that retention application.  No hearing was ever conducted to consider this motion and the Debtor did not prosecute it any further due to the subsequent change in ownership and control of the Debtor.

*Change in Ownership and Control of Debtor*.  The Debtor's previous corporate parent, Secondary, filed a chapter 11 petition with the Bankruptcy Court on July 9, 2023 in an effort to

halt the foreclosure by AREPIII MVTS, LLC and CREP Times Square Hotel LLC (together, the "Mezzanine Lenders") of their collateral – 100% of the equity interests in the Debtor. On July 12, 2023, the Mezzanine Lenders filed a motion seeking relief from the stay in Secondary's bankruptcy case. That motion was ultimately resolved by the entry of a Stipulation and Order Lifting the Automatic Stay entered on September 1, 2023. On October 16, 2023, a public auction was conducted with respect to the equity interests in the Debtor. The Mezzanine Lenders submitted the successful bid. On December 19, 2023, the Mezzanine Lenders consummated the transfer of the equity interests in the Debtor with such interests being transferred to their affiliate, AC MVTS Holdco, LLC, the Debtor's current corporate parent. In connection with the consummation of the foreclosure, the Debtor's management was replaced.

*Garment Center Congregation Adversary Proceeding.* On December 28, 2023, the Congregation commenced an adversary proceeding against the Debtor seeking a declaration from the Court that approximately $1.7 million held in escrow was property of, and should be released to, the Congregation. The complaint further sought an order declaring and directing that the Debtor replenish funds previously removed from the escrow in the approximate amount of $800,000 and the concomitant release of such replenished funds to the Congregation. The adversary proceeding was thereafter consensually resolved by the parties, with the Debtor agreeing to release the approximately $1.7 million (without replenishing any funds) held in escrow to the Congregation.

*Retention of Debtor Professionals.* On December 29, 2023 the Debtor filed an application seeking to retain Cozen O'Connor as its principal bankruptcy counsel which was thereafter granted by order entered on March 25, 2024. The Debtor also received Court approval

for its retention of Kroll Restructuring Administration LLC ("Kroll") as its claims and noticing

agent and of LW Hospitality Advisors as its Appraiser.

**Motion to Terminate Joint Administration**.  On January 12, 2024, the Debtor filed a

motion to terminate the joint administration of its bankruptcy case with that of Secondary.  As

set forth above, the Court had previously consolidated the cases for procedural purposes.

However, after the transfer of 100% of the debtor's limited liability company interests to AC

MVTS Holdco, LLC, the Debtor and Secondary were no longer affiliates. Consequently, the

Debtor requested that the Court terminate the joint administration and maintain separate dockets

for each case.  The motion was thereafter granted without opposition.

**Bar Date Motion**.  On February 21, 2024, the Debtor filed a motion seeking to set the last

date for creditors to file proofs of claim.  Due to an error on the Schedules, in which the Debtor's

previous management failed to indicate whether any of the scheduled claims were contingent, the

order entered by the Court setting April 10, 2024 as the deadline for the submission of proofs of

claim (the "Bar Date") required *all* creditors to file a proof of claim, regardless of whether their

claim was contained in the Schedules.

**Motion for Relief From Stay by NEC Financial Services LLC**.  On March 12, 2024,

NEC Financial Services, LLC ("NEC") filed a motion seeking relief from the automatic stay to

repossess and foreclose on certain equipment used in the Debtor's hotel business, but financed

through agreements with a former affiliate, 560 Seventh Avenue JV, LLC, including security,

camera, telephone, and computer equipment. NEC argued that the Debtor had no legal or

equitable title to the equipment and had defaulted on payments since May 2023. The motion

requested the Court to allow repossession or, alternatively, to condition the stay on the Debtor

making adequate protection payments.  NEC's motion was thereafter resolved by stipulation

under which (1) the parties agreed to relief from the automatic stay to the extent necessary for NEC to foreclose upon the equipment; (2) the Debtor and NEC entered into a new installment agreement for the purchase of the equipment; (3) NEC was granted a first priority security interest in the equipment; and (4) the parties exchanged mutual releases.

*Motion for Order Establishing Procedures for Monthly Compensation of Professionals*.  On May 21, 2024, the Debtor filed a motion for an order establishing procedures for the monthly compensation of its professionals under which the Debtor's professionals shall be paid 80% of their monthly fees and 100% of their expenses.  The motion was thereafter granted without opposition on June 13, 2024.

*Motion for Approval of Unsecured Post-Petition Financing*.  On June 24, 2024, the Debtor filed a motion for an order authorizing it to obtain unsecured post-petition financing pursuant to 11 U.S.C. § 364(b).  In order to provide the Debtor with necessary liquidity and funding to maintain its post-petition operations, the Debtor sought post-petition unsecured financing from the Parent in a total amount of up to $23 million, payable on demand with interest at SOFR plus 775 basis points.  The Parent would have an allowed administrative expense claim for the full amount of funds loaned to the Debtor post-petition plus interest.  The Debtor's motion was unopposed and on July 19, 2024, an order was entered granting the requested relief. To date, the Parent has provided $23,928,420.11 to the Debtor under the loan arrangement approved by the Court.  Under the Plan, the Parent will waive any distribution on account of its administrative claims.

*Motion for Relief From Stay by CubeSmart, L.P.*  On July 18, 2024, CubeSmart, L.P. ("CubeSmart") filed a motion seeking relief from the automatic stay to enable it to obtain possession of property contained in a storage unit owned by CubeSmart and selling it to recover

approximately $5,637.00 in unpaid rent for the unit. The Debtor's new management had not been receiving invoices for the storage fees and was unaware of the arrears. The Debtor thereafter became current on its obligations and the parties updated their agreements to ensure that notification procedures were up to date and correct. Accordingly, on July 22, 2024, CubeSmart withdrew its motion.

*Motion to Enter Into Amendments to the Debtor's Food & Beverage Leases.* On August 21, 2024, the Debtor filed a motion seeking Court approval to enter into amendments to its leases under which IMCMV Times Square LLC ("IMCMV") leases space in the hotel and operates food and beverage concessions. The amendments aimed to reinstate the original rent, eliminating previous reductions, and to address a proof of claim filed by IMCMV. The amendments were intended to increase the Debtor's monthly cash inflow and were conditioned upon Court approval. No objections to the motion were received and, on September 24, 2024, the Court entered an order approving the lease amendments.

*Motion for Relief From Stay by Waynette A. Thomas*. On October 24, 2024, Waynette A. Thomas, an individual who had filed a proof of claim asserting a personal injury claim in the amount of $200,000 sought relief from the automatic stay to enable her to proceed against any available insurance proceeds in state court. In connection with her motion, Ms. Thomas agreed to waive any right to a distribution from the Debtor or its estate on account of her claim. The Debtor and Ms. Thomas stipulated to the relief sought and the Court thereafter approved the stipulation.

**B.    Disclosure Statement/Plan Confirmation Hearings**

The Debtor has moved the Court for an order approving this Disclosure Statement as containing "adequate information" to enable a hypothetical, reasonable investor typical of the Holders of Claims in classes eligible to vote on the Plan to make an informed judgment as to

whether to accept or reject the Plan. On February 4, 2025, the Bankruptcy Court entered an order approving the Disclosure Statement and scheduling a hearing on confirmation of the Plan for March 18, 2025.

## VI.
## SUMMARY OF THE PLAN OF REORGANIZATION

### A.    <u>Introduction</u>

The Debtor believes that confirmation of the Plan provides the best opportunity for maximizing recoveries for the Debtor's creditors. The Plan is to be funded by the Debtor's Parent in the form of both cash contributions and the waiver of any distribution on account of its Parent Administrative Claim. It is anticipated that the value of the Parent's necessary contributions to the Plan will exceed $30 million. The Parent's contributions will allow for distributions to be made to Holders of Allowed Administrative Expense Claims, Other Secured Claims, the DHG Claim, Flintlock Claim, Priority Non-Tax Claims, General Unsecured Claims and the Congregation Claim who would otherwise receive no distribution if the Debtor were to be liquidated under chapter 7 of the Bankruptcy Code.

The Debtor expects that total distributions and payments to be made on or within 90 days of the Effective Date under the Plan will total approximately $16.3 million. The Plan provides for the payment of all Allowed unclassified Administrative Expense Claims, Priority Tax Claims, and Professional Fee Claims in full on the Effective Date or as soon thereafter as such claims are Allowed or as reasonably practicable. The Plan further provides for the payment of Allowed Class 1c Other Secured Claims and Allowed Class 2 Priority Non-Tax Claims in full in cash on the Effective Date or as soon thereafter as is reasonably practicable. Other Classes to receive partial or full payment on account of their Allowed Claims on the Effective Date include Class 1 (OWS Secured Claim), which will receive a cash payment equal to $9,373,905.00 or

such other amount necessary to reduce the outstanding claim of OWS to $140,000,000; Class 3 (General Unsecured Claims) whose Holders will receive their Pro Rata share of $1,000,000; and Class 3b (Congregation Claim), which will receive a distribution of $4,000,000. Any cure payments required to be made by the Debtor in connection with its assumption of executory contracts or unexpired leases will also be paid on the Effective Date. With the exception of a cure payment to be made to Nouveau Elevator Industries, LLC in the approximate amount of $49,893, the Debtor does not anticipate the need to make any other cure payments on the Effective Date.

Classes which will receive periodic distributions subsequent to the Effective Date include Class 1 (OWS Secured Claim) which will receive distributions on account of the $140 million loan extension over a period of two years, interest-only with the balance to be paid at the end of the extended two-year term (subject to two one-year Debtor extension options); and Holders of Allowed Claims in Class 1a (DHG Claim) and 1b (Flintlock Claim)[6] which will each receive distributions following the Effective Date in an amount calculated pursuant to agreements with each member of such classes pursuant to Exhibits B and C to the Plan.

Prior to the Confirmation Date, the Plan Distribution Reserve will be fully funded through the Debtor's cash on hand and the Parent Funding Contribution. The cash in the Plan Funding Reserve shall be sufficient to make all distributions and payments required to be made on the Effective Date. Post-Effective Date periodic payments to Holders of Allowed Class 1 Claims and Class 1b Claims shall be paid from cash generated by the Debtor's post-Effective Date operations and/or a refinancing, sale or other disposition of the Debtor's hotel business.

---

[6] The Debtor and DHG have negotiated and agreed to the treatment for the DHG Claim and, accordingly, the Debtor expects that Class 1a will vote to accept the Plan. To the extent that Class 1b (Flintlock Claim) votes to reject the Plan, the Flintlock Claim will become a Class 1c Claim, subject to any and all defenses of the Debtor or Reorganized Debtor as the case may be.

The Debtor will act as its own distribution agent.  Payments under the Plan to Class 1a will be made by the Parent and/or the Debtor's hotel manager, Highgate Hotels, L.P. in accordance with the terms set forth on Exhibit B to the Plan.

The Debtor will demonstrate that its Creditors will receive more under the Plan than they would in a hypothetical liquidation under chapter 7 of the Bankruptcy Code.  The following is a summary of the Plan.  The Plan is attached as <u>Exhibit A</u> to this Disclosure Statement.  The terms of the Plan govern in the event of any discrepancies with the following discussion.

### B.    <u>Treatment of Administrative Expenses and Priority Tax Claims</u>

#### 1.    **Administrative Expenses**

(i)    Administrative Expense Bar Date; Treatment of Administrative Expense Claims

To the extent not previously paid, all Administrative Expense Requests for Administrative Expense Claims arising on or after the Petition Date (other than with respect to Professional Fee Claims) and accruing through the Effective Date and not otherwise paid in the ordinary course of business shall be filed with the Bankruptcy Court by no later than thirty (30) days after the Effective Date (the "<u>Administrative Expense Bar Date</u>"), and objections (if any) to such Administrative Expense Requests will be filed no later than sixty (60) days after the Administrative Expense Bar Date.  Any Holder of an Administrative Expense Claim arising on or after the Petition Date (other than Professional Fee Claims) who fails to file a timely Administrative Expense Request that is required to be filed on or before the Administrative Expense Bar Date:  (a) shall be forever barred, estopped and enjoined from asserting such Administrative Expense Claim against the Debtor and the Debtor's estate, (or filing a request for the allowance thereof), and the Debtor and the Debtor's estate, shall be forever discharged from any and all indebtedness or liability with respect to such Administrative Expense Claim; and

(b) such Holder shall not be permitted to participate in any distribution under the Plan on account of such Administrative Expense Claim.  Notwithstanding anything to the contrary in the Plan, neither Parent nor OWS shall be required to file an Administrative Expense Request.

To the extent not previously paid, on the later to occur of (a) the Effective Date (or as soon as reasonably practicable thereafter) and (b) the date on which an Administrative Expense Claim shall become Allowed, the Debtor, in full and final satisfaction of such Administrative Expense Claim, will (i) pay to each Holder of an Allowed Administrative Expense Claim, in cash, the full amount of such Allowed Administrative Expense Claim, or (ii) satisfy and discharge such Allowed Administrative Expense Claim on such other terms and conditions as may be agreed between the Holder of such Allowed Administrative Expense Claim, on the one hand, and the Debtor, on the other hand.

Notwithstanding the Parent's right to payment in full of the Parent Administrative Claim as set forth in the preceding paragraph, the Parent shall contribute the Parent Administrative Claim Distribution Waiver as part of the New Value Contribution.

## 2.    Professional Fee Applications; Treatment of Professional Fees

Notwithstanding anything in the Plan or in any prior order of the Bankruptcy Court to the contrary, all Professional Fee Applications for Professional Fees through the Effective Date, for Allowance on a final basis, shall be filed on or before the date that is sixty (60) days after the Effective Date.  To the extent not previously paid, Allowed Professional Fees will be paid in accordance with an order of the Bankruptcy Court allowing such Professional Fees.

## 3.    Priority Tax Claims

To the extent not previously paid, on the later to occur of (a) the Effective Date (or as soon as reasonably practicable thereafter) and (b) the date on which a Priority Tax Claim shall

become Allowed, the Debtor, in full and final satisfaction of such Priority Tax Claim, will (i) pay to each Holder of an Allowed Priority Tax Claim, in cash, the full amount of such Allowed Priority Tax Claim, or (ii) satisfy and discharge such Allowed Priority Tax Claim on such other terms and conditions as may be agreed between the Holder of such Priority Tax Claim and the Debtor.  At the Debtor's sole option, in lieu of the foregoing, the Debtor may pay any Holder of an Allowed Priority Tax Claim the full amount of such Allowed Priority Tax Claim in equal quarterly installments over a period of five (5) years, paid at the statutory rate of interest.

### C.    Classification and Treatment of Claims and Equity Interests

#### 1.    Summary

The categories listed below classify Claims against and Equity Interests in the Debtor for all purposes, including voting, confirmation and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim or Equity Interest shall be deemed classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class.  A Claim or Equity Interest is in a particular Class only to the extent that such Claim or Equity Interest is Allowed in that Class and has not been paid or otherwise satisfied prior to the Effective Date.

### Summary of Classification and Treatment of Claims and Equity Interests

| Class | Claim | Status | Voting Right |
|---|---|---|---|
| Class 1 | OWS Secured Claim | Impaired | Entitled to vote |
| Class 1a | DHG Claim | Impaired | Entitled to vote |
| Class 1b | Flintlock Claim | Impaired | Entitled to vote |
| Class 1c | Other Secured Claims | Unimpaired | None, deemed to accept |
| Class 2 | Priority Non-Tax Claims | Unimpaired | None, deemed to accept |
| Class 3 | General Unsecured Claims | Impaired | Entitled to vote |
| Class 3a | Personal Injury Claims | Impaired | Entitled to vote |
| Class 3b | Congregation Claim | Impaired | Entitled to vote |
| Class 4 | Equity Interests | Unimpaired | None, deemed to accept |

2.      **Classification, Treatment and Voting**

**Class 1 OWS Secured Claim**

(i)      Classification:  Class 1 is comprised of the OWS Secured Claim.

(ii)     *Treatment*:  The OWS Secured Claim shall be deemed Allowed under the Plan and paid over time in accordance with the terms and conditions set forth on the OWS Term Sheet attached as Exhibit A to the Plan.

Per the OWS Term Sheet, OWS shall receive an initial distribution in Cash on the Effective Date in the amount of $9,373,905.00[7] (or such other amount which would reduce the OWS Secured Claim to $140,000,000.00) plus additional amounts for OWS's fees and

---

[7] The size of the OWS Secured Claim may be subject to paydowns from the Parent.  To the extent any such paydowns are made after the filing of this Plan, the size of the cash Distribution on the Effective Date shall be reduced in an amount equal to such paydown.

expenses, including the Restructuring Expenses, incurred in connection with the restructuring of the OWS Secured Claim under the Plan. The remaining $140,000,000.00 of the OWS Secured Claim shall be restructured and paid, interest only, over a period of two years, with the balance due to be paid at the end of the extended term (subject to two one-year Debtor extension options). The treatment under the Plan for the Holder(s) of the OWS Secured Claim shall be in full satisfaction, release and discharge of the Debtor's obligations with regard to the OWS Secured Claim.

(iii)    *Voting:*  Class 1 is Impaired, and the Class 1 Creditor is entitled to vote to accept or reject the Plan.

### Class 1a DHG Claim

(i)    *Classification*:  Class 1a is comprised of the DHG Claim.

(ii)    *Treatment*:  Provided DHG votes in favor of the Plan, on the Effective Date, DHG, the Reorganized Debtor, AREPIII MVTS, LLC, *CREP* Times Square Hotel, LLC, Brookriver Hotels & Resorts, LLC and Highgate Hotels, L.P. shall be deemed to have executed and entered into the DHG Agreement annexed to the Plan as Exhibit B and the DHG Claim treated in accordance therewith in full satisfaction, release and discharge of the Debtor's obligations with regard to the DHG Claim. In the event that DHG does not vote in favor of the Plan, that portion of the DHG Claim asserting a Secured Claim will automatically become a Class 1c claim (subject to any and all defenses of the Debtor or Reorganized

Debtor as the case may be) and that portion of the DHG Claim asserting a General Unsecured Claim will automatically become a Class 3 Claim (subject to any and all defenses of the Debtor or Reorganized Debtor as the case may be).

(iii)   *Voting:*  Class 1a is Impaired, and the Class 1a Creditor is entitled to vote to accept or reject the Plan. The Debtor and DHG have negotiated for the treatment provided under the Plan and the Debtor therefor expects DHG to vote in favor of the Plan. Nevertheless, for Plan voting purposes, DHG shall receive both a Class 1a Ballot and a Class 3 Ballot.  If DHG votes in favor of the Plan as expected, any vote that it casts in Class 3 shall be disregarded.  If DHG votes to reject the Plan, any Class 3 Ballot that it timely submits will be counted as a vote as a Class 3 Creditor in the amount of DHG's asserted General Unsecured Claim.

### Class 1b Flintlock Claim

(i)   *Classification*:  Class 1b is comprised of the Flintlock Claim.

(ii)   *Treatment*:  If Class 1b votes in favor of the Plan, the Flintlock Claim shall be paid over time in accordance with the terms annexed to the Plan as Exhibit C in full and final satisfaction, release and discharge of the Debtor's obligations with respect to the Flintlock Claim. In the event that the Holder of the Class 1b Flintlock Claim does not vote in favor of the Plan, then the Flintlock Claim will become a Class 1c claim (subject to any and

all defenses of the Debtor or Reorganized Debtor as the case may be).

(iii)   *Voting:*  Class 1b is Impaired, and the Class 1b Creditor is entitled to vote to accept or reject the Plan.  If the Holder of the Class 1b Claim does not vote in favor of the Plan, then the Class 1b Claim will automatically become a Class 1c Claim (subject to any and all defenses of the Debtor or Reorganized Debtor as the case may be), and Class 1b shall be disregarded as a Class.

**Class 1c Other Secured Claims**

(i)   *Classification*:  Class 1c is comprised of Secured Claims except for the OWS Secured Claim, the Flintlock Claim and the DHG Claim.

(ii)   *Treatment*:  To the extent not previously paid, in full satisfaction, release and discharge of the Debtor' Pre-Petition obligations to each Holder of an Allowed Class 1c Secured Claim, on the later to occur of (a) the Effective Date (or as soon as reasonably practicable thereafter) and (b) the date on which a Secured Claim shall become Allowed, each Holder of an Allowed Secured Claim shall receive, at the Debtor's option, and to the extent such Claim is secured by collateral in the possession of the Debtor as of the Effective Date (i) payment in Cash of 100% of the Allowed Secured Claim; (ii) the return of the relevant collateral (provided, however, that to the extent that such collateral is subject to the first priority mortgage and security interest securing the OWS Secured

Claim, then any return of relevant collateral may not occur unless the OWS Secured Claim and Restructuring Expenses have been paid in full); (iii) such treatment that leaves unaltered the legal, equitable and contractual rights of the Holder of such Allowed Secured Claim; or (iv) such less favorable treatment as the Debtor and the Holder of such Secured Claim may agree upon.

(iii)    Voting:   Class 1c is Unimpaired, and Class 1c Creditors are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Class 1c Creditors are not entitled to vote to accept or reject the Plan.

**Class 2 Priority Non-Tax Claims**

(i)    *Classification*:   Class 2 is comprised of the Priority Non-Tax Claims.

(ii)    *Treatment*:   The Plan will not alter any of the legal, equitable and contractual rights of the Holders of Allowed Priority Non-Tax Claims.  To the extent not previously paid, and except to the extent that a Holder of a Priority Non-Tax Claim agrees in writing with the Debtor to a less favorable treatment, on the later to occur of (a) the Effective Date (or as soon as reasonably practicable thereafter) and (b) the date on which a Priority Non-Tax Claim shall become Allowed, the Debtor, in full and final satisfaction of such Priority Non-Tax Claim, will (i) pay to each Holder of an Allowed Priority Non-Tax Claim, in cash, the full amount of such Allowed Priority Non-Tax Claim, or (ii) satisfy and discharge such

Allowed Priority Non-Tax Claim on such other terms and conditions as may be agreed between the Holder of such Allowed Priority Non-Tax Claim and the Debtor.

(iii)    *Voting*:    Class 2 is Unimpaired, and Class 2 Creditors are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Class 2 Creditors are not entitled to vote to accept or reject the Plan.

### Class 3 General Unsecured Claims

(i)    *Classification*:    Class 3 is comprised of all General Unsecured Claims except for Personal Injury Claims and the Congregation Claim.

(ii)    *Treatment*:    Provided Class 3 accepts the Plan, in full and final satisfaction, release and discharge of the Debtor's obligations with respect to General Unsecured Claims, and except to the extent that a Holder of a General Unsecured Claim agrees in writing with the Debtor to a less favorable treatment, on the later to occur of (a) the Effective Date (or as soon as reasonably practicable thereafter) and (b) the date on which a General Unsecured Claim shall become Allowed, each Holder of an Allowed General Unsecured Claim in Class 3 shall receive, in full and complete settlement, satisfaction and discharge of such Allowed General Unsecured Claim, its Pro Rata share of $1,000,000.00.  If Class 3 rejects the Plan, Holders of Class 3 Claims shall not receive any distribution under the Plan.

(iii)    *Voting*: Class 3 is impaired, and Class 3 Creditors are entitled to vote to accept or reject the Plan.

## Class 3a Personal Injury Claims

(i)    *Classification*:  Class 3a is comprised of Personal Injury Claims.

(ii)    *Treatment:* Notwithstanding any injunction or similar provision contained in this Plan, except to the extent that a Holder of a Personal Injury Claim agrees in writing with the Debtor to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Personal Injury Claim, to the extent not previously paid, Holders of Personal Injury Claims will receive the following treatment:

(i) the Holder of a Personal Injury Claim may pursue such Claim to final judgment, including any appeals, in any court(s) having competent jurisdiction, or settlement.  Any such final judgment or settlement will be satisfied solely to the extent of any available proceeds of any applicable Personal Injury Insurance Policy,[8] and the provisions of (B)(ii) hereof.  The Debtor may be named in the litigation as a party defendant(s) subject to the provisions herein. Nothing in the Plan, the Plan Supplement, or the Disclosure

---

[8]   The Debtor maintained prepetition liability insurance coverage in the amount of $1,000,000.00 under policy number CC5GL00056221 issued by Everest Premier Insurance Company.  Additionally, excess insurance coverage was provided to the Debtor through Everest National Insurance Company in the amount of 10,000,000.00 under policy number XC5CU00261-221 and through The North River Insurance Company in the amount of $15,000,000.00 under policy number 5228113257.  The Debtor also maintained a commercial general liability insurance policy with Starr Indemnity & Liability Company with a policy limit of $1,000,000.00 under policy number 1000305813231.

Statement releases the Debtor from its liability for Personal Injury Claims, provided however, its liability is limited to the amount of available proceeds of any applicable Personal Injury Insurance Policy and the provisions of (B)(ii) hereof. Except as provided above and notwithstanding anything that is otherwise to the contrary in the Plan or Plan Supplement, effective as of the Effective Date, the Debtor shall be discharged of all Personal Injury Claims pursuant to section 1121(d) of the Bankruptcy Code, and Holders of Personal Injury Claims shall solely be entitled to the treatment provided in this Article III.B.7; and

(ii) to the extent that any applicable Personal Injury Insurance Policy contains a SIR, such SIR on an Allowed Personal Injury Claim shall be paid, satisfied, settled and discharged by the allowance of a Class 3 General Unsecured Claim in the amount of the applicable SIR. The Debtor may file such motions with the Bankruptcy Court as it deems appropriate for the administration of Claims in the amount of the applicable SIR.

(iii)    *Voting*: Class 3a is Impaired, and Class 3a Creditors are entitled to vote to accept or reject the Plan.

**Class 3b Congregation Claim**

(i)     *Classification*:  Class 3b is comprised of the Congregation Claim. The Congregation Claim is separately classified from other General Unsecured Claims due to a provision in paragraph 42 of the Congregation Lease under which the Congregation acknowledged and agreed that the Debtor (as successor to the Landlord thereunder) "shall have no personal liability with respect to any of the provisions in [the Lease]" and that in the event of a breach, the Congregation "shall look solely to the interest of such Landlord in the improved premises of which the demised premises form a part for the satisfaction of Tenant's remedies, and no other property or assets of such Landlord shall be subject to levy, execution or other enforcement procedure for the satisfaction of Tenant's remedies against Landlord hereunder".  In addition, the Congregation is the only Creditor whose Claim is subject to the lease rejection provisions of section 365(h) of the Bankruptcy Code due to the Debtor's Plan-based rejection of the Congregation Lease, under which the Debtor is the lessor.  The Debtor and the Congregation, by far the largest general unsecured creditor in this Chapter 11 Case, engaged in good faith arms' length negotiations for the treatment of the Congregation Claim.  Each of the parties to those discussions were represented and advised by competent legal counsel.  As a result of those discussions, the parties agreed to the treatment of the Congregation Claim – to be effectuated under a

plan – as set forth below. As part of that settlement, the Congregation has agreed that it will vote in favor and will not object to confirmation of the Plan, provided that the Confirmation Order is entered no later than July 31, 2025.

(ii)    *Treatment*:  In full and final satisfaction, release and discharge of the Debtor's obligations with respect to the Congregation Claim, the Congregation Claim, which is hereby deemed Allowed, shall be treated as follows:

- In connection with the rejection of the Congregation Lease under the Plan, on the Effective Date, the Congregation shall be deemed to have opted for the treatment provided under section 365(h)(1)(A)(i) of the Bankruptcy Code such that the Congregation Lease shall be deemed terminated by such rejection and the Congregation shall have no right to occupy any part or portion of the leasehold Premises.

- The Congregation shall receive a Cash distribution of $4,000,000.00 on the Effective Date.

- Upon the Congregation's receipt of the $4,000,000.00 Cash distribution as set forth above, the Congregation and the Debtor shall enter into a stipulation dismissing the Congregation Action as it pertains to any and all Claims against the Debtor and any counterclaims by the Debtor against the Congregation, which stipulation shall also include mutual releases by and

between the Debtor and the Congregation, and which shall be filed by the Congregation in the Congregation Action.

- The Debtor currently rents storage space at a CubeSmart facility located at 150 Fairchild Avenue, Plainview, NY 11803 in which property belonging to the Congregation is held. Following the Effective Date, the Debtor shall either transfer its rights in the storage space to the Congregation or otherwise permit the Congregation to remove all of its property from the storage space.

(iii)   *Voting:*  Class 3b is Impaired, and the Class 3b Creditor is entitled to vote to accept or reject the Plan.  The Debtor and the Class 3b Creditor have fully negotiated and agreed upon the treatment reflected in the Plan and, as a result, the Debtor expects Class 3b to vote to accept the Plan.

## Class 4 Equity Interests

(i)   *Classification*:  Class 4 is comprised of Equity Interests.

(ii)   *Treatment*:  In consideration for the New Value Contribution, the Parent, as the Holder of Equity Interests, shall be entitled to one of the following two options to be exercised prior to the Effective Date:

- existing Equity Interests shall be reinstated in full and the Parent will own 100% of the outstanding Equity Interests in the Reorganized Debtor; or

- all existing Equity Interests shall be cancelled and new Equity Interests shall be issued in the Reorganized Debtor and distributed to one or more entities of the Parent's choosing.

(iii)     *Voting*:  Class 4 is Unimpaired, and Class 4 Interest Holders are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.   Therefore, Class 4 Interest Holders are not entitled to vote to accept or reject the Plan.

### D.     Provisions for Implementation of Plan

#### 1.     Settlement

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan.

#### 2.     Binding Effect

Except as otherwise expressly provided in the Plan, on and after the Effective Date, the Plan shall bind the Debtor and all Holders of Claims and Equity Interests.

#### 3.     Corporate Action

Each of the matters provided for under the Plan involving any corporate action to be taken or required by the Debtor shall, as of the Effective Date, be deemed be authorized and approved by the Debtor's members, managers, and board of managers.

#### 4.     REIT Structuring Transaction

On the Effective Date, the Reorganized Debtor shall be deemed to have acquired 100% of the equity interests in AC MVTS Operator, LLC ("Operator") from AREPIII Property Trust, LLC and Corten Real Estate Fund TIER LLC and/or their Affiliates for no consideration.  At the

same time, the Debtor and Operator shall enter into an operating lease substantially in the form annexed to the Plan as Exhibit D. As set forth below, certain of the Debtor's contracts and leases shall be assumed and assigned to Operator on the Effective Date. This organizational structure is intended to preserve rights and benefits under a real estate investment trust organizational structure.

### 5.    Sources of Consideration for Plan Distributions

The Debtor and the Parent shall fund distributions under the Plan (including with respect to settlements embodied herein) with (i) Cash on hand; and (ii) the New Value Contribution.

### 6.    Management of Reorganized Debtor

Joseph Caruso and Brandon Flury, each currently managing the Debtor as vice presidents, shall continue in their current positions following the Effective Date as vice presidents and managers of the Reorganized Debtor as well as of Operator. Highgate Hotels, L.P. shall continue to manage the Debtor's hotel operations on a day-to-day basis.

### 7.    Cancellation of Notes, Instruments, and Debentures

On the Effective Date, except to the extent provided otherwise in the OWS Term Sheet, the Plan, or the treatment provided under the Plan, any agreement, note, instrument, certificate or other document evidencing or creating any Claim against the Debtor shall be automatically cancelled and terminated and of no further force and effect, without any further act or action and deemed surrendered without further act or action under any applicable agreement, law, regulation, order or rule and the obligations of the Debtor under the agreements, notes, instruments, certificates or other documents governing such Claims shall be discharged.

E.      **Executory Contracts and Unexpired Leases; Rejection Claims Bar Date**

1.      **Assumption and Assignment of IMCMV Unexpired Commercial Leases**

Pursuant to an agreement between the Debtor and IMCMV Times Square LLC ("IMCMV"), on the Effective Date, all unexpired leases (including all amendments thereto) between the Debtor and IMCMV shall be deemed assumed and assigned to Operator; IMCMV shall have an allowed Class 3 General Unsecured Claim in the amount of $207,021.32 which shall be treated in accordance with the terms and conditions of this Plan; and no other or further cure shall be due or owing to IMCMV. The entry of the Confirmation Order by the Bankruptcy Court will constitute approval of such assumption(s) pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

2.      **Assumption and Assignment of Highgate Hotels, L.P. Executory Contract**

On the Effective Date, all executory contracts, including that certain Hotel Management Agreement for the Margaritaville Resort Times Square with an effective date of February 1, 2024 (including all amendments thereto) (the "Hotel Management Agreement"), between the Debtor and Highgate Hotels, L.P. shall be deemed assumed and assigned to Operator. No default exists with regard to such agreements and, therefore, no cure shall be due and owing. The entry of the Confirmation Order by the Bankruptcy Court will constitute approval of such assumption(s) pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

On the Effective Date, Highgate Hotels, L.P. shall be deemed to have executed and entered into the DHG Agreement and the Hotel Management Agreement[9] shall be deemed amended as follows:

---

[9]   Capitalized terms not defined in Article V.C of the Plan shall have the terms ascribed to them in the Hotel Management Agreement and/or the First Letter Agreement, as the case may be.

Fee Sharing. Operator covenants and agrees that, from and after the Effective Date, Operator shall, pursuant to the provisions of Paragraph 2(b) of the DHG Agreement, pay to Brookriver the total amount of $1,242,662.49 (the "Pre-Default Amount"), on a monthly basis, an amount equal to thirty-five percent (35%) of the Base Management Fees paid by Owner to Operator for each such month (each such monthly payment, a "Monthly Fee-Share Payment"), in accordance with the terms set forth in the DHG Agreement. Monthly Fee-Share Payments shall (x) be made within five (5) days of the date on which each monthly payment of Base Management Fees is received by Operator, (y) be made to the account(s) designated by Brookriver by wire transfer of immediately available funds, and (z) continue until the full amount of the Pre-Default Amount has been paid to Brookriver, as applicable. If Operator shall fail to make any such Monthly Fee-Share Payment Brookriver on the date when due, then Owner shall have the right in its sole discretion immediately to make a payment to Brookriver in an amount equal to the applicable Monthly Fee-Share Payment amount for such month and, notwithstanding anything in the Hotel Management Agreement to the contrary, deduct such amount from the next monthly payment of Management Fees due to Operator; provided, however, that if Owner makes any such Monthly Fee-Share Payment directly to Brookriver, then the amount of the immediately succeeding month's Monthly Fee-Share Payment shall be calculated based on the full amount of Management Fees that Operator would have received had Owner not deducted the amount of such Owner-made Monthly Fee-Share Payment.

3.    **Assumption and Assignment of HTC Collective Bargaining Agreement**

Notwithstanding anything otherwise contained in the Plan, on the Effective Date the Debtor or Reorganized Debtor, as applicable, shall assume and assign to Operator the collective bargaining agreement ("CBA") with the Hotel and Gaming Trades Council ("HTC"), which constitutes an Executory Contract pursuant to sections 365(a) and 1123 of the Bankruptcy Code. The cure amounts, if any, related to the assumption of the CBA shall be satisfied in full by payment by the Debtor or the Reorganized Debtor, as applicable, in the ordinary course, of all obligations arising under the CBA, including but not limited to grievances, grievance and other settlements, arbitration awards, and contributions to the NY Hotel Trades Council and Hotel Association of New York City, Inc. Employee Benefit Fund, in each case to the extent such obligations are due, owing, valid and payable in accordance with the terms of the CBA; provided however, that that all of the Debtor's and the Reorganized Debtor's rights, remedies, defenses,

privileges, claims, and counterclaims with respect to the CBA and the claims or obligations that may arise thereunder, are expressly preserved. As a result, no proof of claim, request for administrative expense, or cure claim need be filed with respect to such cure amounts, if any.

4. **Assumption and Assignment of Nouveau Elevator**

Effective on the Effective Date, the Debtor's contract with Nouveau Elevator Industries, LLC for which a cure in the approximate amount of $49,893 is due, shall be deemed assumed and assigned to Operator hereunder and the Debtor shall pay the cure amount on the Effective Date. Notwithstanding any contracts and leases to be assumed pursuant to Article V.A through V.E above, the Debtor reserves the right to reject any executory contract or unexpired lease at any time prior to the Effective Date by setting forth such executory contract or unexpired lease in the Plan Supplement as one which shall be deemed rejected.

5. **Rejection of Margaritaville Resort of Times Square, LLC Executory Contract**

On the Effective Date, all executory contracts (including all amendments thereto) between the Debtor and Margaritaville Resort of Times Square, LLC ("Margaritaville") shall be deemed rejected. Margaritaville shall have an allowed Class 3 General Unsecured Claim in the amount of $1,847,690.00. The entry of the Confirmation Order by the Bankruptcy Court will constitute approval of such rejection pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Separately, the Debtor and Margaritaville intend to enter into a new franchise agreement for which Court approval will be sought by separate motion prior to the Confirmation Date. The new franchise agreement shall be deemed assumed and assigned to Operator under the Plan.

6.    **General Rejection of Executory Contracts and Unexpired
Commercial Leases**

Any other executory contracts or unexpired leases that have not expired by their own terms on or prior to the Effective Date, which are not expressly assumed by the Plan or which the Debtor has not previously assumed or rejected with the approval of the Bankruptcy Court, shall be deemed rejected by the Debtor on the Effective Date, and the entry of the Confirmation Order by the Bankruptcy Court will constitute approval of such rejections pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Notwithstanding the foregoing, the Debtor may at any time prior to the date that is ninety (90) days following the Effective Date, assume any executory contract or unexpired lease which would otherwise have been deemed rejected under this section of the Plan by filing a notice of such assumption with the Court, providing written notice to the counterparty to such unexpired lease or executory contract, and paying any applicable cure.

