**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------x

In re                                                          Chapter 11

560 Seventh Avenue Owner Primary LLC,                          Case No. 23-11289-PB

                    Debtor.

------------------------------------------------------------x

### DECLARATION OF ALFRED DILMORE IN SUPPORT OF CONFIRMATION OF THE SECOND AMENDED CHAPTER 11 PLAN OF 560 SEVENTH AVENUE OWNER PRIMARY LLC

I, Alfred Dilmore, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

1.      I am the Chief Financial Officer of Arden Group, Inc. and a controller at 560 Seventh Avenue Owner Primary LLC (the "Debtor").

2.      I submit this declaration (this "Declaration") in support of confirmation of the *Second Amended Chapter 11 Plan of 560 Seventh Avenue Owner Primary LLC* (as may be further amended, modified or supplemented from time to time, the "Plan")[1] [Dkt. No. 217], including the agreements and other documents set forth in the Plan Supplement. I have reviewed, and I am generally familiar with, the terms and provisions of the Plan, the documents comprising the Plan Supplement, the *Amended Disclosure Statement With Respect to Second Amended Chapter 11 Plan of 560 Seventh Avenue Owner Primary LLC* [Dkt. No. 218] (the "Disclosure Statement"), the *Debtor's Memorandum of Law (i) In Support of Confirmation of the Second Amended Chapter 11 Plan of 560 Seventh Avenue Owner Primary LLC Under Chapter 11 of the Bankruptcy Code and (ii) in Response to Objections Thereto* [Dkt. No. 236], the proposed Confirmation Order, and the requirements for confirmation of the Plan under section 1129 of the Bankruptcy Code.

---

[1]  Capitalized terms not defined herein shall have the meanings ascribed to them in the Plan.

3.      Except as otherwise indicated, the facts set forth in this Declaration (or incorporated by reference herein) are based upon my personal knowledge, my review of relevant documents and the Debtor's books and records, my discussions with members of the Debtor's senior management and the Debtor's other advisors, information provided to me by employees working under my supervision or other employees of the Debtor, my opinion based upon my experience and knowledge related to the Debtor's operations, businesses, and financial condition, or upon information supplied to me by the Debtor's counsel and advisors. If called upon to testify, I would testify competently to the facts set forth herein. I am authorized to submit this Declaration on behalf of the Debtor.

4.      Based on my personal involvement in the formation of the Plan, my discussions with the Debtor's advisors (including counsel), and my review of the Plan, the Plan Supplement and the Disclosure Statement, I believe that the Plan complies with the applicable provisions of the Bankruptcy Code, that the Plan was proposed in good faith, and that the Debtor, acting through its officers, directors, and professionals, has conducted itself in a manner that complies with applicable law in relation to the formulation and negotiation of, and solicitation of votes on, the Plan.

## **BACKGROUND**

5.      On August 12, 2023 (the "**Petition Date**"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the Bankruptcy Court.  The Debtor continued as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6.      No trustee, examiner, or statutory committee of creditors has been appointed in the Debtor's Chapter 11 Case.

7.      The Debtor is the owner of that certain real property located at 560 Seventh Avenue, New York, New York 10018 (the "**Property**").  The Property is improved with a hotel comprised

of 234 guestrooms and other hotel amenities presently known as the "Margaritaville Resort Times Square" (the "**Hotel**").

8.      The Debtor's Chapter 11 Case was filed by its former ownership and management as part of an overall strategy to halt the foreclosure of the equity interests in the Debtor which had been held by the Debtor's then-parent.  That strategy failed.  This Court granted stay relief in the then-parent's chapter 11 case and the senior mezzanine lender in that case foreclosed on its collateral – 100% of the equity interests in the Debtor – and subsequently took control over the ownership and management of the Debtor.

9.      Since current management/ownership of the Debtor took control of the Debtor in December, 2023, it has worked with its key Creditors to negotiate a confirmable Plan that will treat all of the Debtor's Creditors fairly. The Plan is the culmination of months of discussions and negotiations with those key Creditors and stakeholders. The Plan is predicated on agreements that the Debtor has reached with many of its largest Creditors for the treatment of their Claims as outlined herein and in the Plan. Chief among those is an agreement with the Debtor's senior secured Creditor, OWS, which agreement is set forth in the OWS Term Sheet attached to the Plan. The OWS Term Sheet provides for the Plan's treatment of the OWS Secured Claim, which is in the approximate amount of $150 million, plus all other amounts due in connection with the existing OWS loan. OWS will (i) receive a Cash payment on or prior to the Effective Date of the Plan and (ii) provide the Reorganized Debtor with a $140 million loan extension on the Effective Date with the balance to be paid over a two-year period thereafter, with two Debtor options each to extend the term by an additional one year.