*If the rejection under the Plan of an executory contract or unexpired lease results in damages to the other party or parties to such contract or lease, any Claim for such damages, if not heretofore evidenced by a Proof of Claim that has been timely Filed, shall be forever barred and shall not be enforceable against the Debtor or its properties, successors or assigns, unless a Proof of Claim therefore is timely Filed with Kroll, either (i) electronically through Kroll's website at* https://cases.ra.kroll.com/560SeventhAve/*; (ii) by submitting the original Proof of Claim (with an original signature) by first-class U.S. Mail to Kroll at the following address: Seventh Avenue Owner Primary LLC Claims Processing Center, c/o Kroll Restructuring Administration LLC, Grand Central Station, PO Box 4850, New York, NY 10163-4850; or (iii) by submitting the original Proof of Claim (with an original signature) by overnight courier or other hand delivery system to Kroll at the following address: Seventh Avenue Owner Primary LLC Claims Processing Center, c/o Kroll Restructuring*

*Administration LLC, 850 3rd Avenue, Suite 412, Brooklyn, NY 11232 and served upon counsel for the Debtor, Cozen O'Connor, Attn: Christina Sanfelippo, 123 North Wacker Drive, Suite 1800, Chicago, IL 60606 (csanfelippo@cozen.com) on or before (x) thirty (30) days after the later to occur of (i) notice of the Effective Date and (ii) the date of entry of an order by the Bankruptcy Court authorizing rejection of a particular executory contract or unexpired lease, or (y) such other date as may be ordered by the Bankruptcy Court. Nothing in the Plan should be construed or deemed to alter the applicable deadlines for filing a Proof of Claim for executory contracts or unexpired leases previously rejected pursuant to prior orders of the Bankruptcy Court.*

### F.  Provisions Regarding Distributions

#### 1.  Distributions Made by the Debtor

All distributions under the Plan shall be made by the Reorganized Debtor.

#### 2.  Plan Distribution Reserve

Prior to the Confirmation Date, the Debtor shall establish and maintain a reserve account (the "Plan Distribution Reserve") sufficient to enable it to make all distributions hereunder that are required to be made on the Effective Date.

#### 3.  Disputed Claims Reserve

From and after the Effective Date, and until such time as all Disputed Claims have been compromised, settled or determined by Final Order, the Debtor shall establish and maintain a reserve account (the "Disputed Claims Reserve") necessary to ensure that each Holder of a Disputed Claim shall receive payment of its Allowed amount in accordance with the provisions of the Plan in the event such Claim is Allowed in the maximum amount claimed.

4.      **Manner of Distribution under Plan**

Any distribution in cash to be issued under the Plan shall be made by check drawn on a domestic bank or, in the Debtor's or Reorganized Debtor's sole discretion, by wire transfer. Any fees, costs or other expenses associated with the distribution by wire transfer to any Holder shall be deducted from and paid out of such Holder's distribution.

5.      **Delivery of Distributions**

Subject to the provisions of Bankruptcy Rule 2002(g), and except as otherwise provided herein, distributions and deliveries to Holders of record of Allowed Claims shall be made at the address of each such Holder set forth on the Debtor's books and records unless superseded by the address set forth on Proofs of Claim filed by any such Holders. The Debtor shall be permitted, in its discretion, to withhold distributions until it shall have received a tax identification number and such other tax withholding forms as it may reasonably require to comply with applicable federal, state, or local laws. In the event that any such tax information is not supplied within one month following a written request for such information, then that Holder of an Allowed Claim shall have that claim discharged and shall be forever barred from asserting such Claim against the Debtor.

6.      **Undeliverable Distributions**

(a)      <u>Holding of Undeliverable Distributions</u>. If any distribution to the Holder of an Allowed Claim under the Plan is returned as undeliverable, no further distributions shall be made to such Holder unless and until the Debtor is notified in writing of such Holder's then-current address. Any Holder ultimately receiving a distribution that was initially returned as undeliverable shall not be entitled to any interest or other accruals of any kind on

such distribution.  Nothing contained in the Plan shall require the Debtor to attempt to locate any Holder of an Allowed Claim.

(b)    Failure to Claim Undeliverable Distributions.  Any Holder of an Allowed Claim or Equity Interest that does not assert its rights pursuant to the Plan to receive a distribution within ninety (90) days from and after the date such distribution is returned as undeliverable shall have such Claim or Equity Interest for such undeliverable distribution discharged and, except for distributions to be made after the Holders provide the Debtor their proper address, shall be forever barred from asserting any such Claim against or Equity Interests in the Debtor, its professionals, the Plan Distribution Reserve, or the Disputed Claims Reserve.  In such case, any consideration held for distribution on account of such Claim or Equity Interest shall belong to the Reorganized Debtor.

7.    **Time Bar to Payments**

Checks issued on account of Allowed Claims or Equity Interests shall be null and void if not negotiated within ninety (90) days from and after the date of issuance thereof.  Requests for reissuance of any check shall be made directly to the issuer of the check by the Holder of the Allowed Claim or Equity Interests with respect to which such check originally was issued.  Any request by a Holder of a Claim or Equity Interest in respect of such a voided check shall be made within 180 days from and after the date of issuance of such voided check.  Any fees, costs or other expenses associated with the voided check shall be deducted from and paid out of such Holder's distribution.  After such date, all Claims or Equity Interests in respect of voided checks shall be discharged and forever barred, and the Debtor shall be entitled to retain all monies related thereto.

8.    **Distributions After Effective Date**

Distributions made after the Effective Date to Holders of Claims that are not Allowed as of the Effective Date, but which later become Allowed, shall be deemed to have been made on the Effective Date.

9.    **Fractional Dollars; De Minimis Distributions**

Notwithstanding anything contained herein to the contrary, payments of fractions of dollars will not be made.  Whenever any payment of a fraction of a dollar under the Plan would otherwise be called for, the actual payment made will reflect a rounding of such fraction to the nearest dollar (up or down), with half dollars being rounded down.  No payment shall be made on account of any distribution less than fifty dollars ($50.00) with respect to any Allowed Claim unless a request therefor is made in writing to the issuer of such payment on or before ninety (90) days after the Effective Date.

10.    **Setoffs/Recoupment**

Notwithstanding anything contained herein to the contrary, the Debtor may, pursuant to sections 502(d) or 553 of the Bankruptcy Code or applicable nonbankruptcy law, setoff or exercise recoupment against any Allowed Claim or Allowed Administrative Expense and the distributions to be made on account thereof (before any distribution is made on account of such Claim or Administrative Expense), the rights and Causes of Action of any nature related to the Claim or Administrative Expense that it may hold against the Holder of such Allowed Claim or Allowed Administrative Expense; provided, however, that neither the failure to effect such a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release of any such claims, rights and Causes of Action that the Debtor may possess against such Holder.

11.    **Preservation of Subordination Rights**

Except as otherwise provided herein, all subordination rights and claims relating to the subordination by the Debtor or its successors of any Allowed Claim or Equity Interest shall remain valid, enforceable and unimpaired in accordance with section 510 of the Bankruptcy Code or otherwise.

12.    **Waiver by Creditors of All Subordination Rights**

Except for the Holder of the OWS Secured Claim, each Holder shall be deemed to have waived all contractual, legal and equitable subordination rights that they may have, whether arising under general principles of equitable subordination, section 510(c) of the Bankruptcy Code or otherwise, with respect to any and all distributions to be made under the Plan, and all such contractual, legal or equitable subordination rights that each Holder has individually and collectively with respect to any such distribution made pursuant to the Plan shall be discharged and terminated, and all actions related to the enforcement of such subordination rights will be permanently enjoined unless such rights have been asserted prior to the Effective Date.

13.    **Claims Paid by Third Parties**

(a)    <u>Claims Paid by Third Parties</u>.    A Claim shall be reduced in full, and such Claim shall be Disallowed without an objection to such Claim having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or a Reorganized Debtor.    To the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such Holder shall repay, return or deliver any distribution held by or transferred to the Holder

to the Reorganized Debtor to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.

(b)    Claims Payable by Insurance Carriers.    No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtor's insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Debtor's insurers agrees to pay in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction or otherwise settled), then immediately upon such insurer's agreement, such Claim may be expunged to the extent of any payment on the Claims Register by Kroll without a Claim objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

(c)    Applicability of Insurance Policies.    Except as otherwise provided in the Plan, payments to Holders of Allowed Claims covered by the Debtor's insurance policies shall be in accordance with the provisions of any applicable insurance policy.  Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtor or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any rights or defenses, including coverage defenses, held by such insurers.

### G.    Procedures for Resolution of Disputed, Contingent and Unliquidated Claims

#### 1.    Disallowance of Claims or Interests

**EXCEPT AS OTHERWISE AGREED, ANY AND ALL PROOFS OF CLAIM FILED AFTER THE APPLICABLE DEADLINE FOR FILING SUCH PROOFS OF CLAIM SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS SHALL NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS SUCH LATE PROOF OF CLAIM IS DEEMED TIMELY FILED BY A FINAL ORDER OF THE BANKRUPTCY COURT.**

#### 2.    Amendments to Claims

On or after the Effective Date, except as otherwise provided herein, a Claim may not be filed or amended without the express written authorization of the Bankruptcy Court or the Reorganized Debtor, and, to the extent such authorization is not received, any such new or amended Claim filed shall be deemed disallowed in full and expunged without any further notice to or action, order, or approval of the Bankruptcy Court.

#### 3.    Prosecution of Objections to Disputed Claims

Upon the Effective Date, the Reorganized Debtor shall solely be responsible for pursuing any objection to the allowance of all Disputed Claims and shall have the right to exercise all rights of setoff and recoupment and other defenses that the Reorganized Debtor or its Estate may have with respect to any such Disputed Claim.  The Reorganized Debtor shall have the exclusive authority to settle, compromise or withdraw any objections to any Disputed Claims without necessity of further approval of the Bankruptcy Court.

Unless otherwise provided herein or ordered by the Bankruptcy Court, all objections to Disputed Claims shall be served and filed not later than one-hundred-eighty (180) days after the Effective Date; provided, however, that this deadline may be extended upon motion by the Reorganized Debtor, without notice to Holders of Disputed Claims.

4.      **Estimation of Claims**

The Debtor or Reorganized Debtor may at any time request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtor or Reorganized Debtor previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection. The Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection. Subject to the provisions of section 502(j) of the Bankruptcy Code, in the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, the amount so estimated shall constitute the maximum allowed amount of such Claim. If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Debtor or Reorganized Debtor may pursue supplementary proceedings to object to the allowance of such Claim. All of the aforementioned objection, estimation and resolution procedures are intended to be cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court, including the Claim resolution procedures established under the Plan and approved by the Bankruptcy Court in the Confirmation Order.

5.      **No Distributions Pending Allowance**

If an objection to a Claim or portion thereof is filed, no payment or distribution provided under the Plan shall be made on account of such Claim or portion thereof, as applicable, unless and until such Disputed Claim becomes an Allowed Claim.

6.      **Payments and Distributions on Disputed Claims**

Notwithstanding any provision of the Plan to the contrary, any issuer of a distribution under the Plan may, in its discretion, pay the undisputed portion of a Disputed Claim.

H.      **Conditions Precedent to Confirmation and Effective Date of the Plan**

1.      **Conditions Precedent to Confirmation**

The following are conditions precedent to Confirmation of the Plan that must be (i) satisfied or (ii) waived in the sole discretion of the Debtor: (i) a Final Order finding that the Disclosure Statement contains adequate information pursuant to section 1125 of the Bankruptcy Code shall have been entered by the Bankruptcy Court; (ii) the entry of the Confirmation Order in form and substance reasonably satisfactory to the Debtor; (iii) the Plan Supplement, and all of the schedules, documents, and exhibits contained therein, shall have been filed; and (iv) all conditions contained in the OWS Term Sheet shall have been satisfied or waived by OWS; provided, however, that the conditions contained in the OWS Term Sheet may be waived by OWS only and in its sole discretion.

2.      **Conditions Precedent to Effective Date of Plan**

The following are conditions precedent to the Effective Date of the Plan that must be (i) satisfied or (ii) waived in the sole discretion of the Debtor (subject to OWS' consent as set forth in the Plan): (i) confirmation shall have occurred and the Confirmation Order shall have been entered by the Bankruptcy Court; (ii) the Confirmation Order shall have become a Final Order; (iii) there shall not be in effect on the Effective Date any (a) Order entered by a U.S. court, (b)

order, opinion, ruling or other decision entered by any other court or governmental entity or (c)

United States or other applicable law staying, restraining, enjoining or otherwise prohibiting or

making illegal the consummation of any of the transactions contemplated by the Plan; (iv) all

other actions and documents necessary to implement the Plan shall have been effected or

executed; and (v) all conditions contained in the OWS Term Sheet shall have been satisfied or

waived by OWS; provided, however, that the conditions contained in the OWS Term Sheet may

be waived by OWS only and in its sole discretion.

3.      **Effect of Non-Occurrence of Effective Date**

If the conditions listed in Article VIII.A and B of the Plan (section VI.H.1 and VI.H.2

above) are not satisfied or waived in accordance with Article VIII of the Plan (section VI.H

hereof), the Plan shall be null and void in all respects and nothing contained in the Plan or the

Disclosure Statement shall: (1) constitute a waiver or release of any Claims by or against or any

Equity Interests in the Debtor entities; (2) prejudice in any manner the rights of the Debtor or any

other party; or (3) constitute an admission, acknowledgment, offer or undertaking by the Debtor.

I.      **Release, Exculpation, Injunctive and Related Provisions**

1.      **Discharge of all Claims and Release of Liens.**

**Except as otherwise provided by the Plan, pursuant to section 1141 of the
Bankruptcy Code, the Confirmation Order shall act as a discharge of all Claims
that arose prior to the Confirmation Date.**

**Except with respect to any liens, security interests, deeds of trust, pledges,
mortgages, and any other property interest securing the OWS Secured Claim, on
the Effective Date and concurrently with the applicable distributions made under
the Plan, and in the case of a Secured Claim, satisfaction of the portion of the
Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust,**

**liens, pledges, security interests, or any other property interests securing any Claim against Property of the Estate shall be fully released and discharged, and all right, title, and interest of any Holder of such liens, mortgages, deeds of trust, pledges, security interests, and other property interests shall revert to the Reorganized Debtor and any of its successors or assigns, in each case, without further approval or order of the Bankruptcy Court and without any action or filing being required to be made by the Debtor.  For the avoidance of doubt, this Plan shall not release any liens, mortgages, deeds of trust, pledges, security interests, and any other property interests securing the OWS Secured Claim.**

2.     **Injunction.**

**Except as otherwise expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court, all Entities who have held, hold, or may hold Clams against or Equity Interests in the Debtor which arose before or were held as of the Effective Date, are permanently enjoined, on and after the Effective Date, from (a) commencing or continuing in any manner any action or other proceeding of any kind which would interfere in any way with any Property of the Estate, (b) the enforcement, attachment, collection, or recovery of any Property of the Estate by any manner or means of any judgment, award, decree, or order against the Debtor or its Estate on account of any such Claim or Equity Interest, and/or (c) creating, perfecting, or enforcing any encumbrance of any kind against any Property of the Estate on account of any such Claim or Equity Interest.  Such injunction shall extend to successors of the Debtor and their properties and interests in property.  Any Person or Entity injured by any willful violation of such injunction shall recover actual damages, including costs and attorneys' fees, and in**

appropriate circumstances, may recover punitive damages from the willful violator.

However, nothing contained herein shall prohibit the Holder of a timely filed Proof

of Claim from litigating its right to seek to have such Claim declared an Allowed

Claim and paid in accordance with the distribution provisions of this Plan, or enjoin

or prohibit the interpretation or enforcement by the Creditor of any obligations of

the Debtor under this Plan.

3.      **Releases by the Debtor.**

Notwithstanding anything contained in the Plan to the contrary, pursuant to section

1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy

of which is hereby confirmed, as of the Effective Date, the Debtor and its Estate, and

the Reorganized Debtor, on behalf of themselves and their respective Estates,

including any successor to the Debtor or any Estate representative appointed or

selected pursuant to section 1123(b)(3) of the Bankruptcy Code, shall be deemed to

have conclusively, absolutely, unconditionally, irrevocably, and forever released,

waived and discharged the Released Parties from any and all Claims, Interests,

obligations, rights, suits, damages, Causes of Action, remedies, and liabilities

whatsoever (including any derivative Claims or Causes of Action asserted or that

may be asserted on behalf of the Debtor or its Estate), whether known or unknown,

foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise,

based on or relating to, or in any manner arising from, in whole or in part, any act

or omission, transaction, agreement, event, or other occurrence taking place on or

before the Effective Date, including any Claims or Causes of Action based on or

relating to, or in any manner arising from, in whole or in part, the Chapter 11 Case,

the Debtor, the governance, management, transactions, ownership, or operation of

**the Debtor, the formulation, preparation, dissemination, solicitation, negotiation, entry into, or filing of the Plan, the Disclosure Statement, or any restructuring transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Plan, the Plan Supplement, the Disclosure Statement, the Chapter 11 Case, the pursuit of Confirmation, the pursuit of consummation of the Plan, the administration and implementation of the Plan or Confirmation Order, including the distribution of property under the Plan, or any other agreement, act or omission, transaction, event, or other occurrence taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases set forth in Article IX.C of the Plan shall only be applicable to the maximum extent permitted by law; and (ii) shall not be construed as (a) releasing any Released Party from Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud (provided that actual fraud shall not exempt from the scope of these Debtor releases any Claims or Causes of Action arising under sections 544 or 548 of the Bankruptcy Code or state laws governing fraudulent or otherwise avoidable transfers or conveyances), willful misconduct, or gross negligence, or (b) releasing any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any restructuring**

transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

4.      **Exculpation**

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur liability for, and each Exculpated Party is released and exculpated under the Plan from, any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out, in whole or in part, from the Petition Date through the Effective Date (and following the Effective Date solely with respect to any issuance or distribution of securities, the distribution of any property, or the implementation of the restructuring, each pursuant to and in accordance with the Plan), of the Chapter 11 Case, the Debtor, the formulation, preparation, dissemination, or negotiation of the Plan, the Disclosure Statement, or any restructuring transaction (including the Restructuring), contract, instrument, release, or other agreement or document created or entered into in connection with the Plan, the Disclosure Statement, the pursuit of Confirmation, the pursuit of consummation of the Plan, or the administration and implementation of the Plan or Confirmation Order, including the issuance or distribution of any securities pursuant to the Plan, or the distribution of property under the Plan, or any other related agreement, except for Claims or Causes of Action arising from an act or omission that is judicially determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects, such Exculpated Parties shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities. The Exculpated Parties have, and upon completion of the Plan, shall be deemed to have, participated in good faith and in compliance

with all applicable laws with regard to the solicitation and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan. Notwithstanding anything to the contrary in the foregoing, the exculpations set forth in Article IX.D of the Plan (i) shall only be applicable to the maximum extent permitted by law; and (ii) shall not be construed as (a) exculpating any Exculpated Party from Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud (provided that actual fraud shall not exempt from the scope of these exculpations any Claims or Causes of Action arising under sections 544 or 548 of the Bankruptcy Code or state laws governing fraudulent or otherwise avoidable transfers or conveyances), willful misconduct, or gross negligence, or (b) exculpating any post-Effective Date obligations of any party or Entity under the Plan, any restructuring transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

In addition to the foregoing, to the extent permitted by applicable law, no Exculpated Party shall have nor incur, and each Exculpated Party is hereby released and exculpated from, any Claim, interest, obligation, suit, judgment, damage, demand, debt, right, Causes of Action, loss, remedy, or liability for any claim, arising between the Petition Date and the Effective Date, in connection with or arising out of related to (i) any and all activities by the Debtor or any of its

**subsidiaries or affiliates in the operation of their businesses or in connection with their restructuring efforts, (ii) the Existing Accounts (as defined in the Cash Collateral Order), or other similar account into which funds are deposited or from which funds are disbursed on behalf of or for the benefit of the Debtor, including but not limited to any acts or omissions of any Exculpated Party related to the deposit or disbursement of such funds; or (iii) any actions taken by any Exculpated Party in furtherance of or in connection with its obligations under the Cash Collateral Order.  Notwithstanding anything to the contrary in the foregoing, the exculpations set forth in Article IX.D of the Plan (1) shall only be applicable to the maximum extent permitted by law; and (2) shall not be construed as exculpating any Exculpated Party from Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud (provided that actual fraud shall not exempt from the scope of these exculpations any Claims or Causes of Action arising under sections 544 or 548 of the Bankruptcy Code or state laws governing fraudulent or otherwise avoidable transfers or conveyances), willful misconduct, or gross negligence.**

**J.      Retention and Preservation of Causes of Action**

**1.      Retention of Causes of Action**

Except as otherwise provided in the Plan, all Causes of Action shall, on the Effective Date, automatically and irrevocably vest in the Reorganized Debtor free and clear of liens, claims, encumbrances and interests.  The Reorganized Debtor shall have the exclusive right, authority, and discretion to institute, commence, pursue, prosecute, abandon, transfer, settle, or compromise any and all such Causes of Action (under any theory of law, including, without limitation, the Bankruptcy Code, and in any court or other tribunal) without the consent or

approval of any third party and without any further order of the Bankruptcy Court, except as otherwise provided herein.

## 2. Preservation of Causes of Action

Except as otherwise provided in the Plan, the Reorganized Debtor reserves all rights to pursue any and all Causes of Action, including without limitation, any Causes of Action against Former Directors and Officers, and the Reorganized Debtor hereby reserves the right to pursue, administer, settle, transfer, litigate, enforce and liquidate all Causes of Action consistent with the terms and conditions of the Plan. Except as otherwise provided in the Plan, the, expressly reserves all Causes of Action for later adjudication, and, therefore, no preclusion doctrine or other rule of law, including, without limitation, any statute of limitations or the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to such Causes of Action upon, after or as a result of the Confirmation or Effective Date of the Plan, or the Confirmation Order. In addition, the Reorganized Debtor, on behalf of any successor-in-interest thereto, expressly reserves the right to pursue or adopt any Causes of Action not so waived, relinquished, released, compromised or settled that are alleged in any lawsuit in which the Reorganized Debtor is a defendant or an interested party, against any Entity including, without limitation, the plaintiffs and co-defendants in such lawsuits.

## K. Retention of Jurisdiction

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, and to the extent permitted by applicable law, the Bankruptcy Court shall retain such jurisdiction over any matter arising under the Bankruptcy Code, or arising in or related to the Chapter 11 Case or the Plan after Confirmation and after the Effective Date, and any other matter

or proceeding that is within the Bankruptcy Court's jurisdiction pursuant to 28 U.S.C. § 1334 or

28 U.S.C. § 157 including, without limitation, jurisdiction to:

1. Allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim, including the resolution of any Administrative Expense Request and the resolution of any and all objections to the allowance or priority of Claims;

2. Grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan, for periods ending on or before the Effective Date;

3. Ensure that distributions to Holders of Allowed Claims and Equity Interests are accomplished pursuant to the provisions hereof;

4. Decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters, including all Causes of Action and objections or estimations to Claims or Equity Interests, and grant or deny any applications involving the Debtor that may be pending on the Effective Date or that, pursuant to the Plan, may be instituted by the Reorganized Debtor or any other Entity after the Effective Date; provided, however, that the Reorganized Debtor reserves the right to prosecute the Causes of Action in all appropriate jurisdictions;

5. Enter such orders as may be necessary or appropriate to implement or consummate the provisions hereof and of all contracts, instruments, releases, indentures and other agreements or documents created in connection with the Plan;

6. Enter such orders necessary to sell, dispose of, liquidate, and/or convey any property of the Estate.

7. Resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

8. Issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with consummation or enforcement of the Plan, except as otherwise provided herein;

9. Resolve any cases, controversies, suits or disputes with respect to the releases, injunctions and other provisions contained in Article IX hereof and enter any orders that may be necessary or appropriate to implement such releases, injunctions and other provisions;

10.    Enter and implement any orders that are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

11.    Determine any other matters that may arise in connection with or related to this Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture or other agreement or document created in connection with the Plan or the Disclosure Statement;

12.    Enter an order and/or Final Decree concluding the Chapter 11 Case.

Notwithstanding any other provision in this article in the Plan to the contrary, nothing herein shall prevent the Debtor from commencing and prosecuting any Causes of Action before any other court or judicial body which would otherwise have appropriate jurisdiction over the matter and parties thereto, and nothing herein shall restrict any such courts or judicial bodies from hearing and resolving such matters.

## L.    Miscellaneous Provisions

### 1.    No Stay of Confirmation Order

The Confirmation Order shall contain a waiver of any stay of enforcement otherwise applicable, including pursuant to Bankruptcy Rules 3020(e), 6004(h), 6006(d) and 7062.

### 2.    Vesting of Property in the Reorganized Debtor

As of the Effective Date, all assets of the Debtor shall vest in the Reorganized Debtor or to the extent set forth herein be transferred to Operator, in each case free and clear of all Liens, Claims and Equity Interests, except as otherwise provided in this Plan or the Confirmation Order.

### 3.    Compromise of Controversies

Pursuant to Bankruptcy Rule 9019 in consideration for the classification, distribution and other benefits provided under the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims and controversies resolved pursuant to the Plan, including, without limitation, all Claims arising prior to the Petition Date, whether known or unknown, foreseen or unforeseen, asserted or unasserted, by or against the Debtor, arising out of, relating to, or in

connection with, the business or affairs of, or transactions with, the Debtor.  The entry of the Confirmation Order shall constitute approval by the Bankruptcy Court of the foregoing compromises or settlements, and all other compromises and settlements provided for in the Plan or the Disclosure Statement, and the findings of the Bankruptcy Court shall constitute its determination that such compromises and settlements are in the best interests of the Debtor, the Estate, creditors and other parties in interest, and are fair and equitable and within the range of reasonableness.  The provisions of the Plan, including without limitation, its release, injunction, exculpation and compromise provisions, are mutually dependent and non-severable.

4.        **Payment of Statutory Fees**

All fees payable pursuant to section 1930(a) of title 28 of the United States Code shall be paid on the earlier of when due or the Effective Date, or as soon thereafter as practicable.  From and after the Effective Date, the reorganized Debtor shall be liable for and shall pay the fees under 28 U.S.C. § 1930 until entry of an order converting, dismissing or closing the Chapter 11 Case, whichever occurs first.  In addition, the Debtor shall file post-confirmation quarterly reports in conformity with U.S. Trustee guidelines, until entry of an order closing or converting the Chapter 11 Case, whichever comes first.

5.        **Continuation of Retiree Benefits.**

Payment of all retiree benefits, as that term is defined in section 1114 of the Bankruptcy Code, shall be continued after the Effective Date at the level established pursuant to subsection (e)(1)(B) or (g) of section 1114 of the Bankruptcy Code, at any time prior to Confirmation of the Plan, for the duration of the period the Debtor has obligated itself to provide such benefits.

6.        **Modification of Plan**

Subject to the limitations contained in the Plan and the OWS Term Sheet:

The Plan may be amended or modified by the Debtor (a) before the Confirmation Date, to the extent permitted by section 1127 of the Bankruptcy Code; (b) after the Confirmation Date and prior to substantial consummation of the Plan, as defined in section 1101(2) of the Bankruptcy Code, to the extent the Debtor institutes proceedings in the Bankruptcy Court, pursuant to section 1127(b) of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order or to accomplish such matters as may be necessary or appropriate to carry out the purposes and effects of the Plan; provided, however, that prior notice of such proceedings shall be served in accordance with the Bankruptcy Rules or orders of the Bankruptcy Court; or (c) after the entry of the Confirmation Order, upon order of the Bankruptcy Court in accordance with section 1127(b) of the Bankruptcy Code.

The Debtor reserves the right to modify or amend the Plan upon a determination by the Bankruptcy Court that the Plan is not confirmable pursuant to section 1129 of the Bankruptcy Code to the extent permissible under section 1127 of the Bankruptcy Code without the need to resolicit acceptances.

After the Effective Date, the Reorganized Debtor may amend or modify, upon order of the Bankruptcy Court, the Plan in accordance with section 1127(b) of the Bankruptcy Code or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan.

7.    **Revocation of Plan**

The Debtor reserves the right to revoke or withdraw the Plan prior to the Confirmation Date and to file subsequent plans of reorganization or liquidation. If the Debtor revokes or withdraws the Plan, or if Confirmation or the Effective Date does not occur, then (i) the Plan shall be null and void in all respects, (ii) any settlement or compromise embodied in the Plan

(including the fixing or limiting to an amount certain any Claim or Equity Interest or Class of Claims or Equity Interests), assumption or rejection of executory contracts or leases effected by the Plan, and any document or agreement executed pursuant hereto, shall be deemed null and void, and without prejudice to any party, and (iii) nothing contained in the Plan shall (a) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Debtor or any other Entity, (b) prejudice in any manner the rights of the Debtor or any other Entity, or (c) constitute an admission of any sort by the Debtor any other Entity.  For the avoidance of doubt, Article XII.F of the Plan shall not impact or abridge any rights of OWS pursuant to or set forth in the Cash Collateral Order or the OWS Term Sheet.

### 8.      Confirmation of the Plan

The Debtor requests Confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to any Impaired Class that does not accept the Plan pursuant to section 1126 of the Bankruptcy Code. The Debtor reserves the right to amend the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

### 9.      Successors and Assigns

The rights, benefits and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Entity.

### 10.     Reservation of Rights

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order and the Effective Date shall occur.  None of the filing of the Plan, any statement or provision contained therein, or the taking of any action by the Debtor with respect to the Plan, the Disclosure Statement or the Plan Supplement shall be

or shall be deemed to be an admission or waiver of any rights of the Debtor with respect to the Holders of Claims or Equity Interests prior to the Effective Date.

### 11.    Section 1146 Exemption

Pursuant to section 1146(a) of the Bankruptcy Code, under the Plan, (i) the issuance, distribution, transfer or exchange of any debt, equity security or other interest in the Debtor; (ii) the creation, modification, consolidation or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (iii) the making, assignment or recording of any lease or sublease or (iv) the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of or in connection with, this Plan, including any deeds, bills of sale, assignments or other instrument of transfer executed in connection with any transaction arising out of, contemplated by or in any way related to the Plan shall not be subject to any document recording tax, mortgage recording tax, stamp tax or similar government assessment, and the appropriate state or local government official or agent shall forego the collection of any such tax or government assessment and accept for filing and recording any of the foregoing instruments or other documents without the payment of any such tax or government assessment.

All subsequent issuances, transfers or exchanges of securities, or the making or delivery of any instrument of transfer by the Debtor in the Chapter 11 Case, whether in connection with a sale pursuant to section 363 of the Bankruptcy Code or otherwise, shall be deemed to be or have been done in furtherance of this Plan.

### 12.    Further Assurances

The Creditors and Equity Interest Holders receiving distributions hereunder and all other parties in interest shall, from time to time, prepare, execute and deliver any agreements or

documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan.

### 13. Service of Documents

Any pleading, notice or other document required by the Plan to be served on or delivered shall be sent by first class U.S. mail, postage prepaid, as follows:

> To the Debtor or Reorganized Debtor:
> Cozen O'Connor
> 3 WTC, 175 Greenwich Street
> New York, NY 10007
> Attn.: Frederick E. Schmidt, Jr.

> To the U.S. Trustee:
> Office of the United States Trustee
> Alexander Hamilton Custom House
> One Bowling Green, Suite 534
> New York, NY 10004-1408
> Attn: Brian Masumoto

### 14. Transactions on Business Days

If the date on which a transaction may occur under the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

### 15. Filing of Additional Documents

On or before the Effective Date, the Debtor may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and provisions hereof.

### 16. Post-Confirmation Date Service List

From and after the Confirmation Date, all notices of appearance and demands for service of process filed with the Bankruptcy Court prior to such date shall no longer be effective. No further notices, other than notice of entry of the Confirmation Order shall be required to be sent

to such Entities.  Any party in interest that requests notice of matters after the Confirmation Date

shall contact the Debtor, in accordance with Section XII(L) of the Plan.

## 17.   **Post-Effective Date Fees and Expenses**

From and after the Effective Date, the Reorganized Debtor shall, in the ordinary course of

business and without the necessity for any approval by the Bankruptcy Court, pay the reasonable

and necessary fees and expenses in accordance with and from the funds provided for such use in

this Plan.

## 18.   **Severability**

The provisions of the Plan shall not be severable unless such severance would constitute

a permissible modification of this Plan pursuant to section 1127 of the Bankruptcy Code.

## 19.   **Conflicts**

To the extent any provision of the Plan or the Disclosure Statement or any document

executed in connection therewith or any documents executed in connection with the Plan (or any

exhibits, schedules, appendices, supplements or amendments to any of the foregoing) conflicts

with, or is in any way inconsistent with, the terms of the Confirmation Order, the terms and

provisions of the Confirmation Order shall govern and control.

To the extent any provision of the Disclosure Statement or any document executed in

connection therewith or any documents executed in connection with the Plan (or any exhibits,

schedules, appendices, supplements or amendments to any of the foregoing) conflicts with, or is

in any way inconsistent with, the terms of the Plan, the terms and provisions of the Plan and the

Confirmation Order shall govern and control.

## 20.   **Term of Injunctions or Stays**

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or

stays in effect in the Chapter 11 Case pursuant to sections 105 or 362 of the Bankruptcy Code or

any order of the Bankruptcy Court and still extant on the Confirmation Date (excluding any injunctions or stays contained in this Plan or the Confirmation Order), shall remain in full force and effect until the closing of the Chapter 11 Case.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

### 21.   Entire Agreement

The Plan and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings and representations on such subjects, all of which have become merged and integrated into the Plan.

### 22.   Closing of Chapter 11 Case

The Reorganized Debtor shall promptly, upon the full administration of the Chapter 11 Case, file with the Bankruptcy Court all documents required by the Bankruptcy Rules and any applicable orders of the Bankruptcy Court to close the Chapter 11 Case.  Furthermore, Kroll is authorized to destroy all paper/hardcopy records related to this matter two (2) years after the Effective Date has occurred.

### 23.   Change of Control Provisions

Any acceleration, vesting or similar change of control rights under any employment, benefit or other arrangements triggered by the consummation of the Plan shall be waived or otherwise cancelled under the Plan.

## VII.
## CONFIRMATION PROCEDURE

Under the Bankruptcy Code, the following steps must be taken to confirm the Plan:

### A.   <u>Solicitation of Votes</u>

In accordance with sections 1126 and 1129 of the Bankruptcy Code, the Claims in Classes 1, 1a, 1b, 3, 3a and 3b of the Plan are Impaired and are entitled to vote to accept or reject

the Plan.  Claims in Classes 1c, 2 and 4 are Unimpaired.  The Holders of Allowed Claims in such Classes are conclusively presumed to have accepted the Plan and the solicitation of acceptances with respect to such Classes therefore is not required under section 1126(f) of the Bankruptcy Code.  Chapter 11 of the Bankruptcy Code provides that, in order for the Bankruptcy Court to confirm the Plan as a consensual plan, the Holders of Impaired Claims against, and Impaired Interests in, the Debtor that are entitled to vote must accept the Plan.

An Impaired Class of Claims will have accepted the Plan if (i) the Holders of at least two-thirds in amount of the Allowed Claims actually voting in the Class have voted to accept the Plan and (ii) the holders of more than one-half in number of the Allowed Claims actually voting in the Class have voted to accept the Plan, not counting the vote of any Holder designated under section 1126(e) of the Bankruptcy Code or any insider.

A vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that acceptance or rejection was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

Any Creditor in an impaired Class who filed a Proof of Claim on or before the applicable Bar Date (or, if not filed by such date, any Proof of Claim filed within any other applicable period of limitations or with leave of the Bankruptcy Court), which Claim is not the subject of an objection or request for estimation, is entitled to vote.

### B.    **The Confirmation Hearing**

The Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a confirmation hearing.  The Confirmation Hearing in respect of the Plan has been scheduled for March 18, 2025, at 10:00 a.m. (Prevailing Eastern Time), before the Honorable Philip Bentley, at the Bankruptcy Court for the Southern District of New York, Alexander Hamilton Custom House, One Bowling Green, New York, NY 10004-1408.  The Confirmation Hearing may be

adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing.  Any objection to Confirmation must be made in writing and specify in detail the name and address of the objector, all grounds for the objection and the amount of the Claim held by the objector.  Any such objection must be filed with the Bankruptcy Court and served so that it is received by the Bankruptcy Court and the following parties on or before March 7, 2025 at 4:00 p.m. (Prevailing Eastern Time): (i) counsel for the Debtor, Cozen O'Connor, 3WTC, 175 Greenwich Street, New York, New York 10007, Attn: Frederick E. Schmidt, Jr. (eschmidt@cozen.com), Peter J. Roberts (proberts@cozen.com), and Christina Sanfelippo (csanfelippo@cozen.com); (ii) counsel for OWS CRE Funding I, LLC, Cadwalader, Wickersham & Taft LLP, 200 Liberty Street, New York, NY 10281, Attn:  Gregory M. Petrick (Gegory.Petrick@cwt.com), Thomas J. Curtin (Thomas.Curtin@cwt.com), and Anthony L. Greene (Anthony.Greene@cwt.com); (iii)  the Office of the United States Trustee, Alexander Hamilton Custom House, One Bowling Green, Room 534, New York, NY 10004-108, Attn: Brian S. Masumoto; and (iv) all entities which have filed a notice of appearance and demand for service of documents in these cases (the foregoing, collectively, the "Notice Parties").