10.     The Debtor also reached a significant resolution with its largest general unsecured Creditor – the Garment Center Congregation (the "**Congregation**") – which had filed a Proof of

Claim asserting a $39 million Claim and which would otherwise have the ability to supplement that Claim due to the rejection of the Congregation Lease under the Plan. The Debtor's former hotel management company, DHG TSQ, LLC ("**DHG**"), a judgment Creditor which had filed a Proof of Claim in the approximate amount of $4.5 million (of which approximately $3.1 million was asserted as secured), also agreed to treatment under which its Claim will be paid over time, subject to certain conditions, and by non-Debtor entities.

11.     The Debtor's agreements with OWS and DHG helped to provide the Debtor with sufficient funding and liquidity to make distributions to its other Creditors under the Plan.

12.     The Debtor's plan will not only provide required full payment of all Allowed Other Secured Claims, Administrative Expense Claims, Priority Tax Claims and Priority Non-Tax Claims, but will also provide $1 million to be shared pro rata by Holders of General Unsecured Claims and will permit Holders of Personal Injury Claims to pursue their Claims against any available insurance proceeds.

13.     As an integral part of the Plan, the Debtor's Parent will make a new value contribution to the Plan in the approximate value of $43 million in a combination of an estimated $19.2 million in cash contributions under the Plan and the waiver of its Parent Administrative Claim in the approximate amount of $23,928,420. Without this critical contribution, the Plan could not be confirmed.

## PLAN CONFIRMATION

.

14.     **Compromises and Settlements**. The Plan is the result of good faith, arm's length negotiations among the Debtor, certain of its creditors, and other parties in interest.

15.     The settlements of Claims effectuated by the Plan were entered into after months of arm's-length discussions and negotiations between competent counsel for the parties. The Plan

4

treatment of Claims held by OWS, DHG and the Congregation embody the settlements reached with each of these creditors. Together, along with the Parent Contribution, they form the backbone of the Plan. They maximize the value of the Debtor's estate. The Plan and the settlements contained therein constitute a good faith, arm's length compromise and settlement of all claims or controversies relating to the rights that a Holder of a Claim or Equity Interest may have with respect to any Allowed Claim or Equity Interest or any distribution to be made or obligation to be incurred pursuant to the Plan. Such compromises or settlements (i) are in the best interests of (x) the Debtor and its Estate and (y) Holders of Claims and Equity Interests, and (ii) are fair, equitable, and reasonable.

16.     No parties in interest have objected to the settlements contained in the Plan. Further, litigation with regard to any of the Claims being compromised under the Plan would have been expensive and risky. Counsel representing both sides of the negotiations was competent and experienced supporting the experience and knowledge of this Court.

17.     Importantly, the settlements embodied in the Plan are necessary and an integral part of the Plan. I have overseen and participated in the preparation of a liquidation analysis which is annexed to the Disclosure Statement as Exhibit C (the "**Liquidation Analysis**"). Pursuant to the Liquidation Analysis, in the event of a liquidation, general unsecured creditors (including the Congregation), would not receive any distribution on account of their claims. Nor would holders of priority claims. Holders of Administrative Expense Claims could expect a partial distribution but only in a Recovery High scenario. The Parent Funding Contribution combined with the settlements reached by the Debtors with OWS, the Congregation, and DHG under the Plan are the reasons why full distributions to holders of Allowed Administrative Expenses, Priority Non-Tax

LEGAL\76063934\2

Claims, and Priority Tax Claims can be made under the Plan and why Holders of General Unsecured Claims will receive a Pro Rata share of $1 million.

**I.      The Plan Satisfies the Bankruptcy Code's Requirements for Confirmation**

18.      Based on my understanding of the Plan, the events that have occurred during this Chapter 11 Case, and discussions I have had with the Debtor's professionals regarding the requirements of the Bankruptcy Code, I believe that the Plan satisfies all provisions of section 1129 of the Bankruptcy Code and complies with all other applicable sections of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), the Local Bankruptcy Rules for the Southern District of New York (the "Local Rules") and applicable non-bankruptcy law, and should therefore be confirmed.

A.      The Plan Satisfies Bankruptcy Code Section 1129(a)(1).

19.      I understand that section 1129(a)(1) of the Bankruptcy Code requires the Plan to comply with the applicable provisions of the Bankruptcy Code. As detailed below, I have been advised by the Debtor's advisors that the Plan satisfies this requirement.

i.      *Classification of Claims and Interests Complies with Bankruptcy Code Section 1122.*

20.      The Plan designates Claims and Interests into the following Classes: Class 1 (OWS Secured Claim), Class 1a (DHG Claim), Class 1b (Flintlock Claim)[2], Class 1c (Other Secured Claims), Class 2 (Priority Non-Tax Claims), Class 3 (General Unsecured Claims), Class 3a (Personal Injury Claims), Class 3b (Congregation Claim), and Class 4 (Equity Interests). I believe

---

[2] I note that the Holder of a Class 1b Flintlock Claim did not submit a ballot. Accordingly, pursuant to Article III.B.3 of the Plan, Class 1b is automatically eliminated and the Flintlock Claim will automatically become a Claim in Class 1c (Other Secured Claims) which is unimpaired.

LEGAL\76063934\2

the Debtor's classification scheme is consistent with the bounds of section 1122 of the Bankruptcy Code as it has been explained to me.