Objections to Confirmation of the Plan are governed by Bankruptcy Rule 9014 and orders of the Bankruptcy Court.

### C.    Confirmation

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code are met.  Among the requirements for confirmation of the Plan are that the Plan is (i) accepted by all Impaired Classes of Claims and Equity Interests or, if rejected by an Impaired Class, that the Plan "does not discriminate

unfairly" and is "fair and equitable" as to such Class, (ii) feasible and (iii) in the "best interests"
of Creditors and stockholders that are Impaired under the Plan.

### 1.    Acceptance

Classes 1, 1a, 1b, 3, 3a, and 3b of the Plan are Impaired under the Plan.  Classes 1c, 2 and
4 of the Plan are Unimpaired and, therefore, are conclusively presumed to have voted to accept
the Plan.

### 2.    Feasibility

The Bankruptcy Code requires a plan proponent to demonstrate that confirmation of a
plan of reorganization is not likely to be followed by the liquidation or the need for further
financial reorganization of a debtor unless so provided by the plan of reorganization.  Here, the
Plan contemplates plan distributions both at or near the Effective Date as well as payments to
Classes 1, 1a and 1b over time.  For those distributions required to be made at or near the
Effective Date, in advance of the Confirmation Hearing, the Debtor and its Parent will have fully
funded the Plan Distribution Reserve so that all such distributions can be timely made.  In
addition, the Debtor has prepared financial projections which are attached hereto as Exhibit D
which demonstrate the Debtor's anticipated ability to make distributions required to be made
under the Plan following the Effective Date.  As for the monthly interest-only payments to be
made to OWS, as reflected on the OWS Term Sheet (Exhibit A to the Plan), the Parent is
required, among other things, to enter into a debt service carry and reserve guaranty.

### 3.    Best Interests Test

With respect to each Impaired Class of Claims and Equity Interests, Confirmation of the
Plan requires that each holder of an Allowed Claim or Equity Interest either (i) accept the Plan or
(ii) receive or retain under the Plan property of a value, as of the Effective Date, that is not less
than the value such Holder would receive or retain if the Debtor were liquidated under chapter 7

of the Bankruptcy Code.  To determine what Holders of Claims and Equity Interests of each Impaired Class would receive if the Debtor were liquidated under chapter 7, the Bankruptcy Court must determine the dollar amount that would be generated from the liquidation of the Debtor's assets and properties in the context of a chapter 7 liquidation case.  The cash amount that would be available for satisfaction of Claims and Equity Interests would consist of the proceeds resulting from the disposition of the unencumbered assets and properties of the Debtor, augmented by the unencumbered cash held by the Debtor at the time of the commencement of the liquidation case.  Such cash amount would be reduced by the amount of the costs and expenses of the liquidation and by such additional administrative expense and priority claims that might result from the use of chapter 7 for the purposes of liquidation.

The Debtor's costs of liquidation under chapter 7 would include the fees and commissions payable to a chapter 7 trustee, as well as those fees that might be payable to attorneys and other professionals that such a trustee might engage.  The foregoing types of claims and other claims that might arise in a liquidation case or result from the pending Chapter 11 Case, including any unpaid expenses incurred by the Debtor during the Chapter 11 Case such as compensation for attorneys, would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay pre-petition Claims.

After considering the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors in the Chapter 11 Case, including the increased costs and expenses of a liquidation under chapter 7 arising from fees payable to a trustee in bankruptcy and professional advisors to such trustee, the Debtor has determined that confirmation of the Plan will provide each holder of an Allowed Claim or Equity Interest with a recovery that is not less than such holder would receive pursuant to liquidation of the Debtor

under chapter 7. The Debtor also believes that the value of any distributions to each Class of Allowed Claims could be less than under the Plan because such distributions in a chapter 7 case may not occur for a substantial period of time.

A Liquidation Analysis of the Debtor, prepared by the Debtor and its advisors, is attached hereto as Exhibit C. The information set forth in Exhibit C provides a summary of the liquidation values of the Debtor's assets, assuming a chapter 7 liquidation in which a trustee appointed by the Bankruptcy Court would liquidate the assets of the Debtor's estate.

Underlying the Liquidation Analysis are a number of estimates and assumptions that, although developed and considered reasonable by the Debtor, are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of the Debtor. The Liquidation Analysis is also based on assumptions with regard to liquidation decisions that are subject to change. Accordingly, the values reflected might not be realized if the Debtor was, in fact, to undergo such a liquidation.

## VIII.
## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the Plan is not confirmed and consummated, the alternatives to the Plan include (i) liquidation of the Debtor under chapter 7 of the Bankruptcy Code and (ii) an alternative plan of reorganization.

### A.    Liquidation Under Chapter 7

If no plan is confirmed, the Chapter 11 Case may be converted to a case under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be selected to liquidate the Debtor's remaining assets for distribution in accordance with the priorities established by chapter 7. As discussed above, the Debtor believes that liquidation under chapter 7 would result in smaller distributions being made to creditors than those provided for in the Plan because there would not

be sufficient recoveries to make any distributions to creditors after distributions are made on account of Secured Claims.

**B.    Alternative Plan of Reorganization**

If the Plan is not confirmed, the Debtor or any other party in interest could attempt to formulate a different plan.  However, no party has expressed an interest in proposing an alternate plan of reorganization, despite the expiration of the Debtor's exclusive right to file a plan having expired on or about December 11, 2023.

## IX.
## CERTAIN RISK FACTORS TO BE CONSIDERED

HOLDERS OF CLAIMS AGAINST THE DEBTOR AND INTERESTS IN THE DEBTOR SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR INCORPORATED BY REFERENCE), PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN.   THESE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

**A.    Certain Bankruptcy Law Considerations**

**1.    Risk of Non-Confirmation of the Plan**

Although the Debtor believes that the Plan will satisfy all requirements necessary for Confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion.  Moreover, there can be no assurance that modifications of the Plan will not be required for Confirmation or that such modifications would not necessitate the re-solicitation of votes.

2.      **Risk of Non-Occurrence of the Effective Date**

Although the Debtor believes that all of the conditions to the Effective Date will occur after the entry of the Confirmation Order, there can be no assurance as to the timing of the Effective Date or that such conditions will ever occur.

B.      **Certain Tax Matters**

For a summary of certain federal income tax consequences of the Plan to holders of Claims and to the Debtor, see Article XI hereof, "Certain Federal Income Tax Consequences Of The Plan."

C.      **Additional Factors to be Considered**

1.      **The Debtor Has No Duty to Update**

The statements contained in this Disclosure Statement are made by the Debtor as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date. The Debtor has no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

2.      **No Representations Outside This Disclosure Settlement Are Authorized**

No representations concerning or related to the Debtor, the Chapter 11 Case, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan other than as contained in, or included with, this Disclosure Statement should not be relied upon by you in arriving at your decision.

3.      **No Legal or Tax Advice is Provided to You By This Disclosure Statement**

The contents of this Disclosure Statement should not be construed as legal, business or tax advice.  Each holder of a Claim or Equity Interest should consult his, her, or its own legal counsel and accountant as to legal, tax and other matters concerning his, her, or its Claim or Equity Interest.

This Disclosure Statement is not legal advice to you.  This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

4.      **No Admission Made**

Prior to the approval of this Disclosure Statement, nothing contained herein shall constitute an admission of, or be deemed evidence of, the tax or other legal effects of the Plan on the Debtor or on holders of Claims or Equity Interests; provided, however, that upon approval of this Disclosure Statement, nothing contained herein shall constitute an admission in any proceeding other than the Chapter 11 Case.

## X.
## SECURITIES LAWS MATTERS

The Plan does not contemplate the issuance of any securities.

## XI.
## CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtor and holders of certain claims against the Debtor. This discussion does not address the U.S. federal income tax consequences of the implementation of the Plan to holders of claims that are entitled to reinstatement, unimpaired or otherwise entitled to payment in full in cash under the Plan.

The discussion of U.S. federal income tax consequences set forth below is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), U.S. Department of Treasury regulations promulgated or proposed thereunder, judicial authorities, published positions of the Internal Revenue Service ("IRS") and other applicable authorities, all as in effect on the date of this document and all of which are subject to change or differing interpretations (possibly with retroactive effect).  The U.S. federal income tax consequences of the contemplated transactions are complex and are subject to significant uncertainties.  The Debtor has not requested a ruling from the IRS or any other tax authority, or an opinion of counsel, with respect to any of the tax aspects of the contemplated transactions, and the discussion below is not binding upon the IRS or such other authorities.  Thus, no assurance can be given that the IRS or such other authorities would not assert, or that a court would not sustain, a different position from any discussed herein.

Except as specifically stated otherwise, this summary assumes that a holder holds a claim or an existing Equity Interest as a capital asset for U.S. federal income tax purposes.  This summary does not address foreign, state or local tax consequences of the contemplated transactions, nor does it purport to address the U.S. federal income tax consequences of the transactions to special classes of taxpayers (*e.g.,* foreign persons or entities, small business investment companies, regulated investment companies, real estate investment trusts, banks and certain other financial institutions, insurance companies, tax-exempt organizations, holders that are, or hold claims or existing Equity Interests through, pass-through entities, persons whose functional currency is not the U.S. dollar, dealers in securities or foreign currency, and persons holding claims or existing Equity Interests as a hedge against, or that is hedged against, currency risk or as part of a straddle, constructive sale or conversion transaction).

The discussion does not address U.S. federal taxes other than income taxes, nor does it apply to any person that acquires any of the consideration issued pursuant to the Plan through means other than directly participating in the exchange.  If a partnership (or another entity that is treated as a partnership for U.S. federal income tax purposes) holds claims or existing Equity Interests, the tax treatment of a partner (or other equity owner) generally will depend upon the status of such partner (or other owner) and upon the activities of the partnership (or other entity). This discussion is based on currently available information regarding the Plan terms and may not reflect the actual terms of the Plan upon its implementation.  The following summary of certain U.S. federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon the individual circumstances pertaining to a holder of claims or existing Equity Interests.

**IRS Circular 230 Notice**:  To ensure compliance with IRS Circular 230, holders of Claims and existing Equity Interests are hereby notified that: (A) any discussion of U.S. federal tax issues contained or referred to in this Disclosure Statement is not intended or written to be used, and cannot be used, by such holders for the purpose of avoiding penalties that may be imposed on them under the Tax Code; (B) such discussion is written in connection with the promotion or marketing by the Debtor of the transactions or matters addressed herein; and (C) such holders should seek advice based on their particular circumstances from independent tax advisors.

A.    **Consequences to the Debtor**

The Plan, as currently contemplated, may result in U.S. federal income tax consequences to the Debtor and to the Debtor's Parent.

### B.    Consequences to Claim Holders

A Claim holder that receives money or other property in discharge of a Claim for interest accrued during the period the holder owned such Claim and not previously included in such holder's income will be required to recognize ordinary income equal to the amount of such money and the fair market value of such property received in respect of such Claim.  A holder generally may claim an ordinary deduction (or, possibly, a write-off against a reserve for bad debts) to the extent of any Claim for accrued interest that was previously included in such holder's taxable income and which will not be paid in full by the Debtor under the Plan (after allocating any payment to be made by the Debtor between principal and accrued interest), even if the underlying Claim is held as a capital asset.  The tax basis of any property received in exchange for a Claim for accrued interest under the Plan will equal the fair market value of such property on the Effective Date, and the holding period for such property will begin on the day following the Effective Date.

The extent to which consideration distributable under the Plan is allocable to interest is unknown.  Holders of Claims are advised to consult their own tax advisers to determine the amount, if any, of consideration received under the Plan that is allocable to interest.

**THE FOREGOING SUMMARY HAS BEEN PROVIDED FOR INFORMATIONAL PURPOSES ONLY.  ALL HOLDERS OF CLAIMS OR EXISTING EQUITY INTERESTS ARE URGED TO CONSULT THEIR TAX ADVISORS CONCERNING THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES APPLICABLE TO THEM.**

## XII.
## RECOMMENDATION AND CONCLUSION

For all of the reasons set forth in the Disclosure Statement, the Debtor believes that confirmation and consummation of the Plan is preferable to all other alternatives.  Consequently, the Debtor urges all eligible Holders of Impaired Claims and Interests to vote to **accept** the Plan, and to complete and return their Ballots so that they are actually **received** by Kroll, the Debtor's Voting Agent, on or before **4:00 p.m. (Prevailing Eastern Time) on March 7, 2025**.

Dated: February 3, 2025

<u>**DEBTOR**</u>

By:    Joseph Caruso
Title:   Vice President

EXHIBIT "A"


SECOND AMENDED CHAPTER 11 PLAN OF 560
SEVENTH AVENUE OWNER PRIMARY LLC

**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------x

In re                                 Chapter 11

560 SEVENTH AVENUE OWNER       Case No. 23-11289 (PB)
PRIMARY LLC,

        Debtor.

--------------------------------------------------------x


**SECOND AMENDED CHAPTER 11 PLAN OF**
**560 SEVENTH AVENUE OWNER PRIMARY LLC**


**Dated: February 3, 2025**


**COZEN O'CONNOR**
3 WTC, 175 Greenwich Street
New York, New York 10007
(212) 883-4900
(212) 986-0604
Frederick E. Schmidt, Jr.

Peter J. Roberts
Christina M. Sanfelippo
123 N Wacker Drive, Ste. 1800
Chicago, Illinois 60606
(312) 382-3100
proberts@cozen.com
csanfelippo@cozen.com


*Attorneys for 560 Seventh Avenue Owner*
*Primary LLC*

## TABLE OF CONTENTS

**Page**

**ARTICLE I**    DEFINED TERMS, COMPUTATION OF TIME AND GOVERNING
LAW ................................................................................................................1

**ARTICLE II**    TREATMENT OF ADMINISTRATIVE
EXPENSES AND PRIORITY TAX CLAIMS ..................................................9

**ARTICLE III**    CLASSIFICATION AND TREATMENT
OF CLAIMS AND EQUITY INTERESTS......................................................10

**ARTICLE IV**    PROVISIONS FOR IMPLEMENTATION OF PLAN...................................16

**ARTICLE V**    EXECUTORY CONTRACTS AND UNEXPIRED
LEASES; REJECTION CLAIMS BAR DATE .................................................17

**ARTICLE VI**    PROVISIONS REGARDING DISTRIBUTIONS ...........................................20

**ARTICLE VII**    PROCEDURES FOR RESOLUTION OF DISPUTED,
CONTINGENT AND UNLIQUIDATED CLAIMS.......................................23

**ARTICLE VIII**    CONDITIONS PRECEDENT TO CONFIRMATION AND
EFFECTIVE DATE OF THE PLAN ..............................................................25

**ARTICLE IX**    RELEASE, EXCULPATION, INJUNCTIVE AND RELATED
PROVISIONS..................................................................................................26

**ARTICLE X**    RETENTION AND PRESERVATION OF CAUSES OF ACTION..............29

**ARTICLE XI**    RETENTION OF JURISDICTION ...................................................................30

**ARTICLE XII**    MISCELLANEOUS PROVISIONS ...............................................................31

## CHAPTER 11 PLAN

Pursuant to title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code"), 560 Seventh Avenue Owner Primary LLC (the "Debtor"), as debtor and debtor in possession in the above-captioned chapter 11 case, hereby respectfully proposes the following chapter 11 plan:

## ARTICLE I

## DEFINED TERMS, COMPUTATION OF TIME AND GOVERNING LAW

A.    *Computation of Time and Governing Law*

1.    In computing any period of time prescribed or allowed hereby, the provisions of Bankruptcy Rule 9006(a) shall apply.

2.    Except to the extent that the Bankruptcy Code or Bankruptcy Rules apply, and subject to the express provisions of any contract, instrument, release, note or other agreement or document entered into in connection herewith, including the Restructuring Documents, the laws of the State of New York, giving effect to the conflict of laws' principles thereof, shall govern the construction of the Plan and any agreements, documents and instruments executed in connection with the Plan including, without limitation, any rule of law or procedure supplied by federal law as interpreted under the decisions of the State of New York (including the Bankruptcy Code and the Bankruptcy Rules).

B.    *Defined Terms*

Unless the context otherwise requires, the following terms shall have the following meanings when used in capitalized form herein:

1.    *"Administrative Expense"* means any cost or expense of administration of the Chapter 11 Case pursuant to sections 503(b) and 507(a)(2) or 507(b) of the Bankruptcy Code, including but not limited to: (a) the actual and necessary costs and expenses incurred after the Petition Date of preserving the Estate and operating the Debtor's business; (b) compensation for legal, financial advisory, accounting and other professional services, and reimbursement of expenses Allowed pursuant to sections 327, 328, 330, 331, 503 or 1103 of the Bankruptcy Code, including Professional Fees; (c) all fees and charges assessed against the Estate pursuant to 28 U.S.C. § 1930; and (d) any Restructuring Expenses.

2.    *"Administrative Expense Bar Date"* has such meaning set forth in Article II.A.1 herein.

3.    *"Administrative Expense Request"* means a request for payment of an Administrative Expense.

4.      "*Affiliate*" shall have the meaning ascribed to such term in section 101(2) of the Bankruptcy Code.

5.      "*Allowed*" means, (i) with respect to a Claim, allowable pursuant to section 502 of the Bankruptcy Code and (a) for which a Proof of Claim was filed on or before the applicable Bar Date established by the Bankruptcy Court or pursuant to other order of the Bankruptcy Court and as to which no objection or other challenge to allowance thereof has been timely Filed, or, if an objection or challenge has been timely Filed, such Claim is allowed by a Final Order; or (b) that is deemed allowed under the Plan or by prior order of the Bankruptcy Court; provided, however, that, as to subparagraph (a) only, "Allowed Claim" shall not include any Claim subject to disallowance in accordance with section 502(d) of the Bankruptcy Code; and (ii) with respect to an Administrative Expense, allowable pursuant to section 503 of the Bankruptcy Code and (a) for which an Administrative Expense Request was Filed on or before the applicable Bar Date established by the Bankruptcy Court or pursuant to other order of the Bankruptcy Court and which is allowed by a Final Order; or (b) that is deemed allowed under the Plan or by prior order of the Bankruptcy Court.

6.      "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended from time to time, as in effect on the Confirmation Date or otherwise applicable to the Chapter 11 Case.

7.      "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of New York.

8.      "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure, as amended from time to time and as applicable to the Chapter 11 Case, promulgated pursuant to 28 U.S.C. § 2075, and the General, Local and Chambers Rules of the Bankruptcy Court, as amended from time to time.

9.      "*Bar Date*" means, as applicable, the (i) Claims Bar Date, (ii) Governmental Unit Bar Date, or (iii) Administrative Expense Bar Date.

10.      "*Bar Date Order*" means that certain Order Establishing Deadline for Filing Proofs of Claim and Approving the Form and Manner of Notice Thereof [Docket No. 115], entered by the Bankruptcy Court on February 27, 2024, establishing the Claims Bar Date and Governmental Unit Bar Date in the Chapter 11 Case.

11.      "*Business Day*" means any day, other than a Saturday, Sunday, "legal holiday" (as defined in Bankruptcy Rule 9006(a)) or any other day on which commercial banks in New York are required or are authorized to close by law or executive order.

12.      "*Cash*" means the legal tender of the United States of America or the equivalent thereof.

13.      "*Cash Collateral Order*" means that certain *Final Order (I) Authorizing The Use Of Cash Collateral; (II) Authorizing The Prepetition Senior Mortgage Lender To Maintain Existing Accounts; (III) Granting Adequate Protection To The Prepetition Senior Mortgage*

LEGAL\75402219\1

*Lender; And (IV) Granting Related Relief* entered in this Chapter 11 Case on February 28, 2024 as Docket No. 117.

14.    "*Causes of Action*" means, without limitation, all Claims, actions, causes of action, choses in action, suits, debts, dues, damages, judgments, third-party claims, counterclaims and cross-claims (including, but not limited to, all claims arising under state, federal or other non-bankruptcy law) of the Debtor or its Estate that are or may be pending or existing on the Effective Date, or which are based on any facts or circumstances occurring on or before the Effective Date, against any Insiders, Holders of Claims, and/or any Entity, based in law or equity, including, but not limited to, under the Bankruptcy Code, whether direct, indirect, known or unknown, derivative, or otherwise and whether asserted or unasserted as of the Effective Date, including without limitation any avoidance, recovery, subordination or other actions, Claims, causes of action, suits, judgments, third-party claims, counterclaims and cross-claims against Insiders, Holders of Claims, and/or any other Entities under chapter 5 of the Bankruptcy Code.

15.    "*Chapter 11 Case*" means the chapter 11 case styled *In 560 Seventh Avenue Owner Primary LLC*, Chapter 11 Case No. 23-11289 (PB), pending in the Bankruptcy Court.

16.    "*Claim*" means a claim, as defined in section 101(5) of the Bankruptcy Code, against any of the Debtor.

17.    "*Claims Bar Date*" means April 10, 2024, at 5:00 p.m. (prevailing Eastern time), which is the date established by the Bankruptcy Court in the Bar Date Order by which Creditors and Governmental Units are required to have filed Proofs of Claim.

18.    "*Class*" means a category of Holders of Claims or Equity Interests as set forth in Article IV herein.

19.    "*Confirmation*" means entry of the Confirmation Order on the docket of the Chapter 11 Case.

20.    "*Confirmation Date*" means the date of Confirmation.

21.    "*Confirmation Hearing*" means the hearing(s) at which the Bankruptcy Court considers entry of the Confirmation Order.

22.    "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, which shall be (i) in form and substance acceptable to the Debtor; and (ii) in form and substance (a) acceptable to OWS to the extent the terms of such order relate to the OWS Secured Claim or the OWS Term Sheet, and (b) otherwise reasonably acceptable to OWS.

23.    "*Congregation*" means Garment Center Congregation.

24.    "*Congregation Action*" means the action in the Supreme Court of the State of New York, County of New York styled *Garment Center Congregation v. Seventh Avenue Development, LLC, 560 Seventh Avenue Owner LLC, 560 Seventh Avenue Owner Primary LLC, and Stewart Title Insurance Company*, and bearing Index Number 654427/2022.

25.     "*Congregation Claim*" means any and all Allowed Claims asserted by the Congregation, including (to the extent Allowed) the Proof of Claim filed by the Congregation on or about April 5, 2024 and assigned Claim Number 36 asserting a General Unsecured Claim in the amount of $39,000,000.00 and any Allowed Claim arising from the Debtor's rejection of the Congregation Lease pursuant to the Plan.

26.     "*Congregation Lease*" means that certain lease made the 21st day of April, 1977 between the Congregation, as tenant, and Albert A. List, as landlord for the premises known as 560 Seventh Avenue, New York, New York, as thereafter amended.

27.     "*Creditor*" means a Holder of a Claim.

28.     "*DHG*" means DHT TSQ, LLC.

29.     "*DHG Agreement*" has the meaning ascribed to it in Article III.B.2 of the Plan.

30.     "*DHG Claim*" means the Claim of DHG TSQ, LLC asserted by proof of claim number 39, asserted on or about April 9, 2024.  The DHG Claim is asserted in the total amount of $4,464,128.44, $3,111,115.25 of which was asserted as a Secured Claim and $1,353,013.19 of which was asserted as a General Unsecured Claim.

31.     "*Disallowed*" means any Claim, or any portion thereof, that has (i) has been disallowed by Final Order or settlement; (ii) is scheduled at zero or as contingent, disputed, or unliquidated on the Schedules and as to which a Bar Date has been established but no Proof of Claim has been timely Filed or deemed timely Filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court, including any claims bar date order, or otherwise deemed timely Filed under applicable law; or (iii) is not scheduled on the Schedules and as to which a Bar Date has been established but no Proof of Claim has been timely Filed or deemed timely Filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely Filed under applicable law. "Disallow" and "Disallowance" shall have correlative meanings.

32.     "*Disclosure Statement*" means the Disclosure Statement for the Plan as it may be amended, supplemented or modified from time to time.

33.     "*Disputed*" means, with respect to any Claim, as of the date of determination:  (a) listed on the Schedules as unliquidated, disputed or contingent, unless and until it is Allowed pursuant to a Final Order or deemed allowed under the Plan; (b) as to which the Debtor, or any other party-in-interest has Filed a timely objection or request for estimation in accordance with the Bankruptcy Code and the Bankruptcy Rules, which objection or request for estimation has not been withdrawn with prejudice, determined by a Final Order or deemed allowed under the Plan; (c) as to which the deadline for filing objections has not passed (whether or not an objection has been Filed), unless and to the extent such Claim or Equity Interest has been Allowed pursuant to a Final Order or deemed allowed under the Plan; or (d) that is otherwise disputed by the Debtor or any other party-in-interest, or is subject to any right of setoff or recoupment, or the Holder thereof is subject to any Claim or cause of action, in accordance with applicable law, which dispute, right of setoff or recoupment, Claim or cause of action, has not been withdrawn or determined in favor of such Holder by a Final Order or otherwise resolved or allowed pursuant to the Plan.

4

34.     *"Distribution Agent"* means the Reorganized Debtor or any Entity the Reorganized Debtor selects to make or to facilitate distributions in accordance with the Plan.

35.     *"Effective Date"* means the date that is the first Business Day after the Confirmation Date on which:  (a) no stay of the Confirmation Order is in effect, (b) all conditions specified in Article VIII.B herein have been satisfied or waived pursuant to Article VIII.C herein, and (c) the Debtor files with the Bankruptcy Court a notice of the occurrence of the Effective Date.

36.     *"Entity"* means an entity as defined in section 101(15) of the Bankruptcy Code.

37.     *"Equity Interest"* means the legal, equitable, contractual or other rights of any Entity with respect to any capital stock, membership interest or other ownership interest in the Debtor, whether or not transferable, and any option, warrant or right to purchase, sell, subscribe for, or otherwise acquire or receive an ownership interest or other equity security in the Debtor.

38.     *"Estate"* means the Debtor's estate created pursuant to section 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Case.

39.     *"Exculpated Parties"* means each of the following in their capacity as such and, in each case, to the maximum extent permitted by law: (i) the Debtor; (ii) each member, director, manager, or officer of the Debtor serving in such capacity on or after December 20, 2023; and (iii) OWS (including Related Parties of OWS).  For the avoidance of doubt, Former Directors and Officers shall not be Exculpated Parties.

40.     *"File"* or *"Filed"* means file or filed with the Bankruptcy Court in the Chapter 11 Case.

41.     *"Final Decree"* means the decree contemplated under Bankruptcy Rule 3022.

42.     *"Final Order"* means an order of the Bankruptcy Court: (i) as to which the time to appeal, petition for certiorari or move for reargument, reconsideration or rehearing has expired and as to which no appeal, petition for certiorari or other proceeding for reargument, reconsideration or rehearing is pending; or (ii) if an appeal, writ of certiorari, reargument or rehearing thereof has been sought, such order has been affirmed by the highest court to which such order was appealed or from which certiorari was sought, reargument, reconsideration or rehearing has been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for reargument, reconsideration or rehearing has expired; provided, however, that the possibility of a motion pursuant to Rule 59 or 60 of the Federal Rules of Civil Procedure or any analogous Bankruptcy Rule being Filed with respect to such order shall not cause such order to be deemed a non-Final Order.

43.     *"Flintlock"* means Flintlock Construction Services, LLC

44.     *"Flintlock Claim"*  means the Claim asserted by Flintlock in proof of claim number 46, asserting a Secured Claim in the amount of $3,277,814.24.

45.     *"Former Directors and Officers"* means any and all directors, officers, members and/or managers of the Debtor prior to December 20, 2023.

LEGAL\75402219\1

46.    "*General Unsecured Claim*" means any Claim other than an Administrative Expense, Secured Claim, or Priority Claim.

47.    "*Governmental Unit*" means a governmental unit as defined in section 101(27) of the Bankruptcy Code.

48.    "*Governmental Unit Bar Date*" means April 10, 2024, at 5:00 p.m. (prevailing Eastern time), which is the deadline established by the Bankruptcy Court in the Bar Date Order by which Governmental Units are required to have filed Proofs of Claim.

49.    "*Holder*" means the Entity holding the beneficial interest in a Claim, Equity Interest, Administrative Expense or right to distributions from the Debtor.

50.    "*Impaired*" means, with respect to any Class, impaired as defined in section 1124 of the Bankruptcy Code.

51.    "*Insider*" means an insider as defined in section 101(31) of the Bankruptcy Code.

52.    "*Interests*" means any common stock, limited liability company interest, equity security (as defined in section 101(16) of the Bankruptcy Code), equity, ownership, profit interests, unit, or share in any Debtor (including all options, warrants, rights, or other securities or agreements to obtain such an interest or share in such Debtor), whether or not arising under or in connection with any employment agreement and whether or not certificated, transferable, preferred, common, voting, or denominated "stock" or a similar security.

53.    "*Lien*" means a lien as defined in section 101(37) of the Bankruptcy Code.

54.    "*New Value Contribution*" means the Plan contributions by the Parent in the form of (i) the Administrative Claim Distribution Waiver; and (ii) the Parent Funding Contribution.

55.    "*Operator"* means AC MVTS Operator, LLC.

56.    "*OWS"* means OWS CRE Funding I, LLC.

57.    "*OWS Secured Claim"* means the Secured Claim of OWS, which shall include the "Lender Claim" as that term is defined in the OWS Term Sheet.

58.    "*OWS Term Sheet"* has the meaning ascribed to it in Article III.B.1. of the Plan.

59.    "*Parent"* means AC MVTS Holdco, LLC and/or its affiliates or corporate parents.

60.    "*Parent Administrative Claim"* means the Allowed Administrative Claim held by the Parent in the approximate amount of $23,928,420.11.

61.    "*Parent Administrative Claim Distribution Waiver"* means the Parent's waiver hereunder of its right to receive a distribution on account of the Parent Administrative Claim.

62.    "*Parent Funding Contribution"* means the Parent's commitment to provide a Cash contribution to the Debtor, in an amount sufficient to make up for any shortfall in funding

distributions required to be made on the Effective Date under this Plan, subject to the terms and conditions of the Plan.

63.    *"Person"* shall have the meaning set forth in section 101(41) of the Bankruptcy Code.

64.    *"Personal Injury Claim"* means a timely asserted Claim that asserts a claim for personal injury damages, including any and all Claims asserted by or on behalf of Michael Nicoletta, Waynette A. Thomas, and Harriet Larkins.

65.    *"Personal Injury Insurance Policy"* means any insurance policies issued or providing coverage to which the Debtor asserts that coverage is/was provided for, *inter alia*, defense and damages, if any, that are alleged to be caused be defective and/or dangerous real property conditions including all Personal Injury Claims.

66.    "*Petition Date*" means August 12, 2023.

67.    "*Plan*" means this chapter 11 plan, including the Plan Supplement and all exhibits, supplements, appendices, and schedules hereto, either in its present form or as it may be altered, amended, modified or supplemented from time to time in accordance with the terms hereof, the Bankruptcy Code and the Bankruptcy Rules.

68.    "*Plan Supplement*" means any supplement filed by the Debtor appending documents or information required by or described in the Plan.

69.    "*Premises*" means the real property and improvements located at 560 Seventh Avenue, New York, NY 10018.

70.    "*Priority Claim*" means any Priority Non-Tax Claim or Priority Tax Claim.

71.    "*Priority Non-Tax Claim*" means any Claim accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim or Administrative Expense.

72.    "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in sections 502(i) or 507(a)(8) of the Bankruptcy Code.

73.    "*Pro Rata*" means (i) with respect to a Class of Claims, the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in such Class and (ii) with respect to a Class of Equity Interests, the proportion that an Allowed Interest in a particular Class bears to the aggregate amount of Allowed Equity Interests in such Class.

74.    "*Professional*" means any Entity employed pursuant to a Final Order in accordance with sections 327 or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to the Confirmation Date, pursuant to sections 327, 328, 330, 331, 503 or 1103 of the Bankruptcy Code, or for which compensation and reimbursement has been allowed by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

LEGAL\75402219\1

75.     "*Professional Fee Application*" means a request for the Bankruptcy Court to approve and allow Professional Fees.

76.     "*Professional Fees*" means any compensation for services rendered and reimbursement of expenses incurred (including, but not limited to, hourly, transaction and success fees) by Professionals in the Chapter 11 Case.

77.     "*Proof of Claim*" means a proof of claim as defined in Bankruptcy Rule 3001.

78.     "*Reinstated*" or "*Reinstatement*" means, with respect to Claims and Interests, the treatment provide for in section 1124(2) of the Bankruptcy Code.

79.     "*Related Parties*" means, with respect to an Entity, its current and former Affiliates, and such Entity's and its current and former Affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, predecessors, participants, successors, and assigns, subsidiaries, and each of their respective current and former equity holders, officers, directors, managers, principals, members, employees, agents, fiduciaries, trustees, advisory board members, financial advisors, partners, limited partners, general partners, attorneys, accountants, managed accounts or funds, management companies, fund advisors, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

80.     "*Released Party*" means each of the following in their capacity as such: (i) the Debtor; (ii) the Reorganized Debtor; (iii) the Debtor's Estate; (iv) OWS; and (v) with respect to each of the foregoing Entities such Entity's Related Parties to the maximum extent permitted by law.  Notwithstanding anything to the contrary herein, no Former Directors and Officers or any Related Party to Former Directors and Officers shall be Released Parties

81.     "*Reorganized Debtor*" means the Debtor on and after the Effective Date, or any successor thereto, by merger, consolidation, or otherwise.

82.     "*Restructuring*" means the financial restructuring of the Debtor, the principal terms of which are set forth in this Plan and the OWS Term Sheet.

83.     "*Restructuring Documents*" means any agreements, documents and instruments executed in connection with the Restructuring.

84.     "*Restructuring Expenses*" means the fees and expenses incurred by OWS, OWS BCA FUNDING, LLC or any of their respective parents, Affiliates, successors and/or assigns in connection with the Restructuring, the OWS Term Sheet, and the Chapter 11 Case, in each case payable without the requirement for the filing of retention applications, fee applications, or any other applications in the Chapter 11 Case, which shall be Allowed in full as Administrative Expenses upon incurrence and shall not be subject to any offset, defense, counterclaim, reduction or credit.  Restructuring Expenses shall include all expenses and fees that are payable under the OWS Term Sheet.

85.    "*Schedules*" means the schedules of assets and liabilities and the statement of financial affairs that were filed by the Debtor on September 15, 2023, in accordance with section 521 of the Bankruptcy Code and the Bankruptcy Rules, as they may be further amended and supplemented from time to time.

86.    "*Secured Claim*" means any Claim or portion of any Claim (a) reflected in the Schedules or upon a Proof of Claim as secured by a Lien on property of the Debtor or the Estate, which Lien is valid, perfected and enforceable under applicable law or by reason of a Final Order, or that is subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code as determined by Final Order, to the extent of the value of such interest as determined pursuant to section 506(a) of the Bankruptcy Code, or (b) deemed secured under the Plan or by prior order of the Bankruptcy Court.

87.    "*SIR*" means any self-insured retention pursuant to a Personal Injury Insurance Policy.

88.    "*Treasury Regulations*" means title 26 of the Code of Federal Regulations.

89.    "*U.S. Trustee*" means the United States Trustee for the Southern District of New York.

90.    "*Unencumbered Assets*" means those certain assets of the Debtor that are not secured by any valid, perfected and enforceable Lien.

91.    "*Unimpaired*" means, with respect to any Class, not Impaired.

92.    "*Voting Agent*" means Kroll Restructuring Administration LLC.

## ARTICLE II

## TREATMENT OF ADMINISTRATIVE
## EXPENSES AND PRIORITY TAX CLAIMS

A.    *Administrative Expenses*

1.    Administrative Expense Bar Date; Treatment of Administrative Expense Claims

To the extent not previously paid, all Administrative Expense Requests for Administrative Expense Claims arising on or after the Petition Date (other than with respect to Professional Fee Claims) and accruing through the Effective Date and not otherwise paid in the ordinary course of business shall be filed with the Bankruptcy Court by no later than thirty (30) days after the Effective Date (the "Administrative Expense Bar Date"), and objections (if any) to such Administrative Expense Requests will be filed no later than sixty (60) days after the Administrative Expense Bar Date.  Any Holder of an Administrative Expense Claim arising on or after the Petition Date (other than Professional Fee Claims) who fails to file a timely Administrative Expense Request that is required to be filed on or before the Administrative Expense Bar Date: (a) shall be forever barred, estopped and enjoined from asserting such Administrative Expense Claim against the Debtor and the Debtor's estate, (or filing a request for the allowance thereof), and the Debtor

9

and the Debtor's estate, shall be forever discharged from any and all indebtedness or liability with respect to such Administrative Expense Claim; and (b) such Holder shall not be permitted to participate in any distribution under the Plan on account of such Administrative Expense Claim. Notwithstanding anything to the contrary herein, neither Parent nor OWS shall be required to file an Administrative Expense Request.

To the extent not previously paid, on the later to occur of (a) the Effective Date (or as soon as reasonably practicable thereafter) and (b) the date on which an Administrative Expense Claim shall become Allowed, the Debtor, in full and final satisfaction of such Administrative Expense Claim, will (i) pay to each Holder of an Allowed Administrative Expense Claim, in cash, the full amount of such Allowed Administrative Expense Claim, or (ii) satisfy and discharge such Allowed Administrative Expense Claim on such other terms and conditions as may be agreed between the Holder of such Allowed Administrative Expense Claim, on the one hand, and the Debtor, on the other hand.