21.    Several of the Classes in the Plan are single-claim Classes (Class 1, Class 1a, and Class 3b).  With respect to those Classes which contain multiple Claims, I believe that each of the Claims or Interests in those particular Classes are substantially similar to the other Claims or Interests in such Class.  I also believe that each Class differs from the other Classes based on legal attributes or other relevant and objective criteria. Further, I do not believe that the classification structure was designed to gerrymander the Classes to create an impaired consenting class.

22.    As a result of the foregoing, I believe that the Debtor's classification scheme complies with section 1122 of the Bankruptcy Code as it has been explained to me, and should be approved.

   ii.    *The Plan Complies with Bankruptcy Code Section 1123(a).*

23.    I have been advised that the Plan fully complies with each of the seven requirements of section 1123(a) of the Bankruptcy Code, based on the following:

   (a)    <u>Section 1123(a)(1) of the Bankruptcy Code</u>.  The Plan designates Classes of Claims and Interests.

   (b)    <u>Section 1123(a)(2) of the Bankruptcy Code</u>. The Plan specifies which Classes of Claims are Unimpaired under the Plan.

   (c)    <u>Section 1123(a)(3) of the Bankruptcy Code</u>. The Plan specifies the treatment of each Class of Claims and Interests that is Impaired under the Plan and the treatment for each such Impaired Class.

   (d)    <u>Section 1123(a)(4) of the Bankruptcy Code</u>.  Except as otherwise agreed to by a Holder of a particular Claim or Interest, the treatment of each Claim or Interest in each particular Class is the same as the treatment of each other Claim or Interest in such Class.

7

(e)      <u>Section 1123(a)(5) of the Bankruptcy Code</u>.  I understand that Article IV of the Plan, and various other provisions of the Plan, provide adequate means for its implementation.

(f)      <u>Section 1123(a)(6) of the Bankruptcy Code</u>.  I understand that section 1123(a)(6) does not apply to this Chapter 11 Case because the Debtor is a limited liability company.  Nevertheless, the Debtor does not, and the Reorganized Debtor will not have separate classes of equity or nonvoting securities.

(g)      <u>Section 1123(a)(7) of the Bankruptcy Code</u>.  I understand that Article IV.F. of the Plan provides that Joseph Caruso and Brandon Flury, each of whom managed the Debtor as a vice president, shall continue in their positions as vice presidents and managers of the Reorganized Debtor as well as Operator.  Further, Highgate Hotels, L.P. shall continue to manage the Reorganized Debtor's hotel operations on a day-to-day basis.  I understand that the continuation of this management team is consistent with the interests of creditors and interest holders and with public policy.  Neither Messrs. Flury nor Caruso will be paid by the Reorganized Debtor.

(h)      <u>Section 1123(a)(8) of the Bankruptcy Code</u>.  I understand that section 1123(a)(8) of the Bankruptcy Code applies only to individual debtors and is not applicable to this Chapter 11 Case.

24.      Accordingly, I believe the requirements of section 1123(a) of the Bankruptcy Code have been satisfied.

      *iii.*      *The Plan Complies with Bankruptcy Code Section 1123(b).*

          *a.  Plan Permissive Provisions.*

25.      I have been advised that section 1123(b) of the Bankruptcy Code sets forth permissive provisions that may be incorporated into a chapter 11 plan and, as discussed in more detail below, I believe that each of the provisions of the Plan is consistent with section 1123(b).

8

(a)      <u>Section 1123(b)(1) of the Bankruptcy Code</u>.   Pursuant to Article III of the Plan, Claims or Equity Interests in the Impaired Classes are impaired and Claims in the Unimpaired Classes are unimpaired.

(b)      <u>Section 1123(b)(2) of the Bankruptcy Code</u>. Article V of the Plan provides for the assumption and rejection of various executory contracts and unexpired leases not previously rejected and, as I understand it, meets the requirements of section 365 of the Bankruptcy Code. Article V of the Plan provides for the assumption and rejection of various executory contracts and unexpired leases not previously rejected and meets the requirements of section 365 of the Bankruptcy Code.  That list has been supplemented pursuant to the Plan Supplement.  Although Article V.D. of the Plan provides for the assumption of its elevator maintenance contract with Nouveau Elevator Industries, LLC ("<u>Nouveau</u>") upon payment of a cure in the amount of $49,893, no cure under that agreement is actually due.  The Debtor has discussed this with counsel to Nouveau on February 20, 2025, and followed up with an email to Nouveau's counsel on March 10, 2025.  Based upon those communications, the Debtor does not believe Nouveau has any objection to such assumption without cure.  Nevertheless, in the event that there is any such objection, the Debtor retains the right to reject the Nouveau agreement as permitted by Article V.D. of the Plan.

(c)      <u>Section 1123(b)(3) of the Bankruptcy Code</u>.  As I understand is permitted by section 1123(b)(3) of the Bankruptcy Code, Article X of the Plan provides for the retention and preservation of all Causes of Action.