Notwithstanding the Parent's right to payment in full of the Parent Administrative Claim as set forth in the preceding paragraph, the Parent shall contribute the Parent Administrative Claim Distribution Waiver as part of the New Value Contribution.

2.      Professional Fee Applications; Treatment of Professional Fees

Notwithstanding anything herein or in any prior order of the Bankruptcy Court to the contrary, all Professional Fee Applications for Professional Fees through the Effective Date, for Allowance on a final basis, shall be filed on or before the date that is sixty (60) days after the Effective Date.

To the extent not previously paid, Allowed Professional Fees will be paid in accordance with an order of the Bankruptcy Court allowing such Professional Fees.

B.      *Priority Tax Claims*

To the extent not previously paid, on the later to occur of (a) the Effective Date (or as soon as reasonably practicable thereafter) and (b) the date on which a Priority Tax Claim shall become Allowed, the Debtor, in full and final satisfaction of such Priority Tax Claim, will (i) pay to each Holder of an Allowed Priority Tax Claim, in cash, the full amount of such Allowed Priority Tax Claim, or (ii) satisfy and discharge such Allowed Priority Tax Claim on such other terms and conditions as may be agreed between the Holder of such Priority Tax Claim and the Debtor.  At the Debtor's sole option, in lieu of the foregoing, the Debtor may pay any Holder of an Allowed Priority Tax Claim the full amount of such Allowed Priority Tax Claim in equal quarterly installments over a period of five (5) years, paid at the statutory rate of interest.

10

## ARTICLE III

### CLASSIFICATION AND TREATMENT
### OF CLAIMS AND EQUITY INTERESTS

A.     *Summary*

The categories listed below classify Claims against and Equity Interests in the Debtor for all purposes, including voting, confirmation and distribution pursuant hereto and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim or Equity Interest shall be deemed classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class.  A Claim or Equity Interest is in a particular Class only to the extent that such Claim or Equity Interest is Allowed in that Class and has not been paid or otherwise satisfied prior to the Effective Date.

**Summary of Classification and Treatment of Claims and Equity Interests**

| Class | Claim | Status | Voting Right |
|---|---|---|---|
| Class 1 | OWS Secured Claim | Impaired | Entitled to vote |
| Class 1a | DHG Claim | Impaired | Entitled to vote |
| Class 1b | Flintlock Claim | Impaired | Entitled to vote |
| Class 1c | Other Secured Claims | Unimpaired | None, deemed to accept |
| Class 2 | Priority Non-Tax Claims | Unimpaired | None, deemed to accept |
| Class 3 | General Unsecured Claims | Impaired | Entitled to vote |
| Class 3a | Personal Injury Claims | Impaired | Entitled to vote |
| Class 3b | Congregation Claim | Impaired | Entitled to vote |
| Class 4 | Equity Interests | Unimpaired | None, deemed to accept |

B.     *Classification, Treatment and Voting*

**1.     Class 1 OWS Secured Claim**

(A)     *Classification*:  Class 1 is comprised of the OWS Secured Claim.

11

(B)    *Treatment*:  The OWS Secured Claim shall be deemed Allowed hereunder and paid over time in accordance with the terms and conditions set forth on the term sheet attached as Exhibit A  hereto (the "OWS Term Sheet").

Per the OWS Term Sheet, OWS shall receive an initial distribution in Cash on the Effective Date in the amount of $9,373,905.00[1] (or such other amount which would reduce the OWS Secured Claim to $140,000,000.00) plus additional amounts for OWS's fees and expenses, including the Restructuring Expenses, incurred in connection with the restructuring of the OWS Secured Claim hereunder (or such other amount which would reduce the OWS Secured Claim to $140,000,000.00).  The remaining $140,000,000.00 of the OWS Secured Claim shall be restructured and paid, interest only, over a period of two years, with the balance due to be paid at the end of the extended term (subject to two one-year Debtor extension options).  The treatment under the Plan for the Holder(s) of the OWS Secured Claim shall be in full satisfaction, release and discharge of the Debtor's obligations with regard to the OWS Secured Claim.

(C)    *Voting:*  Class 1 is Impaired, and the Class 1 Creditor is entitled to vote to accept or reject the Plan.

## 2.    Class 1a DHG Claim

(A)    *Classification*:  Class 1a is comprised of the DHG Claim.

(B)    *Treatment*:  Provided DHG votes in favor of the Plan, on the Effective Date, DHG, the Reorganized Debtor, AREPIII MVTS, LLC, CREP Times Square Hotel, LLC, Brookriver Hotels & Resorts, LLC and Highgate Hotels, L.P. shall be deemed to have executed and entered into the agreement annexed hereto as Exhibit B (the "DHG Agreement") and the DHG Claim treated in accordance therewith in full satisfaction, release and discharge of the Debtor's obligations with regard to the DHG Claim.  In the event that DHG does not vote in favor of the Plan, that portion of the DHG Claim asserting a Secured Claim will become a Class 1c claim (subject to any and all defenses of the Debtor or Reorganized Debtor as the case may be) and that portion of the DHG Claim asserting a General Unsecured Claim will become a Class 3 Claim (subject to any and all defenses of the Debtor or Reorganized Debtor as the case may be).

(C)    *Voting:*  Class 1a is Impaired, and the Class 1a Creditor is entitled to vote to accept or reject the Plan.

## 3.    Class 1b Flintlock Claim

(A)    *Classification*:  Class 1b is comprised of the Flintlock Claim.

(B)    *Treatment*:  If Class 1b votes in favor of the Plan, the Flintlock Claim shall be paid over time in accordance with the terms annexed hereto as Exhibit C in full and final satisfaction, release and discharge of the Debtor's obligations with respect to the Flintlock Claim.

---

[1] The size of the OWS Secured Claim may be subject to paydowns from the Parent.  To the extent any such paydowns are made after the filing of this Plan, the size of the cash Distribution on the Effective Date shall be reduced in an amount equal to such paydown.

(C)    *Voting:*  Class 1b is Impaired, and the Class 1b Creditor is entitled to vote to accept or reject the Plan.  In the event that the Holder of the Class 1b Flintlock Claim does not vote in favor of the Plan, then the Flintlock Claim will become a Class 1c claim (subject to any and all defenses of the Debtor or Reorganized Debtor as the case may be) and Class 1b shall automatically be eliminated.

### 4.    Class 1c Other Secured Claims

(A)    *Classification*:  Class 1c is comprised of Secured Claims except for the OWS Secured Claim, the Flintlock Claim and the DHG Claim.

(B)    *Treatment*:  To the extent not previously paid, in full satisfaction, release and discharge of the Debtor' Pre-Petition obligations to each holder of an Allowed Class 1c Secured Claim, on the later to occur of (a) the Effective Date (or as soon as reasonably practicable thereafter) and (b) the date on which a Secured Claim shall become Allowed, each holder of an Allowed Secured Claim shall receive, at the Debtor's option, and to the extent such Claim is secured by collateral in the possession of the Debtor as of the Effective Date (i) payment in Cash of 100% of the Allowed Secured Claim; (ii) the return of the relevant collateral (provided, however, that to the extent that such collateral is subject to the first priority mortgage and security interest securing the OWS Secured Claim, then any return of relevant collateral may not occur unless the OWS Secured Claim and Restructuring Expenses have been paid in full); (iii) such treatment that leaves unaltered the legal, equitable and contractual rights of the holder of such Allowed Secured Claim; or (iv) such less favorable treatment as the Debtor and the holder of such Secured Claim may agree upon.

(C)    *Voting*:  Class 1c is Unimpaired, and Class 1c Creditors are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Class 1c Creditors are not entitled to vote to accept or reject the Plan.

### 5.    Class 2 Priority Non-Tax Claims

(A)    *Classification*:  Class 2 is comprised of the Priority Non-Tax Claims.

(B)    *Treatment*:  The Plan will not alter any of the legal, equitable and contractual rights of the Holders of Allowed Priority Non-Tax Claims.  To the extent not previously paid, and except to the extent that a Holder of a Priority Non-Tax Claim agrees in writing with the Debtor to a less favorable treatment, on the later to occur of (a) the Effective Date (or as soon as reasonably practicable thereafter) and (b) the date on which a Priority Non-Tax Claim shall become Allowed, the Debtor, in full and final satisfaction of such Priority Non-Tax Claim, will (i) pay to each Holder of an Allowed Priority Non-Tax Claim, in cash, the full amount of such Allowed Non-Priority Tax Claim, or (ii) satisfy and discharge such Allowed Non-Priority Tax Claim on such other terms and conditions as may be agreed between the Holder of such Allowed Priority Non-Tax Claim and the Debtor.

(C)    *Voting*:  Class 2 is Unimpaired, and Class 2 Creditors are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Class 2 Creditors are not entitled to vote to accept or reject the Plan.

LEGAL\75402219\1

6.      **Class 3 General Unsecured Claims**

(A)      *Classification*:  Class 3 is comprised of all General Unsecured Claims except for Personal Injury Claims and the Congregation Claim.

*Treatment*:  Provided Class 3 accepts the Plan, in full and final satisfaction, release and discharge of the Debtor's obligations with respect to General Unsecured Claims, and except to the extent that a Holder of a General Unsecured Claim agrees in writing with the Debtor to a less favorable treatment, on the later to occur of (a) the Effective Date (or as soon as reasonably practicable thereafter) and (b) the date on which a General Unsecured Claim shall become Allowed, each holder of an Allowed General Unsecured Claim in Class 3 shall receive, in full and complete settlement, satisfaction and discharge of such Allowed General Unsecured Claim, its Pro Rata share of $1,000,000.00.

If Class 3 rejects the Plan, Holders of Class 3 Claims shall not receive any distribution hereunder.

(B)      *Voting*: Class 3 is Impaired, and Class 3 Creditors are entitled to vote to accept or reject the Plan.

7.      **Class 3a Personal Injury Claims**

(A)      *Classification*:  Class 3a is comprised of Personal Injury Claims.

(B)      *Treatment:* Notwithstanding any injunction or similar provision contained in this Plan, except to the extent that a Holder of a Personal Injury Claim agrees in writing with the Debtor to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Personal Injury Claim, to the extent not previously paid, Holders of Personal Injury Claims will receive the following treatment:

(i) the Holder of a Personal Injury Claim may pursue such Claim to final judgment, including any appeals, in any court(s) having competent jurisdiction, or settlement. Any such final judgment or settlement will be satisfied solely to the extent of any available proceeds of any applicable Personal Injury Insurance Policy, and the provisions of (B)(ii) hereof.  The Debtor may be named in the litigation as a party defendant(s) subject to the provisions herein.  Nothing in the Plan, the Plan Supplement, or the Disclosure Statement releases the Debtor from its liability for Personal Injury Claims, provided however, its liability is limited to the amount of available proceeds of any applicable Personal Injury Insurance Policy and the provisions of (B)(ii) hereof.  Except as provided above and notwithstanding anything that is otherwise to the contrary in the Plan or Plan Supplement, effective as of the Effective Date, the Debtor shall be discharged of all Personal Injury Claims pursuant to section 1121(d) of the Bankruptcy Code, and Holders of Personal Injury Claims shall solely be entitled to the treatment provided in this Article III.B.7; and

(ii) to the extent that any applicable Personal Injury Insurance Policy contains a SIR, such SIR on an Allowed Personal Injury Claim shall be paid, satisfied, settled and discharged by the allowance of a Class 3 General Unsecured Claim in the

LEGAL\75402219\1

amount of the applicable SIR. The Debtor may file such motions with the Bankruptcy Court as it deems appropriate for the administration of Claims in the amount of the applicable SIR.

(C)     *Voting*: Class 3a is Impaired, and Class 3a Creditors are entitled to vote to accept or reject the Plan.

### 8.     Class 3b Congregation Claim

(A)     *Classification*:  Class 3b is comprised of the Congregation Claim.  The Congregation Claim is separately classified from other General Unsecured Claims due to a provision in paragraph 42 of the Congregation Lease under which the Congregation acknowledged and agreed that the Debtor (as successor to the Landlord thereunder) "shall have no personal liability with respect to any of the provisions in [the Lease]" and that in the event of a breach, the Congregation "shall look solely to the interest of such Landlord in the improved premises of which the demised premises form a part for the satisfaction of Tenant's remedies, and no other property or assets of such Landlord shall be subject to levy, execution or other enforcement procedure for the satisfaction of Tenant's remedies against Landlord hereunder".  In addition, the Congregation is the only Creditor whose Claim is subject to the lease rejection provisions of section 365(h) of the Bankruptcy Code due to the Debtor's Plan-based rejection of the Congregation Lease, under which the Debtor is the lessor.  The Debtor and the Congregation, by far the largest general unsecured creditor in this Chapter 11 Case, engaged in good faith arms' length negotiations for the treatment of the Congregation Claim.  Each of the parties to those discussions were represented and advised by competent legal counsel.  As a result of those discussions, the parties agreed to the treatment of the Congregation claim – to be effectuated under a plan – as set forth below.  As part of that settlement, the Congregation has agreed that it will vote in favor and will not object to confirmation of the Plan, provided that the Confirmation Order is entered no later than July 31, 2025.

(B)     *Treatment*:  In full and final satisfaction, release and discharge of the Debtor's obligations with respect to the Congregation Claim, the Congregation Claim, which is hereby deemed Allowed, shall be treated as follows:

(1) In connection with the rejection of the Congregation Lease under the Plan, on the Effective Date, the Congregation shall be deemed to have opted for the treatment provided under section 365(h)(1)(A)(i) of the Bankruptcy Code such that the Congregation Lease shall be deemed terminated by such rejection and the Congregation shall have no right to occupy any part or portion of the leasehold Premises.

(2) The Congregation shall receive a Cash distribution of $4,000,000.00 on the Effective Date.

(3) Upon the Congregation's receipt of the $4,000,000.00 Cash distribution as set forth above, the Congregation and the Debtor shall enter into a stipulation dismissing the Congregation Action as it pertains to any and all Claims against the Debtor and any counterclaims by the Debtor against the Congregation, which stipulation shall also include mutual releases by and between the Debtor and the Congregation, and which shall be filed by the Congregation in the Congregation Action.

15

(4) The Debtor currently rents storage space at a CubeSmart facility located at 150 Fairchild Avenue, Plainview, NY 11803 in which property belonging to the Congregation is held.  Following the Effective Date, the Debtor shall either transfer its rights in the storage space to the Congregation or otherwise permit the Congregation to remove all of its property from the storage space.

(C)     *Voting:* Class 3b is Impaired, and the Class 3b Creditor is entitled to vote to accept or reject the Plan.  The Debtor and the Class 3b Creditor have fully negotiated and agreed upon the treatment reflected herein and, as a result, the Debtor expects Class 3b to vote to accept the Plan.

## 9.     Class 4 Equity Interests

(A)     *Classification*:  Class 4 is comprised of Equity Interests.

(B)     *Treatment*:  In consideration for the New Value Contribution, the Parent, as the Holder of Equity Interests, shall be entitled to one of the following two options to be exercised prior to the Effective Date:

(i)     existing Equity Interests shall be reinstated in full and the Parent will own 100% of the outstanding Equity Interests in the Reorganized Debtor; or

(ii)     all existing Equity Interests shall be cancelled and new Equity Interests shall be issued in the Reorganized Debtor and distributed to one or more entities of the Parent's choosing.

(C)     *Voting*:  Class 4 is Unimpaired, and Class 4 Interest Holders are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Class 4 Interest Holders are not entitled to vote to accept or reject the Plan.

## ARTICLE IV

## PROVISIONS FOR IMPLEMENTATION OF PLAN

A.     *Settlement*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan.

B.     *Binding Effect*

Except as otherwise expressly provided in the Plan, on and after the Effective Date, the Plan shall bind the Debtor and all Holders of Claims and Equity Interests.

16

C.     *Corporate Action*

Each of the matters provided for under the Plan involving any corporate action to be taken or required by the Debtor shall, as of the Effective Date, be deemed be authorized and approved by the Debtor's members, managers, and board of managers.

D.     *REIT Structuring Transaction*

On the Effective Date, the Reorganized Debtor shall be deemed to have acquired 100% of the equity interests in Operator from AREPIII Property Trust, LLC and Corten Real Estate Fund II TIER LLC and/or their Affiliates for no consideration.  At the same time, the Debtor and Operator shall enter into an operating lease substantially in the form annexed hereto as Exhibit "D" (the "Operating Lease").

E.     *Sources of Consideration for Plan Distributions*

The Debtor and the Parent shall fund distributions under the Plan (including with respect to settlements embodied herein) with (i) Cash on hand; and (ii) the New Value Contribution.

F.     *Management of Reorganized Debtor*

Joseph Caruso and Brandon Flury, each currently managing the Debtor as vice presidents, shall continue in their current positions following the Effective Date as vice presidents and managers of the Reorganized Debtor as well as Operator.  Highgate Hotels, L.P. shall continue to manage the Debtor's hotel operations on a day-to-day basis.

G.     *Cancellation of Notes, Instruments, and Debentures*

On the Effective Date, except to the extent provided otherwise in the OWS Term Sheet, the Plan, or the treatment provided under the Plan, any agreement, note, instrument, certificate or other document evidencing or creating any Claim against the Debtor shall be automatically cancelled and terminated and of no further force and effect, without any further act or action and deemed surrendered without further act or action under any applicable agreement, law, regulation, order or rule and the obligations of the Debtor under the agreements, notes, instruments, certificates or other documents governing such Claims shall be discharged.

## ARTICLE V

## EXECUTORY CONTRACTS AND UNEXPIRED
## LEASES; REJECTION CLAIMS BAR DATE

A.     *Assumption and Assignment of IMCMV Unexpired Commercial Leases*

On the Effective Date, all unexpired leases (including all amendments thereto) between the Debtor and IMCMV Times Square LLC ("IMCMV") shall be deemed assumed and assigned to Operator; IMCMV shall have an allowed Class 3 General Unsecured Claim in the amount of $207,021.32 which shall be treated in accordance with the terms and conditions of this Plan; and no other or further cure shall be due or owing to IMCMV.  The entry of the Confirmation Order

17

by the Bankruptcy Court will constitute approval of such assumption(s) pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

B.    *Assumption and Assignment of Highgate Hotels, L.P. Executory Contract*

On the Effective Date, all executory contracts, including that certain Hotel Management Agreement for the Margaritaville Resort Times Square with an effective date of February 1, 2024 (including all amendments thereto) (the "Hotel Management Agreement"), between the Debtor and Highgate Hotels, L.P. shall be deemed assumed and assigned to Operator. No default exists with regard to such agreements and, therefore, no cure shall be due and owing. The entry of the Confirmation Order by the Bankruptcy Court will constitute approval of such assumption(s) pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

On the Effective Date, Highgate Hotels, L.P. shall be deemed to have executed and entered into the DHG Agreement and the Hotel Management Agreement[2] shall be deemed amended as follows:

Fee Sharing. Operator covenants and agrees that, from and after the Effective Date, Operator shall, pursuant to the provisions of Paragraph 2(b) of the DHG Agreement, pay to Brookriver the total amount of $1,242,662.49 (the "Pre-Default Amount"), on a monthly basis, an amount equal to thirty-five percent (35%) of the Base Management Fees paid by Owner to Operator for each such month (each such monthly payment, a "Monthly Fee-Share Payment"), in accordance with the terms set forth in the DHG Agreement. Monthly Fee-Share Payments shall (x) be made within five (5) days of the date on which each monthly payment of Base Management Fees is received by Operator, (y) be made to the account(s) designated by Brookriver by wire transfer of immediately available funds, and (z) continue until the full amount of the Pre-Default Amount has been paid to Brookriver, as applicable. If Operator shall fail to make any such Monthly Fee-Share Payment Brookriver on the date when due, then Owner shall have the right in its sole discretion immediately to make a payment to Brookriver in an amount equal to the applicable Monthly Fee-Share Payment amount for such month and, notwithstanding anything in the Hotel Management Agreement to the contrary, deduct such amount from the next monthly payment of Management Fees due to Operator; provided, however, that if Owner makes any such Monthly Fee-Share Payment directly to Brookriver, then the amount of the immediately succeeding month's Monthly Fee-Share Payment shall be calculated based on the full amount of Management Fees that Operator would have received had Owner not deducted the amount of such Owner-made Monthly Fee-Share Payment.

C.    *Assumption and Assignment of HTC Collective Bargaining Agreement*

Notwithstanding anything otherwise contained herein, on the Effective Date the Debtor or Reorganized Debtor, as applicable, shall assume and assign to Operator the collective bargaining agreement ("CBA") with the Hotel and Gaming Trades Council ("HTC"), which constitutes an executory contract pursuant to sections 365(a) and 1123 of the Bankruptcy Code. The cure

---

[2] Capitalized terms not defined in this Article V.C of the Plan shall have the terms ascribed to them in the Hotel Management Agreement and/or the First Letter Agreement, as the case may be.

amounts, if any, related to the assumption of the CBA shall be satisfied in full by payment by the Debtor or the Reorganized Debtor, as applicable, in the ordinary course, of all obligations arising under the CBA, including but not limited to grievances, grievance and other settlements, arbitration awards, and contributions to the NY Hotel Trades Council and Hotel Association of New York City, Inc. Employee Benefit Fund, in each case to the extent such obligations are due, owing, valid and payable in accordance with the terms of the CBA; provided however, that that all of the Debtor's and the Reorganized Debtor's rights, remedies, defenses, privileges, claims, and counterclaims with respect to the CBA and the claims or obligations that may arise thereunder, are expressly preserved.  As a result, no proof of claim, request for administrative expense, or cure claim need be filed with respect to such cure amounts, if any.

D.    *Assumption and Assignment of Nouveau Elevator*

Effective on the Effective Date, the Debtor's contract with Nouveau Elevator Industries, LLC for which a cure in the approximate amount of $49,893 is due, shall be deemed assumed and assigned to Operator hereunder and the Debtor shall pay the cure amount on the Effective Date.

Notwithstanding any contracts and leases to be assumed pursuant to Article V.A through V.E above, the Debtor reserves the right to reject any executory contract or unexpired lease at any time prior to the Effective Date by setting forth such executory contract or unexpired lease in the Plan Supplement as one which shall be deemed rejected.

E.    *Rejection of Margaritaville Resort of Times Square, LLC Executory Contract*

On the Effective Date, all executory contracts (including all amendments thereto) between the Debtor and Margaritaville Resort of Times Square, LLC ("Margaritaville") shall be deemed rejected.  Margaritaville shall have an allowed Class 3 General Unsecured Claim in the amount of $1,847,690.00.  The entry of the Confirmation Order by the Bankruptcy Court will constitute approval of such rejection pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Separately, the Debtor and Margaritaville intend to enter into a new franchise agreement for which Court approval will be sought by separate motion prior to the Confirmation Date.  The new franchise agreement shall be deemed assumed and assigned to Operator hereunder.

F.    *General Rejection of Executory Contracts and Unexpired Commercial Leases*

Any other executory contracts or unexpired leases that have not expired by their own terms on or prior to the Effective Date, which are not expressly assumed by the Plan above or which the Debtor has not previously assumed or rejected with the approval of the Bankruptcy Court, shall be deemed rejected by the Debtor on the Effective Date, and the entry of the Confirmation Order by the Bankruptcy Court will constitute approval of such assumptions pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Notwithstanding the foregoing, the Debtor may at any time prior to the date that is ninety (90) days following the Effective Date, assume any executory contract or unexpired lease which would otherwise have been deemed rejected under this section of the Plan, including without limitation any contract with Margaritaville, by filing a notice of such assumption with the Court, providing written notice to the counterparty to such unexpired lease or executory contract, and paying any applicable cure.

LEGAL\75402219\1

*If the rejection under the Plan of an executory contract or unexpired lease results in damages to the other party or parties to such contract or lease, any Claim for such damages, if not heretofore evidenced by a Proof of Claim that has been timely Filed, shall be forever barred and shall not be enforceable against the Debtor or its properties, successors or assigns, unless a Proof of Claim therefore is timely Filed with Kroll Restructuring Administration LLC ("Kroll"), either (i) electronically through Kroll's website at https://cases.ra.kroll.com/560SeventhAve/; (ii) by submitting the original Proof of Claim (with an original signature) by first-class U.S. Mail to Kroll at the following address: Seventh Avenue Owner Primary LLC Claims Processing Center, c/o Kroll Restructuring Administration LLC, Grand Central Station, PO Box 4850, New York, NY 10163-4850; or (iii) by submitting the original Proof of Claim (with an original signature) by overnight courier or other hand delivery system to Kroll at the following address: Seventh Avenue Owner Primary LLC Claims Processing Center, c/o Kroll Restructuring Administration LLC, 850 3rd Avenue, Suite 412, Brooklyn, NY 11232 and served upon counsel for the Debtor, Cozen O'Connor, Attn: Christina Sanfelippo, 123 North Wacker Drive, Suite 1800, Chicago, IL 60606 (csanfelippo@cozen.com) on or before (x) thirty (30) days after the later to occur of (i) notice of the Effective Date and (ii) the date of entry of an order by the Bankruptcy Court authorizing rejection of a particular executory contract or unexpired lease, or (y) such other date as may be ordered by the Bankruptcy Court. Nothing in the Plan should be construed or deemed to alter the applicable deadlines for filing a Proof of Claim for executory contracts or unexpired leases previously rejected pursuant to prior orders of the Bankruptcy Court.*

## ARTICLE VI

## PROVISIONS REGARDING DISTRIBUTIONS

A.    *Distributions Made by the Debtor*

All distributions under the Plan shall be made by the Reorganized Debtor.

B.    *Plan Distribution Reserve*

Prior to the Confirmation Date, the Debtor shall establish and maintain a reserve account (the "Plan Distribution Reserve") sufficient to enable it to make all distributions hereunder that are required to be made on the Effective Date.

C.    *Disputed Claims Reserve*

From and after the Effective Date, and until such time as all Disputed Claims have been compromised, settled or determined by Final Order, the Debtor shall establish and maintain a reserve account (the "Disputed Claims Reserve") necessary to ensure that each Holder of a Disputed Claim shall receive payment of its Allowed amount in accordance with the provisions of the Plan in the event such Claim is Allowed in the maximum amount claimed.

D.    *Manner of Distribution under Plan*

Any distribution in cash to be issued under the Plan shall be made by check drawn on a domestic bank or, in the Debtor's or Reorganized Debtor's sole discretion, by wire transfer. Any

fees, costs or other expenses associated with the distribution by wire transfer to any Holder shall be deducted from and paid out of such Holder's distribution.

E.    *Delivery of Distributions*

1.    Subject to the provisions of Bankruptcy Rule 2002(g), and except as otherwise provided herein, distributions and deliveries to Holders of record of Allowed Claims shall be made at the address of each such Holder set forth on the Debtor's books and records unless superseded by the address set forth on Proofs of Claim filed by any such Holders.  The Debtor shall be permitted, in its discretion, to withhold distributions until it shall have received a tax identification number and such other tax withholding forms as it may reasonably require to comply with applicable federal, state, or local laws. In the event that any such tax information is not supplied within one month following a written request for such information, then that Holder of an Allowed Claim shall have that claim discharged and shall be forever barred from asserting such Claim against the Debtor.

F.    *Undeliverable Distributions*

1.    Holding of Undeliverable Distributions

If any distribution to the Holder of an Allowed Claim under the Plan is returned as undeliverable, no further distributions shall be made to such Holder unless and until the Debtor is notified in writing of such Holder's then-current address.  Any Holder ultimately receiving a distribution that was initially returned as undeliverable shall not be entitled to any interest or other accruals of any kind on such distribution.  Nothing contained in the Plan shall require the Debtor to attempt to locate any Holder of an Allowed Claim.

2.    Failure to Claim Undeliverable Distributions

Any Holder of an Allowed Claim or Equity Interest that does not assert its rights pursuant to the Plan to receive a distribution within ninety (90) days from and after the date such distribution is returned as undeliverable shall have such Claim or Equity Interest for such undeliverable distribution discharged and, except for distributions to be made after the Holders provide the Debtor their proper address, shall be forever barred from asserting any such Claim against or Equity Interests in the Debtor, its professionals, the Plan Distribution Reserve, or the Disputed Claims Reserve.  In such case, any consideration held for distribution on account of such Claim or Equity Interest shall belong to the Reorganized Debtor.

G.    *Time Bar to Payments*

Checks issued on account of Allowed Claims or Equity Interests shall be null and void if not negotiated within ninety (90) days from and after the date of issuance thereof.  Requests for reissuance of any check shall be made directly to the issuer of the check by the Holder of the Allowed Claim or Equity Interests with respect to which such check originally was issued.  Any request by a Holder of a Claim or Equity Interest in respect of such a voided check shall be made within 180 days from and after the date of issuance of such voided check.  Any fees, costs or other expenses associated with the voided check shall be deducted from and paid out of such Holder's

distribution. After such date, all Claims or Equity Interests in respect of voided checks shall be discharged and forever barred, and the Debtor shall be entitled to retain all monies related thereto.

H.    *Distributions After Effective Date*

Distributions made after the Effective Date to Holders of Claims that are not Allowed as of the Effective Date, but which later become Allowed, shall be deemed to have been made on the Effective Date.

I.    *Fractional Dollars; De Minimis Distributions*

Notwithstanding anything contained herein to the contrary, payments of fractions of dollars will not be made. Whenever any payment of a fraction of a dollar under the Plan would otherwise be called for, the actual payment made will reflect a rounding of such fraction to the nearest dollar (up or down), with half dollars being rounded down. No payment shall be made on account of any distribution less than fifty dollars ($50.00) with respect to any Allowed Claim unless a request therefor is made in writing to the issuer of such payment on or before ninety (90) days after the Effective Date.

J.    *Setoffs/Recoupment*

Notwithstanding anything contained herein to the contrary, the Debtor may, pursuant to sections 502(d) or 553 of the Bankruptcy Code or applicable nonbankruptcy law, setoff or exercise recoupment against any Allowed Claim or Allowed Administrative Expense and the distributions to be made on account thereof (before any distribution is made on account of such Claim or Administrative Expense), the rights and Causes of Action of any nature related to the Claim or Administrative Expense that it may hold against the Holder of such Allowed Claim or Allowed Administrative Expense; provided, however, that neither the failure to effect such a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release of any such claims, rights and Causes of Action that the Debtor may possess against such Holder.

K.    *Preservation of Subordination Rights*

Except as otherwise provided herein, all subordination rights and claims relating to the subordination by the Debtor or its successors of any Allowed Claim or Equity Interest shall remain valid, enforceable and unimpaired in accordance with section 510 of the Bankruptcy Code or otherwise.

L.    *Waiver by Creditors of All Subordination Rights*

Except for the Holder of the OWS Secured Claim, each Holder shall be deemed to have waived all contractual, legal and equitable subordination rights that they may have, whether arising under general principles of equitable subordination, section 510(c) of the Bankruptcy Code or otherwise, with respect to any and all distributions to be made under the Plan, and all such contractual, legal or equitable subordination rights that each Holder has individually and collectively with respect to any such distribution made pursuant to the Plan shall be discharged and terminated, and all actions related to the enforcement of such subordination rights will be permanently enjoined unless such rights have been asserted prior to the Effective Date.

M.      *Claims Paid by Third Parties*

1.      <u>Claims Paid by Third Parties</u>.  A Claim shall be reduced in full, and such Claim shall be Disallowed without an objection to such Claim having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or a Reorganized Debtor.  To the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such Holder shall repay, return or deliver any distribution held by or transferred to the Holder to the Reorganized Debtor to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.

2.      <u>Claims Payable by Insurance Carriers</u>.  No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtor's insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Debtor's insurers agrees to pay in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction or otherwise settled), then immediately upon such insurer's agreement, such Claim may be expunged to the extent of any payment on the Claims Register by the Claims and Noticing Agent without a Claim objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

3.      <u>Applicability of Insurance Policies</u>.  Except as otherwise provided in the Plan, payments to Holders of Allowed Claims covered by the Debtor's insurance policies shall be in accordance with the provisions of any applicable insurance policy.  Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtor or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any rights or defenses, including coverage defenses, held by such insurers.

## ARTICLE VII

## PROCEDURES FOR RESOLUTION OF DISPUTED, CONTINGENT AND UNLIQUIDATED CLAIMS

A.      *Disallowance of Claims or Interests*

**EXCEPT AS OTHERWISE AGREED, ANY AND ALL PROOFS OF CLAIM FILED AFTER THE APPLICABLE DEADLINE FOR FILING SUCH PROOFS OF CLAIM SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS SHALL NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS SUCH LATE PROOF OF CLAIM IS DEEMED TIMELY FILED BY A FINAL ORDER OF THE BANKRUPTCY COURT.**

B.      *Amendments to Claims*

On or after the Effective Date, except as otherwise provided herein, a Claim may not be filed or amended without the express written authorization of the Bankruptcy Court or the Reorganized Debtor, and, to the extent such authorization is not received, any such new or amended Claim filed shall be deemed disallowed in full and expunged without any further notice to or action, order, or approval of the Bankruptcy Court.

C.      *Prosecution of Objections to Disputed Claims*

Upon the Effective Date, the Reorganized Debtor shall solely be responsible for pursuing any objection to the allowance of all Disputed Claims and shall have the right to exercise all rights of setoff and recoupment and other defenses that the Reorganized Debtor or its Estate may have with respect to any such Disputed Claim.  The Reorganized Debtor shall have the exclusive authority to settle, compromise or withdraw any objections to any Disputed Claims without necessity of further approval of the Bankruptcy Court.

Unless otherwise provided herein or ordered by the Bankruptcy Court, all objections to Disputed Claims shall be served and filed not later than one-hundred-eighty (180) days after the Effective Date; provided, however, that this deadline may be extended upon motion by the Reorganized Debtor, without notice to Holders of Disputed Claims.

D.      *Estimation of Claims*

The Debtor or Reorganized Debtor may at any time request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtor or Reorganized Debtor previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection.  The Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection.  Subject to the provisions of section 502(j) of the Bankruptcy Code, in the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, the amount so estimated shall constitute the maximum allowed amount of such Claim.  If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Debtor or Reorganized Debtor may pursue supplementary proceedings to object to the allowance of such Claim.  All of the aforementioned objection, estimation and resolution procedures are intended to be cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court, including the Claim resolution procedures established under the Plan and approved by the Bankruptcy Court in the Confirmation Order.

E.      *No Distributions Pending Allowance*

If an objection to a Claim or portion thereof is filed, no payment or distribution provided under the Plan shall be made on account of such Claim or portion thereof, as applicable, unless and until such Disputed Claim becomes an Allowed Claim.

F.      *Payments and Distributions on Disputed Claims*

Notwithstanding any provision hereof to the contrary, any issuer of a distribution hereunder may, in its discretion, pay the undisputed portion of a Disputed Claim.

## ARTICLE VIII

## CONDITIONS PRECEDENT TO CONFIRMATION AND EFFECTIVE DATE OF THE PLAN

A.      *Conditions Precedent to Confirmation*

The following are conditions precedent to Confirmation of the Plan that must be (i) satisfied or (ii) waived in the sole discretion of the Debtor: (i) a Final Order finding that the Disclosure Statement contains adequate information pursuant to section 1125 of the Bankruptcy Code shall have been entered by the Bankruptcy Court; (ii) the entry of the Confirmation Order in form and substance reasonably satisfactory to the Debtor; (iii) the Plan Supplement, and all of the schedules, documents, and exhibits contained therein, shall have been filed; and (iv) all conditions contained in the OWS Term Sheet shall have been satisfied or waived by OWS; provided, however, that the conditions contained in the OWS Term Sheet may be waived by OWS only and in its sole discretion.

B.      *Conditions Precedent to Effective Date of Plan*

The following are conditions precedent to the Effective Date of the Plan that must be (i) satisfied or (ii) waived in the sole discretion of the Debtor:  (i) confirmation shall have occurred and the Confirmation Order shall have been entered by the Bankruptcy Court; (ii) the Confirmation Order shall have become a Final Order; (iii) there shall not be in effect on the Effective Date any (a) Order entered by a U.S. court, (b) order, opinion, ruling or other decision entered by any other court or governmental entity or (c) United States or other applicable law staying, restraining, enjoining or otherwise prohibiting or making illegal the consummation of any of the transactions contemplated by the Plan; (iv) all other actions and documents necessary to implement the Plan shall have been effected or executed; and (v) all conditions contained in the OWS Term Sheet shall have been satisfied or waived by OWS; provided, however, that the conditions contained in the OWS Term Sheet may be waived by OWS only and in its sole discretion.

C.      *Effect of Non-Occurrence of Effective Date*

If the conditions listed in Article VIII.A and B hereof are not satisfied or waived in accordance with Article VIII hereof, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any Claims by or against or any Equity Interests in the Debtor entities; (2) prejudice in any manner the rights of the Debtor or any other party, including the Congregation on account of the full amount of the claim asserted in the Congregation Claim; or (3) constitute an admission, acknowledgment, offer or undertaking by the Debtor.

25

# ARTICLE IX

## RELEASE, EXCULPATION, INJUNCTIVE AND RELATED PROVISIONS

A.    *Discharge of all Claims and Release of Liens*

Except as otherwise provided by the Plan, pursuant to section 1141 of the Bankruptcy Code, the Confirmation Order shall act as a discharge of all Claims that arose prior to the Confirmation Date.