(d)      <u>Section 1123(b)(4) of the Bankruptcy Code</u>.  The Plan does not provide for the sale, transfer or assignment of all or substantially all of the Debtor's property and, therefore,

LEGAL\76063934\2

as I understand it, section 1123(b)(4) of the Bankruptcy Code is inapplicable in this Chapter 11 Case.

(e)     Section 1123(b)(5) of the Bankruptcy Code. As I understand is permitted by section 1123(b)(5) of the Bankruptcy Code, the Plan modifies the rights of Holders of Claims and Equity Interests in Impaired Classes, and leaves unaffected the rights of Holders of Claims in Unimpaired Classes.

(f)     Section 1123(b)(6) of the Bankruptcy Code. It is my understanding that section 1123(b)(6) of the Bankruptcy Code provides that a plan may include any other appropriate provision not inconsistent with the applicable provisions of the Bankruptcy Code. As I understand is in accordance with section 1123(b)(6) of the Bankruptcy Code, Article IX of the Plan includes certain exculpation, release, and injunction provisions that are critical to the Plan and, I am advised, are consistent with the applicable provisions of the Bankruptcy Code. The Exculpated Parties have relied on the efficacy and conclusive effects of such exculpation and injunctions when making concessions and exchanging consideration in connection with the Chapter 11 Case and the Plan. Such exculpation and injunction provisions in Article IX of the Plan are (a) in exchange for the good, valuable, and reasonably equivalent consideration provided by the Exculpated Parties, (b) in the best interests of the Debtor, the Estate, and Creditors, (c) fair, equitable, and reasonable, and (d) a bar to the assertion of any Claims or Causes of Action which are subject to such exculpation, release, and injunctions.

26.     Accordingly, I believe that each of the foregoing permissive provisions is consistent with section 1123(b) of the Bankruptcy Code.

### iv. *Section 1123(c) of Bankruptcy Code Is Not Applicable.*

27.    I am advised that section 1123(c) of the Bankruptcy Code is inapplicable in this Chapter 11 Case because it applies only when the chapter 11 debtor is an individual, and the Debtor is not an individual.

### v. *The Plan Complies with Section 1123(d) of Bankruptcy Code.*

28.    I am advised that the Plan fully complies with the requirements of section 1123(d) of the Bankruptcy Code.  The interest rate to be paid on account of the OWS Secured Claim is specified in its treatment and does not rely on the curing of any default.

29.    Article V of the Plan provides for the assumption and assignment or for the rejection of certain executory contracts and unexpired leases.  In addition, Article V.F of the Plan provides that, on the Effective Date, all other executory contracts or unexpired leases not previously assumed and/or assigned, not subject to a pending motion to assume and/or assign as of the Effective Date, or not rejected before the Effective Date, will be deemed rejected.  It is my understanding that any monetary amounts by which any executory contract or unexpired lease that may be assumed under the Plan is in default shall be satisfied by payment or provision for payment of the required cure amount, if any, as required by section 365(b)(1) of the Bankruptcy Code.  Thus, I believe that the Plan complies with section 1123(d) of the Bankruptcy Code.

### B.    The Plan Satisfies Bankruptcy Code Section 1129(a)(2).

30.    To the best of my knowledge and belief, based on discussions with the Debtor's legal counsel and other advisors, I believe that the Debtor has satisfied section 1129(a)(2) of the Bankruptcy Code, including sections 1125 and 1126 of the Bankruptcy Code, regarding disclosure and Plan solicitation.  It is also my understanding that the Debtor has complied with the terms of this Court's Disclosure Statement Order and with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and other applicable law in transmitting the Plan,

11

the Disclosure Statement, the ballots, and related documents and notices and in soliciting and tabulating the votes on the Plan through Kroll.

C.      The Plan Has Been Proposed in Good Faith in Compliance with Bankruptcy Code Section 1129(a)(3).

31.    It is my view that the Debtor has proposed the Plan in good faith and in consultation with the Debtor's counsel and advisors, and not by any means forbidden by law. I believe the Debtor has proposed the Plan with honesty and good intentions in order to effectuate an orderly reorganization that is fair for all stakeholders. Further, I believe the Plan is the product of arm's-length negotiations among the Debtor and other parties-in-interest. In my view, the Plan thus reflects a consensus among all key stakeholders about the proper restructuring of the Debtor.

32.    For these and other reasons, I believe that the Plan has been proposed by the Debtor in good faith and solely for the legitimate and honest purposes of maximizing the value of the Debtor's assets and maximizing distributions to creditors.

D.      The Plan Complies with Bankruptcy Code Section 1129(a)(4).

33.    I understand that all payments made or promised by the Debtor, or a person acquiring property under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Case, or in connection with the Plan and incident to the Chapter 11 Case, have been approved by, or are subject to approval of, the Bankruptcy Court as reasonable. Accordingly, I believe, based on discussions with the Debtor's legal counsel, that the Plan satisfies section 1129(a)(4) of the Bankruptcy Code.