Except with respect to any liens, security interests, deeds of trust, pledges, mortgages, and any other property interest securing the OWS Secured Claim, on the Effective Date and concurrently with the applicable distributions made under the Plan, and in the case of a Secured Claim, satisfaction of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, liens, pledges, security interests, or any other property interests securing any Claim against Property of the Estate shall be fully released and discharged, and all right, title, and interest of any Holder of such liens, mortgages, deeds of trust, pledges, security interests, and other property interests shall revert to the Reorganized Debtor and any of its successors or assigns, in each case, without further approval or order of the Bankruptcy Court and without any action or filing being required to be made by the Debtor.  For the avoidance of doubt, this Plan shall not release any liens, mortgages, deeds of trust, pledges, security interests, and any other property interests securing the OWS Secured Claim.

B.    *Injunction.*

Except as otherwise expressly provided in this Plan, the Confirmation Order, or a separate order of the Bankruptcy Court, all Entities who have held, hold, or may hold Clams against or Equity Interests in the Debtor which arose before or were held as of the Effective Date, are permanently enjoined, on and after the Effective Date, from (a) commencing or continuing in any manner any action or other proceeding of any kind which would interfere in any way with any Property of the Estate, (b) the enforcement, attachment, collection, or recovery of any Property of the Estate by any manner or means of any judgment, award, decree, or order against the Debtor or its Estate on account of any such Claim or Equity Interest, and/or (c) creating, perfecting, or enforcing any encumbrance of any kind against any Property of the Estate on account of any such Claim or Equity Interest.  Such injunction shall extend to successors of the Debtor and their properties and interests in property.  Any Person or Entity injured by any willful violation of such injunction shall recover actual damages, including costs and attorneys' fees, and in appropriate circumstances, may recover punitive damages from the willful violator.  However, nothing contained in this article shall prohibit the holder of a timely filed proof of claim from litigating its right to seek to have such Claim declared an Allowed Claim and paid in accordance

with the distribution provisions of this Plan, or enjoin or prohibit the interpretation
or enforcement by the Claimant of any obligations of the Debtor under this Plan.

C.    *Releases by the Debtor.*

Notwithstanding anything contained in the Plan to the contrary, pursuant to section
1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy
of which is hereby confirmed, as of the Effective Date, the Debtor, and the
Reorganized Debtor, on behalf of themselves and their respective Estates, including
any successor to the Debtor or any Estate representative appointed or selected
pursuant to section 1123(b)(3) of the Bankruptcy Code, shall be deemed to have
conclusively, absolutely, unconditionally, irrevocably, and forever released, waived
and discharged the Released Parties from any and all Claims, Interests, obligations,
rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever
(including any derivative Claims or Causes of Action asserted or that may be asserted
on behalf of the Debtor or its Estate), whether known or unknown, foreseen or
unforeseen, existing or hereinafter arising, in law, equity, or otherwise, based on or
relating to, or in any manner arising from, in whole or in part, any act or omission,
transaction, agreement, event, or other occurrence taking place on or before the
Effective Date, including any Claims or Causes of Action based on or relating to, or
in any manner arising from, in whole or in part, the Chapter 11 Case, the Debtor, the
governance, management, transactions, ownership, or operation of the Debtor, the
formulation, preparation, dissemination, solicitation, negotiation, entry into, or filing
of the Plan, the Disclosure Statement, or any restructuring transaction, contract,
instrument, release, or other agreement or document (including any legal opinion
requested by any Entity regarding any transaction, contract instrument, document,
or other agreement contemplated by the Plan or the reliance by any Released Party
on the Plan or Confirmation Order in lieu of such legal opinion) created or entered
into in connection with the Plan, the Plan Supplement, the Disclosure Statement, the
Chapter 11 Case, the pursuit of Confirmation, the pursuit of consummation of the
Plan, the administration and implementation of the Plan or Confirmation Order,
including the distribution of property under the Plan, or any other agreement, act or
omission, transaction, event, or other occurrence taking place on or before the
Effective Date. Notwithstanding anything to the contrary in the foregoing, the
releases set forth in this Article IX.C shall only be applicable to the maximum extent
permitted by law; and (ii) shall not be construed as (a) releasing any Released Party
from Claims or Causes of Action arising from an act or omission that is judicially
determined by a Final Order to have constituted actual fraud (provided that actual
fraud shall not exempt from the scope of these Debtor releases any Claims or Causes
of Action arising under sections 544 or 548 of the Bankruptcy Code or state laws
governing fraudulent or otherwise avoidable transfers or conveyances), willful
misconduct, or gross negligence, or (b) releasing any post-Effective Date obligations
of any party or Entity under the Plan, the Confirmation Order, any restructuring

transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

D.    *Exculpation*

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from, any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out, in whole or in part, from the Petition Date through the Effective Date (and following the Effective Date solely with respect to any issuance or distribution of securities, the distribution of any property, or the implementation of the restructuring, each pursuant to and in accordance with the Plan), of the Chapter 11 Case, the Debtor, the formulation, preparation, dissemination, or negotiation of the Plan, the Disclosure Statement, or any restructuring transaction (including the Restructuring), contract, instrument, release, or other agreement or document created or entered into in connection with the Plan, the Disclosure Statement, the pursuit of Confirmation, the pursuit of consummation of the Plan, or the administration and implementation of the Plan or Confirmation Order, including the issuance or distribution of any securities pursuant to the Plan, or the distribution of property under the Plan, or any other related agreement, except for Claims or Causes of Action arising from an act or omission that is judicially determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects, such Exculpated Parties shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities. The Exculpated Parties have, and upon completion of the Plan, shall be deemed to have, participated in good faith and in compliance with all applicable laws with regard to the solicitation and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan. Notwithstanding anything to the contrary in the foregoing, the exculpations set forth in this Article IX.D (i) shall only be applicable to the maximum extent permitted by law; and (ii) shall not be construed as (a) exculpating any Exculpated Party from Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud (provided that actual fraud shall not exempt from the scope of these exculpations any Claims or Causes of Action arising under sections 544 or 548 of the Bankruptcy Code or state laws governing fraudulent or otherwise avoidable transfers or conveyances), willful misconduct, or gross negligence, or (b) exculpating any post-Effective Date obligations of any party or Entity under the Plan, any restructuring transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

In addition to the foregoing, to the extent permitted by applicable law, no Exculpated Party shall have nor incur, and each Exculpated Party is hereby released and exculpated from, any Claim, interest, obligation, suit, judgment, damage, demand, debt, right, Causes of Action, loss, remedy, or liability for any claim, arising between

28

the Petition Date and the Effective Date, in connection with or arising out of related to (i) any and all activities by the Debtor or any of its subsidiaries or affiliates in the operation of their businesses or in connection with their restructuring efforts, (ii) the Existing Accounts (as defined in the Cash Collateral Order), or other similar account into which funds are deposited or from which funds are disbursed on behalf of or for the benefit of the Debtor, including but not limited to any acts or omissions of any Exculpated Party related to the deposit or disbursement of such funds; or (iii) any actions taken by any Exculpated Party in furtherance of or in connection with its obligations under the Cash Collateral Order. Notwithstanding anything to the contrary in the foregoing, the exculpations set forth in this Article IX.D (1) shall only be applicable to the maximum extent permitted by law; and (2) shall not be construed as exculpating any Exculpated Party from Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud (provided that actual fraud shall not exempt from the scope of these exculpations any Claims or Causes of Action arising under sections 544 or 548 of the Bankruptcy Code or state laws governing fraudulent or otherwise avoidable transfers or conveyances), willful misconduct, or gross negligence.

## ARTICLE X

## RETENTION AND PRESERVATION OF CAUSES OF ACTION

A.      *Retention of Causes of Action*

Except as otherwise provided in the Plan, all Causes of Action shall, on the Effective Date, automatically and irrevocably vest in the Reorganized Debtor free and clear of liens, claims, encumbrances and interests. The Reorganized Debtor shall have the exclusive right, authority, and discretion to institute, commence, pursue, prosecute, abandon, transfer, settle, or compromise any and all such Causes of Action (under any theory of law, including, without limitation, the Bankruptcy Code, and in any court or other tribunal) without the consent or approval of any third party and without any further order of the Bankruptcy Court, except as otherwise provided herein.

B.      *Preservation of Causes of Action*

Except as otherwise provided in the Plan, the Reorganized Debtor reserves all rights to pursue any and all Causes of Action, including without limitation, any Causes of Action against Former Directors and Officers, and the Reorganized Debtor hereby reserves the right to pursue, administer, settle, transfer, litigate, enforce and liquidate all Causes of Action consistent with the terms and conditions of the Plan. Except as otherwise provided in the Plan, the, expressly reserves all Causes of Action for later adjudication, and, therefore, no preclusion doctrine or other rule of law, including, without limitation, any statute of limitations or the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to such Causes of Action upon, after or as a result of the Confirmation or Effective Date of the Plan, or the Confirmation Order. In addition, the Reorganized Debtor, on behalf of any successor-in-interest thereto, expressly reserves the right to pursue or adopt any Causes of Action not so waived, relinquished, released, compromised or settled that are alleged in

any lawsuit in which the Reorganized Debtor is a defendant or an interested party, against any Entity including, without limitation, the plaintiffs and co-defendants in such lawsuits.

## ARTICLE XI

## RETENTION OF JURISDICTION

A.    *Bankruptcy Court*

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, and to the extent permitted by applicable law, the Bankruptcy Court shall retain such jurisdiction over any matter arising under the Bankruptcy Code, or arising in or related to the Chapter 11 Case or the Plan after Confirmation and after the Effective Date, and any other matter or proceeding that is within the Bankruptcy Court's jurisdiction pursuant to 28 U.S.C. § 1334 or 28 U.S.C. § 157 including, without limitation, jurisdiction to:

1.    Allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim, including the resolution of any Administrative Expense Request and the resolution of any and all objections to the allowance or priority of Claims;

2.    Grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan, for periods ending on or before the Effective Date;

3.    Ensure that distributions to Holders of Allowed Claims and Equity Interests are accomplished pursuant to the provisions hereof;

4.    Decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters, including all Causes of Action and objections or estimations to Claims or Equity Interests, and grant or deny any applications involving the Debtor that may be pending on the Effective Date or that, pursuant to the Plan, may be instituted by the Reorganized Debtor or any other Entity after the Effective Date; provided, however, that the Reorganized Debtor reserves the right to prosecute the Causes of Action in all appropriate jurisdictions;

5.    Enter such orders as may be necessary or appropriate to implement or consummate the provisions hereof and of all contracts, instruments, releases, indentures and other agreements or documents created in connection with the Plan;

6.    Enter such orders necessary to sell, dispose of, liquidate, and/or convey any property of the Estate.

7.    Resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

8.    Issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with consummation or enforcement of the Plan, except as otherwise provided herein;

LEGAL\75402219\1

9.      Resolve any cases, controversies, suits or disputes with respect to the releases, injunctions and other provisions contained in Article IX hereof and enter any orders that may be necessary or appropriate to implement such releases, injunctions and other provisions;

10.     Enter and implement any orders that are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

11.     Determine any other matters that may arise in connection with or related to this Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture or other agreement or document created in connection with the Plan or the Disclosure Statement;

12.     Enter an order and/or Final Decree concluding the Chapter 11 Case.

Notwithstanding any other provision in this article to the contrary, nothing herein shall prevent the Debtor from commencing and prosecuting any Causes of Action before any other court or judicial body which would otherwise have appropriate jurisdiction over the matter and parties thereto, and nothing herein shall restrict any such courts or judicial bodies from hearing and resolving such matters.

## ARTICLE XII

## MISCELLANEOUS PROVISIONS

A.      *No Stay of Confirmation Order*

The Confirmation Order shall contain a waiver of any stay of enforcement otherwise applicable, including pursuant to Bankruptcy Rules 3020(e), 6004(h), 6006(d) and 7062.

B.      *Vesting of Property in the Reorganized Debtor*

As of the Effective Date, all assets of the Debtor shall vest in the Reorganized Debtor or, to the extent set forth herein be transferred to Operator, in each case free and clear of all Liens, Claims and Equity Interests, except as otherwise provided in this Plan or the Confirmation Order.

C.      *Compromise of Controversies*

Pursuant to 1123(b) of the Bankruptcy Code and Bankruptcy Rule 9019 in consideration for the classification, distribution and other benefits provided under this Plan, the provisions of this Plan shall constitute a good faith compromise of all Claims and controversies resolved pursuant to this Plan, including, without limitation, the Congregation Claim, the claims asserted in the Congregation Claim and all Claims arising prior to the Petition Date,  whether known or unknown, foreseen or unforeseen, asserted or unasserted, by or against the Debtor, arising out of, relating to, or in connection with, the business or affairs of, or transactions with, the Debtor.  The entry of the Confirmation Order shall constitute approval by the Bankruptcy Court of the foregoing compromises or settlements, and all other compromises and settlements provided for in this Plan or the Disclosure Statement, and the findings of the Bankruptcy Court shall constitute its determination that such compromises and settlements are in the best interests of the Debtor, the

LEGAL\75402219\1

Estate, creditors and other parties in interest, and are fair and equitable and within the range of reasonableness.  The provisions of this Plan, including without limitation, its release, injunction, exculpation and compromise provisions, are mutually dependent and non-severable.

D.      *Payment of Statutory Fees*

All fees payable pursuant to section 1930(a) of title 28 of the United States Code shall be paid on the earlier of when due or the Effective Date, or as soon thereafter as practicable.  From and after the Effective Date, the reorganized Debtor shall be liable for and shall pay the fees under 28 U.S.C. § 1930 until entry of an order converting, dismissing or closing the Chapter 11 Case, whichever occurs first.  In addition, the Debtor shall file post-confirmation quarterly reports in conformity with U.S. Trustee guidelines, until entry of an order closing or converting the Chapter 11 Case, whichever comes first.

E.      *Continuation of Retiree Benefits*.

Payment of all retiree benefits, as that term is defined in section 1114 of the Bankruptcy Code, shall be continued after the Effective Date at the level established pursuant to subsection (e)(1)(B) or (g) of section 1114 of the Bankruptcy Code, at any time prior to confirmation of the Plan, for the duration of the period the Debtor has obligated itself to provide such benefits.

F.      *Modification of Plan*

Subject to the limitations contained in the Plan and the OWS Term Sheet:

1.      The Plan may be amended or modified by the Debtor (a) before the Confirmation Date, to the extent permitted by section 1127 of the Bankruptcy Code; (b) after the Confirmation Date and prior to substantial consummation of the Plan, as defined in section 1101(2) of the Bankruptcy Code, to the extent the Debtor institutes proceedings in the Bankruptcy Court, pursuant to section 1127(b) of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order or to accomplish such matters as may be necessary or appropriate to carry out the purposes and effects of the Plan; provided, however, that prior notice of such proceedings shall be served in accordance with the Bankruptcy Rules or orders of the Bankruptcy Court; or (c) after the entry of the Confirmation Order, upon order of the Bankruptcy Court in accordance with section 1127(b) of the Bankruptcy Code.

2.      The Debtor reserves the right to modify or amend the Plan upon a determination by the Bankruptcy Court that the Plan is not confirmable pursuant to section 1129 of the Bankruptcy Code to the extent permissible under section 1127 of the Bankruptcy Code without the need to resolicit acceptances.

3.      After the Effective Date, the Reorganized Debtor may amend or modify, upon order of the Bankruptcy Court, the Plan in accordance with section 1127(b) of the Bankruptcy Code or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan.

G.    *Revocation of Plan*

The Debtor reserves the right to revoke or withdraw the Plan prior to the Confirmation Date and to file subsequent plans of reorganization or liquidation.  If the Debtor revokes or withdraws the Plan, or if Confirmation or the Effective Date does not occur, then (i) the Plan shall be null and void in all respects, (ii) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Equity Interest or Class of Claims or Equity Interests and any settlement of the Congregation Claim or any claims asserted in the Congregation Action), assumption or rejection of executory contracts or leases effected by the Plan, and any document or agreement executed pursuant hereto, shall be deemed null and void, and without prejudice to any party, and (iii) nothing contained in the Plan shall (a) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Debtor or any other Entity, (b) prejudice in any manner the rights of the Debtor or any other Entity, or (c) constitute an admission of any sort by the Debtor any other Entity.  For the avoidance of doubt, this Article XII.F shall not impact or abridge any rights of OWS pursuant to or set forth in the Cash Collateral Order or the OWS Term Sheet.

H.    *Confirmation of the Plan*

The Debtor requests confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to any Impaired Class that does not accept the Plan pursuant to section 1126 of the Bankruptcy Code. The Debtor reserves the right to amend the Plan to the extent, if any, that confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

I.    *Successors and Assigns*

The rights, benefits and obligations of any Entity named or referred to herein shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Entity.

J.    *Reservation of Rights*

Except as expressly set forth herein, this Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order and the Effective Date shall occur.  None of the filing of this Plan, any statement or provision contained herein, or the taking of any action by the Debtor with respect to this Plan, the Disclosure Statement or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of the Debtor with respect to the Holders of Claims or Equity Interests prior to the Effective Date.

K.    *Section 1146 Exemption*

Pursuant to section 1146(a) of the Bankruptcy Code, under this Plan, (i) the issuance, distribution, transfer or exchange of any debt, equity security or other interest in the Debtor; (ii) the creation, modification, consolidation or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (iii) the making, assignment or recording of any lease or sublease or (iv) the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of or in connection with, this Plan, including any deeds, bills of sale, assignments or other instrument of transfer executed in

connection with any transaction arising out of, contemplated by or in any way related to this Plan shall not be subject to any document recording tax, mortgage recording tax, stamp tax or similar government assessment, and the appropriate state or local government official or agent shall forego the collection of any such tax or government assessment and accept for filing and recording any of the foregoing instruments or other documents without the payment of any such tax or government assessment.

All subsequent issuances, transfers or exchanges of securities, or the making or delivery of any instrument of transfer by the Debtor in the Chapter 11 Case, whether in connection with a sale pursuant to section 363 of the Bankruptcy Code or otherwise, shall be deemed to be or have been done in furtherance of this Plan.

L.    *Further Assurances*

The Creditors and Equity Interest Holders receiving distributions hereunder and all other parties in interest shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan.

M.    *Service of Documents*

Any pleading, notice or other document required by the Plan to be served on or delivered shall be sent by first class U.S. mail, postage prepaid, as follows:

To the Debtor or Reorganized Debtor:

Cozen O'Connor
3 WTC, 175 Greenwich Street
New York, NY 10007
Attn.:   Frederick E. Schmidt, Jr.

To the U.S. Trustee:

Office of the United States Trustee
Alexander Hamilton Custom House
One Bowling Green, Suite 534
New York, NY 10004-1408
Attn:   Brian Masumoto

N.    *Transactions on Business Days*

If the date on which a transaction may occur under this Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

LEGAL\75402219\1

O.    *Filing of Additional Documents*

On or before the Effective Date, the Debtor may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and provisions hereof.

P.    *Post-Confirmation Date Service List*

From and after the Confirmation Date, all notices of appearance and demands for service of process filed with the Bankruptcy Court prior to such date shall no longer be effective.  No further notices, other than notice of entry of the Confirmation Order shall be required to be sent to such Entities.  Any party in interest that requests notice of matters after the confirmation date shall contact the Debtor, in accordance with Section XII(L) of this Plan.

Q.    *Post-Effective Date Fees and Expenses*

From and after the Effective Date, the Reorganized Debtor shall, in the ordinary course of business and without the necessity for any approval by the Bankruptcy Court, pay the reasonable and necessary fees and expenses in accordance with and from the funds provided for such use in this Plan.

R.    *Severability*

The provisions of this Plan shall not be severable unless such severance would constitute a permissible modification of this Plan pursuant to section 1127 of the Bankruptcy Code.

S.    *Conflicts*

To the extent any provision of this Plan or the Disclosure Statement or any document executed in connection therewith or any documents executed in connection with the Plan (or any exhibits, schedules, appendices, supplements or amendments to any of the foregoing) conflicts with, or is in any way inconsistent with, the terms of the Confirmation Order, the terms and provisions of the Confirmation Order shall govern and control.

To the extent any provision of the Disclosure Statement or any document executed in connection therewith or any documents executed in connection with the Plan (or any exhibits, schedules, appendices, supplements or amendments to any of the foregoing) conflicts with, or is in any way inconsistent with, the terms of this Plan, the terms and provisions of the Plan and the Confirmation Order shall govern and control.

T.    *Term of Injunctions or Stays*

Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Case pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court and still extant on the Confirmation Date (excluding any injunctions or stays contained in this Plan or the Confirmation Order), shall remain in full force and effect until the closing of the Chapter 11 Case.  All injunctions or stays contained in this Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

U.    *Entire Agreement*

This Plan and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings and representations on such subjects, all of which have become merged and integrated into this Plan.

V.    *Closing of Chapter 11 Case*

The Reorganized Debtor shall promptly, upon the full administration of the Chapter 11 Case, file with the Bankruptcy Court all documents required by the Bankruptcy Rules and any applicable orders of the Bankruptcy Court to close the Chapter 11 Case.  Furthermore, the Voting Agent is authorized to destroy all paper/hardcopy records related to this matter two (2) years after the Effective Date has occurred.

W.    *Change of Control Provisions*

Any acceleration, vesting or similar change of control rights under any employment, benefit or other arrangements triggered by the consummation of the Plan shall be waived or otherwise cancelled under the Plan.

Dated: February 3, 2025

**DEBTOR**

_____

By:    Joseph Caruso
Title:    Vice President

# **EXHIBIT A**

# **OWS TERM SHEET**



**PERSONAL AND CONFIDENTIAL**

October 17, 2024

Brandon Flury
Corten Real Estate Partners
5425 Wisconsin Ave Ste 700
Chevy Chase, MD 29815

Greg Denton
Arden Real Estate Partners
1600 Market St. Ste 2600
Philadelphia, PA 19103

**RE: Margaritaville Times Square – Preliminary Summary of Indicative Terms**

| | |
|---|---|
| **Bankruptcy Case:** | Borrower is a debtor and debtor-in-possession in a chapter 11 case pending before the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") under Chapter 11 Case No. 23-11289 (PB) (the "Bankruptcy Case"). |
| **Existing Loan Balance:** | Lender holds a first priority secured claim in the Bankruptcy Case in the amount of $152,902,018.10, plus all other amounts due in connection with the existing loan, which shall include any exit fee on the existing loan (the "Lender Claim"). |
| **Plan/Confirmation Order:** | Borrower will propose and seek confirmation of a plan of reorganization in the Bankruptcy Case (the "Plan"). The Plan will contain terms reasonably acceptable to the Lender and will specifically provide for the plan treatment contemplated herein. The Lender Claim will be separately classified under the Plan and Lender will have the right to vote on the Plan. |
| | Any amendments to the Plan, any order confirming the Plan (the "Confirmation Order"), and any other documents related to the Plan shall be in form and substance acceptable to the Lender to the extent the terms of such documents relate to the Lender Claim or this Loan; provided, that the terms of such documents that do not relate to the Lender Claim or this Loan shall require the reasonable consent of the Lender. |
| | The Plan and Confirmation Order shall include customary protections in favor of the Lender, including exculpation and a release by the Debtor in favor of the Lender, which exculpation and release shall include any and all actions taken by the Lender pursuant to the terms of the Final Cash Collateral Order in the Bankruptcy Case. The Confirmation Order shall be in form and substance acceptable to the Lender, and shall also include customary provisions inuring to the benefit of the Lender, including releases/exculpation, automatic perfection of liens, and validation of the Lender Claim and Loan, property interests, and any related definitive documentation. |
| | The Debtor shall take all reasonable steps necessary in the Bankruptcy Action to ensure that any fees and expenses payable pursuant to this Preliminary Summary of Indicative Terms shall be afforded administrative expense claim treatment pursuant to sections 503(b) and 507(a)(2) of the Bankruptcy Code. |
| **Closing Date:** | The closing will take place on the date that the Plan becomes effective by its terms (the "Effective Date" or "Closing Date") |
| **Property:** | The Property is a 234 key full-service hotel with 4,865 sf of ground floor retail and approximately 29,000 square feet of food and beverage space located at 560 Seventh Ave in New York, NY. |
| **Lender:** | OWS BCA FUNDING, LLC or any of its affiliates, successors and/or assigns ("Lender"). |

LEGAL\75402219\1

| | |
|---|---|
| **Sponsor:** | An entity or individual acceptable to Lender, at Lender's sole discretion. |
| **Borrower:** | 560 Seventh Avenue Owner Primary, LLC or its designee(s) named pursuant to the terms of the Plan (the "<u>Reorganized Debtor</u>" or "<u>Borrower</u>"). |
| **Cash Payment:** | The parties acknowledge that the financing transaction contained herein is insufficient on its own to satisfy the Lender Claim in full. Accordingly, on or prior to the Effective Date of the Plan, the Borrower, or AC MVTS Holdco, LLC, AREPIII MVTS, LLC and/or CREP Times Square Hotel LLC will also make a cash payment to Lender equal to the difference between the Lender Claim and the Loan (as defined below). The Lender Claim may be subject to paydowns from the Parent after the filing of the Plan. To the extent that any paydowns are made by the Parent, then such paydown shall reduce the size of the cash payment required under this paragraph. |
| 1. **Total Loan Extension Amount:** | $140,000,000 (the "<u>Loan</u>" or "<u>Total Loan Extension Amount</u>"). |
| 2. **Loan Extension Term** | Two (2) years from the Effective Date with two (2) one-year extension options (each a "Subsequent Extension") subject to: (i) no default or event of default, (ii) payment of the Subsequent Extension Fee (defined below), (iii) borrower to replace the interest rate cap for the term of the extension, (iv) satisfaction of Lender's other standard extension requirements and (iv) Lender shall have determined that the property is achieving at least a 9.0% debt yield at the time of the first Subsequent Extension and at least an 11.50% debt yield at the time of the second Subsequent Extension. |
| **Q.** | **Amortization:**    The Loan will be interest only during the initial two year term and the first extension option. Amortization shall commence on a 30-year, straight-lined schedule upon exercise of the second Subsequent Extension. |
| **Indicative Interest Rate:** | The Interest Rate will be the sum of one-month SOFR plus 5.375%. Interest shall be payable monthly, in arrears and calculated on the basis of actual days elapsed in a 360-day year. |
| **SOFR Floor:** | The greater of (i) the 2-year SOFR swap rate at closing and (ii) 3.75%. |
| **Interest Rate Cap:** | The Borrower shall purchase an interest rate cap with a notional amount equal to the Total Loan Extension Amount and a SOFR strike price equal to the lesser of (i) 1 month term SOFR at closing and (ii) 5.30%, for the initial term of the Loan Extension with payments and interest period calculations in accordance with the Loan Extension documentation. Any subsequent extension will be conditioned on purchasing an Interest Rate Cap for such extension. |
| **Extension Origination Fee:** | As partial compensation for costs incurred and efforts spent by the Lender in connection with the extension of the Lender Claim as contemplated herein (including structuring, negotiating and re-underwriting of the transaction), Borrower shall pay a fee of 1.00% of the Total Loan Extension Amount, payable to Lender at closing. |
| **Exit Fee:** | 0.50% of the Total Loan Extension Amount, payable to Lender upon the prepayment or repayment of the Loan. |
| **Subsequent Extension Fees:** | 0.25% of the outstanding Loan Amount for each subsequent extension, payable to Lender upon extension. |
| **Lender Fees and Expenses**: | At closing, Borrower shall pay the fees and expenses of the Lender incurred in connection with the restructuring of the Lender Claim under the Plan in the Bankruptcy Case, including fees and expenses incurred in negotiating and executing any definitive documentation. |
| **Minimum NOI:** | At closing, the Property shall have a minimum Underwritten Net Operating Income of $11.8 million, calculated assuming (i) T12 hotel net cash flow (adjusted for actual real estate taxes and insurance premiums due and other adjustments at Lender's discretion), plus (ii) the rental rate for the retail space (assuming the lease is in place and the tenant is in occupancy and is paid current) plus (iii) the rental rate from IMCMV assuming the third |

LEGAL\75402219\1

amendment is voided and nullified and IMCMV is paying full rent of not less than $3.984 million per year (as may be adjusted pursuant to its original lease, first and second amendments).

Such calculation shall be in Lender's discretion and subject to adjustment based on Lender's underwriting and leases and payments actually being in place at closing.

**Prepayment:** The Loan, as extended, may be prepaid in whole at any time subject to Lender receiving a minimum of 15 months of interest ("Minimum Interest"). Upon any pre-payment and/or repayment of any portion of the Loan, the Exit Fee and Minimum Interest, if any, shall be due and payable on amounts being prepaid and/or repaid.

**Recourse:** The Loan shall be non-recourse except for standard recourse carveouts and any Additional Recourse as detailed below.

**Additional Recourse:** Guarantor shall execute guaranties of (i) any leasing costs outstanding at closing and may be incurred following closing, (ii) indemnity for any outstanding unsubordinated liabilities that remain post-bankruptcy as approved by Lender in its sole discretion, and (iii) a debt service carry and reserve guaranty.

**Collateral:** The Loan will be secured by a continuation of the existing first mortgage lien encumbering the Property, a pledge of all the rents and revenues generated thereby, a pledge of 100% of the equity interests in Borrower; an assignment of all leases, contracts, management agreements, architecture and engineering agreements, construction management agreements and licenses and permits; an irrevocable first lien on all Property related accounts; an assignment of the Interest Rate Cap; and such other collateral as Lender may require.

**Cash Management Account:** Rents to be deposited into a Lender controlled clearing account ("Lockbox") with a financial institution acceptable to Lender ("Lockbox Bank"). Prior to a Cash Sweep Event (hereinafter defined), all funds in the Lockbox Account shall be released to Borrower. Upon the occurrence of a Cash Sweep Event, all funds in the Lockbox Account (less the reasonable fees of the clearing bank) shall be swept daily into a newly established Cash Management Account controlled by Lender. Funds in the Cash Management Account shall be applied by Lender each business day to payments of debt service, taxes, insurance, other required reserves, and other items required by Lender. So long as no EOD Trigger (hereinafter defined) exists, remaining cash flow shall be released to Borrower for budgeted and approved operating expenses. All other funds not released pursuant to the foregoing sentence shall be held by Lender as additional collateral for the Loan. Borrower may request amounts held by Lender for seasonal operating and debt service shortfalls up to the cumulative amount deposited with Lender in any rolling twelve (12) month period.

For purposes hereof, a "Cash Sweep Event" shall mean (a) an event of default (an "EOD Trigger"), or (b) the bankruptcy or insolvency of Borrower, or Guarantor, or (c) the bankruptcy or insolvency of Hotel Manager or Franchisor, or (d) for two consecutive quarters the DY falls below (i) 7.0% prior to the first anniversary of the Loan, (ii) 8.5% following the first anniversary of the Loan and prior to the second anniversary of the Loan, (iii) 9.0% following the second anniversary of the Loan and prior to the third anniversary of the Loan, and (iv) 11.0% thereafter. To the extent (x) the Cash Sweep Event is related to (d), if the DY is at least 0.5% higher than the then applicable DY trigger in (i)-(iv) above for at least two (2) consecutive quarters (each a "Cash Sweep Event Cure"), and (y) no other defaults or Cash Sweep Event exists, any swept amounts then held by Lender shall be released to Borrower upon written request; provided, however, Lender shall not be obligated to release such funds within 120 days of the then current maturity date or during an extension option.

**Upfront Reserves:** Intentionally Omitted.

**Debt Service Reserve:** None required prior to an Event of Default. Upon an Event of Default, Borrower and/or Guarantor shall deposit an amount equal to the greater of (i) projected debt service and operating expense shortfalls from the Event of Default through the then scheduled maturity date, and (ii) six (6) months of full interest payments.

**Replacement Reserve:** During the Loan Extension Term, Borrower shall make monthly deposits into the replacement reserve in an amount equal to 3.0% of Room Revenue per annum increasing to 4.0% of Room Revenue per annum during the second Subsequent Extension Term, in each case subject to adjustment following the Property Condition Report.

**Tax and Insurance Reserve:** Borrower shall be required to make monthly deposits into a tax and insurance reserve in an amount equal to $1/12^{th}$ of the annual taxes and insurance premiums.

**Additional Financing:** None permitted without Lender's express written consent in its sole discretion.

**Insurance:** Borrower shall maintain insurance coverage on the Property satisfactory to Lender issued by insurers with a claims-paying ability rated "A" or better or its equivalent by the rating agencies.

**Conditions to Loan Closing:** Normal and customary for loans of this type, including but not limited to review of third party reports.

**Special Condition to Closing:** 1) Property and Borrower to emerge from bankruptcy pursuant to the Plan at or prior to closing in form, substance and on terms satisfactory to Lender in its discretion including, without limitation, Lender's approval of any remaining liabilities, entry of a final and non-appealable Confirmation Order (as defined herein), and all other terms listed in Plan/Confirmation Order, above.

2) Any outstanding matters with the Franchise to be resolved prior to closing to Lender's satisfaction, including updated economics and term of agreement. Franchisor shall sign an estoppel in form satisfactory to Lender in its discretion. Lender to have approval over any proposed changes/modifications to the franchise agreement in its discretion.

3) The Fourth Amendment to the IMCMV lease shall be approved by the Bankruptcy Court, in full force and effect, and IMCMV shall be paying full rent at rates contemplated therein. IMCMV shall sign an estoppel confirming the same and otherwise in form acceptable to Lender in its discretion.

4) Closing shall be conditioned upon the procurement of secondary market financing for the Loan on terms and conditions satisfactory to Lender in its sole discretion, or, in the alternative, the adjustment of certain terms contained herein, which adjustments shall be satisfactory to OWS in all respects.

5) Lender's obligation to provide the loan modification is subject to confirmation by the Lender, in its sole discretion, of no materially adverse change in debt capital markets from the date hereof to the Effective Date.

**Confidentiality:** This Preliminary Summary of Indicative Terms is being furnished to Borrower and Sponsor on a confidential basis.

This Preliminary Summary of Indicative Terms is for discussion purposes only, is not a commitment to lend money. Additionally, this Preliminary Summary of Indicative Terms is subject to, among other things, confirmation of the Plan, the occurrence of the Effective Date of the Plan, Lender's pre-confirmation due diligence, credit review procedures and internal approvals customary for a transaction of this nature, as well as satisfactory secondary market conditions, the absence of any material adverse change and other usual and customary conditions. Notwithstanding the foregoing, the confidentiality provisions contained herein shall be binding on the Borrower and its affiliates.

4

**EXHIBIT B**

**DHG AGREEMENT**

LEGAL\75402219\1

## SETTLEMENT AGREEMENT

**THIS SETTLEMENT AGREEMENT** ("Agreement"), deemed effective as of the date that a plan proposed by 560 Seventh Avenue Owner Primary LLC (the "Plan")[3] becomes effective (the "Effective Date"), is entered into by and among 560 Seventh Avenue Owner Primary LLC, as debtor and debtor-in-possession ("Owner"), AREPIII MVTS, LLC ("AREP Lender"), CREP TIMES SQUARE HOTEL LLC, as co-lender ("CREP Lender"; and together with AREP Lender, collectively, "Lender"), DHG TSQ, LLC ("DHG"), BROOKRIVER HOTELS & RESORTS, LLC (as successor-in-interest to DHG, "Brookriver"), and Highgate Hotels, L.P. ("Highgate").

WHEREAS, Owner is the direct owner of the real property commonly known as the Margaritaville Resort Times Square and located at 560 Seventh Avenue, New York, New York (the "Property");

WHEREAS, prior to the consummation of the UCC Disposition Sale (as hereinafter defined), Owner was a wholly-owned subsidiary of 560 Seventh Avenue Owner Secondary LLC ("Borrower");

WHEREAS, on February 22, 2019, Owner entered into that certain Management Agreement (the "Hotel Management Agreement"), with DHG, pursuant to which DHG was engaged to act as the manager of the hotel located at the Property (the "Hotel");

WHEREAS, on September 13, 2021, Borrower entered into that certain Mezzanine Loan Agreement (the "Loan Agreement") with AREP Lender, pursuant to which AREP Lender made a mezzanine loan in the original principal amount of $57,000,000 (the "Loan") to Borrower, which Loan was secured by, among other things, that certain Pledge and Security Agreement, dated as of September 13, 2021, made by Borrower to AREP Lender, pursuant to which AREP Lender was granted a first-priority security interest in Borrower's one hundred percent (100%) direct ownership interests in Owner (the "Collateral");

WHEREAS, in connection with the Loan, the Hotel Management Agreement was subordinated to the Loan Agreement and the other Loan Documents (as hereinafter defined), to Borrower's obligations to AREP Lender under the Loan Agreement and the other Loan Documents pursuant to that certain Mezzanine Subordination of Management Agreement, dated as of September 13, 2021 (the "Subordination Agreement"), made by Borrower to AREP Lender, and consented and agreed to by DHG and Owner;

WHEREAS, on or about February 2, 2023, DHG's parent company, Dream Hotel Group sold all or substantially all of its assets, including both owned properties and management relationships but specifically excluding the Hotel Management Agreement, to Hyatt Hotels Corporation (the "DHG Sale");

WHEREAS, concurrently with the DHG Sale, the Hotel Management Agreement was assigned by DHG to Brookriver;

---

[3] Capitalized terms not defined herein shall have the meanings ascribed to them in the Plan.