E.      The Plan Complies with Bankruptcy Code Section 1129(a)(5).

34.    I have been advised that section 1129(a)(5) of the Bankruptcy Code is satisfied because the Plan discloses the management of the reorganized debtor. Brandon Flury and Joseph Caruso, the two gentlemen currently managing the Debtor as Vice Presidents, are identified and

fully disclosed in Article IV.F of the Plan, and I am advised that such continued management by Messrs. Flury and Caruso as vice presidents is consistent with the interests of Holders of Claims against and Equity Interests in the Debtor and with public policy.  There have been no allegations to the contrary asserted by any party in interest.  Further, Messrs. Flury and Caruso will continue to be compensated by their current employers, rather than by the Reorganized Debtor.  As such, they will receive no compensation from the Reorganized Debtor.

     F.     <u>The Plan Does Not Contain Any Rate Changes</u>.

35.     I am advised that the Plan does not provide for any rate changes by the Debtor, and thus section 1129(a)(6) does not apply to the Plan.

     G.     <u>The Plan Is in the Best Interests of All Creditors and Interest Holders</u>.

36.     I have been advised that section 1129(a)(7) of the Bankruptcy Code requires that, with respect to each impaired class of claims or interests, each holder of a claim or interest of such class either (a) accept the plan or (b) receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor liquidated under chapter 7 of the Bankruptcy Code.  For the purposes of determining whether the Plan meets this requirement, I, in consultation with the Debtor and its counsel, oversaw and participated in the preparation of the liquidation analysis attached to the Disclosure Statement as Exhibit C (the "<u>Liquidation Analysis</u>"), which I hereby incorporate by reference.

37.     The Liquidation Analysis demonstrates that the Plan satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code.  The Liquidation Analysis estimates potential distributions to Holders of Allowed Claims in both a hypothetical chapter 7 liquidation of the Debtor and as prescribed in the Plan.  The Liquidation Analysis demonstrates that all Classes of Claims or Interests will recover under the Plan value equal to or in excess of what such Claims or Interests would receive in a hypothetical chapter 7 liquidation.

13

38.    I believe that the Debtor's Liquidation Analysis is reasonable and that the assumptions and estimates in the Liquidation Analysis are appropriate in the context of this Chapter 11 Case.  A chapter 7 trustee would need to complete the liquidation of the Debtor's real property, manage costs related to the liquidation process, such as wind-down costs and trustee, professional and other administrative fees, and distribute the net proceeds to the Holders of Claims and Interests in accordance with the priority scheme under chapter 7 of the Bankruptcy Code.

39.    The Liquidation Analysis includes the results of a professional valuation of the Hotel by LW Hospitality Advisors, which was retained by the Debtor as its appraiser.  Under either the High Recovery or the Low Recovery basis, the Liquidation Analysis demonstrates that there would be no distribution to general unsecured creditors in a hypothetical chapter 7 liquidation. Importantly, the Liquidation Analysis is intended to be read in conjunction with the notes and assumptions included in Exhibit C to the Disclosure Statement, and I understand that such assumptions are reasonable and consistent with what actually would have occurred had the Debtor liquidated under chapter 7 of the Bankruptcy Code.

40.    In addition, the Liquidation Analysis demonstrates that holders of administrative expense claims would not receive a full recovery on account of their claims in a chapter 7 liquidation.  In contrast, the Plan provides for full payment of Allowed Administrative Expense Claims and provides for a recovery to Holders of Class 3 General Unsecured Claims.  All other Holders of an Impaired Claim or Equity Interest have either (i) accepted the Plan; or (ii) agreed to receive less favorable treatment.

41.    For these reasons, I understand that the best interests test is satisfied as to every single Holder of a Claim against or Interest in the Debtor.

H.    The Plan Has Been Accepted by Impaired Voting Classes.

42.    I am informed by the Debtor's counsel that Claims in Classes 1c, 2 and 4 are unimpaired under the Plan and are conclusively presumed to have accepted the Plan without the solicitation of acceptances or rejections pursuant to section 1126(f) of the Bankruptcy Code.

43.    As set forth in the Voting Certification filed in support of the Plan, the following Voting Classes voted to accept the Plan in accordance with section 1126 of the Bankruptcy Code: Classes 1, 1a, 1b, 3a, and 3b.  U.S. Specialty Insurance Company ("USSIC") and Margaritaville Enterprises, LLC ("Margaritaville"), each holders of Claims in Class 3, voted to reject the Plan. They were the only creditors to vote against the Plan.  However, I understand that Margaritaville is expected to change its vote, effective as of the Confirmation Hearing, to an acceptance once the new franchise agreement is approved as part of the resolution of its objection to Plan confirmation. I am further advised that USSIC is seeking to change its vote to one accepting the Plan.

44.    Accordingly, I understand that the Plan satisfies (or will satisfy prior to the Confirmation Hearing) the requirements of section 1129(a)(8) of the Bankruptcy Code.