WHEREAS, on June 22, 2022, a fifty percent (50%) interest in the Loan, the Loan Agreement, the Pledge and Security Agreement, the Subordination Agreement and the other loan documents executed in connection with the Loan (collectively, the "<u>Loan Documents</u>") and in the Collateral was assigned to CREP Lender pursuant to that certain Mezzanine Loan Assignment and Assumption Agreement by and between AREP Lender and CREP Lender;

WHEREAS, on March 9, 2023, an event of default occurred under the Loan (the "<u>Default</u>"); and

WHEREAS, on July 13, 2023, DHG obtained a judgment confirming the Final Award issued by Arbitrator Marc E. Isserles pursuant to an arbitration between Owner and DHG commenced under the Hotel Management Agreement in the total amount of $3,080,864.75 in favor of DHG and against Owner (the "<u>Judgment</u>"), in an action captioned *560 Seventh Avenue Owner Primary LLC v. DHG TSQ, LLC*, Supreme Court of the State of New York, New York County (Index No. 655926/21);

WHEREAS, on August 12, 2023, Owner filed with the U.S. Bankruptcy Court for the Southern District of New York (the "<u>Bankruptcy Court</u>"), a voluntary petition in bankruptcy under Chapter 11 of the Bankruptcy Code (the "<u>Bankruptcy Proceeding</u>");

WHEREAS, on October 16, 2023, following Lender's issuance of certain default and disposition notices arising from the Default, Lender conducted a collateral disposition sale of the Collateral pursuant to New York's Uniform Commercial Code (the "<u>UCC Disposition Sale</u>");

WHEREAS, Lender was the successful bidder at the UCC Disposition Sale and designated AC MVTS Holdco, LLC ("<u>Designee</u>"), an affiliate of Lender, to take title to the Collateral;

WHEREAS, on December 20, 2023, Lender completed the closing of the UCC Disposition Sale pursuant to which Designee became the one hundred percent (100%) owner and holder of all limited liability company interests in Owner;

WHEREAS, on or about April 8, 2024, DHG filed a proof of claim in the Bankruptcy Proceeding (Claim No. 39) asserting a total claim against Owner in the amount of $4,464,128.44, $3,111,115.25 of which was alleged as secured, and $1,353,013.19 of which was alleged to be a general unsecured claim;

WHEREAS, Owner and Highgate entered into a Hotel Management Agreement dated effective as of February 1, 2024 (the "<u>Highgate HMA</u>") for Highgate's management of the Property

**NOW, THEREFORE,** in consideration of the foregoing and the mutual covenants set forth herein, Owner, Lender, DHG, Brookriver and Highgate (but as to Highgate solely with respect to Paragraph 2(b)(i)) (collectively, the "<u>Parties</u>"), intending to be legally bound, hereby agree as follows:

1.    **<u>Distributions to DHG and/or Brookriver</u>**.    In full and complete settlement, satisfaction and discharge of all amounts alleged to be due from Owner to DHG

and/or Brookriver, and in consideration the Releases described in Paragraph 5 of this Agreement, Lender and/or Highgate (with respect to item 2(b) below) shall pay (or cause to be paid) to Brookriver, the aggregate amount of (i) the Base Management Fees described in Section 2(a) below; plus (ii) $3,080,864.75 (the "Settlement Amount"), payable as described in Section 2(b). Payments shall be made as follows:

    a. <u>Base Management Fees.</u> For Base Management Fees for DHG's/Brookriver's continued management of the Hotel through January 31, 2024, DHG/Brookriver acknowledge that a total of $30,653.88 and $9,030.12 in post-petition out of pocket expenses has already been paid to DHG/Brookriver prior to the Effective Date.

    b. <u>The Settlement Amount</u>.

        i. <u>The Pre-Default Amount</u>. The Settlement Amount includes a total of $1,242,662.49 (the "<u>Pre-Default Amount</u>"), which shall be paid by Highgate in monthly installments in amounts equal to thirty five percent (35%) of the Base Management Fees for the applicable month actually collected by Highgate pursuant to the terms of the Highgate HMA, which monthly payments shall (x) commence within five (5) days of the date on which the first monthly payment is received by Highgate under the Highgate HMA and (y) continue until the full amount of the Pre-Default Amount has been paid to Brookriver, as applicable; <u>provided</u>, <u>however</u>, that if the Property is monetized (e.g., the Property (or any direct or indirect interest therein) is sold or refinanced (each, a "<u>Monetization Event</u>")) prior to the repayment to Brookriver in full of the Pre-Default Amount, then upon the consummation of any such Monetization Event, Lender shall pay (or cause to be paid) any remaining balance of the Pre-Default Amount directly to Brookriver, from the Net Proceeds, if any, of such Monetization Event. As used herein, "<u>Net Proceeds</u>" shall mean the gross proceeds of a Monetization Event less all of Owner's costs and expenses actually incurred and payable to non-affiliates of Owner in connection therewith (including brokerage commissions, closing costs, and reasonable attorneys' fees) and the repayment in full of any and all outstanding bona fide third-party secured debt encumbering either the Property or any of the direct or ownership interests therein. Notwithstanding the foregoing, in the event that the Highgate HMA is terminated at any time prior to the Pre-Default Amount having been paid in full, then the remaining unpaid portion of the Pre Default Amount shall be paid in full to Brookriver immediately upon such termination.

        ii. <u>The Settlement Amount Balance</u>. The balance of the Settlement Amount in an aggregate amount equal to $1,838,202.26 shall be paid by Lender as follows:

            1. fifty percent (50%) upon the date on which respective investors in AREP Lender and CREP Lender shall have received a simple return on the Lender Investment Amount (i.e., zero percent (0%) IRR); and

            2. fifty percent (50%) upon the date on which respective the respective investors in AREP Lender and CREP Lender shall have received a return on the Lender Investment Amount equal to a fifteen percent (15%) IRR.

As used herein, the term "<u>Lender Investment Amount</u>" shall mean the aggregate amount of cumulative equity and/or debt investments made in the Loan and the Property by AREP Lender and CREP Lender through their respective investors, including, without limitation, in connection with the operation and maintenance of the Property but shall not include attorneys' fees and costs through the Effective Date in connection with the preparation and execution of this Agreement or anything related to this Agreement.  . For the avoidance of doubt, the Lender Investment Amount shall include, without limitation, any and all such cumulative equity and/or debt investments made (x) prior to the Effective Date and (y) from and after the Effective Date, which additional investments shall be made in such amounts and at such times as Lender may determine in Lender's sole and absolute discretion.  Lender shall provide DHG and Brookriver with an annual financial statement or other documentation sufficient to show the total Lender Investment Amount from 2025 forward until such time as the Settlement Amount is paid in full.

2.    **Cooperation in Related Matters**.  Each of DHG and Brookriver shall cooperate with Owner and Lender in any action in pursuit of the guarantors named under the Loan Documents (the "<u>Guarantors</u>") to collect any monies owed to the Parties under the Loan; provided, that, neither DHG nor Brookriver have any obligation to incur any out-of-pocket costs, expenses or legal fees in connection with such cooperation.

3.    **Costs**.  The Parties shall each bear the cost of their respective attorneys' fees incurred in connection with the disputes between them and in connection with the Agreement.

4.    **Modification**.  No provision of this Agreement may be changed, altered, modified or waived after the occurrence of the Effective Date except in writing signed by all Parties, which writing shall specifically reference this Agreement and the provision which the Parties intend to waive or modify.

5.    **Entire Agreement**.  This Agreement embodies the entire agreement among the Parties relating to the subject matter hereof and supersedes and replaces any and all prior agreements, representations, understandings, and arrangements, if any, relating to the subject matter hereof.

6.    **Warranties and Representations**.  The Parties warrant and represent that: (i) they have fully read this Agreement, that they have fully discussed all the terms, conditions, and consequences of this Agreement with their attorneys and that they completely understand and voluntarily accept all the terms, conditions, and consequences of this Agreement, (ii) no promise or inducement has been offered, made, or accepted in connection with this Agreement except for the mutual covenants expressly set forth herein, and that they have accepted and executed this Agreement without reliance upon any statements, claims or representations, (iii) neither the fact of this Agreement nor the payment specified herein shall constitute or shall be construed as an admission of fault or as a determination of liability on the part of any Party, and (iv) they have the sole right and exclusive authority to execute this Agreement.

7.      **Binding Effect**. Upon the occurrence of the Effective Date, this Agreement shall be binding upon and shall inure to the benefit of the Parties hereto, including their respective agents, employees, representatives, officers, directors, divisions, parent, subsidiaries, affiliates, assigns, heirs, successors in interest and shareholders/members.

8.      **Joint Preparation**.  The Parties agree that the terms and conditions of this Agreement are the result of negotiations between the Parties and that this Agreement shall not be construed in favor of or against any Party by reason of the extent to which any Party or its professional advisors participated in the preparation or drafting of this Agreement.

9.      **Cooperation**.    Each of the Parties shall reasonably cooperate in the execution of any and all other documents and in the completion of any additional actions that may be necessary or appropriate to give full force and effect to the terms and intent of this Agreement.

10.      **Headings**.    The captions, numbering, and headings throughout this Agreement are for convenience and reference only and shall in no way be considered in the interpretation of this Agreement.

11.      **Construction**.    Unless the context of this Agreement clearly requires otherwise, references to the plural include the singular, references to the singular include the plural, and the terms "includes" and "including" are not limiting.

*[remainder of this page intentionally left blank]*

6

**IN WITNESS WHEREOF,** the parties have caused this Agreement to be executed as of the date first set forth above.

**560 SEVENTH AVENUE OWNER PRIMARY LLC**

By: _____
      Name:
      Title:

**AREPIII MVTS, LLC**

By: _____
      Name:
      Title:

**CREP TIMES SQUARE HOTEL LLC**

By: _____
      Name:
      Title:

**DHG TSQ, LLC**

By: _____
      Name:
      Title:

**BROOKRIVER HOTELS & RESORTS, LLC**

By: _____
      Name:
      Title:

**HIGHGATE HOTELS, L.P.**

By: _____
      Name:
      Title:

1

## EXHIBIT C

## TREATMENT OF FLINTLOCK CLAIM

1

**Claimant**:  Flintlock Construction Services, LLC (the "Claimant")

**Claim**:  Proof of Claim Number 46 asserting a secured claim in the amount of $3,277,814.24 (the "Claim")

**Plan Treatment**:

The Claim appears to contain charges for subcontractors who filed their own secured claims against the Debtor.  The Debtor and the Claimant shall negotiate in good faith to revise the amount of the Claim to determine the amount to become Allowed and to ensure that there is no overlap with other claims filed against the Debtor  (as and when revised, the "Allowed Claim").

In full and final satisfaction of the Claim, Claimant shall receive the following distributions under a plan of reorganization (the "Plan") to be proposed by 560 Seventh Avenue Owner Primary LLC (the "Debtor") and confirmed by the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") in the Debtor's chapter 11 case pending under Case Number 23-11071 (PB) (the "Chapter 11 Case"):

1.  An initial distribution in the amount of 33% of the Allowed Claim ten (10) business days (or as soon thereafter as is practicable) from the later to occur of (i) the date that the Plan becomes effective by its terms (the "Effective Date"); (ii) the date on which a final Certificate of Occupancy is obtained and all open construction items itemized on Schedule 1 hereto for the building and property located at 560 Seventh Avenue, New York, New York (the "Building") have been resolved in a manner satisfactory to the Debtor in its sole discretion.; and (iii) the date on which the Claim becomes an Allowed Claim.

2.  An additional distribution of up to 33% of the Allowed Claim from the Net Proceeds of a Monetization Event remaining after payment of the Funding Amount, payable ten (10) business days (or as soon thereafter as is practicable) following (i) the date of closing of the Monetization Event, and (ii) the recovery by the direct and indirect holders of the Debtor's equity interests, and their affiliates and investors (collectively, the "Equity Holders") of the full amount of the Funding Amount on a dollar-for-dollar basis.

    The term "Monetization Event" shall mean a sale or refinancing of the Building or the equity interests in the reorganized Debtor following the Effective Date.

    The term "Net Proceeds" shall mean the gross proceeds of a Monetization Event less all of the costs and expenses actually incurred and payable in connection therewith (including brokerage commissions, closing costs, and reasonable attorneys' fees) and the repayment in full of any and all outstanding bona fide third-party secured debt encumbering either the Building or any of the direct or ownership interests therein.
    The term "Funding Amount" shall mean the aggregate amount of (i) all of the Equity Holders' claims (as that term is defined under section 101 of Title 11 of the United

2

States Code (the "<u>Bankruptcy Code</u>")) against the Debtor as of the date immediately preceding the entry of an Order by the Bankruptcy Court confirming the Plan; and (ii) all obligations due and owing to the Equity Holders by the Debtor's former corporate parent, 560 Seventh Avenue Owner Secondary LLC, as of December 19, 2023.

3.  An additional distribution of up to 33% of the Allowed Claim from the Net Proceeds of a Monetization Event remaining after full payment of the Funding Amount and the IRR to the Equity Holders, payable ten (10) business days (or as soon thereafter as is practicable) following (i) the Monetization Event, and (ii) the recovery by the Equity Holders of (A) the full amount of the Funding Amount on a dollar-for-dollar basis, plus (B) an additional internal rate of return on the Funding Amount equal to fifteen percent (15%) (the "<u>IRR</u>").

3

## SCHEDULE 1

## Open Construction Items

| Application # | Description/Status |
|---|---|
| 122266010 | Fire Alarm Letter of Defect and Engineer's Affidavit to be approved by commissioner's office |
| | Fire Alarm application to be signed off after LOA issued and FA As Built Plans entered by FDNY |
| 121192949 | Equipment Use Permits to be issued |
| | Construction Inspection to be performed and passed |
| | Water/Sanitary Roughing – results for inspection to be submitted via DOB NOW (missing floors MZ3, 7, 9, 10s) |
| | Storm Roughing – results for inspection to be submitted via DOB NOW (missing floors SC2, 2-20) |
| | Gas Roughing – results for inspection to be submitted via DOB NOW (missing floors SC2, 2, 4-23) |
| | Request for worktype signoff to be submitted by DOB NOW for Plumber of Record [Tap Letter, Meter Permit, Sewer Signoff Letter, GEN215 for RPZs installed) |
| | Final Survey to be verified by the architect and the examiner |
| | Street Tree Sign-off |
| | Preliminary Commissioning Report Certification |
| 140328777 | Request for sprinkler worktype signoff to be submitted via DOB NOW |
| | Request for standpipe worktype signoff to be submitted via DOB NOW |
| | Sprinkler/Standpipe System application to be signed off after SP/SD permits closed out<br>TR1 – Sprinkler systems<br>TR1 – Standpipe systems<br>TR1 – Fire Resistant penetrations and joints (firestop)<br>TR1 – Final Inspection |
| 122984789 | TR-1 for standpipe systems to be submitted to Borough office |
| | Request for temp standpipe worktype signoff to be submitted via DOB NOW |
| | Temp standpipe application to be signed off after SD permit closed out |
| | Standpipe work type to be inspected and signed off<br>TR1 – Standpipe systems<br>TR1 – Final Inspection |
| M00177401 | Elevator application to be signed off for devices 1P0989501, 1P0989501, 1P0989500, 1P0989499, 1P0989498 |
| M00083559 | Electrical Permit (I.P. Electric Inc) |
| M00161226 | Electrical Permit (I.P. Electric Inc) |
| M00188210 | Electrical Permit (JAM Electrical Corp) |

1

| M00300032 | Electrical Permit (JAM Electrical Corp) |
|---|---|
| M00401602 | Electrical Permit (I.P. Electric Inc) |
| M00776472 | Electrical Permit (Signs Cad Corp) |
| M00776506 | Electrical Permit (Signs Cad Corp) |
| M00776555 | Electrical Permit (Signs Cad Corp) |
| M00776605 | Electrical Permit (Signs Cad Corp) |
| M01090283 | Electrical Permit (Accurate Electrical) |
| 123843136 | Builders Pavement Plan Final Survey |
| | Builders Pavement Plan DOB Inspection and resolution of any subsequent objections |
| | Street Tree Permit and/or Parks Receipt to match ST-1 |
| | Engineer's Affadavit, Core Strength, and Sampling Plan |
| | As-Built Photo Log |
| | DOT Permits for Sidewalk, Rodeway, and Corb for each street frontage |
| 122506591 | Fire Alarm (ARCS) application to be signed off after LOA issued and FA As Built Plans entered by FDNY |
| 140328713 | Boiler work type to be inspected and sign off<br>TR1 – heating systems<br>TR1 – chimneys<br>TR8 – HVAC and service water heating system controls<br>EN2 – as built energy analysis |
| 140328731 | Emergency Generator Fuel Storage work type to be inspected and signed off<br>TR1 – Emergency and standby power systems (generators)<br>TR1 – Fuel Oil storage and fuel oil piping systems<br>TR1 – Final Inspection<br>TR8 – Maintenance information<br>EN2 – as built energy analysis |
| 141003492 | Installation of marquee structure over building on West 40th (OT filed 7/2/21) |
| 141003483 | Installation of marquee structure over building on 7th Ave entrance (OT filed 7/2/21) |
| 141000841 | Tenant protection plan (filed 4/9/21) |
| 141000529 | Tenant protection plan (filed 4/2/21) |
| 140834480 | Mini crane and gantry temporary equipment (EQ filed 3/29/19) |
| 140343769 | BPP (filed 2/18/16) |
| | |
| **ECB Violation #** | **Description** |
| 35453636P | Failure to safeguard all persons and property affected by construction operations (issued 11/08/2019) |
| 35503637J | Responsibility of owner to have chimney extended at adjoining building (issued 5/20/2021) |

LEGAL\75402219\1

## EXHIBIT D

## OPERATING LEASE

LEGAL\75402219\1

HOTEL OPERATING LEASE

560 SEVENTH AVENUE OWNER PRIMARY LLC,
a Delaware limited liability company

Landlord

AND

AC MVTS OPERATOR, LLC,
a Delaware limited liability company

Tenant

## Table of Contents

Page

1. **TERM; CONDITION OF PREMISES**.................................................................. 2

    1.1   **Term** ........................................................................................................... 2

    1.2   **Lease Commencement Date** ...................................................................... 3

    1.3   **Condition of Premises** .............................................................................. 3

2. **RENT**. ............................................................................................................... 3

    2.1   **Rent**. .......................................................................................................... 3

    2.2   **CPI Increases; Rent Reset**. ....................................................................... 6

    2.3   **Additional Rent**. ....................................................................................... 6

    2.4   **Personal Property Limitation** ................................................................... 7

    2.5   **Sublease Rent Limitation** ......................................................................... 7

    2.6   **REIT Requirements** .................................................................................. 7

    2.7   **Rent Payable without Setoff** ..................................................................... 8

3. **MANAGEMENT AGREEMENT; FRANCHISE AGREEMENT** ..................... 8

    3.1   8

    3.2   **Franchise Agreement** ............................................................................... 9

4. **TAXES** ............................................................................................................. 9

    4.1   **Payment of Impositions** ........................................................................... 9

    4.2   **"Impositions" Defined** ........................................................................... 11

5. **INSURANCE, LIABILITY AND INDEMNITY** .......................................... 11

    5.1   **Tenant's Insurance** ................................................................................. 11

    5.2   **Tenant Insurance Particulars** ................................................................. 12

    5.3   **Tenant Shall Provide Adequate Coverage** .............................................. 12

    5.4   **Waiver of Subrogation** ........................................................................... 12

    5.5   **Non-Liability of Landlord** ..................................................................... 13

    5.6   **Indemnification of Landlord** ................................................................. 13

    5.7   **Indemnification of Tenant** ..................................................................... 14

6. **UTILITIES**. .................................................................................................... 14

7. **OPERATION**. ................................................................................................ 14

    7.1   **General**. .................................................................................................... 14

    7.2   **Hazardous Materials** .............................................................................. 15

Table of Contents
(continued)

Page

| | | |
|---|---|---|
| 7.3 | Use | 16 |
| 7.4 | Books and Records | 16 |
| 8. | MAINTENANCE, REPAIRS, AND ALTERATIONS TO THE PREMISES | 17 |
| 8.1 | Tenant's Maintenance and Repair Obligations | 17 |
| 8.2 | Alterations | 17 |
| 8.3 | Mechanic's Liens | 17 |
| 8.4 | Failure | 18 |
| 8.5 | Title | 18 |
| 8.6 | Surrender | 18 |
| 9. | CASUALTY | 18 |
| 9.1 | Restoration | 18 |
| 9.2 | Termination; Uninsured Casualty | 19 |
| 10. | CONDEMNATION | 19 |
| 10.1 | Definitions | 19 |
| 10.2 | Total Condemnation | 19 |
| 10.3 | Partial Condemnation | 19 |
| 10.4 | Allocation of Award | 20 |
| 11. | ASSIGNMENT AND SUBLETTING | 20 |
| 12. | SUBORDINATION | 20 |
| 12.1 | Subordination | 20 |
| 12.2 | Estoppel Certificates | 20 |
| 12.3 | Termination | 21 |
| 12.4 | Attornment | 21 |
| 13. | DEFAULT AND REMEDIES | 21 |
| 13.1 | Default | 21 |
| 13.2 | Remedies | 22 |
| 14. | MISCELLANEOUS | 24 |
| 14.1 | Landlord Default | 24 |
| 14.2 | Holding Over | 24 |
| 14.3 | Quiet Enjoyment | 25 |

Table of Contents
(continued)

Page

14.4   **Non-Recourse Liability** ................................................................... 25

14.5   **Recording** ......................................................................................... 25

14.6   **Counterparts** .................................................................................... 25

14.7   **Access By Landlord** .......................................................................... 26

14.8   **Notices** ............................................................................................. 26

14.9   **Time** ................................................................................................. 26

14.10  **Entire Agreement** ............................................................................ 26

14.11  **Further Assurances** ......................................................................... 26

14.12  **Applicable Law** ............................................................................... 26

14.13  **Controversy** .................................................................................... 27

14.14  **Headings and Gender** ...................................................................... 27

14.15  **Successors** ....................................................................................... 27

14.16  **Authority** ........................................................................................ 27

14.17  **Waiver** ............................................................................................. 27

14.18  **Matters of Record** ........................................................................... 27

14.19  **Project Financing** ............................................................................ 28

14.20  **Brokers** ............................................................................................ 28

14.21  **Sole Parties** ..................................................................................... 28

14.22  **Personalty on Termination** .............................................................. 28

14.23  **Business Day** .................................................................................... 29

14.24  **Treatment of Lease** .......................................................................... 29

14.25  **Tax Characterization** ....................................................................... 29

## HOTEL OPERATING LEASE

THIS HOTEL OPERATING LEASE (this "**Lease**"), dated as of _____, 2025 (the "**Effective Date**"), is made and entered into by and between 560 SEVENTH AVENUE OWNER PRIMARY LLC, a Delaware limited liability company ("**Landlord**"), and AC MVTS OPERATOR, LLC, a Delaware limited liability company ("**Tenant**").

## LEASE OF PREMISES

Landlord owns fee title to that certain real property more particularly described on **Exhibit A** attached hereto (the "**Land**"), on which that certain hotel, commonly known as the Margaritaville Times Square, together with related facilities and improvements, is located (collectively, the "**Hotel**").

Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord, subject to all of the terms and conditions set forth herein, those certain premises (the "**Premises**") which consist of: (i) the Land, (ii) the Hotel, (iii) all lands adjacent to the Land over which, and to the extent that, Landlord currently holds easements, licenses or other rights to use, access or passage relevant to the use and operation of the Hotel, and (iv) such personal property that is owned by Landlord and necessary for the use and operation of the Premises (the "**Hotel Personalty**").

## BASIC LEASE PROVISIONS

| | | |
|---|---|---|
| A. | **Lease Commencement Date**: | The Effective Date |
| B. | **Term**: | See <u>Section 1.1</u>. |
| C. | **Expiration Date**: | The date that is five (5) years after the Lease Commencement Date. |
| D. | **Rent**: | See <u>Section 2.1</u>. All payments under this Lease shall be sent to Landlord at the address designated by Landlord from time to time. |
| E. | **Security Deposit**: | None |
| F. | **Addresses for Notices**: | |

Landlord/Tenant/REIT:    c/o Corten Real Estate Partners
1000 N. West Street, Suite 913
Wilmington, DE 19801
Attention: P.J. Yeatman
Email: pjy@cortenrealestate.com

c/o Corten Real Estate Partners
2929 Arch Street, Suite 1705
Philadelphia, PA 19104

Attention: P.J. Yeatman
Email: pjy@cortenrealestate.com

and

c/o Arden Group
1600 Market Street, Suite 2600
Philadelphia, Pennsylvania 19103
Attention: Craig A. Spencer and Joseph
S. Caruso
Email: cas@ardengroup.com and
jsc@ardengroup.com

with a copy to:

ArentFox Schiff LLP
44 Montgomery Street, 38th Floor
San Francisco, California 94105
Attention: Richard L. Brand, Esq.
Email: rbrand@afslaw.com

and

Vos-IP
1600 Market Street, Suite 2600
Philadelphia, Pennsylvania 19103
Attention: Brian Nath, Esq.
Email: brian@vos-ip.com

and

Paul Hastings LLP
515 South Flower Street, 25th Floor
Los Angeles, California 90071
Attention: Rick S. Kirkbride, Esq.
Email: rickkirkbride@paulhastings.com

G.    **Date of this Lease**:                The Effective Date

H.    **Landlord's Broker**:              None

I.    **Tenant's Broker**:                None

## STANDARD LEASE PROVISIONS

1.    **TERM; CONDITION OF PREMISES**

1.1    **Term**. Unless earlier terminated pursuant to the provisions hereof, the term of this Lease (the "**Term**") shall be the period commencing on the Lease Commencement Date and expiring on the Expiration Date. Notwithstanding anything to the contrary contained herein, the

2

Term shall automatically expire and this Lease shall automatically terminate immediately upon consummation of a sale by Landlord of Landlord's interest in all or substantially all of the Premises. Upon such termination, the provisions of <u>Section 14.22</u> shall apply. Upon such termination, Tenant shall, except for a termination pursuant to <u>Section 12.3 or 13.2(a)</u>, be entitled to a termination fee in the amount of the fair market value of Tenant's leasehold estate hereunder as of the date of termination. For the purposes of this <u>Section 1.1</u>, fair market value of the leasehold estate means an amount equal to the price that a willing buyer not compelled to buy would pay a willing seller not compelled to sell for Tenant's leasehold estate under this Lease.

       1.2    **<u>Lease Commencement Date</u>**. The Term shall commence on the Lease Commencement Date shown in Item A of the Basic Lease Provisions.

       1.3    **<u>Condition of Premises</u>**. Tenant agrees to accept the Premises on the Lease Commencement Date in the "AS IS" condition existing on the date hereof. Tenant agrees that, except as expressly provided herein, (a) it enters into this Lease without any representations, warranties or promises by Landlord, its agents, representatives, employees, servants or any other person in respect of the Premises and (b) no rights, easements or licenses are acquired by Tenant by implication or otherwise.

2.    **<u>RENT</u>**.

       2.1    **<u>Rent</u>**.

       (a)    Tenant agrees to pay for the use of the Premises during each Lease Year of the Term the Base Rent (as defined in <u>Section 2.1(b)</u>) and the Percentage Rent (as defined in <u>Section 2.1(c)</u>) (collectively, the "**Base+Percentage Rent**") calculated in accordance with this <u>Section 2.1</u>, and all other Rent (as defined in <u>Section 2.3</u>). As used herein, the term "**Lease Year**" shall mean each period from March 1 through the following last day of February, except that the first Lease Year begins on the Lease Commencement Date and ends on February 28, 2026 and the final Lease Year begins on March 1 and ends on the date this Lease expires or is terminated. As used herein, the term "**Lease Quarter**" shall mean the period beginning on the Lease Commencement Date and ending on the day immediately prior to the first full calendar quarter of the Term (i.e., December 31, March 31, June 30 or September 30, as the case may be), and each calendar quarter thereafter, other than the final Lease Quarter, which shall commence on the day immediately after the last full calendar quarter of the Term (i.e., January 1, April 1, July 1 or October 1, as the case may be) and end on the date this Lease expires or is terminated.

       (b)    The "**Base Rent**" payable hereunder shall be $1,258,333.33 per month, which Tenant and Landlord acknowledge and agree is based upon the Fair Market Rental (as defined in <u>Section 2.1(d)</u>) and shall be subject to adjustment in accordance with <u>Sections 2.2(a)</u> and <u>2.2(b)</u> below. The Base Rent shall be paid by Tenant, in arrears, on or before the fifteenth (15th) day following the end of each calendar month during the Term (provided that the last payment shall be due on or before the fifteenth (15th) day following the last day of the Term), without deduction or offset. Monthly Base Rent for any partial calendar month shall be pro-rated on a per-diem basis calculated on a thirty (30)-day month.

(c)    Tenant shall also pay Landlord Percentage Rent quarterly, in arrears, on or before the fifteenth (15th) day following the end of each calendar quarter during the Term (provided that the last payment shall be due on or before the fifteenth (15th) day following the last day of the Term). "**Percentage Rent**" is defined as either, as and if applicable, (A) the percentage rentals set forth below for the First Threshold (as defined in <u>Section 2.1(c)(i)</u>), or (B) the percentage rentals set forth below for the Second Threshold (as defined in <u>Section 2.1(c)(ii)</u>), <u>less</u> the sum of all Percentage Rent payments received to date by Landlord for such Lease Year, and shall be determined on the basis of a written statement, signed and certified by Tenant or an officer of Tenant, to their knowledge to be materially true and correct, setting forth the amount of Tenant's Room Revenue, Food and Beverage Revenue and Other Revenue made during the immediately preceding Lease Quarter. Within thirty (30) days after the end of each Lease Year during the Term, Tenant shall deliver to Landlord a written statement, signed and certified by Tenant or an officer of Tenant, to their knowledge to be materially true and correct, setting forth the total amount of Room Revenue, Food and Beverage Revenue and Other Revenue made during the immediately preceding Lease Year. Should such statement disclose a deficiency on the part of Tenant, payment of such deficiency should accompany delivery of the statement to Landlord. Should such statement disclose an overpayment on the part of Tenant, Tenant shall be entitled to a credit against Percentage Rent that may be subsequently due.

(i)    If the aggregate amount of Room Revenue, Food and Beverage Revenue and all Other Revenue equals or exceeds, in any Lease Year, the amount of $39,000,000 (the "**First Threshold**"), then the percentage rentals in such Lease Year shall equal fifty-five percent (55%) (the "**First Threshold Percentage Rent Percentage**") multiplied by the difference between such aggregate amount and the First Threshold, subject to adjustment in accordance with <u>Section 2.2(b)</u> below.

(ii)    If the aggregate amount of Room Revenue, Food and Beverage Revenue and all Other Revenue equals or exceeds, in any Lease Year, the amount of $43,000,000 (the "**Second Threshold**"), then the percentage rentals in such Lease Year shall equal sixty-five percent (65%) (the "**Second Threshold Percentage Rent Percentage**") multiplied by the difference between such aggregate amount and the Second Threshold, subject to adjustment in accordance with <u>Section 2.2(b)</u> below. The First Threshold Percentage Rent Percentage and the Second Threshold Percentage Rent Percentage, individually and collectively, as the context may require, are the "**Percentage Rent Percentage**."

(iii)    Percentage Rent shall be prorated, as applicable, with respect to each calendar quarter (i.e., 25% of the Percentage Rent set forth above shall be due after the first Lease Quarter, 50% shall be due after the second Lease Quarter, 75% shall be due after the third Lease Quarter, and 100% shall be due after the fourth Lease Quarter) and for the first Lease Year and the last Lease Year if such Lease Year is less than a full calendar year.

(iv)    As used herein with respect to any applicable time period, (x) "**Room Revenue**" shall mean that portion of Gross Revenues comprised of all revenues and income of any kind derived from the use of rooms at the Hotel, (y) "**Food and Beverage Revenue**" shall mean that portion of Gross Revenues comprised of all revenues and income of any kind derived from the sale of all food, liquor, soft drinks or other beverages at or from the Hotel, and (z) "**Other Revenue**" means all Gross Revenues, exclusive of Room Revenues and Food and

4

Beverage Revenues. As used herein with respect to any applicable time period, the term "**Gross Revenues**" shall mean the "Gross Revenues," as such term is defined in the Management Agreement (as defined in <u>Section 3.1</u>), and generally means all revenues and income of any kind derived directly or indirectly from or in connection with the operation of the Premises, including, without limitation, revenues deriving from the sale or use of all: rooms at the Hotel, food, liquor, soft drinks or other beverages, rentals or agreements for other guest services, vending machines, telephone, television, video and internet access, banquet and conference facilities and services, concessions, rental or other payments for lessees, sublessees, licensees or concessionaires, from retail or other space uses, interest on accounts, gifts, laundry, tours, transportation, valet and cigars, cigarettes, candy or merchandise, sold or furnished in, at, or from the Premises. The calculation of all types of revenue shall be determined on the accrual method of accounting in accordance with generally accepted accounting principles consistently applied and the most recent edition of the Uniform Systems of Accounts for the Lodging Industry, as published by the American Hotel & Lodging Educational Institute (the "**Uniform System**"), and shall include sales made on a cash basis or on credit, but shall exclude the following items:

(1)    Federal, state and municipal excise taxes and sales taxes paid by customers in connection with goods, merchandise or services purchased by them to the extent that such taxes are separately levied, whether or not itemized on the customer's bill or checks;

(2)    Service charges or gratuities paid directly to employees or, if separately itemized, included in package prices on the customer's bill or check;

(3)    All applicable room, excise, sales and use taxes or similar government charges collected directly from guests of the hotel located on the Premises;

(4)    Revenues from the sale or financing (or refinancing) of all or any part of the operating inventory or surplus items other than in the ordinary course of business;

(5)    Allowances and deductions in determining the sum of "Total Operating Revenue" as provided by the Uniform System, by whatever name it may be called;

(6)    Credits and refunds made to customers with respect to transactions otherwise included in Gross Revenues or other "deemed revenue" in respect of guest rooms and/or food, beverages, goods and/or services offered on a complimentary or discounted basis except to the extent actual revenue is received (for the avoidance of doubt, the actual revenue received on discounted guest rooms and/or food, beverages, goods and/or services shall form part of Gross Revenue);

(7)    Any initial working capital provided under the Management Agreement; and

5

(8)    Rent or any other revenue or income received by Tenant from any areas of the Premises operated by a third party.

All Gross Revenues shall be gross and shall not be netted against the Premises' costs of sales. To the extent Tenant receives any Gross Revenues, such Gross Revenues are subject to any cash management requirements set forth in the Security Documents.

(d)    As used herein, "**Fair Market Rental**" means the Base+Percentage Rent (i.e., Base Rent and Percentage Rent based upon the applicable Percentage Rent Percentage) which a willing tenant (who is not compelled to rent) would pay a willing landlord (who is not compelled to lease) to lease the Premises pursuant to this Lease for the Term (or for the portion remaining in the Term if determining the Fair Market Rental under Section 2.2(b) below), (i) assuming that Tenant is not in Default (as defined in Section 13.1) under this Lease, and (ii) taking into account the other terms and conditions of this Lease. For purposes of this Section 2.1 and Section 2.2(b) below, the Fair Market Rental shall be determined by Tenant, Landlord and the REITs (as defined in Section 2.6) pursuant to a transfer pricing analysis performed by a national accounting firm approved by mutual agreement of Landlord, Tenant and the REITs. Accordingly, unless otherwise agreed to by mutual agreement of Landlord, Tenant and the REITs, this provision calling for determination of the Fair Market Rental shall be specifically enforceable to the extent such remedy is available under applicable Law (as defined in Section 7.1), and any determination hereunder shall be final and binding upon Landlord, Tenant and the REITs except as otherwise provided by applicable Law. Promptly upon request by any of Landlord, Tenant or a REIT, Landlord, Tenant and the REITs shall execute a confirmation letter memorializing the Base+Percentage Rent determined pursuant to this Section 2.1(d). Notwithstanding anything to the contrary set forth herein, in no event shall the determination of Fair Market Rental cause any Rent to fail to qualify as "rents from real property" within the meaning of Code Section 856(d).

2.2    **CPI Increases; Rent Reset**.

(a)    The Base Rent shall be increased on (i) March 1, 2026, to $1,291,666.66 per month, and (ii) March 1, 2027, to $1,333,333.33 per month.

(b)    At the expiration of the third (3rd) Lease Year, the Base+Percentage Rent (i.e., Base Rent, Percentage Rent and the applicable Percentage Rent Percentage) shall be adjusted, if necessary, to Fair Market Rental. Additionally, if Tenant makes any change in the operation of the Hotel that would result in a significant increase or decrease in the aggregate amounts of Gross Revenues, Room Revenues, Food and Beverage Revenues and Other Revenues, Landlord and Tenant agree to amend the Base+Percentage Rent to Fair Market Rental. For purposes of this Section 2.2(b), the Fair Market Rental shall be determined in accordance with the process set forth in Section 2.1(d) or otherwise by mutual agreement of the parties in such other manner as shall be mutually acceptable.

2.3    **Additional Rent**.

(a)    All payments (whether or not specifically denoted as such) to be made by Tenant to Landlord pursuant to the provisions of this Lease in addition to Base+Percentage Rent

6

shall constitute "**Additional Rent**." Base+Percentage Rent and Additional Rent are sometimes referred to herein collectively as "**Rent**."

(b)    All Rent is payable to an account designated by Landlord. Any amount payable hereunder which shall not have been paid within ten (10) days after the date on which the same shall become due and payable shall bear interest at a rate equal to ten percent (10%) per annum, compounded monthly, but in no event in excess of the maximum rate permitted by applicable Law.