I.    The Plan Provides for a Payment in Full of All Allowed Priority Claims.

45.    It is my understanding that the Plan satisfies section 1129(a)(9) of the Bankruptcy Code.  I understand that Article II.A.1 of the Plan provides for the payment of Allowed Administrative Claims on the Effective Date and, with respect to recurring post-petition claims, to be paid in the ordinary course of business.  Also under the Plan, other priority claims are unimpaired and will be paid in full on the Effective Date or such date when such claim becomes Allowed.

46.    Pursuant to Article II.B. of the Plan, Holders of priority tax claims will be paid on the latter to occur of the Effective Date or such claim becomes an Allowed Claim, as allowed under section 1129(a)(9)(C)(i) of the Bankruptcy Code.  Alternatively, at the Debtor's option, the Debtor

may pay any Holder of an Allowed Priority Tax Claim the full amount of such Allowed Priority Tax Claim in equal quarterly installments over a period of five (5) years, paid at the statutory rate of interest as permitted by section 1129(a)(9)(C)(ii) of the Bankruptcy Code. And finally, in accordance with section 1129(a)(9)(D) of the Bankruptcy Code, I understand that the Plan provides essentially the same treatment for Other Secured Claims and priority tax claims.

47.    I am advised that, for these reasons, the Plan satisfies the requirements of sections 1129(a)(9) of the Bankruptcy Code.

J.    The Plan Satisfies Bankruptcy Code Section 1129(a)(10).

48.    I understand that the Plan satisfies section 1129(a)(10) of the Bankruptcy Code, which I am advised requires the affirmative acceptance of the Plan by at least one class of impaired claims, determined without including any acceptance of the Plan by any insider. As discussed above, impaired Classes 1, 1a, 3a and 3b have voted in favor of the Plan. Moreover, once Margaritaville becomes an accepting creditor – the last remaining impaired Class, Class 3, will have voted to accept the Plan. I also understand there is no indication insiders hold Claims in any of these Classes sufficient to alter that result.

K.    The Plan Is Feasible.

49.    I am advised that section 1129(a)(11) of the Bankruptcy Code permits a chapter 11 plan to be confirmed if it is feasible, *i.e.*, it is not likely to be followed by liquidation or the need for further financial reorganization. I understand that, in the context of the Plan, feasibility is generally established by demonstrating the Debtor's ability to implement the provisions of the Plan with a reasonable assurance of success. I have been advised on the various factors courts have considered when assessing the feasibility of a Plan.

50.    Based upon my understanding of the Plan, the advice of the Debtor's other advisors and counsel, and my experience with the Debtor's business and industry, I believe that the Plan is

feasible.   Article VI of the Plan provides that the Debtor shall establish and maintain a Plan Distribution Reserve sufficient to make all distributions required to be made on the Effective Date and to further maintain a Disputed Claims Reserve in an amount sufficient to ensure that each Holder of a Disputed Claim shall receive payment of its Allowed Amount in the event that such Claim is allowed in the maximum amount claimed.   Such reserves are fully funded and the Debtor is prepared to make required distributions on the Effective Date.   In addition, Exhibit D to the Disclosure Statement sets forth the Debtor's financial projections which include provisions for the payment of debt service on account of the OWS Claim.   Moreover, the loan extension that is the basis of the Plan's treatment of the OWS Claim includes a requirement of certain non-Reorganized Debtor guarantees, including a debt service carry and reserve guaranty.

51.     For these reasons, I believe that the Plan satisfies the feasibility requirements of section 1129(a)(11) of the Bankruptcy Code.

L.     The Plan Complies with Bankruptcy Code Section 1129(a)(12).

52.     I am advised that the Plan satisfies the requirements of section 1129(a)(12) of the Bankruptcy Code because it provides that all fees payable under 28 U.S.C. § 1930, as well as interest, when due and payable (including any fraction thereof) until the earliest of the Chapter 11 Case being closed, dismissed or converted to a case under chapter 7 of the Bankruptcy Code.

M.     The Plan Complies with Bankruptcy Code Section 1129(a)(13).

53.     Except for any obligation to continue to contribute benefit fund contributions under its collective bargaining agreement to be assumed and assigned under the Plan, the Debtor is not obligated to pay retiree benefits.   Nevertheless, Article XII.E. of the Plan provides that "[p]ayment of all retiree benefits, as that term is defined in section 1114 of the Bankruptcy Code, shall be continued after the Effective Date at the level established pursuant to subsection (e)(1)(B) or (g)

17

of section 1114 of the Bankruptcy Code, at any time prior to confirmation of the Plan, for the duration of the period the Debtor has obligated itself to provide such benefits."

N.    Bankruptcy Code Section 1129(a)(14) Is Not Applicable.

54.    I am advised that section 1129(a)(14) of the Bankruptcy Code is inapplicable because the Debtor is not an individual and is not required by a judicial or administrative order, or by statute, to pay domestic support obligations.

O.    Bankruptcy Code Section 1129(a)(15) Is Not Applicable.

55.    I am advised that section 1129(a)(15) of the Bankruptcy Code requires individual chapter 11 debtors to either pay all unsecured claims in full or that the plan devote an amount equal to five years' worth of the debtor's projected disposable income to unsecured creditors. Accordingly, it is inapplicable in this Chapter 11 Case because the Debtor is not an individual.