2.4    **Personal Property Limitation**. Anything contained in this Lease to the contrary notwithstanding, rent attributable to personalty for any calendar year (pro-rated for any partial calendar years in the Term) shall not exceed fifteen percent (15%) of the total rent payable under this Lease for such calendar year (pro-rated for any partial calendar years in the Term), as determined under Section 856(d)(1)(C) of the Internal Revenue Code of 1986, as amended, including without limitation any regulations or interpretation with respect thereto (collectively the "**Code**"), which shall be the ratio of the average of the fair market values of the personalty as of the beginning and end of each calendar year to the average of the aggregate fair market values of the personalty and the realty leased under this Lease as of such dates (the "**Personal Property Limitation**"). Landlord and Tenant shall at all times cooperate in good faith and use their best efforts to permit Landlord to comply with the Personal Property Limitation. All such compliance shall be effected in a manner which has no material net economic detriment to Tenant and will not cause the Landlord's gross income to consist of more than five percent (5%) of income not described in Section 856(c)(2) of the Code or more than twenty percent (20%) of income not described in Section 856(c)(3) of the Code. This Section 2.4 is intended to ensure that the rents attributable to personal property qualify as rents from real property within the meaning of Section 856(d) of the Code, and the regulations prescribed thereunder, or any similar or successor provisions thereto, and shall be interpreted in a manner consistent with such intent.

2.5    **Sublease Rent Limitation**. If Landlord consents to the sublet of the Premises pursuant to Section 11, Tenant shall not sublet the Premises on any basis such that the rental or other amounts to be paid by the sublessee thereunder would be based, in whole or in part, on (a) the net income or profits derived by the business activities of the sublessee, (b) a sublessee in which a REIT owns, directly or indirectly, a 10% or more interest, within the meaning of Section 856(d)(2)(B) of the Code and taking into account the constructive ownership rules of Section 856(d)(5) of the Code, or (c) any other formula such that any portion of the Rent would fail to qualify as "rents from real property" within the meaning of Code Section 856(d), or any similar or successor provision thereto.

2.6    **REIT Requirements**. Tenant agrees, and agrees to use best efforts to cause its Affiliates (as defined in Section 5.5), to use best efforts to permit Sections 2.4-2.6 and Section 3.1 of this Lease (the "**REIT Requirements**") to be satisfied and to cooperate in good faith with Landlord and Landlord's and Tenant's indirect owners, Corten Real Estate Fund II TIER LLC, a Delaware limited liability company (the "**Corten REIT**") and AREPIII Property Trust, LLC, a Delaware limited liability company (the "**Arden REIT**" and, together with the Corten REIT, each, a "**REIT**" and collectively, the "**REITs**"), to ensure that the REIT Requirements are satisfied with respect to each REIT. Tenant agrees, and agrees to use best efforts to cause its Affiliates, upon request by Landlord and, where appropriate, at Tenant's expense, to take reasonable action

necessary to ensure compliance with the REIT Requirements. Immediately after becoming aware that the REIT Requirements are not, or will not be, satisfied, Tenant shall notify, or use best efforts to cause its Affiliates to notify, Landlord and the REITs of such noncompliance. In addition to the foregoing:

(a)    Tenant shall not (i) directly or indirectly operate or manage a "lodging facility" within the meaning of Section 856(d)(9)(D)(ii) of the Code or a "health care facility" within the meaning of Section 856(e)(6)(D)(ii) or (ii) directly or indirectly provide to any other person (under a franchise, license, or otherwise) rights to any brand name under which any lodging facility or health care facility is operated; provided, however, that Tenant may provide such rights to Manager (as defined in <u>Section 3.1</u>) to operate or manage a lodging facility as long as such rights are held by Tenant as a franchisee, licensee, or in a similar capacity and such lodging facility is either owned by Tenant or is leased to Tenant by Landlord or one of its Affiliates.

(b)    Tenant shall not, and shall not permit the Manager or any other person to, conduct any wagering activities at or in connection with any of the Premises.

(c)    Tenant shall cause the Manager to provide only customary amenities and facilities that are operated as part of, or associated with, the Hotel that are customary for other properties of a comparable size and class owned by other owners unrelated to Landlord, Tenant, the REITs and any of their subsidiaries.

2.7    **Rent Payable without Setoff**. Except as otherwise expressly provided herein, there shall be no deduction or setoff of any nature whatsoever from Rent payable under this Lease, by reason of (a) any damage to or destruction of the Premises or any portion thereof from whatever cause or any condemnation; (b) the lawful or unlawful prohibition of, or restriction upon, Tenant's use of the Premises, or any portion thereof, unless caused by Landlord or unless the same is a breach of warranty or covenant by Landlord; (c) any claim that Tenant may have against Landlord by reason of any default or breach of any warranty by Landlord under this Lease or any other agreement between Landlord and Tenant, or to which Landlord and Tenant are parties; (d) any bankruptcy, insolvency, reorganization, composition, readjustment, liquidation, dissolution, winding up or other proceedings affecting Landlord or any assignee or transferee of Landlord; or (e) for any other cause whether similar or dissimilar to any of the foregoing. Except as otherwise specifically provided in this Lease, Tenant hereby waives all rights arising from any occurrence whatsoever, which may now or hereafter be conferred upon it by law, to entitle Tenant to any abatement, reduction, suspension or deferment of the Rent or other sums payable or other obligations to be performed by Tenant hereunder. The obligations of each party hereunder shall be separate and independent covenants and agreements, and the Rent and all other sums payable by Tenant hereunder shall continue to be payable in all events unless the obligations to pay the same shall be terminated pursuant to the express provisions of this Lease.

3.    <u>**MANAGEMENT AGREEMENT; FRANCHISE AGREEMENT**</u>.

. Tenant shall not directly or indirectly operate the Hotel but rather shall retain, to operate the Hotel, an "eligible independent contractor" within the meaning of Code Section 865(d)(9)(A) (e.g., without limitation, such contractor must be actively engaged in the trade or business of operating "qualified lodging facilities" as defined in the Code for persons other than those that are related to

the Tenant or the Landlord). Tenant is a party to that certain Hotel Management Agreement, dated as of February 1, 2024, by and between Landlord and Highgate Hotels, L.P. ("**Manager**"), as the same has been assigned from Landlord to Tenant (as the same may be amended, restated, replaced, supplemented, or otherwise modified from time to time, the "**Management Agreement**"). Tenant shall not modify, amend or terminate the Management Agreement, or approve the hiring, termination or replacement of the general manager or director of sales for the Hotel, without Landlord's prior written consent in Landlord's sole and absolute discretion. Pursuant to the Management Agreement, Manager shall manage the Premises on the terms and conditions contained in the Management Agreement. Tenant shall at all times (i) comply with the terms and conditions in the Management Agreement, (ii) do all things necessary to preserve and keep unimpaired its material rights under the Management Agreement, and (iii) notify Landlord in writing of any default, alleged default, or event which with notice or the passage of time would constitute a default under the Management Agreement by either Tenant or Manager. Tenant covenants and agrees to cure any such default by Tenant under the Management Agreement within the time period set forth therein, and any such default by Tenant under the Management Agreement shall be and constitute a Default hereunder. In addition, Tenant hereby covenants and agrees to enforce all its rights and remedies under the Management Agreement against Manager.

3.2    **Franchise Agreement**. Tenant is a party to the Trademark Sub-License Agreement, dated as of March 21, 2018, by and between Tenant (as successor-in-interest to Landlord) and Margaritaville Resort of Times Square LLC ("**Franchisor**") (as the same may be amended, restated, replaced, supplemented, or otherwise modified from time to time, the "**Franchise Agreement**"). Tenant shall not modify, amend or terminate the Franchise Agreement without Landlord's prior written consent in Landlord's sole and absolute discretion. Pursuant to the Franchise Agreement, Tenant shall, or shall cause Manager to, operate the Premises on the terms and conditions contained in the Franchise Agreement. Tenant shall at all times (i) comply with or cause the terms and conditions contained in the Franchise Agreement to be complied with, (ii) do all things necessary to preserve and keep unimpaired its material rights under the Franchise Agreement, and (iii) notify Landlord in writing of any default, alleged default, or event that with notice or the passage of time would constitute a default under the Franchise Agreement by either Tenant or Franchisor. To the extent any of the provisions of the Franchise Agreement impose a greater obligation on Tenant than the corresponding provisions of this Lease, then Tenant shall be obligated to comply with, and to take all reasonable actions necessary to prevent breaches or defaults under, the provisions of the Franchise Agreement. Tenant covenants and agrees to cure or cause the cure of any such default by Tenant under any Franchise Agreement within the time period set forth therein. Any default by Tenant under the Franchise Agreement (beyond any applicable notice and cure periods) shall be and constitute a Default hereunder. In addition, Tenant hereby covenants and agrees to enforce all its rights and remedies under the Franchise Agreement against Franchisor. If the terms of this Lease conflict with the terms of the Franchise Agreement, the terms of the Franchise Agreement shall control.

4.    **TAXES**.

4.1    **Payment of Impositions**. Subject to the requirements of the Security Documents:

(a)    Tenant shall pay, or cause to be paid, all Impositions (as defined in Section 4.2) before any fine, penalty, interest or cost may be added for nonpayment. Tenant shall make

such payments directly to the taxing authorities where feasible, and promptly furnish to Landlord copies of official receipts or other satisfactory proof evidencing such payments. Tenant's obligation to pay Impositions shall be absolutely fixed upon the date such Impositions become a lien upon the Premises, any Alterations (defined in Section 8.2) or any part(s) thereof. If any Imposition may, at the option of the taxpayer, lawfully be paid in installments, whether or not interest shall accrue on the unpaid balance of such Imposition, Tenant may pay the same, and any accrued interest on the unpaid balance of such Imposition, in installments as the same respectively become due and before any fine, penalty, premium, further interest or cost may be added thereto.

(b)    Landlord shall prepare and file all tax returns and reports as may be required by applicable Law with respect to Landlord's net income, gross receipts, franchise taxes and taxes on its capital stock, and Tenant shall prepare and file all other tax returns and reports as may be required by applicable Law with respect to or relating to the Premises and all Alterations.

(c)    Any refund due from any taxing authority in respect of any Impositions paid by Tenant shall be paid over to or retained by Tenant if no Default shall have occurred hereunder and be continuing. Any other refund shall be paid over to or retained by Landlord and applied to the payment of Tenant's obligations under this Lease in such order of priority as Landlord shall determine.

(d)    Landlord and Tenant shall, upon request of the other, provide such data as is maintained by the party to whom the request is made with respect to the Premises as may be necessary to prepare any required returns and reports. If any property covered by this Lease is classified as personal property for tax purposes, Tenant shall file all personal property tax returns in such jurisdictions where it must legally so file. Landlord, to the extent it possesses the same, and Tenant, to the extent it possesses the same, shall provide the other party, upon request, with cost and depreciation records necessary for filing returns for any property so classified as personal property. Where Landlord is legally required to file personal property tax returns and to the extent practicable, Tenant shall be provided with copies of assessment notices indicating a value in excess of the reported value in sufficient time for Tenant to file a protest.

(e)    Tenant may, upon notice to Landlord, at Tenant's option and at Tenant's sole cost and expense, protest, appeal, or institute such other proceedings as Tenant may deem appropriate to effect a reduction of real estate or personal property assessments and Landlord, at Tenant's expense as aforesaid, shall reasonably cooperate with Tenant in such protest, appeal, or other action but at no cost or expense to Landlord. Billings for reimbursement by Tenant to Landlord of personal property or real property taxes shall be accompanied by copies of a bill therefor and payments thereof which identify the personal property or real property with respect to which such payments are made.

(f)    Landlord shall give prompt notice to Tenant of all Impositions payable by Tenant hereunder of which Landlord has knowledge, but Landlord's failure to give any such notice shall in no way diminish Tenant's obligations hereunder to pay such Impositions.

(g)    Impositions imposed or assessed in respect of the tax-fiscal period during which the Term commences or terminates shall be adjusted and prorated between Landlord and Tenant, whether or not such Imposition is imposed or assessed before or after such commencement

or termination, and Tenant's obligation to pay its prorated share thereof shall survive any such termination; provided, however, to the extent Tenant shall have received a credit for the prorated portion of any incurred or accrued taxes and assessments payable with respect to the Premises for any period prior to the Commencement Date, then Tenant shall be responsible for the timely payment of the same as and when due to the extent of the credit so received by Tenant.

4.2 **"Impositions" Defined**. As used herein, the term "**Impositions**" shall mean, collectively, all taxes, including capital stock, real estate, franchise gross margins and other state, municipal and local taxes of Landlord, ad valorem, sales, use, single business, gross receipts, transaction privilege, rent or similar taxes; assessments including assessments for public improvements or benefits, whether or not commenced or completed prior to the date hereof and whether or not to be completed within the Term; ground rents; water, sewer and other utility levies and charges; excise tax levies; fees including license, permit, inspection, authorization and similar fees; and all other governmental charges, in each case whether general or special, ordinary or extraordinary, or foreseen or unforeseen, of every character in respect of the Premises, any Alterations and/or the Rent and all interest and penalties thereon attributable to any failure in payment by Tenant which at any time prior to, during or in respect of the Term hereof may be assessed or imposed on or in respect of or be a lien upon (i) Landlord or Landlord's interest in the Premises, (ii) the Premises or any parts thereof or any rent therefrom or any estate, right, title or interest therein, or (iii) any occupancy, operation, use or possession of, or sales from or activity conducted on or in connection with the Premises or the leasing or use of the Premises or any parts thereof; provided, however, nothing contained in this Lease shall be construed to require Tenant to pay (a) any tax calculated based on net income or net revenue (whether denominated as a franchise or capital stock or other tax) imposed on Landlord or any other Person, (b) any transfer tax of Landlord or any other Person except Tenant and its successors, (c) any tax imposed with respect to the sale, exchange or other disposition by Landlord of the Land, the Premises or the proceeds thereof, or (d) except as expressly provided elsewhere in this Lease, any principal or interest on any indebtedness on the Land for which Landlord is the obligor.

5. **INSURANCE, LIABILITY AND INDEMNITY**.

5.1 **Tenant's Insurance**. Tenant or Manager shall maintain in full force and effect at all times during the Term, at their own expense for the protection of Tenant and Landlord as their interests may appear, policies of insurance (a) as required by the Management Agreement, the Franchise Agreement, any reciprocal easement agreement and/or conditions, covenants, and restrictions now or in the future effecting the Premises (individually and/or collectively as the context may require, the "**Master Project Documents**") and any Security Documents (as defined in Section 12.1) and (b) which afford the following minimum coverages:

(a) Worker's Compensation. Tenant shall cause Manager to obtain, maintain and keep in force Worker's Compensation and Employer's Liability Insurance for employees, if any, of Manager who are employed at the Premises, in form and amount as required by applicable Law;

(b) Umbrella. Tenant or Manager shall obtain, maintain and keep in force a policy providing excess umbrella liability coverage of no less than is required by the Management Agreement, the Franchise Agreement and the Security Documents;

(c)    Casualty. Tenant or Manager shall obtain, maintain and keep in force insurance casualty insurance policies covering loss or damage to the Premises, including, without limitation, Alterations and Hotel Personalty, including replacements thereof, and all other property at the Premises owned by Landlord, in such amounts and form as Landlord reasonably determines prudent; and

(d)    Business Interruption. Tenant or Manager shall carry, maintain and keep in force insurance for business interruption on such terms as shall be reasonably satisfactory to Landlord, but in any event with coverage for not less than twelve (12) months.

5.2    **Tenant Insurance Particulars**. All insurance policies required to be obtained by Tenant or Manager pursuant to the provisions of Section 5.1 (a) shall be maintained with responsible and solvent insurance companies reasonably acceptable to Landlord which are licensed to do business in the state in which the Premises is located, (b) shall be written as primary policies, not contributing with, and not in excess of, any insurance coverage which may be carried by Landlord, (c) shall name Landlord, and any other parties designated by Landlord as additional insureds (except for workers' compensation insurance), (d) shall contain language or bear endorsements that such policy or policies shall not lapse, or be subject to cancellation, material alteration, or reduction of coverage without giving Landlord thirty (30) days' prior written notice thereof, and (e) shall satisfy all applicable requirements of the Management Agreement, the Franchise Agreement, the Master Project Documents and the Security Documents. Tenant or Manager shall deliver to Landlord within three (3) business days after execution of this Lease an insurance certificate evidencing such insurance coverage as is first required to be carried by Tenant, and thereafter shall provide at least twenty (20) days prior to expiration of each such policy, certificates of insurance evidencing the coverage required hereunder with limits not less than those specified above.

5.3    **Tenant Shall Provide Adequate Coverage**. Landlord disclaims any representation that the insurance coverage required to be carried by Tenant pursuant to Section 5.1 is adequate to protect Tenant against Tenant's undertaking under the terms of this Lease or otherwise, and in the event (a) Tenant believes that any such insurance coverage called for under this Lease is insufficient or (b) the insurance coverage required by this Lease is insufficient to meet the requirements of the Management Agreement and the Franchise Agreement, Tenant shall provide, at its own expense, such additional insurance as Tenant deems or as is adequate or necessary, respectively.

5.4    **Waiver of Subrogation**. Notwithstanding anything to the contrary in this Agreement, each of Landlord and Tenant hereby releases the other and waives any and all rights of recovery against the other, and against the Affiliates, officers, directors, employees, agents, and representatives of the other, for loss of or damage to such waiving party or its property or the property of other under its control to the extent that the nature of the loss or damage is covered by the insurance which is required by this Section 5 to be obtained or by any other valid and collectible insurance policy in force at the time of such loss or damage. The foregoing shall apply to losses arising in, on, or about the Premises, including losses to property of every description including both real and personal property, whether due to the negligence of any of said parties, their agents or employees or otherwise. Each of the foregoing waivers and agreements shall extend to and be binding upon the insurance companies, their representatives, successors, heirs, administrators and

assigns of the parties hereto. Each policy of property damage insurance obtained by Landlord or Tenant with respect to the Premises shall include a clause or endorsement denying the insurer any rights of subrogation against the other party.

5.5    **Non-Liability of Landlord**. Landlord shall not be liable to Tenant and Tenant hereby waives all claims against Landlord and its shareholders, partners, members, managers, officers, trustees, affiliates, directors, employees, contractors, agents, and representatives (collectively, "**Affiliates**") for any injury or damage to any person or property occurring or incurred in connection with or in any way relating to the Premises, from any cause; provided, however, that the foregoing shall not apply to the extent any such injury or damage to any person or property results from any gross negligence or willful misconduct by Landlord or its Affiliates, except to the extent otherwise covered by insurance required to be carried by Tenant under Section 5.1 or otherwise carried by Tenant. Without limiting the foregoing, neither Landlord nor any of its Affiliates shall be liable for and there shall be no abatement of Percentage Rent for (i) any damage to Tenant's property stored with or entrusted to Affiliates of Landlord, (ii) loss of or damage to any property by theft or any other wrongful or illegal act, (iii) any injury or damage to persons or property resulting from fire, explosion, falling plaster, steam, gas, electricity, water, or rain which may leak from any part of the Premises or from the pipes, appliances, appurtenances, or plumbing works therein or from the roof, street, or sub-surface or from any other place or resulting from dampness or any other cause whatsoever or from the acts or omissions of other tenants, occupants, or other visitors to the Premises or from any other cause whatsoever, (iv) any criminal activity in or about the Premises, or (v) any diminution or shutting off of light, air, or view by any structure which may be erected on lands adjacent to the Premises. Tenant shall give prompt notice to Landlord in the event of (A) the occurrence of a fire, accident, or casualty in the Premises, or (B) the discovery of any defect therein or in the fixtures or equipment thereof, or (C) the receipt of any notice that the Premises, or any part thereof, is not in compliance with applicable Laws. For purposes of this Lease, Tenant shall not be deemed to be an Affiliate of Landlord.

5.6    **Indemnification of Landlord**. Tenant shall indemnify, defend (with legal counsel reasonably approved by Landlord), protect, and hold Landlord and Landlord's Affiliates harmless from and against any and all causes of action, claims, suits, judgments, losses, costs, obligations, damages, expenses, interest, and liabilities, including, without limitation, reasonable attorneys' fees, for any injury or damage to any person or property whatsoever (collectively, "**Liabilities**") arising out of or in connection with this Lease, the Premises, the Management Agreement, the Franchise Agreement or Tenant's activities in the Premises, including, without limitation, when such injury or damage has been caused in whole or in part by the act, negligence, fault, or omission of Tenant, its agents, servants, contractors, employees, representatives, licensees, or invitees; provided, however, that the foregoing shall not apply to the extent any such Liabilities result from any gross negligence or willful misconduct by Landlord or its Affiliates, except to the extent covered by the insurance to be provided by Tenant pursuant to Section 5.1 or otherwise carried by Tenant. Without limiting the foregoing, Tenant shall reimburse Landlord for all expenses, damages, and fines incurred or suffered by Landlord by reason of any uncured breach, violation, or non-performance by Tenant, its agents, servants, or employees, of any covenant as provision of this Lease, or by reason of damage to persons or property caused by moving property of or for Tenant in or out of the Premises, or by the installation or removal of furniture or other property, or by reason of carelessness, negligence, or improper conduct of Tenant or its agents, employees,

13

or servants in the use or occupancy of the Premises. The provisions of this <u>Section 5.6</u> shall survive the expiration or earlier termination of this Lease.

     5.7    **Indemnification of Tenant**. Landlord shall indemnify, defend (with legal counsel reasonably approved by Tenant), protect, and hold Tenant harmless from and against any and all Liabilities to the extent arising out of or in connection with any gross negligence or willful misconduct by Landlord or its Affiliates, except to the extent covered by the insurance to be provided by Tenant pursuant to <u>Section 5.1</u> or otherwise carried by Tenant; provided, however, that the foregoing shall not apply to the extent any such Liabilities result from any (a) gross negligence or willful misconduct by Tenant or its Affiliates, or (b) breach of Tenant's obligations hereunder. The provisions of this <u>Section 5.7</u> shall survive the expiration or earlier termination of this Lease.

6.    **UTILITIES**. Tenant shall be solely responsible for, and shall promptly pay directly to the utility or service provider the cost (including connection and other charges), of all heat, air conditioning, water, gas, electrical, light, power, sewer charges, telephone service, and all other services and utilities supplied to the Premises, together with any taxes thereon.

7.    **OPERATION**.

     7.1    **General**. Tenant, for itself, Manager (pursuant to the Management Agreement) and their subtenants, agrees:

     (a)    not to cause, permit or suffer any nuisance or waste to or of the Premises;

     (b)    to comply with (i) all applicable federal, state, county, municipal, and other statutes, laws, ordinances, rules, regulations, and orders, including, without limitation, all laws relating to the physical condition of the Premises, such as the Americans With Disabilities Act (or any similar legislation), and any law regarding the fire or life safety systems of the Premises (herein, "**Laws**") now or in the future affecting the Premises and Tenant's (or Manager's) use and operation therein from and after the Lease Commencement Date and each and all of the provisions of this Lease, (ii) any policies of insurance now or in the future in effect pursuant to this Lease, or otherwise held by Landlord or Tenant, (iii) the Management Agreement, (iv) the Franchise Agreement, (v) the Security Documents, (vi) the Master Project Documents, and (vii) without duplication, any easements or other encumbrances now or in the future affecting the Premises;

     (c)    not to take, permit, or suffer any action or thing which would in any way (i) increase the rates of any policy of insurance now or in the future affecting the Premises, (ii) subject Landlord, its other tenants, assignees or subtenants, or their employees or agents, to any liability for injury to person or property as a result thereof, or (iii) violate the certificates of occupancy issued for the Premises; and

     (d)    to continuously cause the Premises to be used for the uses intended under this Lease for the entire term hereof.

7.2    **Hazardous Materials**.

(a)    <u>Definition</u>. As used herein, the term "**Hazardous Material**" means any hazardous or toxic substance, material or waste which is or becomes regulated by any local governmental authority, the state in which the Premises are located or the United States Government, including, without limitation, any material or substance which is (a) defined or listed as a "hazardous waste," "extremely hazardous waste," "restricted hazardous waste," "hazardous substance," or "hazardous material" under any applicable federal, state, or local Laws or administrative code promulgated thereunder, (b) petroleum or a petroleum derivative, (c) asbestos or an asbestos derivative, (d) flammable explosive, (e) radioactive material, (f) a polychlorinated biphenyl, (g) urea formaldehyde, or (h) radon gas.

(b)    <u>Compliance with Laws</u>.

(i)    Tenant hereby agrees that all operations or activities upon, or any use or occupancy of the Premises, or any part thereof, by Tenant, its assignees, subtenants, and their respective permittees, throughout the Term of this Lease, shall be in all respects in compliance with all Laws then governing or in any way relating to the generation, handling, manufacturing, treatment, storage, use, transportation, release, spillage, leakage, dumping, discharge, or disposal of any Hazardous Material.

(ii)    Subject to <u>Sections 7.2(b)(i)</u> and <u>7.2.(c)(i)</u> and the proviso in this sentence, Landlord shall be solely responsible for all cost and expense arising from the presence, suspected presence, release or suspected release of any Hazardous Material in or into the air, soil, surface water or ground water, or any portion thereof, at, on, about, under or within the Premises, including any costs of investigation or remediation; <u>provided</u>, <u>however</u>, that Tenant shall be solely responsible for all cost and expense arising from the presence, suspected presence, release or suspected release of any Hazardous Material in or into the air, soil, surface water or ground water, or any portion thereof, at, on, about, under or within the Premises, including any costs of investigation or remediation, if and to the extent caused by the gross negligence, intentional act or willful misconduct of Tenant.

(c)    <u>Indemnification</u>.

(i)    Tenant agrees to indemnify, defend (with legal counsel reasonably approved by Landlord), and hold Landlord and its Affiliates harmless from any and all claims, actions, administrative proceedings (including informal proceedings), judgments, damages, punitive damages, penalties, fines, costs, liabilities, interest, and losses, including reasonable attorneys' fees and expenses, consultant fees, and expert fees, together with all other costs and expenses of any kind or nature that arise during or after the Term directly or indirectly from or in connection with the presence, suspected presence, release or suspected release, of any Hazardous Material in or into the air, soil, surface water, or groundwater, or any portion thereof, at, on, about, under, or within the Premises, caused in whole or in part by Tenant's breach of <u>Section 7.2(b)(i)</u> or by the gross negligence, intentional act or willful misconduct of Tenant.

(ii)    Landlord agrees to indemnify, defend (with legal counsel reasonably approved by Tenant), and hold Tenant harmless from any and all claims, actions,

administrative proceedings (including informal proceedings), judgments, damages, punitive damages, penalties, fines, costs, liabilities, interest, and losses, including reasonable attorneys' fees and expenses, consultant fees, and expert fees, together with all other costs and expenses of any kind or nature that arise during or after the Term directly or indirectly from or in connection with the presence, suspected presence, release or suspected release, of any Hazardous Material in or into the air, soil, surface water, or groundwater, or any portion thereof, at, on, about, under, or within the Premises, caused in whole or in part by Landlord's breach of <u>Section 7.2(b)(ii)</u>.

      (d)    <u>Survival</u>. Each of the covenants and agreements of Tenant and Landlord set forth in this <u>Section 7.2</u> shall survive the expiration or earlier termination of this Lease.

      7.3    **<u>Use</u>**. Tenant and all parties holding under or through Tenant shall cause the Premises to be used solely for hotel, convention, food service, and office purposes and uses incidental and related thereto in accordance with the certificate of occupancy issued with respect to the Premises, but for no other purpose whatsoever.

      7.4    **<u>Books and Records</u>**. Tenant shall maintain or cause to be maintained by Manager accurate and complete books and records for the Hotel, including the books of account, guest records, front office records and general records of the Hotel, showing the assets and liabilities, operations, transactions and financial condition of Tenant and the Hotel on an accrual basis in accordance with GAAP. All such books and records shall be maintained at the Premises or at the principal business office of Tenant or Manager during the Term and, upon the Expiration Date, shall be delivered to Landlord, subject to Tenant's continuing right to review such books and records and to make copies or extracts of the same. Landlord shall keep such books and records for five (5) years after the expiration or earlier termination of this Lease. Landlord, any of its members or their designees or representatives shall have access to such books and records at the office of Tenant or Manager during regular business hours during the Term and shall have the right, at Landlord's expense, to make copies or extracts thereof.

      (a)    <u>Percentage Rent Records</u>. Tenant covenants that, for the purposes of ascertaining the amount payable to Landlord as Percentage Rent, Tenant shall keep or caused to be kept by Manager books of account and other records in which full, true and correct entries will be made of all financial dealings and actions in relation to the business and affairs of the Hotel in accordance with generally accepted accounting principles, consistently applied, and will preserve such records and books of account throughout the Term.

      (b)    <u>Furnishing Financial Information to Landlord</u>. Tenant shall, as and when received (or required to be received), furnish to Landlord copies of the financial statements and reports furnished (or required to be furnished) by Manager to Tenant pursuant to the terms of the Management Agreement. In addition, if not furnished pursuant to the immediately preceding sentence, Tenant shall furnish to Landlord, as and when required pursuant to the terms of any Security Document, any and all operating statements, financial statements, balance sheets, budgets and reports regarding the Premises, including the Hotel, that are required under such Security Document.

8.    **MAINTENANCE, REPAIRS, AND ALTERATIONS TO THE PREMISES**.

8.1    **Tenant's Maintenance and Repair Obligations**. Subject to the Master Project Documents, Tenant shall be directly responsible for, and shall pay all expenses, costs, and amounts of every kind and nature (collectively, the "**Operating Expenses**") incurred in connection with, the management, maintenance, repair, replacement, restoration and operation of the Premises and all Hotel Personalty in accordance with, and subject to, the requirements of the Franchise Agreement, the Management Agreement, and the Security Documents, including, without limitation, payment of all charges and assessments allocable to or assessed against the Premises under the Master Project Documents and any amounts arising out of or related to (a) general maintenance and repairs, cleaning, sweeping, and other janitorial services; (b) maintaining the Premises in a neat, clean, and orderly condition and in good repair; (c) the cost of supplying all utilities, the cost of operating, maintaining, repairing, replacing, renovating, and managing the utility systems, lighting systems, mechanical systems, fire protection and safety systems, sprinkler systems, sanitary and storm drainage systems, the heating, ventilation, and air conditioning systems communication systems, and escalator and elevator systems, and the cost of supplies, tools, equipment, and maintenance and service contracts in connection therewith; (d) the cost of maintaining, repairing, replacing, and renovating sidewalks and curbs; (e) gardening, including planting and replanting landscaping; (f) the cost of parking area repair, restoration, and maintenance, including but not limited to, resurfacing, repainting, restriping, and cleaning; (g) the repair and maintenance of all aspects of the Premises shell and core (including, without limitation, the roof, exterior walls and skin, bearing walls, structural condition of interior walls, support beams, floor slabs, foundation, support columns, windows, window frames and all exterior glass surfaces); (h) any parking charges, utilities surcharges, or any other costs levied, assessed, or imposed by, or at the direction of, or resulting from, statutes or regulations, or interpretations thereof, promulgated by any governmental authority in connection with the use or occupancy of the Premises or any part thereof; and (i) the cost of licenses, certificates, permits, and inspections, and the cost of contesting the validity or applicability of any governmental enactments which may affect Operating Expenses.

8.2    **Alterations**. Subject to the Franchise Agreement, the Security Documents and Landlord's rights of approval hereunder, Tenant shall have the right at its own expense from time to time to redecorate and renovate the Premises and to make such other alterations, improvements, installations and changes (collectively, "**Alterations**") in the Premises and such parts thereof as Tenant shall deem expedient or necessary for its purposes; provided, however, that Tenant shall not be entitled to make any Alterations to the Premises that are not permitted under the Franchise Agreement or the Security Documents without Franchisor's or Lender's consent, without Landlord's prior approval, which approval may be withheld in Landlord's sole and absolute discretion (but shall not be unreasonably withheld, conditioned or delayed if Franchisor and Lender are required under the terms of the Franchise Agreement and Security Documents, as applicable, to not unreasonably withhold their consent). Any Alterations to the Premises shall be done in good and workmanlike manner, and in accordance with the Franchise Agreement, the Security Documents and all applicable Laws.

8.3    **Mechanic's Liens**. Tenant agrees (a) that it will promptly pay (unless contested in good faith and the other criteria set forth in this Section 8.3 and the Security Documents are satisfied) for all costs of Alterations or other work done or permitted by it or caused to be done by

17

it in or about the Premises, (b) that it will keep the Premises free and clear of any liens arising out of any such Alterations or otherwise, and (c) that should any such lien be made or filed against the Premises on account of such Alterations or other work done or permitted by Tenant, Tenant shall, at its sole cost and expense, bond against (in a form and issued by a surety acceptable to Landlord) or discharge such lien within twenty (20) days after its receipt of written request to do so by Landlord take such other action as is required under the Security Documents.

8.4    **Failure**. In the event that Tenant fails, refuses, or neglects, following reasonable notice from Landlord (a) to commence and complete repairs promptly and adequately, (b) to remove any liens or pay any costs and expenses, (c) to reimburse Landlord, or (d) to otherwise perform any act or fulfill any obligation required of Tenant pursuant to this Section 8, Landlord may, at its option and following reasonable advance notice to Tenant (but in all events, subject to the terms and provisions of the Franchise Agreement and the Security Documents), make or complete any such repairs, remove any such lien, pay such costs and expenses, or perform such act, or the like, at the sole cost and expense of Tenant. Tenant agrees to reimburse Landlord for all costs and expenses of Landlord thereby incurred upon demand after Tenant's receipt of a statement from Landlord setting forth the amount of such costs and expenses. The failure by Tenant to so make repairs, to remove any lien, to pay any costs or expenses, or to so reimburse Landlord, shall constitute a material Default by Tenant under this Lease and shall carry with it the same consequences as the failure to pay any installment of Rent. Landlord's rights and remedies pursuant to this Section 8 shall be in addition to any and all other rights and remedies provided under this Lease or by applicable Law.

8.5    **Title**. All right, title, and interest in and to the Premises and any Alterations shall be held and retained by Landlord and shall be free and clear of any claim or interest of Tenant upon the expiration or earlier termination of this Lease. Tenant shall not waste, destroy, or remove any improvements, fixtures, or other property affixed to the Premises without the prior written consent of Landlord, which consent shall not be unreasonably withheld.

8.6    **Surrender**. On the Expiration Date or any earlier termination of this Lease, Tenant shall, at its sole cost and expense, excepting reasonable wear and tear, promptly, peaceably and quietly surrender up and deliver possession of the Premises to Landlord in a "broom clean" condition and with only those improvements approved by Landlord pursuant hereto. Upon the termination of this Lease for any reason, Tenant shall reasonably cooperate for thirty (30) days with any successor tenant or owner of the Hotel upon the expiration or termination of this Lease to effect a smooth and efficient transition in the operation of the Hotel.

9.    **CASUALTY**.

9.1    **Restoration**. Subject to the requirements of any Security Documents, the Master Project Documents and the Franchise Agreement, in the event the Premises are damaged by fire or other peril, Tenant shall assign to Landlord (or to any party designated by Landlord) all insurance proceeds payable to Tenant under Tenant's insurance required under this Lease. If the proceeds therefrom are sufficient to cover Landlord's costs, Landlord shall, subject to then existing Laws and covenants, conditions, and restrictions then applicable as well as any Security Documents, the Master Project Documents and the Franchise Agreement, repair, reconstruct, and restore the Premises (but not any tenant improvements, alterations, or personal property of Tenant)

(collectively, "**Restore**" or "**Restoration**") with reasonable promptness to a condition reasonably equivalent to its condition immediately prior to such damage, and this Lease shall remain in full force and effect.

9.2    **Termination; Uninsured Casualty**. In the event the Premises are damaged as a result of any cause other than the perils fully covered by insurance, then, subject to the requirements of any Security Documents, the Master Project Documents and the Franchise Agreement, Landlord shall have no obligation to Restore the same. If Landlord agrees to Restore the Premises stemming from an uninsured loss and the Restoration of the Premises is anticipated to take in excess of one (1) year, then (subject to the terms and provisions of the Security Documents and the Franchise Agreement) either Landlord or Tenant shall have the option to give notice to the other, at any time prior to commencement of Restoration, terminating this Lease as of the date specified in such notice, which date shall be no more than thirty (30) days after the giving of such notice. In the event such notice is given, this Lease shall expire and all interest of Tenant in and to the Premises shall terminate on the date specified in such notice. If this Lease is terminated pursuant to this Section 9.2, all insurance proceeds (if any) shall be paid to Landlord (subject to the requirements of any Security Documents) free of any claim or interest therein whatsoever of Tenant.

10.    **CONDEMNATION**.

10.1    **Definitions**. Condemnation ("**Condemnation**") shall be defined as (a) the taking of all or any portion of the Premises through the exercise of any governmental power of condemnation or eminent domain whether by legal proceedings or otherwise, by any public or quasi-public authority, private corporation, entity, or individual having the power of condemnation or eminent domain ("**Condemnor**"), or (b) any voluntary sale or transfer by Landlord, either under the threat of Condemnation or while Condemnation proceedings are pending. Total condemnation ("**Total Condemnation**") shall be defined as the Condemnation of the Premises. Partial condemnation ("**Partial Condemnation**") shall be defined as any Condemnation that does not constitute a Total Condemnation. Condemnation date ("**Condemnation Date**") shall be defined as the earlier of (i) the date when possession of that portion of the Premises subject to Condemnation is taken by the Condemnor, or (ii) the date when title to that portion of the Premises subject to Condemnation vests in the Condemnor or its nominee. Award ("**Award**") shall be defined as all compensation awarded, paid, or received in connection with a Condemnation.