P.    Bankruptcy Code Section 1129(a)(16) Is Not Applicable.

56.    I am advised that section 1129(a)(15) of the Bankruptcy Code is inapplicable because the Debtor is a commercial entity.

Q.    The "Cram Down" Requirements Under Section 1129(b) Of The Bankruptcy Code Are Not Applicable.

57.    It is my understanding that, pursuant to section 1129(b) of the Bankruptcy Code, a plan of reorganization may be confirmed notwithstanding the rejection or deemed rejection by a class of claims or interests (*i.e.*, "crammed down") so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims and interests that is impaired and has not accepted the Plan.  However, this section is not invoked if, as is anticipated here, all impaired classes vote to accept the plan.

58.    My understanding is that only two creditors initially voted to reject the Plan: Margaritaville and USSIC.  I understand that, although Margaritaville's initial vote was to reject

the plan, which would render Class 3 as a rejecting class, but the Debtor believes, based upon communications with Margaritaville and USSIC, that those votes will be changed to votes to accept the Plan as of the Confirmation Hearing.  As a result, Class 3 will be an accepting class, and all other impaired classes have voted to accept the Plan.

59.     Accordingly, I am advised that the cramdown requirements of section 1129(b) of the Bankruptcy Code, including the lack of unfair discrimination and the fair and equitable requirement (including compliance with the absolute priority rule), are (or before the Confirmation Hearing will be) inapplicable to confirmation of the Plan.

60.     I am further advised that in the event that Class 3 is not deemed an accepting class, that the Plan may be confirmed under the "cramdown" provisions set forth in section 1129(b) of the Bankruptcy Code.  For the following reasons, I believe that the Plan meets those requirements.

   a.  I am advised that there is no unfair discrimination of Class 3.  Under the Plan, Class 3 General Unsecured Claims will either share Pro Rata in $1 million if they vote in favor of the Plan as a Class, or no recovery if the Class rejects the Plan.  If Class 3 is determined to have voted in favor of the Plan, it will receive a projected percentage recovery (approximately 17%) which is greater than other general unsecured creditors such as the Congregation (approximately 10%) and Personal Injury Claimants who will receive no recovery outside of any available insurance proceeds (and potentially a Class 3 Claim for any applicable SIR).  The treatment of Class 3 was designed to incentivize the Class to accept the Plan and to avoid the cost and uncertainty of a contested cramdown scenario.

19

b.  I am advised that the Plan does not meet the requirements of the "absolute priority rule" which requires, among other things, that junior classes cannot retain or receive property unless senior classes are paid in full.  Here, the Plan contemplates that the Parent will retain or receive 100% of the equity interests in the Reorganized Debtor while the creditors in Class 3 will not receive 100% recovery on their claims.  I am further advised that there is an exception or corollary to the absolute priority rule when "new value" contribution is made.  I understand that the the following five requirements must be satisfied in order to take advantage of this new value corollary:  the capital contribution by old equity must be (1) new, (2) substantial, (3) money or money's worth, (4) necessary for a successful reorganization and (5) reasonably equivalent to the property that old equity is retaining or receiving.  As set forth below, I believe each of those requirements are satisfied.

c.  **The New Value Contribution is New**.  The New Value Contribution is comprised of the Parent's waiver of a distribution of unquestionably new.  The Parent is contributing new cash from outside the Debtor to fund distributions under the Plan.  Moreover, the Parent Contribution includes a waiver of its allowed Administrative Claim in the Chapter 11 Case in the approximate amount of $23,928,420.11.  The Debtor estimates that other distributions to be made pursuant to the Plan will exceed $20 million and the Parent will need provide the funds for those distributions.

LEGAL\76063934\2

d. **<u>The New Value Contribution is Substantial</u>**.  I understand that whether a new value contribution is "substantial" is measured in the context of the recovery to dissenting general unsecured creditors under the Plan.  Here, the New Value Contribution is essential to getting Class 3 creditors a substantial recovery.  Depending on the outcome of later objections to claims, the Debtor currently estimates a recovery of approximately 17% for Class 3 Claimants.

e. **<u>The New Value Contribution is Money or Money's Worth</u>**.  I understand that new value contribution must be money or money's worth.  Promises of future contributions in the form of services or promissory notes do not qualify as money or money's worth.  Here, the New Value Contribution takes the form of both a new cash funding of approximately $20 million and a waiver of the Parent Administrative Claim of over $23 million.

f. **<u>The New Value Contribution is Necessary for a Successful Reorganization</u>**.  I understand that in order to meet this standard, courts have held that old equity must be willing to contributre more money than any other sorce or it must be the lender of last resort.

g. Here, the Parent is akin to that lender of last resort.  This Chapter 11 Case has been pending since August, 2023.  The exclusive periods for the Debtor to file and seek confirmation of a plan have long since expired.  For more than one year, parties have been free to propose, finance or fund their own plan.  No party in interest has stepped up.  Simply put, there is no other realistic source of capital available to reorganize this Debtor.