10.2    **Total Condemnation**. In the event of a Total Condemnation, this Lease shall terminate as of the Condemnation Date.

10.3    **Partial Condemnation**. In the event of any Partial Condemnation affecting the Premises, either party shall have the option to terminate this Lease, exercisable upon thirty (30) days' prior written notice delivered to the other at any time within thirty (30) days after the Condemnation Date. In the event the Lease is not so terminated, upon Condemnation Landlord shall, subject to the requirements of any Security Documents, the Master Project Documents and the Franchise Agreement, forthwith Restore the Premises irrespective of whether the Award shall be sufficient for such purpose.

10.4    **Allocation of Award**. Subject to the requirements of any Security Documents, the Master Project Documents and the Franchise Agreement, the entire Award made as a result of any Condemnation shall belong solely to, and shall be the sole property of, Landlord, whether such Award shall be as compensation for diminution in value of this Lease, for the value of any unexpired portion of the Term, or as compensation for the fee or for the Premises, and Tenant shall have no claim against either Landlord or the Condemnor with respect thereto. Tenant does hereby covenant and agree, upon the request of Landlord, to execute an assignment of any Award in substance consistent with the provisions of this Section 10.4.

## 11.    **ASSIGNMENT AND SUBLETTING**.

Tenant shall not assign, transfer, mortgage, hypothecate, or encumber, by operation of law or otherwise, this Lease, or any of Tenant's interest herein or hereto, nor sublet the Premises, or any portion thereof, nor grant any license or right of use or occupancy with respect to the Premises, without the prior written consent of Landlord, which consent may be granted or withheld in Landlord's sole discretion.

## 12.    **SUBORDINATION**.

12.1    **Subordination**. Tenant, for itself and its assignees and subtenants, hereby agrees, without the necessity of any further consideration or action, that all of its right, title, and interest in and to this Lease is and shall be in all respects subject, subordinate and inferior to the lien, security interests and all other rights and interest created or to be created by any first mortgage, deed of trust or deed to secure debt now or hereafter encumbering the Premises (herein, "**Mortgage**") or any portion thereof including any such Mortgages given pursuant to the terms of any loan agreement, and related loan documents (together with all modifications, renewals, extensions, consolidations, and replacements thereof, collectively, the "**Security Documents**") and to all indebtedness evidenced or secured thereby and all advances made or hereafter to be made upon the security of the Security Documents. Tenant, for itself and its assignees and subtenants, shall from time to time within ten (10) business days after Landlord and any mortgagee, beneficiary, or beneficiaries provides Tenant with a written request to do so, execute and deliver to Landlord such documents and take such further action as Landlord or such mortgagee, beneficiary, or beneficiaries may reasonably request to confirm such subordination, but the failure of Tenant to execute and deliver such documents and to take such further reasonable action shall not in any manner affect, impair or condition the subordination provided by Tenant in the first sentence of this Section 12.1, such subordination being automatic and complete in all respects. Landlord is hereby irrevocably appointed and authorized as agent and attorney-in-fact of Tenant to execute and deliver all such subordination instruments in the event that Tenant fails to execute and deliver said instruments in a timely fashion. Tenant also agrees that any mortgagee or beneficiary may elect to have this Lease constitute a lien prior to its Mortgage, and in the event of such election and upon notification by such mortgagee or beneficiary to Tenant to that effect, this Lease shall be deemed a prior lien to such Mortgage, whether this Lease is dated prior to or subsequent to the date of said Mortgage.

12.2    **Estoppel Certificates**. Tenant, for itself and its assignees and subtenants, agrees to execute, acknowledge, and deliver to Landlord, from time to time during the Term and within ten (10) business days after Landlord provides Tenant with written notice to do so, an estoppel

certificate certifying in writing to those facts for which certification has been requested, including, without limitation, (a) that this Lease is in full force and effect, unmodified or modified solely as set forth in such estoppel certificate, including, without limitation, a confirmation of the Lease Commencement Date and the Expiration Date of this Lease, (b) the dates to which Rent and other charges hereunder have been paid, (c) that Landlord has, as of the date of such estoppel certificate, to the best of Tenant's knowledge, fully performed all of its obligations under this Lease, without exception or except only as set forth in such estoppel certificate, and (d) that any such estoppel certificate may be relied upon by Landlord and any prospective purchaser or encumbrancer of the Premises.

12.3    **Termination**. In any case in which (a) Landlord's possession or control of the Premises is surrendered or terminated or (b) any Lender (as defined in Section 14.19) takes over control of Landlord, Landlord's interest in this Lease, and/or the Premises, or requires the termination of this Lease, in each case in connection with any enforcement of the rights or remedies of any Lender under the Security Documents, whether by receivership, mortgagee-in-possession, sale upon foreclosure, conveyance-in-lieu, assignment-in-lieu, or otherwise, then this Lease and any and all rights of Tenant hereunder will automatically terminate concurrently with such event without the need for further action or payment of any termination fee, in which event Tenant shall immediately surrender the Premises. If an event described in clause (b) occurs, without the requirement of any further notice to Tenant, Lender or its nominee shall have the right immediately to expel or remove Tenant and any other Tenant or occupant who may be occupying the Premises or any part thereof without being liable for prosecution or any claim or damages therefor, and to enter the Premises and take actual, full, complete, and exclusive possession thereof.

12.4    **Attornment**. Tenant shall cause any sublease permitted under Section 11 to contain language which causes: (a) the sublease to be subject and subordinate to all of the terms and provisions of this Lease and to the rights of Landlord hereunder, (b) the sublessee, at Landlord's option, to attorn to Landlord and waive any rights the sublessee may have to terminate the sublease or to surrender possession thereunder as a result of the termination of this Lease, and (c) after sublessee receives written notice from Landlord or Landlord's assignees, if any, stating that an uncured Default has occurred under the Lease, sublessee to pay all rental accruing under the sublease directly to the party giving such notice or as such party may direct. All rentals received from the sublessee by Landlord or Landlord's assignees, if any, as the case may be, shall be credited against the amounts owed by Tenant under this Lease.

13.    **DEFAULT AND REMEDIES**.

13.1    **Default**. Tenant agrees that the occurrence of any of the following events shall constitute a material default ("**Default**") and breach of this Lease by Tenant:

(a)    **Failure to Pay Rent**. The continued failure of Tenant to pay in full when due any installment or payment of Rent, or any other payment required to be made by Tenant hereunder, within five (5) days after receipt by Tenant of written notice from Landlord of such failure.

(b)    **Failure to Deliver Documents**. Any failure of Tenant to execute and deliver within the time required hereunder any insurance certificate described in Section 5 or statement

described in <u>Section 12</u> requested by Landlord where such failure continues for five (5) days after delivery by Landlord to Tenant of written notice of such failure.

(c)      <u>Default Under Other Agreements</u>. Any default or any action or omission by Tenant which, with the giving of notice or passage of time would constitute a default or event of default under any of the Management Agreement, the Franchise Agreement, the Master Project Documents or any Security Documents if not cured in a timely fashion pursuant to the terms and conditions contained therein.

(d)      <u>Other</u>. The continued failure by Tenant in the performance of or compliance with any of the other covenants, terms, or conditions of this Lease or the breach of any material representation herein made for twenty (20) days after Landlord shall have given written notice of such failure to Tenant; provided, however, that if the nature of such Default is such that Tenant cannot reasonably cure such Default within said twenty (20)-day period, such failure shall not constitute a Default if Tenant shall, within such period of time, commence such performance and thereafter diligently and continuously pursue such performance or compliance to completion; provided, further, however, that in the event of a default by Tenant under the Management Agreement, Franchise Agreement or Security Documents, Tenant shall have only the amount of time required for cure of such default as is set forth in the Management Agreement, Franchise Agreement or Security Documents, as applicable.

(e)      <u>Bankruptcy</u>. Tenant shall file an application for, or consent to, the appointment of a receiver, trustee or liquidator of itself or of all of its assets, or file a voluntary petition in bankruptcy or for reorganization, or have filed against it an involuntary petition in bankruptcy which is not dismissed within sixty (60) days, or file a pleading in any court of record admitting in writing its inability to pay its debts as they come due, or make a general assignment for the benefit of creditors or file an answer admitting the material allegations of, or its consenting to, or defaulting in answering, a petition filed against it in any bankruptcy or reorganization proceeding.

(f)      <u>Receivership</u>. Any order, judgment or decree by any court of competent jurisdiction is entered adjudicating Tenant as bankrupt, or appointing a receiver, trustee or liquidator of it or of all of its assets, and such order, judgment or decree continues unstayed and in effect for any period of ninety (90) consecutive days.

13.2    **Remedies**. In the event of a Default, Landlord shall have the option to pursue any one (1) or more of the following remedies, each and all of which shall be cumulative and non-exclusive, without any notice or demand whatsoever (subject to any notice requirements set forth in the Management Agreement, the Franchise Agreement and/or the Security Documents), and Landlord may, in addition to any and all remedies or means of redress to which it may be lawfully or equitably entitled, in its discretion, while such Default continues:

(a)      <u>Termination</u>. Terminate this Lease and any and all rights of Tenant hereunder, by any lawful means and without payment of any termination fee, in which event Tenant shall immediately surrender the Premises to Landlord and Landlord, without the requirement of any further notice to Tenant, shall have the right immediately to expel or remove Tenant and any other Tenant or occupant who may be occupying the Premises or any part thereof

without being liable for prosecution or any claim or damages therefor, and to enter the Premises and take actual, full, complete, and exclusive possession thereof. In the event that Landlord shall elect to so terminate this Lease, then Landlord may recover from Tenant: (i) the worth at the time of award of any unpaid rent which had been earned at the time of such termination; plus (ii) the worth at the time of award of the amount by which the unpaid rent which would have been earned after termination until the time of award exceeds the amount of such rental loss which reasonably could have been avoided; plus (iii) the worth at the time of award of the amount by which the unpaid rent for the balance of the Term after the time of award exceeds the amount of such rental loss which reasonably could be avoided; and (iv) any other amount reasonably necessary to compensate Landlord for all detriment proximately caused by the Tenant Default. As used in (i) and (ii) above, the "worth at the time of the award" is computed by allowing interest at the rate of ten percent (10%) per annum. As used in (iii) above, the "worth at the time of award" is computed by discounting such amount at the discount rate of the Federal Reserve Bank of New York at the time of award plus one percent (1%). Further, "time of award" means the earlier of such date as a court of competent jurisdiction determines that the Lease has terminated or the date Landlord retakes the Premises. In the event of Tenant's Default, Landlord shall have an obligation to take promptly all action reasonably available to it to mitigate its damages.

(b)    Continuation. Continue this Lease in full force and effect, but enforce any of its other rights and remedies hereunder, including, without limitation, the right to recover all of the Rent as it becomes due under this Lease, in which event the rights of Tenant to possession of the Premises under this Lease and the right of Tenant to assign this Lease and sublease the Premises, if any, pursuant to the provisions of Section 11, shall continue, provided, however, that any and all acts of maintenance or preservation or efforts to relet the Premises by Landlord or the appointment of a receiver by Landlord to protect its interest in and to the Premises or any portion thereof or this Lease, shall neither constitute a termination of this Lease nor interference with the rights of Tenant to possess the Premises, assign this Lease or sublease all or a portion of the Premises, in each case, pursuant to the provisions of Section 11.

(c)    Additional Rights. Pursue all remedies available to Landlord at law or in equity, in connection with which Tenant does hereby agree that (a) the waiver of any Default by Landlord shall be effective only if in writing signed and dated by Landlord and shall not in any event be continuing in nature or otherwise a waiver of any subsequent Default, and (b) the acceptance of any unpaid but due portion of the Rent shall be in mitigation of Landlord's damages and shall not, unless specified with particularity in a writing signed and dated by Landlord, (i) constitute a waiver of any Default, or any of the rights and remedies of Landlord hereunder, at law or at equity, or (ii) invalidate or compromise any notice of a Default provided before such acceptance, or any deadline specified in such notice. In addition and without prejudice to any other right or remedy of Landlord, if Tenant shall be in Default under this Lease, Landlord may (but shall not be obligated to), without waiving or releasing Tenant from any of Tenant's obligations under this Lease, cure the same at the expense of Tenant (A) immediately and without notice in the case (x) of emergency, or (y) of a Default that will result in the violation of Laws or the cancellation of any insurance policy maintained by Landlord, and (B) in any other case if such Default continues for thirty (30) days from the receipt by Tenant of notice of such Default from Landlord. All costs incurred by Landlord in curing such Defaults, including, without limitation, reasonable attorneys' fees, shall be reimbursable by Tenant as Additional Rent hereunder upon demand, together with interest thereon at the maximum rate permitted by Law calculated from the

date of payment by Landlord. Accordingly, if Landlord does not elect to terminate this Lease on account of any Default by Tenant, Landlord may, from time to time, without terminating this Lease, enforce all of its rights and remedies under this Lease, including the right to recover all Rent as it becomes due.

(d)    Waiver of Redemption. Tenant hereby expressly waives any and all rights of redemption granted by or under any present or future law to Tenant in connection with the eviction or dispossession of Tenant for any cause or due to a Default.

14.    **MISCELLANEOUS**.

14.1    **Landlord Default**. Landlord shall not be in default of any obligation of Landlord hereunder unless and until Landlord has failed to perform such obligation within thirty (30) days after receipt of written notice of such failure from Tenant; provided, however, that in the event that the nature of Landlord's obligation is such that more than thirty (30) days are required for complete performance, Landlord shall not be in default pursuant to this Section 14.1 if Landlord commences performance within such thirty (30)-day period and thereafter diligently prosecutes such performance to completion.

(a)    Notice. As a condition to the effectiveness of any notice of default given by Tenant to Landlord, Tenant shall also concurrently give such notice to each mortgagee or beneficiary under a mortgage or deed of trust encumbering the Premises of whom Tenant has received written notice (such notice to specify the address of the mortgagee or beneficiary). In the event that Landlord shall fail to cure any breach or default within the time period specified in Section 14.1(a), then prior to the pursuit of any remedy therefor by Tenant, each such mortgagee or beneficiary shall have an additional thirty (30) days within which to cure such default, or if such default cannot reasonably be cured within such period, then each such mortgagee or beneficiary shall have such additional time as shall be necessary to cure such default, provided that within such thirty (30)-day period, such mortgagee or beneficiary has commenced and is diligently pursuing the remedies available to it which are necessary to cure such default (including, without limitation, as appropriate, commencement of foreclosure proceedings).

(b)    Remedies of Tenant. Tenant's exclusive remedies for default by Landlord under this Lease shall be an action for damages, injunction, and/or specific performance; in no event shall Tenant have the right to terminate this Lease nor shall there be any abatement of Rent as the result of Landlord's default.

(c)    Limitations. All liability of Landlord under this Lease or otherwise with respect to any acts or omissions of Landlord or events which occur during the term of this Lease and which in any way relate to Tenant's tenancy hereunder or occupancy of the Premises shall terminate one (1) year following the expiration or sooner termination of this Lease other than as to those claims, if any, asserted in reasonable detail in a writing delivered by Tenant to Landlord prior to the expiration of such one (1) year period.

14.2    **Holding Over**. Tenant acknowledges that (a) Tenant's complete vacancy and surrender of the Premises in strict compliance with Section 8.6 (and all other provisions of this Lease) on or before the Expiration Date or earlier termination may be critical to the sale by

Landlord of the Premises, and (b) if Tenant or any person or entity occupying the Premises (or any part thereof) by or through Tenant holds over past the Expiration Date for any period of time, however brief, such holding over will compromise and deleteriously affect Landlord's ability to timely conclude any sale of the Premises. In light of the foregoing, (i) Tenant and any person or entity occupying the Premises (or any part thereof) by or through Tenant shall not be permitted to hold over for any period of time beyond the Expiration Date for any reason or length of time, (ii) if Tenant (or any person or entity holding through Tenant) shall hold over for any period whatsoever, Tenant shall be a tenant at sufferance, subject to eviction without notice, and (iii) Tenant shall indemnify, defend (with legal counsel reasonably approved by Landlord), and hold Landlord harmless from all causes of action, claims, debts, liabilities, controversies, damages, costs, losses, and expenses (including reasonable attorneys' fees) suffered or incurred by Landlord, including lost profits, by reason of Tenant's failure (or the failure of any person or entity occupying all or any portion of the Premises under or through Tenant) to completely vacate and surrender the Premises on or before the Expiration Date in strict compliance with Section 8.6 and all other applicable provisions of this Lease.

14.3    **Quiet Enjoyment**. Upon Tenant's paying Rent reserved hereunder and observing and performing all of the covenants, conditions, and provisions on Tenant's part to be observed and performed hereunder, Tenant shall have quiet possession of the Premises for the Term without hindrance or ejection by any person lawfully claiming under Landlord, subject to (a) all Laws, and (b) all of the provisions of (i) this Lease, (ii) any encumbrance now or in the future affecting the Premises, (iii) the Master Project Documents,(iv) any Security Documents, and (v) any policy of insurance now or in the future affecting the Premises.

14.4    **Non-Recourse Liability**. Landlord and each of its Affiliates, officers, directors, shareholders, members and partners shall in no event or at any time be personally liable for the payment or performance of any obligation required or permitted of the Landlord under this Lease or under any document executed in connection herewith. In the event of any actual or alleged failure, breach or default by Landlord under this Lease or any such document, the sole recourse of Tenant shall be against the interest of Landlord in the Premises. No attachment, execution, writ, or other process shall be sought or obtained, and no judicial proceeding shall be initiated by or on behalf of Tenant, against Landlord (or any of Landlord's officers, directors, shareholders, members or partners) personally or Landlord's assets as a result of any such failure, breach, or default. In no event shall Landlord have any liability for any loss of profits, business interruptions and/or indirect or consequential damages of Tenant. If Landlord from time to time transfers its interest in the Premises, then, to the extent the Premises is transferred, from and after each such transfer, Tenant shall look solely to the applicable transferee for the performance of the obligations of Landlord hereunder.

14.5    **Recording**. Tenant shall not under any circumstance record this Lease or a memorandum of this Lease without the prior written consent of Landlord, which consent may be granted or withheld in Landlord's sole discretion.

14.6    **Counterparts**. This Lease may be executed in several counterparts, each of which shall be deemed an original, and all such counterparts shall together constitute one and the same instrument. Any counterpart delivered by facsimile, pdf or other electronic means shall have the same import and effect as original counterparts and shall be valid, enforceable and binding for the

25

purposes of this Lease. This Lease may be accepted, executed or agreed to through the use of an electronic signature in accordance with the Electronic Signatures in Global and National Commerce Act, Title 15, United States Code, Sections 7001 et seq., the Uniform Electronic Transaction Act and any applicable state law and any document accepted, executed or agreed to in conformity with such laws will be binding on each party as if it were physically executed.

14.7    **Access By Landlord**. Landlord and Landlord's agents shall have the right to enter the Premises during normal business hours and upon reasonable prior notice (which notice shall not be necessary in the case of an emergency) and in such a manner so as to not interfere with Tenant's business, to examine the Premises and to show the Premises to prospective purchasers, landlords, partners, investors, government officials, and tenants of the Premises, to make such repairs, alterations, improvements or additions as may be required upon Tenant's failure to do the same pursuant to Section 8.4, without the same constituting an eviction of Tenant, in whole or in part, or a trespass; provided, however, that in no event shall Rent abate while said repairs, alterations, improvements, or additions are being made, by reason of loss or interruption of Tenant's business or otherwise. Throughout the Term, Landlord may place upon the Premises "to let" or "for sale" notices or signs which Tenant shall permit to remain thereon.

14.8    **Notices**. All notices, demands and communications permitted or required to be given hereunder shall be in writing, and shall be delivered (a) personally, (b) by United States registered or certified mail, postage prepaid, (c) by Federal Express or other reputable courier service regularly providing evidence of delivery (with charges paid by the party sending the notice), or (d) by a PDF or similar attachment to an email, provided that such email attachment shall be followed within one (1) business day by delivery of such notice pursuant to clause (a), (b) or (c) above. Any such notice to a party shall be addressed to such party at the addresses set forth in Item F of the Basic Lease Provisions (subject to the right of a party to designate a different address for itself by notice similarly given).

14.9    **Time**. Time is of the essence of this Lease with respect to each and every provision of this Lease in which time is a factor.

14.10    **Entire Agreement**. This Lease, including, without limitation, the Exhibits attached hereto and made parts hereof, sets forth the entire agreement between the parties hereto, and fully supersedes any and all prior agreements or understandings between the parties hereto pertaining to the subject matter hereof; no change in, modification of, or addition, amendment, or supplement to this Lease shall be valid unless (i) set forth in writing and signed and dated by each and all of the parties hereto subsequent to execution of this Lease and (ii) to the extent required under the Security Documents, approved by Lender.

14.11    **Further Assurances**. Each of the parties hereto, without further consideration, agrees to execute and deliver such other documents and take such other action as may be necessary to more effectively consummate the purposes and subject matter of this Lease.

14.12    **Applicable Law**. The existence, validity, construction and operational effect of this Lease, any and all of its covenants, agreements, terms and conditions and the rights and obligations hereunder of each of the parties hereto shall be determined in accordance with the laws of the state in which the Premises are located; provided, however, that any provision of this Lease which may

be prohibited by law or otherwise held invalid shall be ineffective only to the extent of such prohibition or invalidity and shall not invalidate or otherwise render ineffective any or all of the remaining provisions of this Lease. Under no circumstances whatsoever shall this Lease be construed as creating either a partnership, an agency or an employment relationship between the parties hereto.

14.13    **Controversy**. In the event of any controversy, claim or dispute between the parties hereto arising out of or relating to this Lease, the prevailing party shall be entitled to recover from the non-prevailing party (and shall be awarded) its reasonable expenses, including, without limitation, reasonable accountants' and attorneys' fees.

14.14    **Headings and Gender**. The section headings used in this Lease are intended solely for convenience of reference and shall not in any way or manner amplify, limit, modify, or otherwise be used in the interpretation of any of the provisions of this Lease, and the masculine, feminine, or neuter gender and the singular or plural number shall be deemed to include the others whenever the context so indicates or requires.

14.15    **Successors**. Except as otherwise provided in this Lease, all of the covenants, agreements, terms, and conditions contained in this Lease shall be binding upon and inure to the benefit of the successors and assigns of the parties hereto. Tenant shall attorn to each purchaser, successor, or assignee of Landlord.

14.16    **Authority**. Tenant hereby covenants and warrants that Tenant is a duly authorized and existing Delaware limited liability company, that Tenant has and is qualified to do business in the state in which the Premises are located, that Tenant has full right and authority to enter into this Lease, and that each person signing on behalf of Tenant is authorized to do so. Tenant shall provide Landlord on demand with such evidence of such authority as Landlord shall reasonably request.

14.17    **Waiver**. No waiver by Landlord or Tenant of any provision of this Lease or of any breach by Tenant or Landlord hereunder shall be deemed to be a waiver of any other provision hereof, or of any subsequent breach by such party. Landlord's consent to or approval of any act by Tenant requiring Landlord's consent or approval under this Lease shall not be deemed to render unnecessary the obtaining of Landlord's consent to or approval of any subsequent act of Tenant. No act or thing done by Landlord or Landlord's agents during the Term of this Lease shall be deemed an acceptance of a surrender of the Premises, unless in writing signed by Landlord. The delivery of the keys to any employee or agent of Landlord shall not operate as a termination of the Lease or a surrender of the Premises.

14.18    **Matters of Record**. This Lease and Tenant's rights hereunder are subject and subordinate to all matters affecting Landlord's right to the Premises recorded in the official records of county in which the Premises are located, prior to and subsequent to the date hereof. Tenant agrees for itself and all persons in possession or holding under it that it will comply with and not violate any such covenants, conditions, and restrictions or other matters of record. Landlord reserves the right, from time to time, to grant such easements, rights, and dedications as Landlord deems necessary or desirable, and to cause the recordation of parcel maps and covenants, conditions, and restrictions affecting the Premises, as long as such easements, rights, dedications,

maps, and covenants, conditions, and restrictions do not materially interfere with the use of the Premises by Tenant. At Landlord's request, Tenant shall join in the execution of any of the aforementioned documents.

14.19  **Project Financing**. Tenant acknowledges that as a material inducement to Landlord to execute this Lease, (a) Tenant shall timely acknowledge and deliver to Landlord all such documents and instruments as may be customarily and reasonably required by any lender providing financing to Landlord and/or Tenant from time to time during the Term hereof (each, a "**Lender**"), as well as those documents and instruments which may be required under Section 12, and (b) if any prospective lender to Landlord and/or Tenant shall request or require in connection with the placement of any financing to Landlord and/or Tenant any modification of this Lease, Tenant shall not delay or withhold its agreement to such proposed modification provided the same shall not modify the Rent payable hereunder nor materially and adversely affect the obligations of Tenant hereunder or the rights and obligations of Landlord hereunder. Tenant shall at all times comply with the provisions of any Security Documents.

14.20  **Brokers**. Each of Tenant and Landlord warrants that it has had no dealings with any real estate broker or agent in connection with this Lease and that it knows of no real estate broker or agent who is or might be entitled to a commission in connection with this Lease. Each of Landlord and Tenant agrees to indemnify and hold the other harmless from and against any and all liability and cost which Landlord or Tenant, as applicable, may suffer in connection with any real estate brokers claiming by, through, or under Landlord or Tenant, as applicable, seeking any commission, fee or payment in connection with this Lease. The indemnification obligations of the parties under this Section 14.20 shall survive the expiration or termination of this Lease.

14.21  **Sole Parties**. This Lease is made exclusively for the benefit of and solely for the protection of Landlord and Tenant, and except for the REITs, who shall be express third-party beneficiaries hereof and shall have the right to enforce Sections 2.1 and 2.6 of this Lease as if a party hereto, no other person or persons shall have the right to enforce the provisions hereof by action or legal proceedings or otherwise.

14.22  **Personalty on Termination**. Upon the termination of this Lease for any reason, (a) Tenant shall leave at the Hotel the Hotel Personalty and Operating Supplies, and (b) Tenant shall assign to Landlord or any third party designated by Landlord all of Tenant's right, title and interest in and to (i) all service contracts required in the ordinary course of business in operating the Hotel, including contracts for water, electricity, gas, telephone, refuse removal, vermin extermination, cable, internet, cleaning, laundry, pool service, vending services, fire systems inspection and testing, elevator and boiler maintenance, and all other services, as applicable, (ii) all licenses and permits required in connection with the management and operation of the Hotel, and (iii) without duplication, and subject to the applicable terms thereof, the Management Agreement and Franchise Agreement (collectively, the "**Assigned Items**"). Upon termination of this Lease and surrender of the Hotel by Tenant, Landlord shall either assume or cause to be assumed all of the Assigned Items and perform or otherwise cause to be performed all of Tenant's obligations thereunder relating to any period after the Expiration Date. As used herein, "**Operating Supplies**" means all supplies, except kitchen, restaurant and bar equipment, used or held in storage for future use in connection with operation of the Hotel in accordance with the Franchise Agreement, including, without limitation, all engineering, maintenance and housekeeping

supplies, guest room cleaning supplies, soap and other toiletries, toilet paper, stationery, writing pens, office supplies, and food and beverages of all kinds.

14.23 **Business Day**. As used herein, "**business day**" means any day other than a Saturday, Sunday, or any day on which commercial banks in New York, New York are authorized or required to close.

14.24 **Treatment of Lease**. Landlord and Tenant hereby acknowledge and agree this Lease shall be treated as an operating lease for all purposes and not as a synthetic lease, financing lease or loan, and Landlord shall be entitled to all the benefits of ownership of the Premises, including depreciation for all federal, state and local tax purposes.

14.25 **Tax Characterization**. Notwithstanding anything to the contrary in this Lease, the parties acknowledge that this Lease is intended to qualify as a true lease for U.S. federal income tax purposes and will not take any position inconsistent with such characterization.

[Signature Pages Follow]

IN WITNESS WHEREOF, as of the date set forth above, the parties hereto have executed this Lease.

## **LANDLORD**

**560 SEVENTH AVENUE OWNER PRIMARY LLC**,
a Delaware limited liability company


By: _____
Name:
Title:


## **TENANT**

**AC MVTS OPERATOR, LLC**,
a Delaware limited liability company


By: _____
Name:
Title:

[Signature Page to Hotel Operating Lease]

## EXHIBIT A

## LEGAL DESCRIPTION OF LAND

The land is described as follows:

ALL that certain plot, piece or parcel of land, situate, lying and being in the Borough of Manhattan, City, County and State of New York, more particularly bounded and described as follows:

BEGINNING at the corner formed by the intersection of the westerly side of Seventh Avenue, with the northerly side of 40th Street;

RUNNING THENCE northerly along the westerly side of Seventh Avenue, 74 feet 2 inches;

THENCE westerly parallel with 40th Street, 100 feet;

THENCE northerly parallel with Seventh Avenue, 24 feet 7 inches;

THENCE westerly parallel with 40th Street, 25 feet;

THENCE southerly parallel with Seventh Avenue, 98 feet 9 inches to the northerly side of 40th Street; and

THENCE easterly along the northerly side of 40th Street, 125 feet to the corner, the point or place of BEGINNING.

## **Exhibit B**

Disclosure Statement Order

**Exhibit C**

Margaritaville Liquidation Analysis

**Assets:**

|  | Recovery Low |  | Recovery High |
|---|---|---|---|
| Property | $ 127,000,000 |  | $ 156,000,000 |
| Cash | $ 989,632 |  | $ 989,632 |
| Receivables, Escrows & Prepaids | $ 3,281,651 |  | $ 3,281,651 |
| Avoidance Actions | $ 319,713 |  | $ 594,878 |
| **Total Assets Available for Distribution:** | **$ 131,590,996** |  | **$ 160,866,162** |

**Claims:**

|  | Recovery Low | % | Remaining | Recovery High | % | Remaining |
|---|---|---|---|---|---|---|
| OWS Secured | $ 149,373,905 | 88% | $ - | $ 149,373,905 | 100% | $ 11,492,256.63 |
| Other Secured | $ 7,398,126 | 0% | $ - | $ 3,845,126 | 100% | $ 7,647,130.76 |
| Chapter 7 Trustee Commissions | $ - | 0% | $ - | $ 4,847,637 | 100% | $ 2,799,493.56 |
| Chapter 7 Professionals | $ 500,000 | 0% | $ - | $ 250,000 | 100% | $ 2,549,493.56 |
| Chapter 11 Professionals | $ 500,000 | 0% | $ - | $ 250,000 | 100% | $ 2,299,493.56 |
| Chapter 11 Administrative | $ 32,209,132 | 0% | $ - | $ 32,209,132 | 7% | $ - |
| Priority | $ 1,717,955 | 0% | $ - | $ 1,036,765 | 0% | $ - |
| General Unsecured | $ 49,745,805 | 0% | $ - | $ 48,194,143 | 0% | $ - |

Notes:

Property value is net of brokerage fees/closing costs

Claims based on filed proofs of claim taking into account amendments but without adjustment for any potential objections

No increase in general unsecured claims for contract/lease rejections is included

Does not include damages arising from rejection of collective bargaining agreements

In low recovery scenario, it is likely that a trustee would abandon the real property so no Chapter 7 Trustee commissions reflected

Chapter 11 Administrative consists of $23,928,420 Parent Administrative Claim, asserted 503(b)(9) claims, current liabilities of debtor such as accounts payables and accrued expenses plus termination costs associated with post-petition contracts

Each of the required pay downs of OWS loan ($3,750,000 and $3,750,000) could also be correctly accounted for as Other Secured by operation of section 509 of the Bankruptcy Code

UST Quarterly Fees are not included

### MARGARITAVILLE RESORT TIMES SQUARE FORECASTED INCOME AND EXPENSE (APRIL, 2025 - MARCH, 2027)

| | April 2025 | May 2025 | June 2025 | July 2025 | August 2025 | September 2025 | October 2025 | November 2025 | December 2025 | January 2026 | February 2026 | March 2026 | Annual (Months 1-12) Apr 2025-Mar 2026 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Revenues | $ 2,775,127 | $ 3,167,919 | $ 3,089,324 | $ 2,996,394 | $ 2,889,121 | $ 3,365,361 | $ 3,424,518 | $ 2,870,419 | $ 3,849,259 | $ 1,777,065 | $ 1,714,825 | $ 2,575,705 | $ 34,495,037 |
| Operating Expenses | $ 1,853,103 | $ 1,998,781 | $ 1,918,054 | $ 2,049,731 | $ 2,012,593 | $ 2,101,420 | $ 2,102,907 | $ 1,996,151 | $ 2,254,138 | $ 1,470,072 | $ 1,380,109 | $ 1,725,941 | 22,863,000 |
| Net Income | $ 922,024 | $ 1,169,138 | $ 1,171,270 | $ 946,663 | $ 876,528 | $ 1,263,941 | $ 1,321,611 | $ 874,268 | $ 1,595,121 | $ 306,993 | $ 334,716 | $ 849,764 | $ 11,632,036 |
| | | | | | | | | | | | | | |
| **Debt Service** | | | | | | | | | | | | | |
| Senior Loan Balance | $ 140,000,000 | $ 140,000,000 | $ 140,000,000 | $ 140,000,000 | $ 140,000,000 | $ 140,000,000 | $ 140,000,000 | $ 140,000,000 | $ 140,000,000 | $ 140,000,000 | $ 140,000,000 | $ 140,000,000 | $ 140,000,000 |
| Forecasted SOFR (4.0% floor) | 4.37% | 4.28% | 4.18% | 4.14% | 4.05% | 4.05% | 4.01% | 4.00% | 4.00% | 4.00% | 4.00% | 4.00% | 4.09% |
| Annual Interest Rate (SOFR+5.375%) | 9.75% | 9.66% | 9.56% | 9.52% | 9.43% | 9.43% | 9.39% | 9.38% | 9.38% | 9.38% | 9.38% | 9.38% | 9.47% |
| Debt Service Payment | $ 1,136,917 | $ 1,126,417 | $ 1,114,750 | $ 1,110,083 | $ 1,099,583 | $ 1,099,583 | $ 1,094,917 | $ 1,093,750 | $ 1,093,750 | $ 1,093,750 | $ 1,093,750 | $ 1,093,750 | $ 13,251,000 |
| | | | | | | | | | | | | | |
| Cash Flow After Debt Service | $ (214,893) | $ 42,721 | $ 56,520 | $ (163,420) | $ (223,055) | $ 164,358 | $ 226,694 | $ (219,482) | $ 501,371 | $ (786,757) | $ (759,034) | $ (243,986) | $ (1,618,964) |

| | April 2026 | May 2026 | June 2026 | July 2026 | August 2026 | September 2026 | October 2026 | November 2026 | December 2026 | January 2027 | February 2027 | March 2027 | Annual (Months 13-24) Apr 2026-Mar 2027 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Revenues | $ 2,903,406 | $ 3,324,752 | $ 3,240,901 | $ 3,140,224 | $ 3,024,675 | $ 3,541,370 | $ 3,602,636 | $ 3,005,929 | $ 4,058,513 | $ 1,862,399 | $ 1,789,306 | $ 2,644,946 | $ 36,139,056 |
| Operating Expenses | $ 1,809,513 | $ 1,976,869 | $ 1,901,622 | $ 2,016,371 | $ 1,960,241 | $ 2,081,387 | $ 2,105,977 | $ 1,951,559 | $ 2,293,338 | $ 1,529,158 | $ 1,431,027 | $ 1,777,719 | 22,834,782 |
| Net Income | $ 1,093,893 | $ 1,347,883 | $ 1,339,279 | $ 1,123,853 | $ 1,064,433 | $ 1,459,983 | $ 1,496,658 | $ 1,054,370 | $ 1,765,175 | $ 333,241 | $ 358,279 | $ 867,227 | $ 13,304,275 |
| | | | | | | | | | | | | | |
| **Debt Service** | | | | | | | | | | | | | |
| Senior Loan Balance | $ 140,000,000 | $ 140,000,000 | $ 140,000,000 | $ 140,000,000 | $ 140,000,000 | $ 140,000,000 | $ 140,000,000 | $ 140,000,000 | $ 140,000,000 | $ 140,000,000 | $ 140,000,000 | $ 140,000,000 | $ 140,000,000 |
| Forecasted SOFR (4.0% floor) | 4.00% | 4.00% | 4.00% | 4.00% | 4.00% | 4.00% | 4.00% | 4.00% | 4.00% | 4.00% | 4.00% | 4.00% | 4.00% |
| Annual Interest Rate (SOFR+5.375%) | 9.38% | 9.38% | 9.38% | 9.38% | 9.38% | 9.38% | 9.38% | 9.38% | 9.38% | 9.38% | 9.38% | 9.38% | 9.38% |
| Debt Service Payment | $ 1,093,750 | $ 1,093,750 | $ 1,093,750 | $ 1,093,750 | $ 1,093,750 | $ 1,093,750 | $ 1,093,750 | $ 1,093,750 | $ 1,093,750 | $ 1,093,750 | $ 1,093,750 | $ 1,093,750 | $ 13,125,000 |
| | | | | | | | | | | | | | |
| Cash Flow After Debt Service | $ 143 | $ 254,133 | $ 245,529 | $ 30,103 | $ (29,317) | $ 366,233 | $ 402,908 | $ (39,380) | $ 671,425 | $ (760,509) | $ (735,471) | $ (226,523) | $ 179,275 |