h.  As demonstrated in the Liquidation Analysis, the Hotel is valued at between $127 million and $156 million, with total assets valued at between $131,590,996 to $160,866,162.  Against this value, there will remain under the Plan secured indebtedness to OWS in the amount of $140 million. Accordingly, there would be either negative balance sheet equity (at the $131,590,996 valuation) or $20,866,162 in equity (at the $160,866,162 valuation).  It is therefore hardly surprising that no other funders have arisen.  It would be unreasonable for a third party investor or lender to fund in excess of $43 million against either negative balance sheet equity or (at best) something less than $21 million in equity, or some value in between.

i.  There is an additional and likely insurmountable hurdle to another third party funder:  it is doubtful that OWS would be willing to agree to the same deal for the treatment of its claim with another plan funder.  The existing Plan structure, therefore, would likely be unavailable to another proponent and the process would have to start from scratch.  Setting aside for the moment OWS's comfort with the financial and operational capabilities of the Debtor's existing ownership and management, there are non-Debtor guarantees on the OWS senior secured indebtedness which must be replaced under the terms of the Plan.  Not only would a potential equity funder have to provide funding of millions of dollars in excess of the value of balance sheet equity, but it would also have to enter into replacement guarantees saddling it and its principals with additional risk.  Moreover, it is far from certain that replacement guarantees by a new equity investor would provide

OWS with the same financial security currently provided by the existing guarantees by the Debtor's financially sound Parent. It is possible (and perhaps likely), therefore, that a new lender or equity investor would need to pay the entirety of the OWS claim on the Effective Date, thereby increasing the cash outlay to over $180 million, well in excess of the value of the Debtor's assets.

j. **The New Value Contribution is Reasonably Equivalent to Value of the Property Retained or Received Under the Plan**. I understand that the "reasonably equivalent" prong of the new value corollary requires that the new value being contributed to the plan is reasonably equivalent to the value of the reorganized debtor's equity. Here, given the financial circumstances discussed above, and the lengthy time during which exclusivity has terminated, the Debtor did not run a formal marketing process because such a process would have been unduly time-consuming, objectively futile, risky, and value-destructive. Under the circumstances of this Chapter 11 Case, running a market solicitation for either the purchase of the Hotel outright, or the equity interests under a plan, would entail months of delay and saddle the Debtor's estate with substantial administrative costs. That would significantly change the investment calculus and there is no guaranty that the Debtor's Parent would be willing to shoulder such additional delay and cost increases – particularly since they have already provided the Debtor with unsecured post-petition loans in excess of $23 million to fund operations. If not – and in the very likely event that such a process would

not yield a bona fide plan investor willing to fund its own plan – the estate would likely need to sell the Hotel. Per the Liquidation Analysis, the proceeds of such a sale would not be sufficient to cover accrued Administrative Expenses, much less Priority or General Unsecured Claims. The Debtor's reliance on the absence of plan exclusivity to establish the value of the Reorganized Debtor's equity was, therefore, reasonable and in the best interests of creditors and the Estate.

k.  As discussed above, using the appraised valuations of the Hotel in the Liquidation Analysis, and the estimated other assets of the Debtor, the balance sheet equity of the Reorganized Debtor is either negative or, at most approximately $21 million. Compared to the New Value Contribution of more than $43 million, it is clear that the New Value Contribution is more than reasonably equivalent to the value of the Reorganized Debtor's equity.

R.  The Plan Complies with Bankruptcy Code Section 1129(c).

61.  I am advised that the Plan is the only plan that has been proposed in the Chapter 11 Case and, although the Debtor's exclusive periods to file and seek confirmation of a plan have long since terminated, the Plan is the only plan being confirmed in the Chapter 11 Case. Accordingly, the Plan complies with the requirements of section 1129(c) of the Bankruptcy Code.

S.  The Principal Purpose of the Plan Is Not Avoidance of Taxes.

62.  I believe that the principal purpose of the Plan is not to avoid taxes or the application of section 5 of the Securities Act of 1933. Rather, the Plan is intended to provide distributions to creditors and to enable the Debtor to exit the protection of chapter 11. Accordingly, I believe that section 1129(d) of the Bankruptcy Code is satisfied.

24

## II.    Conclusion

63.    In light of the foregoing, I believe that: (i) the Plan has been structured to accomplish the Debtor's goal of maximizing returns to stakeholders and efficiently restructuring the Debtor; (ii) the Plan has been proposed by the Debtor in good faith; and (iii) confirmation of the Plan is in the best interests of the Debtor, its creditors and other parties-in-interest in this  Chapter 11 Case.

64.    Accordingly, I understand and believe that the Plan satisfies the requirements of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and other applicable non-bankruptcy laws as they have been explained to me, and should therefore be approved.


Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.


Dated:   March **2**, 2025                              /s/  ⟨signature⟩
         New York, New York

                                                       Alfred Dilmore
                                                       Chief Financial Officer, Arden Group

25